Vincent P. Slusher, State Bar No. 00785480
vincent.slusher@dlapiper.com
Andrew Zollinger, State Bar No. 24063944
andrew.zollinger@dlapiper.com
DLA Piper LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201-4629
Telephone: (214) 743-4500
Facsimile: (214) 743-4545

Thomas R. Califano (*pro hac vice pending*)
thomas.califano@dlapiper.com
Gabriella L. Zborovsky (*pro hac vice pending*)
gabriella.zborovsky@dlapiper.com
Jacob S. Frumkin (*pro hac vice pending*)
jacob.frumkin@dlapiper.com
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Tel: (212) 335-4500
Fax: (212) 335-4501

PROPOSED ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | CASE NO. 14-32821-11 |
| | § | |
| **SEARS METHODIST RETIREMENT** | § | **CHAPTER 11** |
| **SYSTEM, INC.,** *et al.*[1] | § | |
| | § | **Joint Administration Pending** |
| **Debtors.** | § | |

## DECLARATION OF PAUL B. RUNDELL
## IN SUPPORT OF FIRST DAY MOTIONS

Paul B. Rundell declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am the Chief Restructuring Officer ("CRO") of Sears Methodist Retirement System, Inc. ("SMRS"), which controls, directly or indirectly, as applicable, Canyons Senior Living, L.P. ("CSL"), Odessa Methodist Housing, Inc. ("OMH"), Sears Brazos Retirement

---

[1] The debtors in these chapter 11 cases, along with the last four (4) digits of their taxpayer identification numbers, are: Sears Methodist Retirement System, Inc. (6330), Canyons Senior Living, L.P. (8545), Odessa Methodist Housing, Inc. (9569), Sears Brazos Retirement Corporation (8053), Sears Caprock Retirement Corporation (9581), Sears Methodist Centers, Inc. (4917), Sears Methodist Foundation (2545), Sears Panhandle Retirement Corporation (3233), Sears Permian Retirement Corporation (7608), Sears Plains Retirement Corporation (8233), Sears Tyler Methodist Retirement Corporation (0571) and Senior Dimensions, Inc. (4016). The mailing address of each of the debtors, solely for purposes of notices and communications, is 2100 Ross Avenue 21st Floor, c/o Paul Rundell, Dallas, Texas 75201.

Corporation ("Brazos"), Sears Caprock Retirement Corporation ("Caprock"), Sears Methodist Centers, Inc. ("SMC"), Sears Methodist Foundation ("SMF"), Sears Panhandle Retirement Corporation ("Panhandle"), Sears Permian Retirement Corporation ("Permian"), Sears Plains Retirement Corporation ("Plains"), Sears Tyler Methodist Retirement Corporation ("Tyler") and Senior Dimensions, Inc. ("SDI"), the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors").

2.      I am also a Managing Director of Alvarez & Marsal Healthcare Industry Group, LLC ("A&M").[2]  I have more than fifteen (15) years of experience, specializing in interim management, with a focus on cash management and financial analysis.  I have provided cash management, financial support, crisis management, turnaround consulting, business strategy and planning, market analysis and operational improvement services to clients, and have advised unsecured and secured creditors and debtors both in and out of court.  I also have extensive experience in advising senior living operators nationally.

3.      In my capacity as CRO for the Debtors, I have personal knowledge of, and am familiar with, the business affairs, day-to-day operations, books and records, and financial condition of the Debtors, and I am authorized to submit this Declaration (the "Declaration") on behalf of the Debtors.

4.      On June 9, 2014 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

5.      The Debtors remain in possession of their assets and continue to manage their

---

[2]  A&M was retained by the Debtors in April 2014.  The Debtors will be filing an application for A&M to provide them with a CRO and certain additional personnel during these chapter 11 cases.

businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6.      No trustee, examiner, or committee has been appointed in these cases.

7.      Contemporaneously herewith, the Debtors have filed the following motions and applications (collectively, the "First Day Motions"):

i)      Motion For Order Directing Joint Administration Of The Debtors' Chapter 11 Cases (the "Joint Administration Motion");

ii)      Motion Of Debtors For Order Authorizing Debtors To File Consolidated Mailing Matrix And Consolidated List Of 30 Largest Unsecured Creditors (the "Consolidated Creditor List Motion");

iii)      Motion For An Order Pursuant To Bankruptcy Rule 1007 Granting An Extension Of Time For Filing Schedules And Statements Of Financial Affairs ("Motion for Extension of Time for Filing Schedules and SOFA");

iv)      Motion Of Debtors Pursuant To 11 U.S.C. §§ 105(a) And 363(b) For An Order Authorizing Payment Of Prepetition (I) Wages, Salaries, And Other Compensation Of Employees, (II) Employee Medical And Similar Benefits, And (III) Reimbursable Employee Expenses, And (IV) Other Miscellaneous Employee Expenses And Benefits (the "Wage Motion");

v)      Motion Of The Debtors For Interim And Final Orders (I) Prohibiting Utilities From Altering, Refusing Or Discontinuing Service, (II) Deeming The Utility Companies Adequately Assured Of Future Performance, And (III) Establishing Procedures For Determining Requests For Additional Adequate Assurance (the "Utilities Motion");

vi)      Motion Of Debtors For Order Authorizing (I) Continued Use Of Existing Cash Management System, (II) Maintenance Of Existing Bank Accounts, (III) Continued Use Of Existing Business Forms, And (IV) Maintenance Of Existing Investment Practices (the "Cash Management Motion");

vii)      Motion For Order Authorizing Retention of Professionals Utilized By Debtors In Ordinary Course Of Business (the "Ordinary Course Professionals Motion");

viii)      Motion Of Debtors Sears Methodist Retirement System, Inc., Sears Permian Retirement Corporation, Sears Methodist Centers, Inc., Sears Panhandle Retirement Corporation, Sears Methodist Foundation, Sears Brazos Retirement Corporation And Senior Dimensions, Inc. For Interim And Final Orders Under 11 U.S.C. §§ 105, 361, 362, 363, And 364 And Bankruptcy Rules 2002, 4001, And 9014 (I) Authorizing Certain Debtors To (A) Use Cash Collateral And (B) Incur Postpetition Secured

Indebtedness, (II) Granting Adequate Protection To Wells Fargo Bank, National Association, As Trustee, (III) Modifying The Automatic Stay And (IV) Scheduling A Final Hearing (the "<u>DIP/CC Financing Motion</u>");

ix) Motion Of Odessa Methodist Housing, Inc. And Canyons Senior Living, L.P. For Interim And Final Orders (I) Authorizing The Use Of Cash Collateral, (II) Granting The Form Of Adequate Protection Provided To The Secured Parties And (III) Scheduling A Final Hearing (the "<u>HUD Debtor Cash Collateral Motion</u>");

x) Motion Of Sears Plains Retirement Corporation For Interim And Final Orders (I) Authorizing The Use Of Cash Collateral, (II) Granting Adequate Protection To Prosperity, And (III) Scheduling A Final Hearing (the "<u>Garrison Cash Collateral Motion</u>");

xi) Motion Of Sears Tyler Methodist Retirement Corporation For Interim And Final Orders (I) Authorizing The Use Of Cash Collateral, (II) Granting Adequate Protection To The Trustee, And (III) Scheduling A Final Hearing (the "<u>Meadow Lake Cash Collateral Motion</u>");

xii) Motion Of Sears Caprock Retirement Corporation For Interim And Final Orders (I) Authorizing The Use Of Cash Collateral, (II) Granting Adequate Protection To Santander Bank, N.A., And (III) Scheduling A Final Hearing (the "<u>Mesa Springs Cash Collateral Motion</u> and together with the HUD Debtor Cash Collateral Motion, Garrison Cash Collateral Motion, Meadow Lake Cash Collateral Motion, the "<u>Cash Collateral Motions</u>");

xiii) Motion Of The Debtors For Entry Of Interim And Final Orders (I) Authorizing The Debtors To (A) Maintain Existing Insurance Policies And Pay All Obligations Arising Thereunder, (B) Maintain Financing Of Insurance Premiums And Pay All Obligations In Connection Therewith, And (C) Renew, Revise, Extend, Supplement, Change, Or Enter Into New Insurance Policies And (II) Granting Certain Related Relief (the "<u>Insurance Motion</u>");

xiv) Motion Of Debtors For Order Authorizing The Debtors To Escrow Certain Entrance Deposits And Refund Certain Entrance Deposits (the "<u>ED Escrow Motion</u>"); and

xv) Application Of The Debtors For Authority To Employ And Retain GCG, Inc. As Notice, Claims, and Solicitation Agent To The Debtors *Nunc Pro Tunc* To The Petition Date (the "<u>GCG Retention Application</u>").

8.     I am submitting this Declaration in support of the Debtors' First Day Motions.

Capitalized terms not defined in this Declaration shall have the meanings ascribed to the term in

the relevant First Day Motion.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinion based upon my experience and knowledge of the Debtors' operations and financial condition, and information provided to me by management, advisors, or other representatives of the Debtors.  If I were called upon to testify, I would testify consistently with the facts set forth in this Declaration.

9.     The Debtors, affiliated non-profit corporations, are leaders in the senior living industry in the State of Texas and have built and maintained a successful business for almost fifty (50) years, beginning with SMC's incorporation in 1966.  During the past several years, however, an inability to service debt obligations, loss of revenue at certain facilities and increased costs have negatively impacted the Debtors and a recapitalization and restructuring of their debt obligations is now required.  Because of these challenges, the Debtors have suffered a substantial loss of revenue and lower than anticipated occupancy rates, which in turn have forced the Debtors to seek chapter 11 protection.

10.     This Declaration provides an overview of the Debtors and the circumstances leading to the commencement of these chapter 11 cases.  <u>Section I</u> provides an overview of the Debtors' operations.  <u>Section II</u> recounts the events preceding the bankruptcy filing.  <u>Section III</u> affirms and incorporates facts that support the First Day Motions.

## I.     OVERVIEW OF THE DEBTORS' BUSINESS

11.     SMRS controls, either directly or indirectly, the activities and business affairs of an affiliated group of corporations comprising the Sears Methodist Retirement System (the "<u>System</u>") that includes the Debtors, Sears Methodist Senior Housing, LLC ("<u>SMSH</u>"), Texas Senior Management, Inc. ("<u>TSM</u>"), Senior Living Assurance, Inc. ("<u>SLA</u>") and Southwest Assurance Company, Ltd. ("<u>SWAC</u>").  An organizational chart of the System is attached hereto

- 5 -

as Exhibit A. The System includes: (i) eight senior living communities located in Abilene, Amarillo, Lubbock, Odessa and Tyler, Texas (the "SMRS-Controlled Communities"); (ii) three veterans homes located in El Paso, McAllen and Big Spring, Texas (the "VLB Homes" and together with the SMRS-Controlled Communities, the "Facilities"), managed by SDI pursuant to contracts between SDI and the Veterans Land Board of Texas ("VLB"); and (iii) TSM, SLA and SWAC, which provide, as applicable, management and insurance services to the System. SMSH is the general partner of, and controls .01% of the interests in, CSL.

12.     In addition to controlling the various Debtor entities that own or operate the Facilities, SMRS provides management and oversight services to certain of the Facilities pursuant to a professional services agreement between SMRS and the relevant Debtor. Among other things, SMRS provides payroll, billing, strategic planning and employee benefit plan administration services. Additionally, the executive office of SMRS is responsible for overseeing residency contract templates, vendor contracting, licensing and regulatory filings, policies, corporate governance and compliance.

13.     The SMRS-Controlled Communities, described in more detail below, are as follows: (i) Parks Methodist Retirement Community ("Parks"), a senior living facility located in Odessa, Texas and owned by Permian; (ii) Wesley Court Methodist Retirement Community ("Wesley Court"), a senior living facility located in Abilene, Texas and owned by SMC; (iii) Craig Retirement Community ("Craig"), a senior living facility located in Amarillo, Texas and owned by Panhandle; (iv) The Mildred and Shirley L. Garrison Geriatric Education and Care Center ("Garrison"), a geriatric learning center and nursing facility located in Lubbock, Texas on the campus of Texas Tech University ("TTU") and owned by Plains; (v) Meadow Lake Retirement Community ("Meadow Lake"), a senior living facility located in Tyler, Texas and

owned by Tyler; (vi) Mesa Springs Retirement Village ("Mesa Springs"), a senior living facility located in Abilene, Texas and owned by Caprock; (vii) Desert Haven Retirement Community ("Desert Haven"), a low-income senior living facility located in Odessa, Texas and owned by OMH; and (viii) Canyons Retirement Community ("Canyons"), a senior living facility located in Amarillo, Texas and owned by CSL.

14. SDI operates the VLB Homes, which are owned by the State of Texas and are designed for veterans, pursuant to separate contracts between SDI and the VLB. The three VLB Homes are: (i) Alfredo Gonzalez Texas State Veterans Home ("Alfredo Gonzalez"), located in McAllen, Texas; (ii) Ambrosio Guillen Texas State Veterans Home ("Ambrosio Guillen"), located in El Paso, Texas; and (iii) Lamun Lusk Sanchez Texas State Veterans Home ("Lamun Lusk Sanchez"), located in Big Spring, Texas.

15. The Facilities offer seniors myriad residency options during their retirement years, providing affordable living accommodations, and in some cases related health care services, to a target market of middle-income seniors aged sixty-two (62) years and older. Each of the Facilities provides unmatched services and top of the line amenities. Specifically, the Facilities include dining experiences in well-appointed dining rooms, scenic Texas views, spacious floor plans, salons and spas, day excursions and housekeeping services. The Facilities also provide residents with multiple social outlets for all stages of their retirement living including, among other things, movie nights, live music, exercise classes and bible study.

16. Depending on the type of Facility, the Debtors receive revenue from several sources, which include: (i) daily rates; (ii) monthly fees; and (iii) entrance deposits ("EDs") from those residents living in certain cottages, apartments or executive homes at Craig, Wesley Court,

Parks, Meadow Lake, Mesa Springs and Garrison[3] (each, an "ED Unit"). Average daily rates, applicable at Garrison and the VLB Homes, range from $116 to $222. Monthly fees, applicable at all Facilities, range from $450 to $3,300. EDs range from $115,000 to $209,000. Monthly and daily fees cover operating expenses and capital costs, and do not include any health care benefits.

17.     Generally speaking, residents living in an ED Unit enter into a personal and non-assignable residency agreement, pursuant to which 90% of such resident's ED is refunded upon certain circumstances (a "90% Refundable Agreement"). The 10% non-refundable portion of the ED is contributed to SMF and used for future benevolent care. Upon termination of a 90% Refundable Agreement, either by the resident, the Debtor-owner, or by reason of death, the Debtor-owner is required to refund 90% of the ED to residents or their estate within 30 days of the resale of the ED Unit and receipt of a new ED from the prospective resident. All refunds are paid without interest.

18.     In 2013, the Debtors collectively received approximately $14.8 million in Medicare payments and approximately $5.5 million in Medicaid payments.

---

[3] Only one unit at Garrison requires an ED.

EAST\71120027.8

A. **Organizational Structure of the Debtors**[4]

1. **Corporate Governance**

19. SMRS is governed by a Board of Trustees. There is an Executive Committee of the Board of Trustees, which makes up the board of directors of each of the Debtors.

2. **Obligated Group**

20. The "Obligated Group," consisting of SMRS, SMC (Wesley Court), Panhandle (Craig), Permian (Parks), Brazos and SMF, was created under that certain Master Trust Indenture (as amended and restated, the "SMRS Master Indenture"), dated as of August 1, 1998 and effective as of May 1, 2013, between the Obligated Group and Wells Fargo Bank, N.A., as successor Master Trustee (the "SMRS Trustee"). The Obligated Group and any future members of the Obligated Group are jointly and severally liable for payment and performance under the approximately $95.5 million of notes issued under the SMRS Master Indenture (the "Obligated Group Bond Debt").

a. **SMRS**

21. SMRS is a non-profit corporation which was chartered under the laws of the State of Texas on December 21, 1993. The mailing address of SMRS is 2100 Ross Avenue, 21st Floor, Dallas, Texas 75201. SMRS has 48 employees: 13 are paid full-time hourly and 35 are full-time salaried employees.

22. As of January 2014, on a book value basis, SMRS had approximately $34.1 million in assets and $103.8 million in liabilities. SMRS's main assets consist of: (i) approximately $8.6 million in cash and cash equivalents, the vast majority of which includes

---

[4] Except as otherwise expressly stipulated or agreed to in any order filed or entered in connection with the DIP/CC Financing Motion or the Cash Collateral Motions, nothing herein or in any First Day Motion constitutes an admission of or stipulation as to the enforceability of any documents underlying the Debtors' debt obligations or any related liens.

trustee-held funds; (ii) approximately $63,500 in accounts receivable; and (iii) approximately $1.9 million in property and equipment. SMRS's main liabilities are: (i) its joint and several liability for the Obligated Group Bond Debt; (ii) approximately $3.2 million loaned by Texas Methodist Foundation ("TMF") to SMRS (the "TMF Loan") in connection with the 2013 restructuring, as described below; (iii) approximately $2.4 million in payables and accrued expenses; and (iv) reimbursement for any amounts drawn on that certain $1.5 million bank letter of credit (the "Letter of Credit"), issued by Life Care Services LLC ("LCS") for the benefit of TMF in connection with the TMF Loan.

### b. Permian/Parks

23. Permian, a Texas non-profit corporation, is controlled by SMRS and its mailing address is 2100 Ross Avenue, 21st Floor, Dallas, Texas 75201. As described above, Permian owns Parks. Permian has 92 employees, including those who work at Desert Haven, which is located in the same town as Parks.

24. Parks is located in Odessa, Texas and offers independent living in 22 patio homes, 33 executive homes, 23 assisted living rooms and suites and 85 nursing beds. As of May 2014, Parks had 136 residents and an 80.1% (YTD) occupancy rate.

25. In June 2013, in connection with a joint venture between Permian, Prevarian Senior Living, L.P. ("Prevarian") and certain other entities, a senior living facility called The Courtyards ("The Courtyards") opened adjacent to the Parks. The Courtyards offers 40 assisted living residences and 30 memory care homes in a single-story community. The System donated the land and Prevarian and the other limited partners incurred all other costs of construction, marketing, working capital, opening and maintenance of The Courtyards. The partnership pays the System a monthly fee to manage the day-to-day operations of The Courtyard. The System has a right of first refusal to purchase The Courtyards and the underlying land upon certain

- 10 -

conditions being met.

26.     As of January 2014, on a book value basis, Permian had approximately $7.5 million in assets and $4.6 million in liabilities, excluding its joint and several liability for the Obligated Group Bond Debt.  Permian's main assets consist of: (i) approximately $1.0 million in accounts receivable; and (ii) approximately $10.4 million in property and equipment.  Permian's main liabilities are: (i) its joint and several liability for the Obligated Group Bond Debt; and (ii) approximately $600,000 in accounts payable.

27.     In 2013, Permian received approximately $2.7 million in Medicare payments and approximately $1.2 million in Medicaid payments.

### c.     SMC/Wesley Court

28.     SMC, a Texas non-profit corporation, is controlled by SMRS and its mailing address is 2100 Ross Avenue, 21st Floor, Dallas, Texas 75201.  SMC has 97 employees.  As described above, SMC owns Wesley Court.

29.     Wesley Court is located in Abilene, Texas and offers independent living in 78 apartments and 49 executive homes, 19 assisted living rooms and suites and 30 nursing beds.  As of May 2014, Wesley Court had 171 residents and a 95.9% (YTD) occupancy rate.

30.     As of January 2014, on a book value basis, SMC had approximately $28.4 million in assets and $13.0 million in liabilities, excluding its joint and several liability for the Obligated Group Bond Debt.  SMC's main assets consist of: (i) approximately $148,000 in accounts receivable; and (ii) approximately $28.3 million in property and equipment.  SMC's main liabilities are: (i) its joint and several liability for the Obligated Group Bond Debt; and (ii) approximately $183,000 in accounts payable.

31.     In 2013, SMC received approximately $317,416 in Medicare payments.

- 11 -

### d.      Panhandle/Craig

32.      Panhandle, a Texas non-profit corporation, is controlled by SMRS and its mailing address is 2100 Ross Avenue, 21st Floor, Dallas, Texas 75201.  Panhandle has 191 employees.  As described above, Panhandle owns Craig.

33.      Craig is located in Amarillo, Texas and offers independent living in 108 apartments and 65 executive homes, 40 assisted living rooms and suites, and 106 nursing beds.  As of May 2014, Craig had 272 residents and an 88.7% (YTD) occupancy rate.

34.      As of January 2014, on a book value basis, Panhandle had approximately $25.3 million in assets and $9.3 million in liabilities, excluding its joint and several liability for the Obligated Group Bond Debt.  Panhandle's main assets consist of: (i) approximately $1.4 million in accounts receivable; and (ii) approximately $25.5 million in property and equipment.  Panhandle's main liabilities are: (i) its joint and several liability for the Obligated Group Bond Debt; and (ii) approximately $490,000 in accounts payable.

35.      In 2013, Panhandle received approximately $2.8 million in Medicare payments and approximately $1.7 million in Medicaid payments.

### e.      SMF

36.      SMF, a Texas non-profit corporation, is controlled by SMRS and its mailing address is 2100 Ross Avenue, 21st Floor, Dallas, Texas 75201.  SMF has no employees.  SMF was formed for the purpose of managing and investing donor-restricted and board-designated investments for benevolent care and capital needs of the System, with the primary responsibility of generating contributions from donors and fundraising activities in the System's primary operating markets.

37.      As of January 2014, on a book value basis, SMF had approximately $15.2 million in assets and $123,000 in liabilities, excluding its joint and several liability for the Obligated

Group Bond Debt. SMF's main assets consist of: (i) approximately $1,300 in cash and cash equivalents; and (ii) approximately $8.7 million in assets limited as to use. SMF's main liabilities are: (i) its joint and several liability for the Obligated Group Bond Debt; and (ii) approximately $108,000 in long-term charitable gift annuities payable.

### f.    Brazos

38.    Brazos, a Texas non-profit corporation, is controlled by SMRS and its mailing address is 2100 Ross Avenue, 21st Floor, Dallas, Texas 75201. Brazos has no employees. Brazos was incorporated in 2002 for the purpose of developing an Alzheimer's care facility in Waco, Texas. Brazos sold the Alzheimer's care facility in November 2011 and has no current operations.

39.    As of January 2014, on a book value basis, Brazos had approximately $0 in assets and $250 in liabilities, excluding its joint and several liability for the Obligated Group Bond Debt. Brazos's main liabilities are its joint and several liability for the Obligated Group Bond Debt.

### 3.    Non-Obligated Group

### a.    Plains/Garrison

40.    Plains, a Texas non-profit corporation, is controlled by SMRS and its mailing address is 2100 Ross Avenue, 21st Floor, Dallas, Texas 75201. Plains has 145 employees. As described above, Plains owns Garrison.

41.    Garrison is located on the campus of TTU in Lubbock, Texas and consists of 104 nursing beds and one executive home. Garrison is also used as a training ground for Texas Tech University Health Sciences Center students. There are no EDs required at Garrison. As of May 2014, Garrison had 86 residents and a 92.7% (YTD) occupancy rate.

42.    As of January 2014, on a book value basis, Plains had approximately $12.8

- 13 -

million in assets and $10.2 million in liabilities. Plains's main assets consist of: (i) approximately $1.1 million in cash and cash equivalents; (ii) approximately $620,000 in accounts receivable; and (iii) approximately $9.2 million in property and equipment. Plains's main liabilities are: (i) approximately $8.2 million of bank loan debt (the "Plains Loan"), issued pursuant to that certain loan agreement (the "Plains Loan Agreement"), dated as of December 1, 2011, between Red River Health Facilities Development Corporation ("Red River"), Plains and Prosperity Bank ("Prosperity"), as successor lender to American State Bank; and (ii) approximately $480,000 in accounts payable.

43. In 2013, Plains received approximately $3.7 million in Medicare payments and approximately $1.6 million in Medicaid payments.

### b. Tyler/Meadow Lake

44. Tyler, a Texas non-profit corporation, is controlled by SMRS and its mailing address is 2100 Ross Avenue, 21st Floor, Dallas, Texas 75201. Tyler has 123 employees. As described above, Tyler owns Meadow Lake.

45. Meadow Lake is located in Tyler, Texas and offers 35 executive homes, 20 assisted living apartments, 80 independent living apartments, 35 memory enhancement beds, and 30 nursing beds. As of May 2014, Meadow Lake had 161 residents and a 79.8% (YTD) occupancy rate.

46. As of January 2014, on a book value basis, Tyler had approximately $56.3 million in assets and $67.8 million in liabilities. Tyler's main assets consist of: (i) approximately $2.2 million in cash and cash equivalents; (ii) approximately $787,000 in accounts receivable; and (iii) approximately $49.5 million in property and equipment. Tyler's main liabilities are: (i) approximately $43,050,000 in respect of the Tyler Bonds (as defined below) issued by HFDC of Central Texas, Inc. ("HFDC"); (ii) approximately $1.5 million in accrued interest payable;

- 14 -

(iii) approximately $350,000 in accounts payable; and (iv) approximately $380,000 in contingent refundable residency fees.

47.     In 2013, Tyler received approximately $1.7 million in Medicare payments.

### c.     Caprock/Mesa Springs

48.     Caprock, a Texas non-profit corporation, is controlled by SMRS with its corporate office located at One Village Drive, Suite 400, Abilene, Texas 79606. Caprock has 96 employees. As described above, Caprock owns Mesa Springs.

49.     Mesa Springs is located in Abilene, Texas and offers 16 independent living executive homes, 34 independent living garden homes, and 10 independent living apartment homes. In addition, Caprock owns and operates The Mission at Mesa Springs, a healthcare center consisting of 75 semi-private and private skilled nursing beds. As of May 2014, Mesa Springs had 116 residents and an 87.2% (YTD) occupancy rate.

50.     As of January 2014, on a book value basis, Caprock had approximately $10.3 million in assets and $12.6 million in liabilities. Caprock's main assets consist of: (i) approximately $265,000 in cash and cash equivalents; (ii) approximately $799,000 in accounts receivable; and (iii) approximately $8.2 million in property and equipment. Caprock's main liabilities are: (i) approximately $7.1 million of bank loan debt (the "Caprock Loan") issued pursuant to that certain Amended and Restated Reimbursement and Credit Agreement, dated as of May 20, 2013, between Caprock and Santander Bank, N.A. ("Santander"), as successor administrative agent and lender to Sovereign Bank (the "Caprock Loan Agreement"); and (ii) approximately $523,000 in accounts payable.

51.     In 2013, Caprock received approximately $2.6 million in Medicare payments and approximately $1.1 million in Medicaid payments.

#### d. CSL/Canyons

52.     CSL, a Texas limited partnership, is indirectly controlled by SMRS and its principal place of business is 1114 Lost Creek Boulevard, Suite 400, Austin, Texas 78746. SMSH is the general partner of, and controls .01% of the interests in, CSL. SDI is the limited partner of, and controls 99.99% percent of the interests in, CSL. As described herein, SMRS is the sole member of SMSH and sole owner of SDI. CSL has 12 employees. As described above, CSL owns Canyons.

53.     Canyons is located in Amarillo, Texas and consists of 109 independent living apartments. There are no EDs required at Canyons. As of May 2014, Canyons had 96 residents and an 86.0% (YTD) occupancy rate.

54.     As of January 2014, on a book value basis, CSL had approximately $12.8 million in assets and $12.0 million in liabilities. CSL's main assets consist of: (i) approximately $43,000 in cash and cash equivalents; (ii) approximately $11,000 in accounts receivable; and (iii) approximately $12.2 million in property and equipment. CSL's main liabilities are: (i) a loan of $3,637,300 (the "Canyons HUD Loan") pursuant to that certain Building Loan Agreement between CSL and Prudential Huntoon Paige Associates, Ltd. ("Prudential"), as lender; and (ii) approximately $193,000 in accounts payable.

#### e. OMH/Desert Haven

55.     OMH, a Texas non-profit corporation, is controlled by SMRS and its mailing address is 2100 Ross Avenue, 21st Floor, Dallas, Texas 75201. As described above, OMH owns Desert Haven. Individuals that work at Desert Haven are employees of Permian, the owner of Parks (located in the same town as Desert Haven).

56.     Desert Haven is located in Odessa, Texas and consists of forty (40) low-income, apartments in Odessa, Texas subsidized by the United States Department of Housing and Urban

Development ("HUD"). There are no EDs required at Desert Haven. As of May 2014, Desert Haven had 37 residents and a 92.5% (YTD) occupancy rate.

57.     As of January 2014, on a book value basis, OMH had approximately $1.2 million in assets and $35,000 in liabilities. OMH's main assets consist of: (i) approximately $64,000 in cash and cash equivalents; and (ii) approximately $1.1 million in property and equipment. OMH's main liabilities are approximately $5,000 in accounts payable.

### f.     SDI/VLB Homes

58.     SDI, a Texas corporation, is a wholly-owned subsidiary of SMRS and its mailing address is 2100 Ross Avenue, 21st Floor, Dallas, Texas 75201. SDI has 530 employees. As described above, SDI operates the VLB Homes pursuant to a separate Management and Operations Agreement between SDI and the VLB for each of Alfredo Gonzalez, Ambrosio Guillen and Lamun Lusk Sanchez.

59.     Alfredo Gonzalez is located in McAllen, Texas and contains in excess of 100 beds dually certified by Medicaid and Medicare. As of May 2014, Alfredo Gonzalez had 160 units, 149 residents, and a 92.2% (YTD) occupancy rate.

60.     Ambrosio Guillen is located in El Paso, Texas and contains in excess of 100 beds dually certified by Medicaid and Medicare. As of May 2014, Ambrosio Guillen had 160 units, 154 residents, and a 95.9% (YTD) occupancy rate.

61.     Lamun Lusk Sanchez is located in Big Spring, Texas and contains in excess of 100 beds dually certified by Medicaid and Medicare. As of May 2014, Lamun Lusk Sanchez had 128 operational units, 114 residents, and an 93.1% (YTD) occupancy rate.

62.     As of January 2014, on a book value basis, SDI had approximately $5.1 million in assets and $4.1 million in liabilities. SDI's main assets consist of: (i) approximately $3.8 million in accounts receivable; and (ii) approximately $211,000 in property and equipment. SDI's main

- 17 -

liabilities are: (i) approximately $1.8 million in accounts payable; and (ii) approximately $900,000 in accrued payroll and related taxes.

63.     In 2013, SDI received approximately $940,621 in Medicare payments.

### 4.     Non-Debtors in the System

#### a.     TSM

64.     TSM is a for-profit Texas corporation formed in December 2010 to serve as the management company for System projects developed outside the nonprofit corporations within the System. TSM manages The Courtyards.

#### b.     SWAC

65.     SWAC is a wholly-owned subsidiary of the System domiciled in Grand Cayman. SWAC provides general and professional liability insurance for the System and its subsidiaries. SWAC is exempt from taxes on income and gains under Cayman Islands tax concession laws.

#### c.     SLA

66.     SLA is a wholly-owned subsidiary of the System domiciled in Grand Cayman. SLA was formed to provide administrative and risk management services to SWAC. It manages the claims from the general and professional liability and employee liability insurance provided by SWAC.

### B.     Regulatory Agencies

67.     The senior care industry is heavily regulated by Federal and state authorities. For example, the System is subject to different regulations concerning, among other things, financial disclosures and solvency. Remedies for violating these regulations include, but are not limited to, temporary suspension of the Facility's license and increased oversight. The regulatory agencies providing oversight to the Debtors are, among others, the Centers for Medicare &

Medicaid Services ("CMS"), the Texas Health and Human Services Commission, the Texas Department of Aging and Disability Services ("TDADS") and the Office of the Attorney General of the State of Texas ("AG"). During the past several years, as a result of surveys and/or investigations by TDADS, certain matters have been referred to CMS and the AG with respect to the VLB Homes.

### C. Leasehold Obligations

68. SMRS is the tenant under 2 office leases: (i) an 11,400 square foot office located at Century Plaza I Office Building, One Village Drive, Suite 400, Abilene, TX (the "Abilene Lease"); and (ii) 2,855 square foot office located at 1114 Lost Creek Blvd., Suite 210, Austin, TX 78746 (the "Austin Lease").

69. The original Abilene Lease was entered into on May 16, 2002. On December 17, 2009, SMRS extended the Abilene Lease for an additional 36 months beginning on January 1, 2013. The current expiration date of the Abilene Lease is December 31, 2015. The lessor for the Abilene Lease is Design Growth Investments, Inc.

70. The Austin Lease, originally entered into July 22, 2009, was recently renewed for a period of 70 months commencing on December 1, 2013 and expiring on September 30, 2019. The lessors for the Austin Lease are Limestone Creek Properties, L.P. and Limestone Springs Properties, L.P.

71. Additionally, the land upon which Garrison sits is leased to Plains pursuant to that certain Ground Lease, effective as of August 1, 1999 (the "TTU Lease"), between TTU, as lessor, and Plains, as lessee. The term of the TTU Lease is for a period of 50 years with two 10-year extensions. In the event Plains seeks to use the premises for a purpose other than the operation of a geriatric, long-term care facility and related ancillary uses, it must obtain the prior approval of TTU for such proposed use. If Plains seeks to assign or otherwise transfer its interest

- 19 -

in the TTU Lease to a third party other than an affiliate of Plains, TTU has a right of first refusal to elect to purchase Plains's leasehold interest.

### D. Life Care Services LLC

72. Prior to the Petition Date, certain management functions related to the Facilities were provided by LCS, an unaffiliated third party, pursuant to separate management agreements entered into during April of 2013 between (i) LCS and the Obligated Group and (ii) LCS, the Debtors other than the Obligated Group and SMSH (collectively, the "LCS Management Agreements"). Pursuant to the LCS Management Agreements, LCS, among other things, recommended and evaluated policies and procedures and made recommendations for the future operations of the communities. Although the LCS Management Agreements provided for LCS to "manage the day-to-day operations of the Communities," because the executive directors and on-site personnel remained employees of SMRS, LCS's role was not that of a day-to-day-manager, but rather that of a supervisor/consultant. Indeed, billing, marketing and operating functions were provided by employees of SMRS, not LCS. Additionally, pursuant to the LCS Management Agreements, LCS provided a Corporate Chief Executive Officer (the "CCEO"), who served as the chief executive of SMRS and was an employee of LCS.

73. During the term of the LCS Management Agreements, the relationship between the System and LCS became strained due to, among other things, LCS's performance under the LCS Management Agreements and the conflicted nature of the CCEO making major decisions of the System while at the same time being employed by LCS. In or around March and April of 2014, the parties engaged in discussions regarding renegotiating the terms of the LCS Management Agreements. In connection with such discussions, the CCEO was terminated. On April 8, 2014, the System received written notice of termination of the LCS Management Agreements.

- 20 -

### E. The Debtors' Prepetition Capital Structure

74. As of the Petition Date, the Debtors' total consolidated funded debt obligations were approximately $160 million and consisted of, among other things, bond debt of the Obligated Group and Tyler, bank loan debt of Plains, Caprock and Canyons and the TMF Loan. The major components of the Debtors' prepetition debt structure and their prepetition debt obligations are described below.

#### 1. The Obligated Group's Prepetition Capital Structure

##### a. Initial Bond Financing

75. Between 1998 and 2003, the Obligated Group secured permanent financing through a series of bond offerings by the Abilene Health Facilities Development Corporation ("Abilene Health") in the aggregate principal amount of approximately $73.1 million, consisting of $30,435,000 Series 1998A Abilene Health Facilities Development Corporation Bonds (the "Series 1998A Bonds"), $7,840,000 Series 1999 Abilene Health Facilities Development Corporation Bonds (the "Series 1999 Bonds") and $34,820,000 Series 2003A Abilene Health Facilities Development Corporation Bonds (the "Series 2003A Bonds" and together with the Series 1998A Bonds and Series 1999 Bonds, the "Previously Issued Bonds"). The Previously Issued Bonds mature on various dates, with the next maturity date being November 15, 2018.

##### b. 2013 Restructuring

76. On May 9, 2013, a refinancing plan was completed for the Obligated Group. Following the refinancing plan, the Obligated Group emerged with $99.1 million of overall debt consisting of $95.6 million of bonds outstanding and $3.5 million in respect of the TMF Loan. As part of the refinancing plan, approximately $22.5 million of new money bonds were issued to help replace the $17.8 million of bank loans previously outstanding.

77. Specifically, pursuant to an Offer to Tender and Exchange, dated April 9, 2013

- 21 -

(the "Offer"), the holders of the Previously Issued Bonds were given the opportunity to tender their Previously Issued Bonds for Series 2013A Retirement Facility Revenue Bonds (the "Series 2013A Bonds") and Series 2013D Retirement Facility Revenue Bonds (the "Series 2013D Bonds" and together with the Series 2013A Bonds, the "Exchange Bonds") to be issued by Red River. As a result of the Offer, the principal amount of the Exchange Bonds to be issued in exchange for the Original Bonds was $69,130,000 (94.54% of the aggregate principal amount outstanding). The holders of $3,965,000 in aggregate outstanding principal amount of the Previously Issued Bonds chose not to tender their bonds (the "Non-Exchanged Bonds").

78.     On May 9, 2013, pursuant to an Indenture of Trust, dated as of May 1, 2013 (the "SMRS Bond Indenture"), between Red River and the SMRS Trustee, Red River issued (i) $69,130,000 in Exchange Bonds; (ii) $19,405,000 in Series 2013B Retirement Facility Revenue Bonds (the "Series 2013B Bonds"), (iii) $2,285,000 in Series 2013C Retirement Facility Revenue Bonds (the "Series 2013C Bonds" and together with the Series 2013B Bonds and the Series 2013D Bonds, the "New Money Bonds"), and (iv) $765,000 in Series 2013D Retirement Facility Revenue Bonds (collectively, the "2013 Bonds"). The Series 2013D Bonds were issued in part as New Money Bonds and in part as Exchange Bonds.

79.     The proceeds of the New Money Bonds were loaned to SMRS pursuant to a Loan Agreement, dated as of May 1, 2013 (the "SMRS Loan Agreement"), between Red River and SMRS. SMRS used these loan proceeds and the TMF Loan, together with certain other monies, to, among other things, (a) finance and refinance a portion of the cost of certain System health facilities located in Abilene, Amarillo, Lubbock, Tyler, and Odessa, Texas; (b) fund a debt service reserve fund to secure the 2013 Bonds; (c) satisfy the outstanding balance of a loan between SMRS and Capital One Bank, N.A.; and (d) pay the costs of issuing the 2013 Bonds.

- 22 -

80. The 2013 Bonds mature on various dates, with the first maturity date being November 15, 2046.

81. The New Money Bonds and the interest payable thereon are payable solely from and secured exclusively by the funds pledged thereto under the SMRS Bond Indenture, the payments to be made by SMRS pursuant to the SMRS Loan Agreement, and certain notes (the "New Money Bond Notes") issued by SMRS under the SMRS Master Indenture.

82. The New Money Bond Notes and other obligations of the Obligated Group under the SMRS Master Indenture are secured under the terms of three separate Deeds of Trust (each including a Security Agreement and Assignment of Rents and Leases) dated as of May 1, 2013 (collectively, the "Deeds of Trust"), between certain members of the Obligated Group and the SMRS Trustee, and two separate Subordinate Deeds of Trust (each including a Security Agreement and Assignment of Rents and Leases) dated as of May 8, 2013 (collectively, the "Subordinate Deeds of Trust"), between certain members of the Obligated Group and the SMRS Trustee. A promissory note evidencing the obligation of SMRS to repay the loan from Red River with respect to the Series 2013A Bonds (the "Series 2013A Note") and the notes securing the Previously Issued Bonds are secured on a parity basis with the New Money Bond Notes under the SMRS Master Indenture and the Deeds of Trust. Additionally, the New Money Bond Notes and the Series 2013A Note are secured on a parity basis under the Subordinate Deeds of Trust.

83. Under the terms of the documents governing Non-Exchanged Bonds and the 2013 Bonds (the "SMRS Bond Documents"), certain accounts were established and are held by the SMRS Trustee, including, but not limited to, (i) the Debt Service Reserve Fund (as defined in the SMRS Master Indenture); the Operating Reserve Fund (as defined in the SMRS Master

Indenture); and the Project Account (as defined in the SMRS Bond Indenture).  These funds, and any other accounts established by the SMRS Bond Documents and held by the SMRS Trustee are referred to herein as the "SMRS Trustee-Held Funds."

84.     As discussed above, SMRS owes approximately $3.2 million in respect of the TMF Loan.  In connection with the TMF Loan, LCS issued a $1.5 million bank letter of credit (the "Letter of Credit") for the benefit of TMF.   The Letter of Credit has a five-year term, and the amount of the Letter of Credit may be reduced proportionate to the reduction in the principal amount of the TMF Loan over the term of the Letter of Credit.   Additionally, SMRS and LCS are parties to that certain Credit Support Agreement, dated as of May 8, 2013, pursuant to which SMRS agreed to, among other things, reimburse LCS for any amounts drawn on the Letter of Credit by TMF for payment of principal on the TMF Loan.  As of the date hereof, no amounts have been drawn on the Letter of Credit.

85.     On May 8, 2013, TMF, the SMRS Trustee, SMRS and LCS entered into an intercreditor agreement (the "Intercreditor Agreement") setting forth the relative priorities of TMF, the SMRS Trustee and LCS with respect to the collateral securing the obligations of the Obligated Group with respect to the 2013 Bonds and the TMF Loan.   Pursuant to the Intercreditor Agreement, except with respect to liens on certain undeveloped land in Waco (the "Waco Property") and Abilene (the "Abilene Property" and together with the Waco Property, the "Undeveloped Properties"), the liens and rights of the SMRS Trustee under the bond documents are superior to the liens and rights of TMF and LCS.  Pursuant to the Intercreditor Agreement, the liens and rights of the SMRS Trustee under its deeds of trust with respect to the Undeveloped Properties are subordinate to those of TMF and LCS.  Moreover, LCS's rights in the Abilene Property are subordinate to TMF's lien in such property.

- 24 -

86.    The monthly debt service payment under the Non-Exchanged Bonds and the 2013 Bonds is approximately $443,667.    The monthly debt service under the TMF Loan is approximately $47,000.

### 2.    Plains/Garrison Prepetition Capital Structure

87.    On December 1, 2011, Plains entered into the Plains Loan Agreement pursuant to which it borrowed $9,000,000 from Prosperity.    The Plains Loan matures on October 1, 2016 and, as of May 2014, the loan balance was approximately $8,234,000.    The Plains Loan is evidenced by an A note, accruing interest at 3.50%, a B note, accruing interest at 3.50% and a C note, accruing interest at 4.25%.    The monthly debt service payment under the Plains Loan is approximately $57,392.

### 3.    Tyler/Meadow Lake Prepetition Capital Structure

#### a.    Tyler Bonds

88.    The construction of Meadow Lake was initially financed with proceeds of $8,545,000 Series 2009A Term Retirement Facility Revenue Bonds and an additional $27,555,000 Series 2009A Term Retirement Facility Revenue Bonds (collectively, the "Series 2009A Bonds") and $7,850,000 Series 2009B Term Retirement Facility Revenue Bonds (the "Series 2009B Bonds" and together with the Series 2009A Bonds, the "Series 2009 Bonds"), issued pursuant to that certain Indenture of Trust, dated as of November 1, 2009 (the "Original Tyler Bond Indenture") between HFDC and UMB Bank, N.A., as successor trustee (the "Tyler Trustee").    HFDC loaned the proceeds of the Series 2009 Bonds to Tyler pursuant to that certain Loan Agreement, dated as of November 1, 2009 (the "Original Tyler Loan Agreement"), between HFDC and Tyler and provided for the repayment of such loans by Tyler pursuant to certain notes issued by Tyler as required by the Original Tyler Loan Agreement (the "Series 2009 Notes").    The Series 2009A Bonds accrue interest at 7.75% and mature on either November

- 25 -

15, 2029 or November 15, 2044. The Series 2009B Bonds accrue interest at 6.375% and mature on November 15, 2019.

89. The second phase of Meadow Lake's construction was financed with the proceeds of $3,895,000 Series 2011A Retirement Facility Revenue Bonds (the "Series 2011A Bonds") and $1,500,000 Series 2011B Retirement Facility Revenue Bonds (the "Series 2011B Bonds" and together with the Series 2011A Bonds, the "Series 2011 Bonds"), issued pursuant to that certain Supplemental Bond Indenture No. 1, dated as of February 1, 2011, between the HFDC and the Tyler Trustee (the "Supplemental Bond Indenture No. 1," and collectively with the Original Tyler Bond Indenture, the "Tyler Bond Indenture"). The Series 2011 Bonds and the Series 2009 Bonds are collectively referred to herein as the "Tyler Bonds." HFDC loaned the proceeds of the Series 2011 Bonds to Tyler pursuant to Amendment No. 1 to the Original Tyler Loan Agreement, dated as of February 1, 2011 ("Amendment No. 1," and collectively with the Original Tyler Loan Agreement, the "Tyler Loan Agreement"), between HFDC and Tyler and provided for the repayment of such loans by Tyler pursuant to the Series 2011 Note (the "Series 2011 Note" and together with the Series 2009 Notes, the "Tyler Notes"), issued by Tyler as required by Amendment No. 1. The Series 2011A Bonds accrue interest at 8.50% and the Series 2011B Bonds accrue interest at 7.25%. Each of the Series 2011 Bonds mature on November 15, 2044. On November 15, 2019, the interest rate on any outstanding Series 2011B Bonds will increase to 10.0% per annum.

90. To secure the payment of the Tyler Bonds and the Tyler Notes, Tyler and the Tyler Trustee entered into that certain Master Trust Indenture, Deed of Trust and Security Agreement, dated as of November 1, 2009 (the "Original Tyler Master Indenture"), as supplemented by Supplemental Indenture Number 1, dated as of November 11, 2009

("Supplemental Indenture No. 1"), Supplemental Indenture Number 2, dated as of February 1, 2011 ( "Supplemental Indenture No. 2"), and Supplemental Indenture Number 3, dated as of May 1, 2012 ("Supplemental Indenture No. 3" and collectively with the Original Tyler Master Indenture, Supplemental Indenture No. 1 and Supplemental Indenture No. 2, the "Tyler Master Indenture").

91.     The proceeds of the Series 2011 Bonds were intended to: (i) pay a portion of the costs of completing the acquisition, construction, furnishing and equipping of Meadow Lake; (ii) fund an increase in the debt service reserve fund securing the Tyler Bonds; (iii) fund interest on the Series 2011 Bonds for approximately three months; and (iv) pay the costs of issuance of the Series 2011 Bonds.

92.     As of May 2014, the outstanding balance owed in respect of the Tyler Bonds was approximately $43,050,000 and the monthly debt service payment was approximately $290,000. Tyler has not made any payments to the Tyler Trustee since May 2013, other than in connection with the forbearance agreements described below.

**b.     Forbearance**

93.     A number of events of default under the Tyler Bonds and the Tyler Master Indenture have occurred and are continuing, including: (i) Tyler has not remitted any of the required interest payments since May 1, 2012; (ii) Tyler did not begin replenishment payments to a certain debt service reserve fund as required under the Tyler Bond documents; (iii) Tyler has not deposited its gross revenues in a certain revenue fund since July 1, 2012; (iv) Tyler failed to maintain cumulative cash from operations at amounts set forth in the loan documents; and (v) Tyler failed to maintain an occupancy covenant (collectively, the "Tyler Events of Default").

94.     As a result of the Tyler Events of Default, Tyler and certain holders of the Tyler

- 27 -

Bonds engaged in negotiations regarding the terms of a permanent restructuring.  In the course of these negotiations, on November 15, 2013, Tyler and the beneficial owners of at least 66-2/3% in aggregate principal amount of the Tyler Bonds entered into a Forbearance Agreement (the "Tyler Forbearance Agreement"), pursuant to which the bondholders agreed to, among other things, forbear from exercising any remedies available with respect to the payment defaults until March 31, 2014.  In connection therewith, Tyler deposited $150,000 with the Tyler Trustee to be used for fees and expenses related to the Tyler Forbearance Agreement. On March 31, 2014, the Tyler Trustee agreed to forbear from initiating any formal legal action to accelerate the Tyler Bonds or to foreclose upon the underlying collateral until April 15, 2014.

95.    On April 15, 2014, the Tyler Trustee and Tyler entered into a separate Forbearance Agreement (the "2014 Forbearance Agreement"), pursuant to which the Tyler Trustee agreed to, among other things, forbear on exercising any rights or remedies against Tyler available to the Tyler Trustee under the Tyler Loan Agreement, the Tyler Master Indenture or any other document governing the Tyler Bonds until the earlier of (i) July 14, 2014 or (ii) the occurrence of any Forbearance Termination Event (as defined therein).  The Tyler Trustee may, in its sole discretion, extend the forbearance period for an additional ninety (90) days beyond July 14, 2014, to the extent that the Tyler Trustee is satisfied with the progress made towards implementing a restructuring or sale transaction and in the absence of contrary direction from the holders of the Tyler Bonds.

96.    Pursuant to the 2014 Forbearance Agreement, Tyler agreed to, among other things, (i) establish a fee escrow account with the Tyler Trustee, consisting of an initial deposit of $100,000 and subsequent deposits of $100,000 on May 15, 2014, and June 16, 2014, respectively and (ii) deliver a restructuring plan to the Tyler Trustee on or before May 30, 2014.

- 28 -

If the Tyler Trustee and Tyler are unable to agree on the terms of the restructuring plan, or if the Tyler Trustee determines that the restructuring plan is not feasible or desirable, then the Tyler Trustee is required to inform Tyler of such determination on or before June 16, 2014.

### c.      Operating Support Agreement

97.     In connection with the issuance of the Series 2009 Bonds, Tyler entered into an Operating Support Agreement with SDI, dated as of November 1, 2009 (the "Operating Support Agreement"), pursuant to which, among other things, SDI (i) agreed to deposit all of its net cash flow from the VLB contracts into an operating support fund, and (ii) granted to Tyler a continuing security interest in and to all right, title and interest of SDI in its right to receive payments of money under the VLB contracts.   Based on historical operations and future projections there is no Net Cash Flow (as defined in the Operating Support Agreement) distributable to Tyler.

### 4.      Caprock/Mesa Springs Prepetition Capital Structure

98.     On April 10, 2008, Caprock acquired the assets of Mesa Springs.  In consideration for the assets of Mesa Springs, Caprock paid the seller $5,600,000.  On that same date, Caprock issued $3,275,000 Series 2008A Variable Rate Demand Retirement Facility Bonds and $4,620,000 Series 2008B Variable Rate Demand Retirement Facility Revenue Bonds (collectively, the "Caprock Bonds").  The proceeds of the Caprock Bonds were used to finance the acquisition, remodeling and equipping of Mesa Springs.  The bonds were also used to fund additional startup costs and miscellaneous capital expenditures for Mesa Springs.  As part of the asset purchase agreement, Caprock agreed to pay the seller, for a period of seven years after the closing, a deferred purchase price payment of (a) 50% of the proceeds of any initial sale or transaction where a deposit is generated or received involving certain gifted homes and (b) 50% of the increase in the amount of the refundable portion of any new deposits collected over the

- 29 -

amount of the refundable portion of the previous deposit in any sale or other transaction where a deposit is generated or received involving remaining non-gifted homes.

99.    Caprock eventually defaulted under the credit and reimbursement agreement governing the Caprock Bonds. As discussed above, on May 20, 2013, Caprock entered into the Caprock Loan Agreement. In connection therewith, the Caprock Bonds were redeemed. The Caprock Loan consists of an A Note and a B Note, both of which accrue interest at LIBOR + 250 and matured on April 10, 2014. As of May 2014, the outstanding balance of the Caprock Loan was approximately $6,967,444 and the monthly debt service payment was approximately $56,200.

### 5.    CSL/Canyons Prepetition Capital Structure

100.    Development of the Canyons began on December 31, 2010, and was financed through (i) the Canyons HUD Loan, (ii) a grant of $7,899,892 (the "TDHCA Grant") awarded by the Texas Department of Housing and Community Affairs ("TDHCA"); and (iii) a grant of $272,500 from the City of Amarillo, Texas (the "Amarillo Grant"). Canyons was completed and placed into service in 2011.

101.    Pursuant to a certain Security Agreement (Equipment, Inventory, and Accounts), dated as of October 28, 2010, by and between CSL and Prudential (the "Canyons Security Agreement"), obligations arising under the Canyons HUD Loan are secured by the goods, inventory, equipment, accounts, general intangibles and fixtures arising from the property upon which Canyons is located.

102.    No amounts are currently due under the TDHCA Grant or the Amarillo Grant. The TDHCA Grant may only be called in the event that CSL fails to comply with certain requirements for use of the grant, including but not limited to maintaining a minimum percentage of units as "low income units." As of May 2014, the outstanding balance of the Canyons HUD

Loan was approximately $3,574,502 and the monthly debt service payment was approximately $26,896.

### 6. OMH/Desert Haven Prepetition Capital Structure

103. On October 9, 1996, OMH received a capital advance note from HUD in the aggregate amount of $1,957,700 (the "Desert Haven HUD Note"). The Desert Haven HUD Note bears no interest and payment is not required as long as the housing remains available for low-income persons. The note will be forgiven at its maturity date of September 1, 2037 if Desert Haven remains available for occupancy by eligible families until that date. Otherwise, the entire amount, plus interest at 7% since October 9, 1996, will be declared due and payable to HUD. Pursuant to a certain Deed of Trust, dated as of October 9, 1996, by and between OMH, as successor grantor and Jack T. Stark, as trustee, the Desert Haven HUD Note is secured by all property owned by OMH and all rents, profits and income attributed to its operations.

## II. EVENTS LEADING TO BANKRUPTCY

### A. The Decline in the Market

104. Senior living facilities have recently experienced substantial declines in occupancy as a result of market changes. Prospective residents are faced with: (i) difficulty selling their homes due to uncertainty in value and (ii) significant declines in their equity portfolio value. This has made it difficult, if not impossible, for seniors to move into or remain in senior housing facilities due to, among other things, the upfront payment of EDs. These market conditions have contributed to decreased revenue and lower than anticipated occupancy rates at certain of the Debtors' Facilities.

105. To address these issues, the Debtors sought to implement a number of restructuring initiatives over the last year, including making appropriate adjustments in staffing and increasing negotiations with creditors. Additionally, in the past four months, the Debtors

retained Cain Brothers & Company, LLC ("Cain") to provide restructuring and other investment advisory services, DLA Piper LLP (US) to provide legal advice in connection with a potential restructuring, and A&M to provide a CRO and other financial advisory services.

106.   As discussed above, the relationship between the System and LCS became strained during the course of LCS's management and the LCS Management Agreements were terminated on April 8, 2014.   Additionally, around that time the CCEO was terminated by the System.   After a detailed search, the Debtors hired an interim chief executive officer who remains employed by the System.

### III.   FACTS IN SUPPORT OF FIRST DAY MOTIONS

107.   Concurrently with the filing of their chapter 11 petitions, the Debtors have filed the First Day Motions.   The Debtors request that each of the First Day Motions described below be granted, as they constitute a critical element in ensuring the Debtors' successful reorganization in these chapter 11 cases.

### A.   Joint Administration Motion

108.   By the Joint Administration Motion, the Debtors seek an order consolidating, for procedural purposes only, the administration of the Debtors' chapter 11 cases with Debtor SMRS as the lead debtor, pursuant to Bankruptcy Rule 1015.   In addition, the Debtors request that the Clerk make an entry on the docket of each of the Debtors' cases, other than the SMRS case, stating that an order has been entered directing joint administration of the chapter 11 cases and that all further pleadings and other papers shall be filed in and all further docket entries shall be made on the SMRS docket.

109.   The Debtors are all affiliates and have all filed petitions in the same court.   I believe that joint administration will be less costly and burdensome than the separate administration of the estates due to the combined docket and combined notice to creditors and

parties in interest. Many applications, motions, orders, hearings and notices will be made in these cases and will affect all of the Debtors. Joint administration will keep all parties informed of matters related to these cases without the inconvenience and confusion of reviewing separate dockets.

110. In addition, as the Debtors are only seeking administrative consolidation by this motion, rather than substantive consolidation, I do not believe creditors' interests will be harmed.

111. I believe that if each Debtor's case were administered independently, there would be a number of duplicative pleadings and overlapping service. This unnecessary duplication of identical documents would be wasteful of the Debtors' resources, as well as other parties' and this Court's resources.

112. Therefore, I believe that the Debtors' chapter 11 cases should be jointly administered for procedural purposes only.

### B.    Consolidated Creditor List Motion

113. By the Consolidated Creditor List Motion, the Debtors request authorization to file a consolidated mailing matrix and a consolidated list of their 30 largest unsecured creditors. The Debtors are comprised of 12 affiliated companies. There are over 2,000 creditors and other parties in interest in these cases, and there may be potential for confusion and/or overlap regarding creditor obligations. Given the circumstances, the Debtors submit that it is appropriate for them to file a consolidated mailing matrix and a consolidated list of their 30 largest unsecured creditors. The consolidated mailing matrix and the consolidated list of creditors will provide good and sufficient notice to all creditors and parties in interest in an efficient manner.

114. I believe that authorizing the Debtors to file a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor and to file a consolidated list of the Debtors' thirty (30) largest unsecured creditors will promote efficiency and conserve the

- 33 -

Debtors' resources. Therefore, I believe that the relief requested in the Consolidated Creditor List Motion should be granted.

### C. Motion for Extension of Time for Filing Schedules and SOFA

115. By the Motion for Extension of Time for Filing Schedules and SOFA, the Debtors seek an order extending their time for filing the Schedules and Statements of Financial Affairs ("SOFAs") for an additional 45 days (for a total of 60 days).

116. Although the Debtors have commenced preparation of their Schedules and SOFAs, I do not believe that the fifteen-day automatic extension will provide the Debtors with sufficient time to permit completion of the Schedules and SOFAs.

117. At this juncture, I believe that an extension of 45 days (for a total of 60 days) will provide sufficient time to prepare and file the Schedules and SOFAs.

### D. Wage Motion

118. By the Wage Motion, the Debtors request authorization to pay certain prepetition claims, honor obligations and continue programs, in the ordinary course of business related to employee and independent contractor compensation, payroll administration, wage deductions, government withholdings and payroll taxes, reimbursable expenses, and employee benefit programs. In addition, the Debtors are requesting an order authorizing and directing banks and other financial institutions to honor all related checks and electronic payment requests.

119. The Debtors have approximately 1,369 employees in the aggregate—959 employees are paid full-time hourly, 263 employees are paid temporary hourly and 147 are full-time salaried employees (collectively, the "Employees"). The approximate monthly costs for wages, salaries, and benefits for each of the Debtors are as follows: SMRS, $360,000; CSL (Canyons),

$15,000; OMH (Desert Haven), $0;[5] Brazos, $0; Caprock (Mesa Springs), $240,000; SMC (Wesley Court), $200,000; SMF, $0; Panhandle (Craig), $450,000; Permian (Parks), $240,000; Plains (Garrison), $300,000; Tyler (Meadow Lake), $290,000; and SDI (VLB Homes), $1,000,000. The Debtors estimate that in total, approximately $1,515,000 in unpaid salary, wages and other compensation is owing to their Employees as of the next pay date of June 12, 2014.

120. I believe that any delay in paying prepetition employee obligations will adversely impact the Debtors' relationship with their Employees and will irreparably impair the Employees' morale, dedication, confidence and cooperation in the chapter 11 process. At this early stage in the cases, the Debtors simply cannot risk the substantial damage to their businesses that would inevitably result from a decline in the Employees' morale and cooperation attributable to the Debtors' failure to pay wages, salary, benefits and other similar items.

### E.    Utilities Motion

121. By the Utilities Motion, the Debtors are requesting interim and final orders to (a) determine that its utility providers (the "Utility Providers") have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (b) approve the Debtors' proposed adequate assurance of a deposit of approximately one month of the aggregate cost of utility service into a segregated interest bearing account, (c) prohibit the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtors' proposed adequate assurance pending entry of the final order, and (d) determine that the Debtors are not required to provide any additional adequate assurance beyond what is proposed by the Utilities Motion.

---

[5] As noted above, individuals that work at Desert Haven are employees of Permian.

122. In the ordinary course of business, the Debtors obtain gas, water, sewer and other similar utility services from various Utility Providers. Approximately sixteen (16) Utility Providers provide these services to the Debtors. On average, the Debtors spend approximately $300,000 each month for utility services.[6]

123. At all relevant times, the Debtors have attempted to remain current with regard to their utility bills. Furthermore, to the best of my knowledge, the Debtors are current on all amounts owing to the Utility Providers, other than payment interruptions that may be caused by the commencement of these chapter 11 cases.

124. I believe that uninterrupted utility services are essential to the ongoing operations of the Debtors, and therefore, to the successful resolution of these cases. Any interruption of utility services, even for a brief period of time, would negatively affect the Debtors' operations, customer relationships, revenues and profits, seriously jeopardizing the Debtors' efforts and, ultimately, the value of creditor recoveries. Equally important, any interruption of utility services would put the health and safety of the residents at risk. It is, therefore, critical that utility services continue uninterrupted during the chapter 11 cases.

125. The Debtors propose that each Debtor will deposit with each of its Utility Providers a sum equal to such Debtor's average monthly payment to the applicable Utility Provider (to the extent a Utility Provider does not already hold such a deposit). The Debtors propose to make such deposits within twenty (20) days of the Petition Date.

126. Certain of the Debtors are also concurrently seeking approval of postpetition financing. Thus, they expect to have funds available for payment to the Utility Providers.

---

[6] The approximate monthly utility costs for each of the Debtors are as follows: SMRS, $0; CSL, $12,000; OMH, $5,000; Brazos, $0; Caprock, $20,000; SMC, $37,000; SMF, $0; Panhandle, $46,000; Permian, $26,000; Plains, $14,000; Tyler, $52,000; and SDI, $82,000.

127. Further, the Debtors propose to protect the Utility Providers by establishing the procedures provided in the Utilities Motion, whereby any Utility Provider can request additional adequate assurance in the event that it believes there are facts and circumstances with respect to its providing postpetition services to the Debtors that would merit greater protection.

128. Therefore, I believe that the Utility Providers have adequate assurance of future performance, and the relief sought in the Utility Motion should be granted.

## F. Cash Management Motion

129. By the Cash Management Motion, the Debtors seek entry of an order granting the following relief:

(a) Authorizing the Debtors to continue to use the Cash Management System, subject to any modification or other relief granted by order of this Court relating thereto, including the following:

    i) the continued use of the existing Bank Accounts with the same names and account numbers as such Bank Accounts existed immediately prior to the Petition Date (with the option of streamlining their Cash Management System by closing or consolidating Bank Accounts);

    ii) the ability of the Debtors to deposit funds into and withdraw funds from any of the Bank Accounts (subject to available funds or, in the case of zero balance accounts, subject to the availability of funds in the applicable linked funding accounts) by all usual means, including but not limited to checks, wire transfers, electronic funds transfers and other debits;

    iii) the ability of the Debtors to continue to make intercompany transfers among the Bank Accounts in the ordinary course of their business through the Cash Management System;

    iv) the ability of the Debtors to otherwise treat the Bank Accounts, along with any accounts opened postpetition, for all purposes as debtor in possession accounts;

    v) the waiver of any requirements to establish separate accounts for cash collateral and/or tax payments; and

    vi) authorizing and directing the Banks to maintain, service and administer such deposit accounts or investment accounts, without interruption and in the ordinary course of business, in accordance with applicable

- 37 -

non-bankruptcy law and the account agreements and/or other service documentation between the applicable Bank and the Debtors relating to such accounts; and

vii)      authorizing the Banks to charge and collect, and authorizing but not directing the Debtors to pay, the prepetition and postpetition service charges and other fees and expenses to which the Banks are entitled under the terms of their account agreements and/or other service documentation with the Debtors;

(b)      Authorizing the Debtors to continue to use their existing business forms without alteration or change; and

(c)      Authorizing the Debtors to maintain their existing investment practices and waiving the requirements of Section 345(b) of the Bankruptcy Code as to the Debtors' Cash Management System.

130.    I believe that by using the existing Bank Accounts, the Debtors will avoid unnecessary expense and delay, which will disrupt the ordinary financial affairs and business operations of the Debtors, delay the administration of the Debtors' estates, and increase the costs to the estates.

131.    Prior to the Petition Date and in the ordinary course of business, each entity in the Obligated Group maintained its own separate cash management system (together, the "Obligated Group Cash Management Systems").  Funds in the Obligated Group Cash Management Systems are generally collected into a centralized operating account, which receives cash from various sources, including in many instances the Sweep Account (as defined below).  The cash maintained in the operating accounts is generally used to fund operating expenses.  Additionally, the funds in the operating account of: (i) SMF are also used to pay for various projects related to donations; (ii) SMC are also used to pay certain payroll taxes; and (iii) SMRS are also used to pay for corporate expenses, payroll and shared services.  A chart depicting the Obligated Group Cash Management Systems is attached to the Cash Management Motion as Exhibit A.

132.    The Obligated Group Cash Management Systems also contain accounts other than the operating accounts.  Specifically, Permian, SMC and Panhandle maintain resident trust

- 38 -

accounts funded from social security payments for Medicaid residents and other personal deposits of residents living at Parks, Wesley Court and Craig. The funds in the resident trust accounts are used to pay for miscellaneous personal expenses of such residents. Additionally, SMRS maintains: (i) an account used to pay Blue Cross Blue Shield health claims and (ii) four separate accounts established pursuant to the debt documents of the Obligated Group. Finally, SMC maintains a payroll account to fund certain payroll expenses of Wesley Court.

133.     Moreover, the Obligated Group Cash Management Systems contain a daily sweep component to maximize interest. Specifically, each night funds from the operating accounts of SMRS, SMF, Panhandle (Craig), Permian (Parks), SMC (Wesley Court) and SDI, the health claims account of SMRS and the payroll account of SMC (collectively, the "Swept Accounts") that have positive balances are swept into a sweep account held in the name of SMC (the "Sweep Account") and the next day funds are swept out of the Sweep Account into the Swept Accounts that have negative balances after (i) deposits are made into such accounts and (ii) checks written on such accounts clear. As such, each of the Swept Accounts have a $0 balance at the end of each night except for SMRS's operating account which is required to have a minimum balance of $175,000.

134.     Likewise, prior to the Petition Date and in the ordinary course of business, SDI, Caprock (Mesa Springs), Plains (Garrison), Tyler (Meadow Lake), OMH (Desert Haven) and CSL (Canyons) maintained their own separate cash management systems (collectively, the "Non-Obligated Group Cash Management Systems," and together with the Obligated Group Cash Management Systems, the "Cash Management System"). Funds in the Non-Obligated Group Cash Management Systems are generally collected into a centralized operating account, which receives cash from various sources. The cash maintained in these operating accounts is

used to fund operating expenses and in at least one circumstance, to collect cash payments. As described above, funds remaining in the operating account for SDI are transferred automatically on a daily basis into the Sweep Account. None of the other accounts maintained by entities in the Non-Obligated Group are connected to the Sweep Account. A chart depicting the Non-Obligated Group Cash Management Systems is attached to the Cash Management Motion as Exhibit B.

135.    The Non-Obligated Group Cash Management Systems also contain accounts other than the operating accounts. First, CSL (Canyons), OMH (Desert Haven), Caprock (Mesa Springs), Plains (Garrison), Tyler (Meadow Lake) and SDI maintain resident accounts funded from social security payments for Medicaid residents, security deposits and other personal deposits of the residents living at Canyons, Desert Haven, Mesa Springs, Garrison, Meadow Lake, Lamun Lusk Sanchez, Ambrosio Guillen and Alfredo Gonzalez. Second, CSL maintains an account used to fund refurbishment of Canyons. Third, OMH maintains separate accounts to: (i) fund capital improvements and (ii) comply with HUD guidelines. Fourth, Plains maintains separate accounts to: (i) comply with debt service requirements for its outstanding loan and (ii) fund an expansion projects at Garrison. Fifth, Tyler maintains separate accounts to: (i) fund resident apartment and home purchases and construction and (ii) comply with the documents governing the Tyler Bonds. Finally, certain reserve accounts with respect to the Canyons HUD Loan are maintained by Prudential.

136.    Furthermore, funds may flow back and forth from the operating accounts in the Obligated Group Cash Management Systems and in the Non-Obligated Group Cash Management Systems (e.g., from a particular Non-Obligated Group entity's operating account to SMRS's operating account) to cover various shared services expenses (e.g., health claims).

- 40 -

Some of these intercompany transfers are made on a monthly basis while others are as-needed. Other Non-Obligated Group Facilities have relationships with Obligated Group Facilities based on geographic location and shared services which require regular cash transfers between the two (e.g., Desert Haven and Parks, Canyons and Craig). No intercompany transfers occur between individual members of the Non-Obligated Group.

137. As of the Petition Date, the Debtors' Cash Management System employed a total of forty (40) bank accounts (collectively, the "Bank Accounts") with the following financial institutions (collectively with any other institutions with which the Debtors maintain or establish deposit accounts or investment accounts, the "Banks"): (a) First Financial Bank; (b) Prosperity; (c) Amarillo National Bank; (d) Austin Bank; (e) Bank of America; (f) Border Capital Bank; (g) Wells Fargo; and (h) UMB Bank.

138. The table attached to the Cash Management Motion at Exhibit C sets forth for each of the Bank Accounts the name of the particular Debtor that maintains the account, the name of the institution at which the account is maintained, the account number (last four digits only) and a description of the purpose of the account. The Debtors manage their cash receipts, transfers and disbursements through the Bank Accounts. In doing so, the Debtors routinely deposit, withdraw and otherwise transfer funds to, from and between the Bank Accounts by various methods including check, wire transfer, automated clearing house transfer and electronic funds transfer. On a daily basis, the Debtors process large numbers of transactions through the Cash Management System. The Debtors maintain current and accurate records of all transactions processed through the Cash Management System.

139. The Debtors' Cash Management System is similar to those commonly employed by corporate enterprises of comparable size and complexity. Among other benefits,

- 41 -

the Cash Management System permits the Debtors to accurately monitor cash availability at all times.  The Cash Management System also permits the Debtors to centrally manage and track the collection and transfer of funds, including intercompany transfers, which reduces administrative burdens and expenses and maximizes interest income.

140.    In addition to the Cash Management System and Bank Accounts, the Debtors use in the ordinary course of their business numerous business forms (including but not limited to checks, deposit slips, letterhead, contracts, purchase orders and invoices).  The Debtors have a supply of these forms on hand.  It would be expensive, wasteful, and disruptive to the Debtors' business to destroy all of these forms and order new ones.

141.    Contemporaneously with the filing of the Cash Management Motion, the Debtors have filed other motions seeking authority to pay certain prepetition obligations, including obligations to employees and other entities.  With respect to certain of these prepetition obligations, the Debtors already have issued, in the ordinary course of business, checks and other debits that have yet to clear the banking system.  In other instances, the Debtors will issue checks or other debits postpetition on account of the prepetition obligations once the Court has entered an appropriate order permitting the Debtors to do so.  The Debtors intend to inform the Banks which prepetition checks and other debits should be honored or dishonored pursuant to orders of the Court authorizing such payments.

142.    I believe that the relief requested in the Cash Management Motion will help to ensure the Debtors' orderly entry into and administration in chapter 11 and avoid many of the possible disruptions and distractions that could divert the Debtors' attention from more pressing matters during the initial days of these chapter 11 cases.

143.    Given the size and complexity of the Debtors' business operations, any disruption

of their accounting and cash management procedures would be enormously burdensome and disruptive, and could adversely impact the Debtors' efforts to reorganize. At this critical juncture, the Debtors must be able to conduct "business as usual" to the extent possible. To this end, it is essential that the Debtors be permitted to continue to use their existing Cash Management System and Bank Accounts.

144.    In light of these factors, I believe that the Debtors should be permitted to maintain their investment practices.

### G.    Ordinary Course Professionals Motion

145.    By the Ordinary Course Professionals Motion, the Debtors seek authorization, pursuant to sections 105(a) and 327 of the Bankruptcy Code, to (i) retain certain attorneys, accountants, tax professionals and other professionals to represent them in matters arising in the ordinary course of their business (the "Ordinary Course Professionals") without the necessity of a separate, formal retention application approved by this Court for each Ordinary Course Professional, and (ii) to compensate the Ordinary Course Professionals for postpetition services rendered, subject to certain limits set forth below, without the necessity of additional Court approval.

146.    The Debtors wish to continue to employ and retain the Ordinary Course Professionals to render services to their estates that are similar to those rendered before the commencement of these chapter 11 cases. Although the automatic stay and other issues in these cases may decrease the Debtors' need for certain Ordinary Course Professionals' services, the Debtors cannot now quantify that need. Moreover, the number of Ordinary Course Professionals renders it impractical and inefficient for the Debtors and this Court to address the proposed retention of Ordinary Course Professionals on an individual basis.

- 43 -

147. The Debtors propose that they be permitted to pay, pursuant to the Allocation Formula (as defined below), without formal application to the Court by any Ordinary Course Professional, one-hundred percent (100%) of the interim fees and disbursements to each of the Ordinary Course Professionals upon the submission to the Debtors of an appropriate invoice setting forth in reasonable detail the nature of the services rendered after the Petition Date so long as such interim fees and disbursements do not exceed a total of $30,000 per month per Ordinary Course Professional, and no more than $250,000 per Ordinary Course Professional for the duration of these chapter 11 cases. Payments in excess of these amounts would be subject to Court approval.

148. By the Ordinary Course Professionals Motion, the Debtors also propose that each Ordinary Course Professional who is an attorney (each an "Attorney Professional") be required to file with the Court and serve upon the United States Trustee for the Northern District of Texas (the "United States Trustee"), any committee appointed in these chapter 11 cases, and counsel to the Debtors, a form Bankruptcy Rule 2014 Affidavit of Attorney Professional within thirty (30) days of the entry of an order granting the Ordinary Course Professionals Motion. Additionally, the United States Trustee and any committee appointed in these chapter 11 cases would be given twenty (20) days from the date of service of an Attorney Professional's affidavit to object to the retention of such Attorney Professional with any unresolved objections being heard by the Court.

149. Accordingly, consistent with the dimensions of these cases and the geographic diversity of the Debtors' businesses, I believe the Debtors should be permitted employ and retain the Ordinary Course Professionals on terms substantially similar to those in effect prior to the Petition Date.

### H. DIP/CC Financing Motion

150. By the DIP/CC Financing Motion, the Obligated Group Debtors and SDI request the entry of interim and final orders, among other things, (a) authorizing the Obligated Group Debtors and SDI to (enter into a financing arrangement on an interim basis on the terms set forth in the interim order (the "Interim Order"), (b) authorizing the Obligated Group Debtors to use cash collateral (the "Obligated Group Cash Collateral"), (c) granting liens and providing super-priority administrative expense status, (d) granting adequate protection to the SMRS Trustee, (e) scheduling a final hearing pursuant to Bankruptcy Rule 4001, and (f) granting related relief.

151. The proposed financing consists of advances from the SMRS Trustee-Held Funds up to an interim maximum amount of $600,000 (the "DIP Loans"), substantially on the terms and conditions set forth in the Interim Order. The proceeds of the DIP Loans will be used by the Obligated Group Debtors and SDI for the purpose of, among other things, providing for the Obligated Group Debtors' and SDI's postpetition operating expenses and general working capital needs during their chapter 11 cases, all in accordance with a budget, a form of which is attached to the DIP/CC Financing Motion as an exhibit.

152. In addition, because the SMRS Trustee has a security interest in the Obligated Group Cash Collateral, including, among other things, amounts on deposit in the Obligated Group Debtors' deposit accounts, the Obligated Group Debtors are requesting authorization to use the Obligated Group Cash Collateral and to provide adequate protection to the SMRS Trustee.

153. Specifically, as adequate protection for the SMRS Trustee with respect to, and solely to the extent of, any diminution of value in the Pre-Petition Bond Collateral (as defined in the DIP/CC Financing Motion), the SMRS Trustee shall receive a valid, perfected and

- 45 -

enforceable continuing replacement lien and security interest (the "Rollover Lien") in all assets of the Obligated Group Debtors existing on or after the Petition Date of the same type as the Pre-Petition Bond Collateral, together with the proceeds, rents, products and profits thereof, whether acquired or arising before or after the Petition Date, to the same extent, validity, perfection, enforceability and priority of the liens and security interests of the SMRS Trustee as of the Petition Date (the "Post-Petition Bond Collateral").

154.    Additionally, the SMRS Trustee shall have a valid, perfected and enforceable continuing supplemental lien and security interest (the "Supplemental Lien") in all of the assets of the Obligated Group of any kind or nature whatsoever within the meaning of Section 541 of the Bankruptcy Code, whether acquired or arising prepetition or postpetition, together with all proceeds, rents, products, and profits thereof, exclusive of causes of action under Chapter 5 of the Bankruptcy Code (other than Section 549 and 550 as made applicable by Section 549) (the "Supplemental Collateral" and, collectively with the "Post-Petition Bond Collateral", the "Collateral").

155.    Finally, as additional adequate protection, the SMRS Trustee shall have a super-priority administrative expense claim pursuant to Section 507(b) of the Bankruptcy Code, with recourse to and payable from any and all assets of the estates of the Obligated Group.

156.    The SMRS Trustee has consented to these forms of adequate protection.   In addition, the Obligated Group Debtors will use Cash Collateral to operate their business, which will maintain and enhance the value of the Collateral.

157.    In the ordinary course of business, the Obligated Group Debtors and SDI require cash on hand and cash flow from their operations to fund their liquidity needs and operate their senior living facilities.  In addition, the Obligated Group Debtors and SDI require

cash on hand to fund these chapter 11 cases. Postpetition financing, in addition to the use of Cash Collateral solely with respect to the Obligated Group, is necessary in order for the Obligated Group Debtors and SDI to preserve sufficient liquidity to maintain ongoing day-to-day operations, ensure proper resident care at their senior living facilities, and fund their working capital needs.

158.    The Obligated Group Debtors and SDI and their advisors have solicited proposals from and negotiated with several institutions in an effort to secure debtor in possession financing on the best terms available. The Obligated Group Debtors and SDI have determined that the terms and conditions of the DIP Facility are the best available under the circumstances and address the Obligated Group Debtors' and SDI's working capital needs. Postpetition financing is not otherwise available without granting, pursuant to section 364(c)(1) of the Bankruptcy Code, claims having priority over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code, and securing such indebtedness and obligations with the security interests in and the liens upon the Collateral pursuant to sections 364(c) and (d) of the Bankruptcy Code.

159.    The Interim Order, if approved, will provide essential working capital that will allow the Obligated Group Debtors and SDI to maintain the value of their assets and their ongoing business operations. In addition, the Interim Order will provide the Obligated Group Debtors' and SDI's various constituencies, including residents, employees, vendors, service providers, and regulatory agencies with confidence in the Obligated Group Debtors' and SDI's ability to maintain operations during these chapter 11 cases. If the relief sought in the DIP/CC Financing Motion is denied or delayed, the Obligated Group Debtors and SDI will experience

business disruptions, will be unable to provide proper resident care, and will be unable to maximize value for their estates.

160. The Interim Order also sets forth certain stipulations and agreements by the Obligated Group Debtors regarding, among other things, (a) the validity and enforceability of Obligated Group Debtors' obligations under the SMRS Master Indenture and related documents, and (b) the validity and enforceability of the liens on and security interests in the Obligated Group Debtors' funds and property granted under the SMRS Master Indenture and related documents. Each of the stipulations and agreements set forth in the Interim Order are true and correct to the best of my knowledge.

161. I believe that the relief requested in the DIP/CC Financing Motion is in the best interests of the Obligated Group Debtors and SDI, their estates and their creditors, and absent such relief, the Obligated Group Debtors and SDI will experience immediate and irreparable harm and their reorganization efforts will be jeopardized.

### I. Cash Collateral Motions

162. By the Cash Collateral Motions, OMH, Plains, Tyler, Caprock and CSL (collectively, the "CC Debtors") seek entry of interim and final orders, pursuant to sections 105(a), 361, 362, 363 and 364 of the Bankruptcy Code, (i) authorizing the CC Debtors to use the cash collateral of their prepetition secured lenders and the Tyler Trustee, as applicable (together, the "Secured Lenders"), (ii) approving the form of adequate protection, and (iii) scheduling a final hearing.

163. In the ordinary course of business, the CC Debtors require cash on hand and cash flow from their operations to pay operating expenses and other routine payables. In addition, the CC Debtors require cash on hand to fund these chapter 11 cases and to successfully reorganize. The cash and cash proceeds of all of the CC Debtors are encumbered by security

- 48 -

interests in favor of the Secured Lenders, as applicable, and, as such, constitute "cash collateral" of such Secured Lenders (as such term is defined in Bankruptcy Code section 363(a), "SL Cash Collateral").

164.    The CC Debtors have an emergency need for the immediate use of SL Cash Collateral to, among other things, maintain ongoing day-to-day operations and fund their working capital needs.  Absent the use of the SL Cash Collateral, the CC Debtors may be forced to cease operations of their businesses, thereby jeopardizing their ability to maximize the value of their estates.  Such an abrupt cessation of the businesses would also have devastating effects on the residents of the relevant Facilities and would cause the residents to suffer immediate and irreparable harm.

165.    The CC Debtors have submitted with the Cash Collateral Motions proposed interim orders granting the relief requested (the "Interim CC Orders").  Attached to the Interim Orders are detailed operating budgets (the "Budgets").  Certain of the terms of the Interim CC Orders are summarized below:[7]

| Term | Brief Summary |
| --- | --- |
| **Use of Cash Collateral** | The CC Debtors are authorized to use the SL Cash Collateral upon the terms and conditions set forth in the applicable Interim CC Order and in accordance with the Budgets from the Petition Date through and including the date of conclusion of the final hearing(s) on the Cash Collateral Motions. |
| **Adequate Protection** | As adequate protection for any diminution in value of the SL Collateral from and after the Petition Date, calculated in accordance with Bankruptcy Code section 506a(a) (a "Diminution in Value"), the applicable Secured Lender shall be granted senior priority replacement liens upon all assets and |

---

[7]  In the event of any inconsistency between this summary and the Interim CC Orders, the terms of the Interim CC Orders shall control.  Interested parties should review the Interim CC Orders for a complete and accurate understanding.

property of the applicable CC Debtor and its estate of any kind or nature whatsoever, now existing or hereafter acquired, including, without limitation, the SL Collateral (the "Replacement Liens"), but excluding all claims and causes of action, and the products and proceeds thereof, arising under or permitted by Sections 502(d), 506(c), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code and any other avoidance claims and causes of action arising under state or federal law; provided, however, that the Replacement Liens shall be subject and subordinate to (a) a Carve-Out (as defined in the applicable Cash Collateral Motion), and (b) certain other liens as set forth in the applicable Cash Collateral Motion.

Furthermore, the CC Debtors shall continue to operate their businesses, and in doing so, shall preserve the value of their estates.

As additional adequate protection, the Secured Lenders of Tyler and Caprock shall be granted administrative claims with a priority equivalent to a claim under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code, on a dollar-for-dollar basis for and solely to the extent of any Diminution in Value, which administrative claim shall, among other things, have priority over all other costs and expenses of the kind specified in, or ordered pursuant to, sections 105, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 1113 and 1114 of the Bankruptcy Code (the "Super-Priority Administrative Claim"), except for expenditures constituting the Carve-Out.

As additional adequate protection, Tyler and Caprock shall pay the reasonable fees and expenses of their Secured Lenders outside legal and financial advisors in accordance with the applicable Budget, subject to certain conditions set forth in the applicable Cash Collateral Motion.

166.    Finally, the Interim CC Orders for Tyler and Caprock set forth certain events of default upon which the cash collateral arrangement described therein shall terminate.

167.    I believe that the relief requested in the Cash Collateral Motions is in the best interests of the CC Debtors, their estates and their creditors, and absent such relief, the CC Debtors will experience immediate and irreparable harm and their reorganization efforts will be jeopardized.

- 50 -

J.     **Insurance Motion**

168.     By the Insurance Motion, the Debtors seek authorization to (a) maintain existing insurance policies and pay all obligations arising thereunder, (b) maintain financing of their insurance premiums and pay all obligations in connection therewith, and (c) renew, revise, extend, supplement, change, or enter into new insurance policies as needed in their business judgment.

169.     The Debtors maintain 15 insurance policies (the "Insurance Policies") that are administered by several insurance carriers (the "Insurance Carriers") and collectively provide coverage for, among other things (a) director and officer liability, (b) automobile liability, (c) property (2 policies), and (d) general and professional liability.  The premiums for certain of the Insurance Policies (the "Financed Insurance Policies") are financed through a certain Premium Financing Agreement (the "Premium Finance Agreement") with BankDirect Capital Finance.  Under the Premium Finance Agreement, the Debtors financed the Financed Insurance Policies, and the balance as of the date of the Petition Date is $501,417.81.  Pursuant to the terms of the Premium Finance Agreement, the Debtors are obligated to pay $53,575.41 in monthly installments due on the first day of each month.  The next monthly insurance premium installment is due on July 1, 2014.  The costs of insurance are allocated among the Debtors on a *pro rata* basis according to the relative revenue generated by each Facility (the "Allocation Formula")

170.     I believe that payment of obligations owing in connection with the Insurance Policies and Premium Finance Agreement and the renewal, revision, extension, supplementation, or change of existing Insurance Policies and entering into new insurance policies as needed in the Debtors' business judgment are necessary to protect and safeguard the Debtors' ongoing operations and ensure compliance with the United States Trustee Guidelines.  Also, failure to pay

amounts related to the Insurance Policies as and when they come due may harm the Debtors' estates, including because Insurance Companies may terminate coverage.

171.    Therefore, I believe that the relief requested in the Insurance Motion is in the best interest of the estates and should be granted.

### K.    ED Escrow Motion

172.    By the ED Escrow Motion, the Debtors seek authority to escrow all EDs collected postpetition in order to provide assurance to new residents that the Debtors' bankruptcy cases will not affect prospective residents' rights to a refund.  Additionally, the Debtors seek authority to return the EDs collected postpetition under certain circumstances.

173.    A prospective resident's willingness to pay an ED is necessarily dependent upon such resident's conviction that the Debtors' bankruptcy cases will not negatively affect the refundability of an ED.  Any negative publicity suggesting that a community is in bankruptcy will necessarily deter prospective residents from entering into the new residency agreements, which are the precursors to the Debtors' receipt of future EDs.  Providing the relief requested in the ED Escrow Motion maintains the status quo pending a resolution of these cases and gives comfort to prospective residents that their EDs will be protected in an escrow account. Accordingly, the Debtors seek authorization to escrow all EDs received postpetition and protect the residents' interest with respect thereto.

### L.    GCG Retention Application

174.    By this application, the Debtors are requesting authority to employ GCG, Inc. ("GCG") as their notice, claims and solicitation agent with respect to these chapter 11 proceedings and to provide services in connection with claims, reporting and other financial responsibilities in these chapter 11 cases.

175.    GCG is a claims agent and provider of restructuring administrative services.  The

- 52 -

professionals at GCG are well-qualified to advise the Debtors in these bankruptcy proceedings, as they have substantial experience providing restructuring administrative services in bankruptcy cases similar in size and complexity to these chapter 11 cases.

176. I believe such experience and knowledge will be valuable to the Debtors during these cases. Accordingly, the Debtors wish to retain GCG to provide assistance during these cases.

## **CONCLUSION**

For all the foregoing reasons, I respectfully request that the Court grant the relief requested in the First Day Motions.  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 10th day of June, 2014.

*/s/ Paul B. Rundell*
Paul B. Rundell

# EXHIBIT A – ORGANIZATIONAL CHART



SEARS METHODIST RETIREMENT SYSTEM, INC. ORGANIZATIONAL CHART

** Sears Permian is a limited partner in Prevarian Al Odessa, LP, which owns The Courtyards, an assisted living facility located on the campus of The Parks. The Courtyards is managed by Texas Senior Management, Inc.

++ Sears Methodist Senior Housing, LLC is the General Partner of, and owns .01% of the interests in, Canyons Senior Living, L.P. Senior Dimensions, Inc. is the Limited Partner of, and owns 99.99% percent of the interests in, Canyons Senior Living, L.P.

• Senior Dimensions, Inc., Sears Methodist Senior Housing, LLC, Texas Senior Management, Inc. and Senior Living Assurance, Inc. are for profit entities. All other entities are not for profit.

• Southwest Assurance Company Ltd. is an offshore captive domiciled in Grand Cayman.

• The three facilities below Senior Dimensions, Inc. are owned by the State of Texas. Senior Dimensions, Inc. operates those three facilities, as well as The Canyons Retirement Community.