**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | CASE NO. 14-32821-11 |
| | § | |
| **SEARS METHODIST RETIREMENT** | § | CHAPTER 11 |
| **SYSTEM, INC.,** *et al*.[1] | § | |
| | § | Jointly Administered |
| Debtors. | § | |

**DISCLOSURE STATEMENT FOR PLAN DEBTORS' JOINT PLAN OF**
<u>**REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**</u>

Vincent P. Slusher, State Bar No. 00785480
vincent.slusher@dlapiper.com
Andrew Zollinger, State Bar No. 24063944
andrew.zollinger@dlapiper.com
DLA Piper LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201-4629
Telephone: (214) 743-4500
Facsimile: (214) 743-4545

Thomas R. Califano (admitted *pro hac vice*)
thomas.califano@dlapiper.com
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Tel:  (212) 335-4500
Fax:  (212) 335-4501

*Attorneys for the Debtors and*
*Debtors in Possession*

Dated: December 6, 2014

---

[1] The debtors in these chapter 11 cases, along with the last four (4) digits of their taxpayer identification numbers, are: Sears Methodist Retirement System, Inc. (6330), Canyons Senior Living, L.P. (8545), Odessa Methodist Housing, Inc. (9569), Sears Brazos Retirement Corporation (8053), Sears Caprock Retirement Corporation (9581), Sears Methodist Centers, Inc. (4917), Sears Methodist Foundation (2545), Sears Panhandle Retirement Corporation (3233), Sears Permian Retirement Corporation (7608), Sears Plains Retirement Corporation (8233), Sears Tyler Methodist Retirement Corporation (0571) and Senior Dimensions, Inc. (4016).  The mailing address of each of the debtors, solely for purposes of notices and communications, is 2100 Ross Avenue, 21st Floor, c/o Paul Rundell, Dallas, Texas 75201.

# TABLE OF CONTENTS

**Page**

I.     **INTRODUCTION** ................................................................................. 3

    A.     Overview of Chapter 11 and the Plan Confirmation Process ............................... 4

    B.     Recommendation of the Plan Debtors and Plan Overview.................................. 5

    C.     Summary of Classification and Treatment of Claims Under the Plan.................. 6

    D.     Summary of Voting Requirements for Plan Confirmation ................................. 10

II.     **BACKGROUND INFORMATION** ............................................................ 13

    A.     Overview of the Debtors' Businesses ............................................................... 13

    B.     Organizational Structure of the Debtors ........................................................... 15

    C.     Regulatory Agencies ........................................................................................ 23

    D.     Leasehold Obligations ...................................................................................... 23

    E.     Life Care Services LLC .................................................................................... 24

    F.     The Debtors' Prepetition Capital Structure...................................................... 24

    G.     Events Leading to the Chapter 11 Cases.......................................................... 31

III.     **EVENTS OCCURRING DURING DEBTORS' CHAPTER 11 CASES** ................. 31

    A.     Bankruptcy Filings and First Day Orders ......................................................... 31

    B.     Escrow of EDs .................................................................................................. 32

    C.     Schedules and Statements .................................................................................. 32

    D.     Retention and Employment of Ordinary Course Professionals .......................... 32

    E.     Retention and Employment of Bankruptcy Professionals ................................. 32

    F.     Cash Collateral .................................................................................................. 33

    G.     DIP Financing ................................................................................................... 33

    H.     Appointment of Creditors' Committee .............................................................. 34

    I.     Appointment of Patient Care Ombudsman ........................................................ 34

    J.     Prudential Stay Relief ....................................................................................... 34

    K.     Interim Compensation and Expense Reimbursement .......................................... 35

    L.     Approval of Exclusivity and Expense Reimbursement Provisions of BRS
    Letter of Intent ................................................................................................. 35

    M.     Exclusivity Extension ....................................................................................... 36

    N.     Assumption and Assignment of TTU Lease ...................................................... 36

    O.     Non-Plan Debtors.............................................................................................. 36

IV.     **THE CHAPTER 11 PLAN** ...................................................................... 36

    A.     Treatment of Claims and Interests Under the Plan ............................................. 36

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| B. | Means for Implementation of the Plan | 57 |
| C. | Acceptance or Rejection of the Plan | 73 |
| D. | Distributions | 74 |
| E. | Procedures for Disputed Claims | 78 |
| F. | Executory Contracts and Unexpired Leases | 80 |
| G. | Conditions Precedent to Confirmation and the Effective Date | 82 |
| H. | Effect of Confirmation | 83 |
| I. | Modification, Revocation or Withdrawal of the Plan | 89 |
| J. | Retention of Jurisdiction | 90 |
| K. | Miscellaneous Provisions | 92 |
| **V.** | **RISK FACTORS IN CONNECTION WITH THE PLAN** | **95** |
| A. | Bankruptcy Considerations | 96 |
| B. | Risks Related to Sales | 97 |
| C. | No Duty to Update Disclosures | 97 |
| D. | Representations Outside this Disclosure Statement | 97 |
| E. | No Admission | 97 |
| F. | Tax and Other Related Considerations | 97 |
| **VI.** | **PLAN CONFIRMATION AND CONSUMMATION** | **98** |
| A. | The Confirmation Hearing | 98 |
| B. | Plan Confirmation Requirements Under the Bankruptcy Code | 98 |
| **VII.** | **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** | **102** |
| A. | Chapter 7 Liquidation | 102 |
| B. | Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code | 102 |
| C. | Dismissal of the Plan Debtors' Chapter 11 Cases | 102 |
| **VIII.** | **CERTAIN FEDERAL TAX CONSEQUENCES** | **103** |
| A. | General | 103 |
| B. | U.S. Federal Income Tax Consequences to the Plan Debtors | 104 |
| C. | U.S. Federal Income Tax Treatment With Respect to the Liquidating Trust | 104 |
| D. | U.S. Federal Income Tax Treatment With Respect to Holders of Allowed Claims that are Beneficiaries of the Liquidating Trust | 106 |
| **IX.** | **RECOMMENDATION AND CONCLUSION** | **108** |

## EXHIBITS

Exhibit 1        Plan Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code, dated December 6, 2014

Exhibit 2        Organizational Chart of the System

Exhibit 3        Liquidation Analyses

## DISCLAIMER

IF YOU ARE ENTITLED TO VOTE TO APPROVE THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR COPY OF THIS DISCLOSURE STATEMENT. THE PLAN DEBTORS URGE YOU TO VOTE TO ACCEPT THE PLAN.

EACH HOLDER OF A CLAIM AGAINST THE PLAN DEBTORS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND BANKRUPTCY CODE SECTION 1125. NO HOLDER OF A CLAIM SHOULD RELY ON ANY INFORMATION RELATING TO THE PLAN DEBTORS, THEIR PROPERTY OR THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE ATTACHED EXHIBITS.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE PLAN. NO SOLICITATIONS FOR OR AGAINST THE PLAN MAY BE MADE EXCEPT THROUGH THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN. ALTHOUGH THE PLAN DEBTORS BELIEVE AND HAVE MADE EVERY EFFORT TO ENSURE THAT THIS SUMMARY PROVIDES ADEQUATE INFORMATION WITH RESPECT TO THE PLAN, IT DOES NOT PURPORT TO BE COMPLETE AND IS QUALIFIED TO THE EXTENT IT DOES NOT SET FORTH THE ENTIRE TEXT OF THE PLAN. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN AND THE SUMMARY OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL. ACCORDINGLY, EACH HOLDER OF A CLAIM SHOULD REVIEW THE PLAN IN ITS ENTIRETY.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016 AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER APPLICABLE NONBANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST THE PLAN DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OF THE PLAN DEBTORS AS TO HOLDERS OF CLAIMS AGAINST THE PLAN DEBTORS.

IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE PLAN DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. NEITHER THIS DISCLOSURE STATEMENT NOR THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.

ALL OF THE PROJECTED RECOVERIES TO CREDITORS ARE BASED UPON THE ANALYSES PERFORMED BY THE PLAN DEBTORS AND THEIR PROFESSIONALS. ALTHOUGH THE PLAN DEBTORS HAVE MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN AND IN THE EXHIBITS ATTACHED HERETO, THE PLAN DEBTORS CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE INFORMATION.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER BUT RATHER AS THE PLAN DEBTORS' STATEMENT OF THE STATUS OF THE RESPECTIVE MATTER.

THE PLAN DEBTORS RECOMMEND THAT CREDITORS SUPPORT AND VOTE TO ACCEPT THE PLAN. IT IS THE OPINION OF THE PLAN DEBTORS THAT THE TREATMENT OF CREDITORS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE PLAN DEBTORS. ACCORDINGLY, THE PLAN DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS.

# I.    INTRODUCTION

On June 10, 2014 (the "***Petition Date***"), Sears Methodist Retirement System, Inc. ("***SMRS***"), Sears Brazos Retirement Corporation ("***Brazos***") Canyons Senior Living, L.P. ("***CSL***"), Odessa Methodist Housing, Inc. ("***OMH***"), Sears Caprock Retirement Corporation ("***Caprock***"), Sears Methodist Centers, Inc. ("***SMC***"), Sears Methodist Foundation ("***SMF***"), Sears Panhandle Retirement Corporation ("***Panhandle***"), Sears Permian Retirement Corporation ("***Permian***"), Sears Plains Retirement Corporation ("***Plains***"), Sears Tyler Methodist Retirement Corporation ("***Tyler***") and Senior Dimensions, Inc. ("***SDI***", and collectively with SMRS, Brazos, CSL, OMH, Caprock, SMC, SMF, Panhandle, Permian, Plains and Tyler, the "***Debtors***") each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, as now in effect or as hereafter amended (the "***Bankruptcy Code***").

SMRS, Caprock, SMC, SMF, Panhandle, Permian, Plains, Tyler and SDI (collectively, the "***Plan Debtors***"), submit this disclosure statement (the "***Disclosure Statement***"), pursuant to section 1125 of the Bankruptcy Code, and rule 3017 of the Federal Rules of Bankruptcy Procedure, as now in effect or as hereafter amended (the "***Bankruptcy Rules***"), in connection with the solicitation of votes on their proposed *Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*, dated as of December 6, 2014 (the "***Plan***")[2] and attached hereto as **Exhibit 1**.  The remaining Debtors, namely Brazos, Canyons and OMH, do not join in the submission of this Disclosure Statement or the Plan as their Chapter 11 Cases will be dismissed outside of the Plan for reasons set forth herein.  The Plan Debtors believe that confirmation and implementation of the Plan is in the best interests of the Plan Debtors' Estates, Creditors and all other interested parties.

This Disclosure Statement and the other documents described herein are being furnished by the Plan Debtors to Creditors in the Plan Debtors' Chapter 11 Cases pending before the United States Bankruptcy Court for the Northern District of Texas (the "***Bankruptcy Court***"). This Disclosure Statement is intended to provide adequate information of a kind, and in sufficient detail, to enable the Plan Debtors' Creditors to make an informed judgment about the Plan, including whether to accept or reject the Plan.  This Disclosure Statement sets forth certain information regarding (i) the Plan Debtors' prepetition operating and financial history; (ii) the Plan Debtors' need to file for relief under chapter 11 of the Bankruptcy Code; (iii) significant events that have occurred during the Plan Debtors' Chapter 11 Cases; (iv) the terms of the Plan; (v) the manner in which distributions will be made under the Plan; (vi) certain effects of confirmation of the Plan; (vii) certain risk factors associated with the Plan; and (viii) the confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

---

[2] As used in this Disclosure Statement, terms defined in the Plan annexed hereto and not otherwise specifically defined herein will have the meanings attributed to them in the Plan.  Each definition in this Disclosure Statement and in the Plan includes both the singular and plural.  Headings are for convenience or reference and shall not affect the meaning or interpretation of this Disclosure Statement.

This Disclosure Statement is subject to the Bankruptcy Court's approval, as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of each of the Classes whose votes are being solicited to make an informed judgment with respect to the Plan. **THE BANKRUPTCY COURT'S CONDITIONAL APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION WITH RESPECT TO THE MERITS OF THE PLAN. ALL CREDITORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN.**

The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. To the extent that the information provided in this Disclosure Statement and the Plan (including any Plan Supplements) conflict, the terms of the Plan (including any Plan Supplements) will control.

### A. Overview of Chapter 11 and the Plan Confirmation Process.

Chapter 11 of the Bankruptcy Code allows debtors to reorganize or to liquidate and wind up their affairs for the benefit of the debtors and their creditors. Upon the commencement of the case, an estate is created comprised of all the legal and equitable interests of the debtors as of the date the petition is filed, which typically remains in control of the debtor as a debtor-in possession. During these Chapter 11 Cases, the Plan Debtors remained in possession of their property and continue to operate their businesses without the oversight of a trustee.

Pursuant to section 362 of the Bankruptcy Code, the filing of a chapter 11 petition imposes an automatic stay of all attempts by creditors or third-parties to collect or enforce prepetition claims from the debtor or otherwise interfere with its property or business, unless modified by an order of the Bankruptcy court.

The Bankruptcy Code is designed to encourage the parties-in-interest in a chapter 11 proceeding to negotiate the terms of a chapter 11 plan so that it may be confirmed. A chapter 11 plan is the vehicle for satisfying or otherwise addressing the claims against and the interests in the debtor. Confirmation of a chapter 11 plan makes it binding on the debtors and all of its creditors and the prior obligations owed by the debtors to such parties are compromised in exchange for the obligations specified in the plan.

After a chapter 11 plan has been filed, the holders of impaired claims against the debtors are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtors to file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical, reasonable investor to make an informed judgment about the plan. This Disclosure Statement is presented to holders of Claims against the Plan Debtors entitled to vote under section 1125 of the Bankruptcy Code in connection with the Plan Debtors' solicitation of votes on the Plan.

4

### B. Recommendation of the Plan Debtors and Plan Overview.

The Plan Debtors believe that the Plan, which provides for, among other things, the orderly sale of substantially all of the Plan Debtors' Assets and the creation of a liquidating trust for the benefit of the Plan Debtors' unsecured Creditors, will allow for a prompt resolution of the Plan Debtors' Chapter 11 Cases and will achieve the best possible result for Creditors and other interested parties. The following is a brief overview of the Plan and is qualified by reference to the Plan itself.

Since the commencement of the Chapter 11 Cases, the Debtors and their Professionals have been actively considering and pursuing potential strategic transactions and/or standalone restructuring alternatives in an effort to achieve the best possible result for their stakeholders. To this end, on July 17, 2014, the Debtors retained RBC Capital Markets, LLC ("*RBC*") as their investment banker to, among other things, solicit offers for a sale of all or substantially all of the Debtors' Assets, an affiliation transaction or a restructuring of all or a portion of the Debtors' indebtedness. After consultation with the Debtors' Professionals to identify the most likely candidates to purchase the Debtors' Assets and/or to affiliate with the Debtors, RBC began contacting potential buyers and partners. To date, RBC has contacted over 500 parties, including strategic for-profit and not-for-profit investors, real estate and private equity investors, and real estate investment trusts. Of those contacted, over eighty (80) parties signed confidentiality agreements and received additional information from RBC regarding the Debtors' businesses and Assets.

In September 2014, the Debtors explored the possibility of a stand-alone restructuring or an affiliation with another not-for-profit entity. When these options were no longer viable, the Debtors, with the input of significant creditor constituents, concluded that the possibility of a restructuring and retention of their core Assets would be difficult, if not impossible, due to the Debtors' significant cash needs. Moreover, each of the Debtors' Facilities require significant capital improvements in addition to debt relief in order to make them viable. Accordingly, the Debtors determined that sales to third parties who agreed to preserve the rights and interests of residents while paying market value for the Debtors' Assets was the most prudent course of action. To that end, as described in more detail in section IV(B) herein, the Obligated Group Sellers, Tyler, Caprock and Plains have entered into asset purchase and sale agreements ("*APAs*"), pursuant to which they have agreed to sell substantially all of their Assets (collectively, the "*Sales*"), including those Assets related to the following Facilities: Parks, Wesley Court, Craig, Meadow Lake, Mesa Springs and Garrison. The APAs further provide that all Residency Agreements at the foregoing Facilities will be assumed and assigned to the respective buyers and all obligations thereunder will be honored.

In order to ensure that maximum value is received for their businesses and Assets, the Plan Debtors have conducted or are currently in the process of conducting an open-market bidding process in which qualified bidders can submit higher or otherwise better offers on all or a portion of the Plan Debtors' Assets. At the conclusion of the bidding process, the Plan Debtors will seek Bankruptcy Court approval to close on the Sales with the parties submitting the highest or best offers for the Plan Debtors' businesses and Assets.

As described in more detail herein, the Plan contemplates that Holders of certain Secured Claims will receive their Pro Rata share of the Net Sale Proceeds of the Assets which secure their Claims that are sold to third parties and certain other Assets in which they have a security interest.   The Plan Debtors' Causes of Action and all other unencumbered Assets (collectively, the "***Liquidating Trust Assets***") will be transferred to a Liquidating Trust for the benefit of the Plan Debtors' unsecured creditors.  The Liquidating Trust is to be managed by a Liquidating Trustee who will be responsible for liquidating the Liquidating Trust Assets and making Distributions to Holders of Allowed Claims as well as all other administrative tasks necessary for the ultimate resolution of the Chapter 11 Cases in accordance with the terms of the Plan and the Liquidating Trust Agreement.

### C.    Summary of Classification and Treatment of Claims Under the Plan.

A brief summary of the Classes established under the Plan, including the treatment and voting rights of each Class, is set forth below.  A complete description of the treatment of each class is set forth in Section 4 of the Plan and Section IV of this Disclosure Statement.  Parties should refer to those sections for a complete description of the proposed treatment for each class.

### 1.    SMRS.

| Class | Claims & Interest | Status | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Paid in Full | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | Paid in Full | No (deemed to accept) | 100% |
| 3 | Obligated Group Bond Claims | Impaired | Pro Rata Share of Net Sale Proceeds from Obligated Group Sale and Obligated Group Encumbered Excluded Assets | Yes | 33-39% |
| 4 | Other Secured Claims | Impaired | Proceeds from sale of Collateral | Yes | TBD |
| 5 | Deficiency Claims | Impaired | Pro Rata Share of Liquidating Trust Distributable Cash | Yes | TBD |
| 6 | General Unsecured Claims | Impaired | Pro Rata Share of Liquidating Trust Distributable Cash | Yes | TBD |

EAST\86228047.5

### 2. Panhandle.

| Class | Claims & Interest | Status | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Paid in Full | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | Paid in Full | No (deemed to accept) | 100% |
| 3 | Obligated Group Bond Claims | Impaired | Pro Rata Share of Net Sale Proceeds from Obligated Group Sale and Obligated Group Encumbered Excluded Assets | Yes | 33-39% |
| 4 | Entrance Deposit Refund Claims | Unimpaired | Assigned to Obligated Group Successful Bidder | No (deemed to accept) | -- |
| 5 | Deficiency Claims | Impaired | Pro Rata Share of Liquidating Trust Distributable Cash | Yes | TBD |
| 6 | General Unsecured Claims | Impaired | Pro Rata Share of Liquidating Trust Distributable Cash | Yes | TBD |
| 7 | Interests in Panhandle | Impaired | No Distribution | No (deemed to reject) | 0% |

### 3. Permian.

| Class | Claims & Interest | Status | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Paid in Full | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | Paid in Full | No (deemed to accept) | 100% |
| 3 | Obligated Group Bond Claims | Impaired | Pro Rata Share of Net Sale Proceeds from Obligated Group Sale and Obligated Group Encumbered Excluded Assets | Yes | 33-39% |
| 4 | Entrance Deposit Refund Claims | Unimpaired | Assigned to Obligated Group Successful Bidder | No (deemed to accept) | -- |
| 5 | Deficiency Claims | Impaired | Pro Rata Share of Liquidating Trust Distributable Cash | Yes | TBD |
| 6 | General Unsecured Claims | Impaired | Pro Rata Share of Liquidating Trust Distributable Cash | Yes | TBD |
| 7 | Interests in Permian | Impaired | No Distribution | No (deemed to reject) | 0% |

### 4. SMC.

| Class | Claims & Interest | Status | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Paid in Full | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | Paid in Full | No (deemed to accept) | 100% |
| 3 | Obligated Group Bond Claims | Impaired | Pro Rata Share of Net Sale Proceeds from Obligated Group Sale and Obligated Group Encumbered Excluded Assets | Yes | 33-39% |
| 4 | Entrance Deposit Refund Claims | Unimpaired | Assigned to Obligated Group Successful Bidder | No (deemed to accept) | -- |
| 5 | Deficiency Claims | Impaired | Pro Rata Share of Liquidating Trust Distributable Cash | Yes | TBD |
| 6 | General Unsecured Claims | Impaired | Pro Rata Share of Liquidating Trust Distributable Cash | Yes | TBD |
| 7 | Interests in SMC | Impaired | No Distribution | No (deemed to reject) | 0% |

### 5. SMF.

| Class | Claims & Interest | Status | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Paid in Full | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | Paid in Full | No (deemed to accept) | 100% |
| 3 | Obligated Group Bond Claims | Impaired | Pro Rata Share of Net Sale Proceeds from Obligated Group Sale and Obligated Group Encumbered Excluded Assets | Yes | 33-39% |
| 4 | Deficiency Claims | Impaired | Pro Rata Share of Liquidating Trust Distributable Cash | Yes | TBD |
| 5 | General Unsecured Claims | Impaired | Pro Rata Share of Liquidating Trust Distributable Cash | Yes | TBD |
| 6 | Interests in SMF | Impaired | No Distribution | No (deemed to reject) | 0% |

### 6. Tyler.

| Class | Claims & Interest | Status | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Paid in Full | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | Paid in Full | No (deemed to accept) | 100% |
| 3 | Tyler Bond Claims | Impaired | Pro Rata Share of Net Sale Proceeds from Tyler Sale and Tyler Encumbered Excluded Assets | Yes | 36-42% |
| 4 | Other Secured Claims | Unimpaired | Assigned to Tyler Successful Bidder | No (deemed to accept) | -- |
| 5 | Entrance Deposit Refund Claims | Unimpaired | Assigned to Tyler Successful Bidder | No (deemed to accept) | -- |
| 6 | Deficiency Claims | Impaired | Pro Rata Share of Liquidating Trust Distributable Cash | Yes | TBD |
| 7 | General Unsecured Claims | Impaired | Pro Rata Share of Liquidating Trust Distributable Cash | Yes | TBD |
| 8 | Interests in Tyler | Impaired | No Distribution | No (deemed to reject) | 0% |

### 7. Caprock.

| Class | Claims & Interest | Status | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Paid in Full | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | Paid in Full | No (deemed to accept) | 100% |
| 3 | Caprock Secured Loan Claim | Impaired | Net Sale Proceeds from Caprock Sale and Caprock Encumbered Excluded Assets | Yes | 57-64% |
| 4 | Entrance Deposit Refund Claims | Unimpaired | Assigned to Successful Caprock Bidder | No (deemed to accept) | -- |
| 5 | Deficiency Claims | Impaired | Pro Rata Share of Liquidating Trust Distributable Cash | Yes | TBD |
| 6 | General Unsecured Claims | Impaired | Pro Rata Share of Liquidating Trust Distributable Cash | Yes | TBD |
| 7 | Interests in Caprock | Impaired | No Distribution | No (deemed to reject) | 0% |

EAST\86228047.5

### 8.    Plains.

| Class | Claims & Interest | Status | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------------|--------|-----------|------------------|--------------------|
| 1 | Other Priority Claims | Unimpaired | Paid in Full | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | Paid in Full | No (deemed to accept) | 100% |
| 3 | Plains Secured Loan Claim | Impaired | Net Sale Proceeds From Plains Sale and Plains Encumbered Excluded Assets | Yes | 58-65% |
| 4 | Deficiency Claims | Impaired | Pro Rata Share of Liquidating Trust Distributable Cash | Yes | TBD |
| 5 | General Unsecured Claims | Impaired | Pro Rata Share of Liquidating Trust Distributable Cash | Yes | TBD |
| 6 | Interests in Plains | Impaired | No Distribution | No (deemed to reject) | 0% |

### 9.    SDI

| Class | Claims & Interest | Status | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------------|--------|-----------|------------------|--------------------|
| 1 | Other Priority Claims | Unimpaired | Paid in Full | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | Paid in Full | No (deemed to accept) | 100% |
| 3 | Other Secured Claims | Unimpaired | Assigned to New Operator | No (deemed to accept) | -- |
| 4 | General Unsecured Claims | Impaired | Pro Rata Share of Liquidating Trust Distributable Cash | Yes | TBD |
| 5 | Interests in SDI | Impaired | No Distribution | No (deemed to reject) | 0% |

### D.    Summary of Voting Requirements for Plan Confirmation.

### 1.    In General.

Creditors should refer only to this Disclosure Statement and the Plan to determine whether to vote to accept or reject the Plan.  Under the Bankruptcy Code, only Holders of Claims that are "impaired" are entitled to vote to accept or reject the Plan.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof; or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.  An impaired class of creditors votes to

10

accept a plan if the holders of at least two-thirds (2/3) in dollar amount, and more than one-half (1/2) in number, of those creditors that actually cast ballots vote to accept such plan. Those classes that are not impaired are not entitled to vote and deemed to accept a plan. Those classes that are not entitled to a distribution nor will they retain property under a plan are deemed to reject a plan.

A class of interest holders is deemed to accept a plan if the holders of at least two-thirds (2/3) in amount of those interest holders that actually cast ballots vote to accept such plan. A class of interest holders are impaired, not entitled to vote, and deemed to reject the plan if the plan treats such holders by providing that they will retain no property and receive no distributions under the plan.

Any Claim in an Impaired Class that is subject to a pending objection or is scheduled as unliquidated, disputed or contingent is not entitled to vote unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing the Claim for the purpose of voting on the Plan.

Pursuant to the Bankruptcy Code, only creditors who actually vote on the Plan will be counted for purposes of determining whether the required number of acceptances have been obtained. Failure to deliver a *properly completed ballot* by the Voting Deadline (as defined herein) will result in an abstention, consequently, the vote will neither be counted as an acceptance or rejection of the Plan.

### 2. Impaired Classes Entitled to Vote.

The Claims in the following Classes are Impaired under the Plan and holders of such Claims in these Classes are entitled to vote to accept or reject the Plan:

| Plan Debtor | Impaired Classes Entitled to Vote |
|---|---|
| SMRS | 3, 4, 5 and 6 |
| Panhandle | 3, 5 and 6 |
| Permian | 3, 5 and 6 |
| SMC | 3, 5 and 6 |
| SMF | 3, 4 and 5 |
| Tyler | 3, 6 and 7 |
| Caprock | 3, 5 and 6 |
| Plains | 3, 4 and 5 |
| SDI | 4 |

### 3.    Unimpaired Classes Deemed to Accept the Plan.

Under Bankruptcy Code section 1126(f), the following Classes are not Unimpaired, are deemed to have accepted the Plan and the vote of holders of such Claims in these Classes will not be solicited.

| Plan Debtor | Unimpaired Classes Deemed to Accept Plan |
|---|---|
| SMRS | 1 and 2 |
| Panhandle | 1, 2 and 4 |
| Permian | 1, 2 and 4 |
| SMC | 1, 2 and 4 |
| SMF | 1 and 2 |
| Tyler | 1, 2, 4 and 5 |
| Caprock | 1, 2 and 4 |
| Plains | 1 and 2 |
| SDI | 1, 2 and 3 |

### 4.    Certain Classes Are Deemed to Reject the Plan and Do Not Vote.

Under Bankruptcy Code section 1126(g), the following Classes will receive no distributions and are deemed to have rejected the Plan.  The vote of holders of such Interests in these Classes will not be solicited.

| Plan Debtor | Impaired Classes Deemed to Reject Plan |
|---|---|
| SMRS | None |
| Panhandle | 7 |
| Permian | 7 |
| SMC | 7 |
| SMF | 6 |
| Tyler | 8 |
| Caprock | 7 |
| Plains | 6 |
| SDI | 5 |

### 5.    Voting Deadline.

The Plan Debtors have engaged GCG, Inc. as their voting agent (the "*Voting Agent*") to assist in the transmission of voting materials and tabulation of votes with respect to the Plan.  If a Creditor holds a Claim classified in a voting Class of Claims under the Plan, the Creditor's acceptance or rejection of the Plan is important and must be in writing and filed on time.  The record date for determining which Creditors may vote on the Plan is December [31], 2014 (the "*Voting Record Date*").  The voting deadline is January [•], 2015 at 4:00 p.m. (prevailing Central Time) (the "*Voting Deadline*").

### 6. Voting Instructions.

IN ORDER FOR A VOTE TO BE COUNTED, THE BALLOT MUST BE PROPERLY COMPLETED IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RETURNED (I) TO THE RESPECTIVE NOMINEES IN SUFFICIENT TIME TO ENABLE THE RESPECTIVE NOMINEES TO COMPLETE THE MASTER BALLOT AND DELIVER IT TO THE VOTING AGENT BY THE VOTING DEADLINE OR (II) TO THE VOTING AGENT BY THE VOTING DEADLINE, AS EACH IS APPLICABLE.

### 7. Ballots.

Creditors must use only the Ballot or Ballots sent to them with this Disclosure Statement.  If a Creditor has Claims in more than one Class, it should receive multiple Ballots.  IF A CREDITOR RECEIVES MORE THAN ONE BALLOT THE CREDITOR SHOULD ASSUME THAT EACH BALLOT IS FOR A SEPARATE CLAIM AND SHOULD COMPLETE AND RETURN ALL OF THEM.

### 8. Additional Information.

If you have any questions about (i) the procedure for voting on your Claim, (ii) the package of materials that you have received, (iii) the amount of your Claim, (iv) obtaining or replacing a ballot, or (v) obtaining an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Voting Agent at:

| If by first class mail: | If by hand delivery or overnight mail: |
|---|---|
| SMR Case Administration | SMR Case Administration |
| c/o GCG, Inc. | c/o GCG, Inc. |
| P.O. BOX 10078 | 5151 Blazer Parkway, Suite A |
| Dublin, OH 43017-6678 | Dublin, OH 43017-6678 |
| Telephone: (844) 322-8219 | Telephone: (844) 322-8219 |
| Email: SMRInfo@gcginc.com | Email: SMRInfo@gcginc.com |

## II. BACKGROUND INFORMATION

### A. Overview of the Debtors' Businesses.

The Debtors, affiliated non-profit corporations, are leaders in the senior living industry in the State of Texas and built and maintained a successful business for almost fifty (50) years.  The Sears Methodist Retirement System (the "*System*"), which includes the Debtors, Sears Methodist Senior Housing, LLC ("*SMSH*"), Texas Senior Management, Inc. ("*TSM*"), Senior Living Assurance, Inc. ("*SLA*") and Southwest Assurance Company, Ltd. ("*SWAC*"), is controlled, either directly or indirectly, by SMRS.  An organizational chart of the System is attached hereto as **Exhibit 2**.  The System includes: (i) eight senior living communities located in Abilene, Amarillo, Lubbock, Odessa and Tyler, Texas (the "*SMRS-Controlled Communities*"); (ii) three veterans homes located in El Paso, McAllen and Big Spring, Texas (the "*VLB Homes*" and together with the SMRS-Controlled Communities, the "*Facilities*"), managed by SDI

pursuant to contracts between SDI and the Veterans Land Board of Texas ("**VLB**"); and (iii) TSM, SLA and SWAC, which provide, as applicable, management and insurance services to the System. SMSH is the general partner of, and controls .01% of the interests in, CSL. In addition to controlling the various Debtor entities that own or operate the Facilities, SMRS provides management and oversight services to certain of the Facilities pursuant to a professional services agreement between SMRS and the relevant Debtor. Among other things, SMRS provides payroll, billing, strategic planning and employee benefit plan administration services. Additionally, the executive office of SMRS is responsible for overseeing residency contract templates, vendor contracting, licensing and regulatory filings, policies, corporate governance and compliance.

The SMRS-Controlled Communities, described in more detail below, are as follows: (i) Parks Methodist Retirement Village ("**Parks**"), a senior living facility located in Odessa, Texas and owned by Permian; (ii) Wesley Court Methodist Retirement Community ("**Wesley Court**"), a senior living facility located in Abilene, Texas and owned by SMC; (iii) Craig Methodist Retirement Community ("**Craig**"), a senior living facility located in Amarillo, Texas and owned by Panhandle; (iv) The Mildred and Shirley L. Garrison Geriatric Education and Care Center ("**Garrison**"), a geriatric learning center and nursing facility located in Lubbock, Texas on the campus of Texas Tech University ("**TTU**") and owned by Plains; (v) Meadow Lake Retirement Community ("**Meadow Lake**"), a senior living facility located in Tyler, Texas and owned by Tyler; (vi) Mesa Springs Retirement Village ("**Mesa Springs**"), a senior living facility located in Abilene, Texas and owned by Caprock; (vii) Desert Haven Retirement Community ("**Desert Haven**"), a low-income senior living facility located in Odessa, Texas and owned by OMH; and (viii) Canyons Retirement Community ("**Canyons**"), a senior living facility located in Amarillo, Texas and owned by CSL.

SDI operates the VLB Homes, which are owned by the State of Texas and are designed for veterans, pursuant to separate contracts between SDI and the VLB. The three VLB Homes are: (i) Alfredo Gonzalez Texas State Veterans Home ("**Alfredo Gonzalez**"), located in McAllen, Texas; (ii) Ambrosio Guillen Texas State Veterans Home ("**Ambrosio Guillen**"), located in El Paso, Texas; and (iii) Lamun Lusk Sanchez Texas State Veterans Home ("**Lamun Lusk Sanchez**"), located in Big Spring, Texas.

The Facilities offer seniors myriad residency options during their retirement years, providing affordable living accommodations, and in some cases related health care services, to a target market of middle-income seniors aged sixty-two (62) years and older. Each of the Facilities provides unmatched services and top of the line amenities. Specifically, the Facilities include dining experiences in well-appointed dining rooms, scenic Texas views, spacious floor plans, salons and spas, day excursions and housekeeping services. The Facilities also provide residents with multiple social outlets for all stages of their retirement living including, among other things, movie nights, live music, exercise classes and bible study.

Depending on the type of Facility, the Debtors receive revenue from several sources, which include: (i) daily rates; (ii) monthly fees; and (iii) entrance deposits ("**EDs**") from

those residents living in certain cottages, apartments or executive homes at Craig, Wesley Court, Parks, Meadow Lake, Mesa Springs and Garrison[3] (each, an "***ED Unit***"). Average daily rates, applicable at Garrison and the VLB Homes, range from $116 to $222. Monthly fees, applicable at all Facilities, range from $450 to $3,300. EDs range from $115,000 to $209,000. Monthly and daily fees cover operating expenses and capital costs, and do not include any health care benefits.

Generally speaking, residents living in an ED Unit enter into a personal and non-assignable residency agreement, pursuant to which ninety percent (90%) of such resident's ED is refunded upon certain circumstances (a "***90% Refundable Agreement***"). The ten percent (10%) non-refundable portion of the ED is contributed to SMF and used for future benevolent care. Upon termination of a 90% Refundable Agreement, either by the resident, the Debtor, or by reason of death, the Debtor is required to refund 90% of the ED to residents or their estate within thirty (30) days of the resale of the ED Unit and receipt of a new ED from the prospective resident. All refunds are paid without interest.

In 2013, the Debtors collectively received approximately $14.8 million in Medicare payments and approximately $5.5 million in Medicaid payments.

**B.     Organizational Structure of the Debtors.**

**1.     Corporate Governance.**

SMRS is governed by a Board of Trustees. There is an Executive Committee of the Board of Trustees, which makes up the board of directors of each of the Debtors.

**2.     Obligated Group.**

The "***Obligated Group***," consisting of SMRS, SMC, Panhandle, Permian, Brazos and SMF, was created under that certain Master Trust Indenture (as amended and restated, the "***SMRS Master Indenture***"), dated as of August 1, 1998 and effective as of May 1, 2013, between the Obligated Group and Wells Fargo Bank, N.A., as successor Master Trustee (the "***Obligated Group Bond Trustee***"). The Obligated Group and any future members of the Obligated Group are jointly and severally liable for payment and performance under the approximately $95.5 million of notes executed in connection with the issuance of certain bonds (the "***Obligated Group Bonds***") under the SMRS Master Indenture (the "***Obligated Group Bond Debt***").

**a.     SMRS.**

SMRS is a non-profit corporation which was chartered under the laws of the State of Texas on December 21, 1993. The mailing address of SMRS is 2100 Ross Avenue, 21st Floor, Dallas, Texas 75201. SMRS has 48 employees: 13 are paid full-time hourly and 35 are full-time salaried employees.

---

[3] Only one unit at Garrison requires an ED.

As reflected in SMRS's financial statements dated as of September 30, 2014,[4] with the exception of the cash balance which is stated as of the week ending November 30, 2014, SMRS had approximately $37.3 million in assets and $106.5 million in liabilities. The fair market value of these assets was approximately $8.5 million. SMRS's main assets consist of: (i) approximately $5,000 in cash and cash equivalents[5]; and (ii) approximately $1.9 million in equipment and furnishings. SMRS's main liabilities are: (i) its joint and several liability for the Obligated Group Bond Debt; (ii) approximately $3.2 million loaned by Texas Methodist Foundation ("***TMF***") to SMRS (the "***TMF Loan***") in connection with the 2013 Restructuring, as described below; (iii) approximately $2.1 million in payables and accrued expenses; and (iv) reimbursement for any amounts drawn on that certain $1.5 million bank letter of credit (the "***Letter of Credit***"), issued by Life Care Services LLC ("***LCS***") for the benefit of TMF in connection with the TMF Loan. The Letter of Credit was drawn on June 23, 2014.

b. **Permian/Parks**.

Permian, a Texas non-profit corporation, is controlled by SMRS and its mailing address is 2100 Ross Avenue, 21st Floor, Dallas, Texas 75201. As described above, Permian owns Parks. Permian has 92 employees, including those who work at Desert Haven, which is located in the same town as Parks.

Parks is located in Odessa, Texas and offers independent living in 22 patio homes, 33 executive homes, 23 assisted living rooms and suites and 85 nursing beds. As of November 2014, Parks had 137 residents and an 84.0% (MTD) occupancy rate.

In June 2013, in connection with a joint venture between Permian, Prevarian Senior Living, L.P. ("***Prevarian***") and certain other entities (the "***Prevarian Transaction***"), a senior living facility called The Courtyards ("***The Courtyards***") opened adjacent to the Parks. The Courtyards offers 40 assisted living residences and 30 memory care homes in a single-story community. The System donated the land and Prevarian and the other limited partners incurred all other costs of construction, marketing, working capital, opening and maintenance of The Courtyards. The partnership pays the System a monthly fee to manage the day-to-day operations of The Courtyards. The System has a right of first refusal to purchase The Courtyards and the underlying land upon certain conditions being met.

---

[4] The financial information contained in this Disclosure Statement and the Debtors' Schedules does not purport to represent financial information prepared in accordance with Generally Accepted Accounting Principles ("***GAAP***") in the United States, nor is it intended to be fully reconciled with the financial statements of each of the Debtors. The financial information is unaudited and reflects the Debtors' reasonable efforts to report the assets and liabilities of each Debtor on an unconsolidated basis. The financial information provided herein may differ from the financial information in the *Declaration of Paul B. Rundell in Support of First Day Motions* [Docket No. 3] due to differences in valuation methods. Unless otherwise noted, values represent book value.

[5] SMRS's financial statements reflect additional cash in the approximate amount of $7 million. These funds, however, are not property of SMRS's Estate and are held by the Obligated Group Bond Trustee.

EAST\86228047.5

The Debtors assert that the Prevarian Transaction involving that certain agreement styled as a limited partnership agreement, dated March 14, 2012, between Permian, GP PAL Odessa, LLC, Sandcap Prevarian Investors I, LLC and PSL Investments, LLC, is in fact a financing and not a partnership. Permian may file an adversary proceeding against Prevarian seeking, among other things, a declaration that the Prevarian Transaction is a financing or come to an agreement with Prevarian regarding the formal classification of the Prevarian Transaction and the parties' respective rights related to The Courtyards. Permian will file the adversary proceeding to the extent it is determined that The Courtyards can provide value to the Permian Estate.

As reflected in Permian's financial statements dated as of September 30, 2014, Permian had approximately $6.7 million in assets and $5.3 million in liabilities, excluding its joint and several liability for the Obligated Group Bond Debt. Permian's main assets consist of: (i) approximately $1.3 million in accounts receivable; and (ii) approximately $10.1 million in land, property and equipment. Permian's main liabilities are: (i) its joint and several liability for the Obligated Group Bond Debt; (ii) approximately $962,000 in accounts payable; and (iii) approximately $3.8 million in contingent resident refund obligations which are expected to come due in the normal course.

In 2013, Permian received approximately $2.7 million in Medicare payments and approximately $1.2 million in Medicaid payments.

c.      **SMC/Wesley Court**.

SMC, a Texas non-profit corporation, is controlled by SMRS and its mailing address is 2100 Ross Avenue, 21st Floor, Dallas, Texas 75201. SMC has 97 employees. As described above, SMC owns Wesley Court.

Wesley Court is located in Abilene, Texas and offers independent living in 78 apartments and 49 executive homes, 19 assisted living rooms and suites and 30 nursing beds. As of November 2014, Wesley Court had 169 residents and a 95.6% (MTD) occupancy rate.

As reflected in SMC's financial statements dated as of September 30, 2014, SMC had approximately $29.5 million in assets and $14.2 million in liabilities, excluding its joint and several liability for the Obligated Group Bond Debt. SMC's main assets consist of: (i) approximately $50,000 in accounts receivable; and (ii) approximately $28.0 million in land, property and equipment. SMC's main liabilities are: (i) its joint and several liability for the Obligated Group Bond Debt; (ii) approximately $308,000 in accounts payable; and (iii) approximately $11.4 million in contingent resident refund obligations which are expected to come due in the normal course.

In 2013, SMC received approximately $317,416 in Medicare payments.

d.    **Panhandle/Craig**.

Panhandle, a Texas non-profit corporation, is controlled by SMRS and its mailing address is 2100 Ross Avenue, 21st Floor, Dallas, Texas 75201.  Panhandle has 191 employees. As described above, Panhandle owns Craig.

Craig is located in Amarillo, Texas and offers independent living in 108 apartments and 65 executive homes, 40 assisted living rooms and suites, and 106 nursing beds. As of November 2014, Craig had 281 residents and an 88.7% (MTD) occupancy rate.

As reflected in Panhandle's financial statements dated as of September 30, 2014, Panhandle had approximately $24.2 million in assets and $10.4 million in liabilities, excluding its joint and several liability for the Obligated Group Bond Debt.  Panhandle's main assets consist of: (i) approximately $821,100 in accounts receivable; and (ii) approximately $25.1 million in land, property and equipment.  Panhandle's main liabilities are: (i) its joint and several liability for the Obligated Group Bond Debt; (ii) approximately $627,000 in accounts payable; and (iii) approximately $8.6 million in contingent resident refund obligations which are expected to come due in the normal course.

In 2013, Panhandle received approximately $2.8 million in Medicare payments and approximately $1.7 million in Medicaid payments.

e.    **SMF**.

SMF, a Texas non-profit corporation, is controlled by SMRS and its mailing address is 2100 Ross Avenue, 21st Floor, Dallas, Texas 75201.  SMF has no employees.  SMF was formed for the purpose of managing and investing donor-restricted and board-designated investments for benevolent care and capital needs of the System, with the primary responsibility of generating contributions from donors and fundraising activities in the System's primary operating markets.

As reflected in SMF's financial statements dated as of September 30, 2014, SMF had approximately $14.3 million in assets and $187,000 in liabilities, excluding its joint and several liability for the Obligated Group Bond Debt.  SMF's main assets consist of: (i) certain real property located in Waco, Texas (the "*Waco Property*"); and (ii) approximately $3.5 million in Texas Methodist Foundation funds and $1.8 million in permanent endowment funds (the "*Restricted Assets*"), neither of which are available to fund the Plan.  The remaining assets consist of intercompany receivables which are not believed to have any value.  SMF's main liabilities are: (i) its joint and several liability for the Obligated Group Bond Debt; and (ii) approximately $126,000 in long-term charitable gift annuities payable and accounts payable.

f.    **Brazos**.

Brazos, a Texas non-profit corporation, is controlled by SMRS and its mailing address is 2100 Ross Avenue, 21st Floor, Dallas, Texas 75201.  Brazos has no employees. Brazos was incorporated in 2002 for the purpose of developing an Alzheimer's care facility in

18

Waco, Texas.  Brazos sold the Alzheimer's care facility in November 2011 and has no current operations.

As reflected in Brazos's Schedules filed on July 8, 2014, Brazos had approximately $0 in assets and $0 in liabilities, excluding its joint and several liability for the Obligated Group Bond Debt.

### 3.    Non-Obligated Group.

#### a.    Plains/Garrison.

Plains, a Texas non-profit corporation, is controlled by SMRS and its mailing address is 2100 Ross Avenue, 21st Floor, Dallas, Texas 75201.  Plains has 145 employees.  As described above, Plains owns Garrison.

Garrison is located on the campus of TTU in Lubbock, Texas and consists of 104 nursing beds and one executive home.  Garrison is also used as a training ground for students of the Texas Tech University Health Sciences Center.  There are no EDs required at Garrison.  As of November 2014, Garrison had 89 residents and a 83.4% (MTD) occupancy rate.

As reflected in Plains's financial statements dated as of September 30, 2014, with the exception of the cash balance which is stated as of the week ending November 30, 2014, Plains had approximately $12.3 million in assets and $10.6 million in liabilities.  Plains's main assets consist of:  (i) approximately $321,000 in cash and cash equivalents; (ii) approximately $516,000 in accounts receivable; and (iii) approximately $9.0 million in land, property and equipment.  Plains's main liabilities are: (i) approximately $8.1 million of bank loan debt (the "*Plains Loan*"), issued pursuant to that certain loan agreement (the "*Plains Loan Agreement*"), dated as of December 1, 2011, between Red River Health Facilities Development Corporation ("*Red River*"), Plains and Prosperity Bank, N.A. ("*Prosperity*"), as successor lender to American State Bank; and (ii) approximately $914,000 in accounts payable.  In addition, Plains is holding one ED in the amount of $287,549.52.

Beginning in 2012, a capital fundraising campaign was commenced to raise funds to construct a 2,000 to 3,000 square foot therapy wing at Garrison (hereinafter, the "*Garrison Expansion Project*").  From January 2013 to February 2014, the fundraising campaign for the Garrison Expansion Project generated contributions totaling approximately $832,057 (the "*Garrison Restricted Cash*").  Historically, funds received as a result of a specific capital fundraising campaign are "reserved" on the books of the Debtor on whose behalf the funds were solicited and deposited in a restricted account held by SMF.  In connection with the Garrison Expansion Project, however, the Garrison Restricted Cash was deposited into a Garrison operating account, and not a restricted SMF account.  Consequently, the Garrison Restricted Cash was commingled with non-restricted funds in the Garrison operating account (the "*Commingled Cash*").  In 2013, the Debtors faced certain operational and financial challenges and the Garrison Restricted Cash was used for purposes other than the Garrison Expansion Project.  Prosperity asserts a cash collateral claim to the Commingled Cash which may or may not be subject to Prosperity's security interest.  The Debtors reserve the right to take the position that the Commingled Cash is unencumbered.

19

In 2013, Plains received approximately $3.7 million in Medicare payments and approximately $1.6 million in Medicaid payments.

### b. Tyler/Meadow Lake.

Tyler, a Texas non-profit corporation, is controlled by SMRS and its mailing address is 2100 Ross Avenue, 21st Floor, Dallas, Texas 75201. Tyler has 123 employees. As described above, Tyler owns Meadow Lake.

Meadow Lake is located in Tyler, Texas and offers 35 executive homes, 20 assisted living apartments, 80 independent living apartments, 35 memory enhancement beds, and 30 nursing beds. As of November 2014, Meadow Lake had 161 residents and a 80.0% (MTD) occupancy rate.

As reflected in Tyler's financial statements dated as of September 30, 2014, with the exception of the cash balance which is stated as of the week ending November 30, 2014, Tyler had approximately $55.8 million in assets and $69.6 million in liabilities. Tyler's main assets consist of: (i) approximately $435,000 in cash and cash equivalents; (ii) approximately $300,000 in accounts receivable; and (iii) approximately $48.5 million in land, property and equipment. Tyler's main liabilities are: (i) approximately $43,050,000 in respect of the Tyler Bonds (as defined below) issued by HFDC of Central Texas, Inc. ("*HFDC*"); (ii) approximately $3.2 million in accrued interest payable; (iii) approximately $538,000 in accounts payable; and (iv) approximately $18.1 million in contingent refund obligations which are expected to come due in the normal course.

In 2013, Tyler received approximately $1.7 million in Medicare payments.

### c. Caprock/Mesa Springs.

Caprock, a Texas non-profit corporation, is controlled by SMRS with its corporate office located at One Village Drive, Suite 400, Abilene, Texas 79606. Caprock has 96 employees. As described above, Caprock owns Mesa Springs.

Mesa Springs is located in Abilene, Texas and offers 16 independent living executive homes, 34 independent living garden homes, and 10 independent living apartment homes. In addition, Caprock owns and operates The Mission at Mesa Springs, a healthcare center consisting of 75 semi-private and private skilled nursing beds. As of November 2014, Mesa Springs had 120 residents and an 86.5% (MTD) occupancy rate.

As reflected in Caprock's financial statements dated as of September 30, 2014, with the exception of the cash balance which is stated as of the week ending November 30, 2014, Caprock had approximately $9.2 million in assets and $12.2 million in liabilities. Caprock's main assets consist of: (i) approximately $206,000 in cash and cash equivalents; (ii) approximately $712,000 in accounts receivable; and (iii) approximately $8.1 million in land, property and equipment. Caprock's main liabilities are: (i) approximately $7.1 million of bank loan debt (the "*Caprock Loan*") issued pursuant to that certain Amended and Restated Reimbursement and Credit Agreement, dated as of May 20, 2013, between Caprock and

EAST\86228047.5

Santander Bank, N.A. ("***Santander***"), as successor administrative agent and lender to Sovereign Bank (the "***Caprock Loan Agreement***"); (ii) approximately $258,000 in accounts payable; and (iii) approximately $3.7 million in contingent refund obligations which are expected to come due in the normal course.

In 2013, Caprock received approximately $2.6 million in Medicare payments and approximately $1.1 million in Medicaid payments.

d.     **CSL/Canyons**.

CSL, a Texas limited partnership, is indirectly controlled by SMRS and its principal place of business is 1114 Lost Creek Boulevard, Suite 400, Austin, Texas 78746. SMSH is the general partner of, and controls .01% of the interests in, CSL. SDI is the limited partner of, and controls 99.99% percent of the interests in, CSL. SMRS is the sole member of SMSH and sole owner of SDI. CSL has 12 employees. As described above, CSL owns Canyons.

Canyons is located in Amarillo, Texas and consists of 109 independent living apartments. There are no EDs required at Canyons. As of August 2014, Canyons had 81 residents and an 85.0% (YTD) occupancy rate.

As reflected in CSL's financial statements dated as of September 30, 2014, CSL had approximately $12.5 million in assets and $11.9 million in liabilities. CSL's main assets consist of: (i) approximately $59,000 in cash and cash equivalents; (ii) approximately $13,000 in accounts receivable; and (iii) approximately $12.0 million in land, property and equipment. CSL's main liabilities are: (i) a loan of $3,637,300 (the "***Canyons HUD Loan***") pursuant to that certain Building Loan Agreement between CSL and Prudential Huntoon Paige Associates, Ltd. ("***Prudential***"), as lender; and (ii) approximately $170,000 in accounts payable.

e.     **OMH/Desert Haven**.

OMH, a Texas non-profit corporation, is controlled by SMRS and its mailing address is 2100 Ross Avenue, 21st Floor, Dallas, Texas 75201. As described above, OMH owns Desert Haven. Individuals that work at Desert Haven are employees of Permian, the owner of Parks (located in the same town as Desert Haven).

Desert Haven is located in Odessa, Texas and consists of 40 low-income apartments in Odessa, Texas subsidized by the United States Department of Housing and Urban Development ("***HUD***"). There are no EDs required at Desert Haven. As of November 2014, Desert Haven had 39 residents and a 97.5% (MTD) occupancy rate.

As reflected in OMH's financial statements dated as of September 30, 2014, with the exception of the cash balance which is stated as of the week ending November 30, 2014, OMH had approximately $1.2 million in assets and $2.0 in liabilities. OMH's main assets consist of: (i) approximately $38,000 in cash and cash equivalents; and (ii) approximately $1.1 million in land, property and equipment. OMH's main liabilities are approximately $13,000 in accounts payable.

21

       f.       **SDI/VLB Homes**.

SDI, a Texas corporation, is a wholly-owned subsidiary of SMRS and its mailing address is 2100 Ross Avenue, 21st Floor, Dallas, Texas 75201. SDI has 530 employees. As described above, SDI operates the VLB Homes pursuant to a separate Management and Operations Agreement between SDI and the VLB for each of Alfredo Gonzalez, Ambrosio Guillen and Lamun Lusk Sanchez.

Alfredo Gonzalez is located in McAllen, Texas and contains in excess of 100 beds dually certified by Medicaid and Medicare. As of November 2014, Alfredo Gonzalez had 160 units, 147 residents, and a 91.3% (MTD) occupancy rate.

Ambrosio Guillen is located in El Paso, Texas and contains in excess of 100 beds dually certified by Medicaid and Medicare. As of November 2014, Ambrosio Guillen had 160 units, 149 residents, and a 94.2% (MTD) occupancy rate.

Lamun Lusk Sanchez is located in Big Spring, Texas and contains in excess of 100 beds dually certified by Medicaid and Medicare. As of November 2014, Lamun Lusk Sanchez had 132 operational units, 124 residents, and an 95.6% (MTD) occupancy rate.

As reflected in SDI's financial statements dated as of September 30, 2014, with the exception of the cash balance which is stated as of the week ending November 30, 2014, SDI had approximately $7.3 million in assets and $8.4 million in liabilities. SDI's main assets consist of: (i) approximately $1.3 million in cash and cash equivalents; (ii) approximately $4.5 million in accounts receivable; and (iii) approximately $172,000 in property and equipment. SDI's main liabilities are approximately $1.6 million in accounts payable.

In 2013, SDI received approximately $940,621 in Medicare payments.

       **4.**       **Non-Debtors in the System.**

       a.       **SMSH**.

As previously discussed, SMSH is the general partner of, and controls .01% of the interests in, CSL.

       b.       **TSM**.

TSM is a for-profit Texas corporation formed in December 2010 to serve as the management company for System projects developed outside the non-profit corporations within the System. TSM manages The Courtyards.

       c.       **SWAC**.

SWAC is a wholly-owned subsidiary of the System domiciled in Grand Cayman. SWAC provides general and professional liability insurance for the System and its subsidiaries. SWAC is exempt from taxes on income and gains under Cayman Islands tax concession laws. Over the course of the next three years, the Debtors are entitled to certain refunds totaling

approximately $1,350,000 (the "**Refunds**").  The Refunds will be allocated to the Debtors' Estates in accordance the Shared Services Allocation.

d. **SLA**.

SLA is a wholly-owned subsidiary of the System domiciled in Grand Cayman. SLA was formed to provide administrative and risk management services to SWAC.  It manages the claims from the general and professional liability and employee liability insurance provided by SWAC.

**C.    Regulatory Agencies.**

The senior care industry is heavily regulated by federal and state authorities.  For example, the System is subject to different regulations concerning, among other things, financial disclosures and solvency.  Remedies for violating these regulations include, but are not limited to, temporary suspension of the Facility's license and increased oversight.  The regulatory agencies providing oversight to the Debtors are, among others, the Centers for Medicare & Medicaid Services ("**CMS**"), the Texas Health and Human Services Commission, the Texas Department of Aging and Disability Services ("**TDADS**") and the Office of the Attorney General of the State of Texas ("**AG**").

During the past several years, as a result of surveys and/or investigations by TDADS, certain matters have been referred to CMS and the AG with respect to the VLB Homes. In particular, after the Petition Date, the AG commenced two actions against SMRS and SDI (together, the "**AG Actions**") alleging that SMRS and SDI failed to satisfy certain standards of care applicable to nursing facilities at the VLB Homes.  Following the commencement of the AG Actions, SMRS and SDI have retained various professionals to assist in the development and implementation of policies that will improve the standard of care at the VLB Homes and have also reached a settlement with the AG that will resolve the AG Actions.

**D.    Leasehold Obligations.**

SMRS is the tenant under two office leases: (i) an 11,140 square foot office located at Century Plaza I Office Building, One Village Drive, Suite 400, Abilene, Texas (the "**Abilene Lease**"); and (ii) 2,855 square foot office located at 1114 Lost Creek Blvd., Suite 210, Austin, TX 78746 (the "**Austin Lease**").

The original Abilene Lease was entered into on May 16, 2002.  On December 17, 2009, SMRS extended the Abilene Lease for an additional thirty-six (36) months beginning on January 1, 2013.  The current expiration date of the Abilene Lease is December 31, 2015.  The lessor for the Abilene Lease is Design Growth Investments, Inc.

The Austin Lease, originally entered into July 22, 2009, was recently renewed for a period of seventy (70) months commencing on December 1, 2013 and expiring on September 30, 2019.  The lessors for the Austin Lease are Limestone Creek Properties, L.P. and Limestone Springs Properties, L.P.

23

Additionally, the land upon which Garrison sits is leased to Plains pursuant to that certain Ground Lease, effective as of August 1, 1999 (the "***TTU Lease***"), between TTU, as lessor, and Plains, as lessee.  The term of the TTU Lease is for a period of fifty (50) years with two ten (10) year extensions.  In the event Plains seeks to use the premises for a purpose other than the operation of a geriatric, long-term care facility and related ancillary uses, it must obtain the prior approval of TTU for such proposed use.  If Plains seeks to assign or otherwise transfer its interest in the TTU Lease to a third party other than an affiliate of Plains, TTU has a right of first refusal to elect to purchase Plains's leasehold interest.  As part of the Plains Sale described herein, Knight Health Holdings LLC, a Nevada limited liability company (referred to herein as the "***Plains Stalking Horse Bidder***") will assume the TTU Lease and related agreements.

E.    **Life Care Services LLC.**

Prior to the Petition Date, certain management functions related to the Facilities were provided by LCS, an unaffiliated third party, pursuant to separate management agreements entered into during April of 2013 between (i) LCS and the Obligated Group; and (ii) LCS, the Debtors other than the Obligated Group and SMSH (collectively, the "***LCS Management Agreements***").  Pursuant to the LCS Management Agreements, LCS, among other things, recommended and evaluated policies and procedures and made recommendations for the future operations of the Facilities.  Although the LCS Management Agreements provided for LCS to "manage the day-to-day operations of the Communities," the executive directors and on-site personnel remained employees of SMRS.  Therefore, LCS's role was not that of a day-to-day-manager, but rather that of a supervisor/consultant.  Indeed, billing, marketing and operating functions were provided by employees of SMRS, not LCS.  Additionally, pursuant to the LCS Management Agreements, LCS provided a Corporate Chief Executive Officer (the "***CCEO***"), who served as the chief executive of SMRS and was an employee of LCS.

During the term of the LCS Management Agreements, the relationship between the System and LCS became strained due to, among other things, LCS's performance under the LCS Management Agreements and the conflicted nature of the CCEO making major decisions of the System while at the same time being employed by LCS.  In or around March and April of 2014, the parties engaged in discussions regarding renegotiating the terms of the LCS Management Agreements.  In connection with such discussions, the CCEO was terminated.  On April 8, 2014, the System received written notice of termination of the LCS Management Agreements.

The Plan Debtors reserve their rights to assert any and all claims or causes of action arising out of or related to the LCS Management Agreements and LCS's termination thereof.

F.    **The Debtors' Prepetition Capital Structure.**

As of the Petition Date, the Debtors' total consolidated funded debt obligations were approximately $160 million and consisted of, among other things, bond debt of the Obligated Group and Tyler, bank loan debt of Plains, Caprock and Canyons and the TMF Loan.  The major components of the Debtors' prepetition debt structure and their prepetition debt obligations are described below.

1.      **The Obligated Group's Prepetition Capital Structure.**

a.      **Initial Bond Financing**.

Between 1998 and 2003, the Obligated Group secured permanent financing through a series of bond offerings by the Abilene Health Facilities Development Corporation ("***Abilene Health***") in the aggregate principal amount of approximately $73.1 million, consisting of $30,435,000 Series 1998A Abilene Health Facilities Development Corporation Bonds (the "***Series 1998A Bonds***"), $7,840,000 Series 1999 Abilene Health Facilities Development Corporation Bonds (the "***Series 1999 Bonds***") and $34,820,000 Series 2003A Abilene Health Facilities Development Corporation Bonds (the "***Series 2003A Bonds***" and together with the Series 1998A Bonds and Series 1999 Bonds, the "***Previously Issued Bonds***"). The Previously Issued Bonds mature on various dates, with the next maturity date being November 15, 2018.

b.      **2013 Restructuring**.

On May 9, 2013, a refinancing plan (the "***2013 Restructuring***") was completed for the Obligated Group. Following the refinancing plan, the Obligated Group emerged with $99.1 million of overall debt consisting of $95.6 million of bonds outstanding and $3.5 million in respect of the TMF Loan. As part of the refinancing plan, approximately $22.5 million of new money bonds were issued to help replace the $17.8 million of bank loans previously outstanding.

Specifically, pursuant to an Offer to Tender and Exchange, dated April 9, 2013 (the "***Offer***"), the holders of the Previously Issued Bonds were given the opportunity to tender their Previously Issued Bonds for Series 2013A Retirement Facility Revenue Bonds (the "***Series 2013A Bonds***") and Series 2013D Retirement Facility Revenue Bonds (the "***Series 2013D Bonds***" and together with the Series 2013A Bonds, the "***Exchange Bonds***") to be issued by Red River. As a result of the Offer, the principal amount of the Exchange Bonds to be issued in exchange for the Previously Issued Bonds was $69,130,000 (94.54% of the aggregate principal amount outstanding). The holders of $3,965,000 in aggregate outstanding principal amount of the Previously Issued Bonds chose not to tender their bonds (the "***Non-Exchanged Bonds***").

On May 9, 2013, pursuant to an Indenture of Trust, dated as of May 1, 2013 (the "***SMRS Bond Indenture***"), between Red River and the Obligated Group Bond Trustee, Red River issued (i) $69,130,000 in Exchange Bonds; (ii) $19,405,000 in Series 2013B Retirement Facility Revenue Bonds (the "***Series 2013B Bonds***"), (iii) $2,285,000 in Series 2013C Retirement Facility Revenue Bonds (the "***Series 2013C Bonds***" and together with the Series 2013B Bonds and the Series 2013D Bonds, the "***New Money Bonds***"), and (iv) $765,000 in Series 2013D Retirement Facility Revenue Bonds (collectively, the "***2013 Bonds***"). The Series 2013D Bonds were issued in part as New Money Bonds and in part as Exchange Bonds.

The proceeds of the New Money Bonds were loaned to SMRS pursuant to a Loan Agreement, dated as of May 1, 2013 (the "***SMRS Loan Agreement***"), between Red River and SMRS. SMRS used these loan proceeds and the TMF Loan, together with certain other monies, to, among other things, (a) finance and refinance a portion of the cost of certain System health facilities located in Abilene, Amarillo, Lubbock, Tyler, and Odessa, Texas; (b) fund a debt

service reserve fund to secure the 2013 Bonds; (c) satisfy the outstanding balance of a loan between SMRS and Capital One Bank, N.A.; and (d) pay the costs of issuing the 2013 Bonds.

The 2013 Bonds mature on various dates, with the first maturity date being November 15, 2046.

The New Money Bonds and the interest payable thereon are payable solely from and secured exclusively by the funds pledged thereto under the SMRS Bond Indenture, the payments to be made by SMRS pursuant to the SMRS Loan Agreement, and certain notes (the "*New Money Bond Notes*") issued by SMRS under the SMRS Master Indenture.

The New Money Bond Notes and other obligations of the Obligated Group under the SMRS Master Indenture are secured under the terms of three separate Deeds of Trust (each including a Security Agreement and Assignment of Rents and Leases) dated as of May 1, 2013 (collectively, the "*Deeds of Trust*"), between certain members of the Obligated Group and the Obligated Group Bond Trustee, and two separate Subordinate Deeds of Trust (each including a Security Agreement and Assignment of Rents and Leases) dated as of May 8, 2013 (collectively, the "*Subordinate Deeds of Trust*"), between certain members of the Obligated Group and the Obligated Group Bond Trustee. A promissory note evidencing the obligation of SMRS to repay the loan from Red River with respect to the Series 2013A Bonds (the "*Series 2013A Note*") and the notes securing the Previously Issued Bonds are secured on a parity basis with the New Money Bond Notes under the SMRS Master Indenture and the Deeds of Trust. Additionally, the New Money Bond Notes and the Series 2013A Note are secured on a parity basis under the Subordinate Deeds of Trust.

Under the terms of the documents governing Non-Exchanged Bonds and the 2013 Bonds (the "*SMRS Bond Documents*"), certain accounts were established and are held by the Obligated Group Bond Trustee, including, but not limited to, (i) the Debt Service Reserve Fund (as defined in the SMRS Master Indenture); the Operating Reserve Fund (as defined in the SMRS Master Indenture); and the Project Account (as defined in the SMRS Bond Indenture). These funds, and any other accounts established by the SMRS Bond Documents and held by the Obligated Group Bond Trustee are referred to herein as the "*Obligated Group Bond Trustee-Held Funds*."

As discussed above, SMRS owes approximately $3.2 million in respect of the TMF Loan. In connection with the TMF Loan, LCS issued the Letter of Credit for the benefit of TMF. The Letter of Credit has a five-year term, and the amount of the Letter of Credit may be reduced proportionate to the reduction in the principal amount of the TMF Loan over the term of the Letter of Credit. Additionally, SMRS and LCS are parties to that certain Credit Support Agreement, dated as of May 8, 2013, pursuant to which SMRS agreed to, among other things, reimburse LCS for any amounts drawn on the Letter of Credit by TMF for payment of principal on the TMF Loan.

On May 8, 2013, TMF, the Obligated Group Bond Trustee, SMRS and LCS entered into an intercreditor agreement (the "*Intercreditor Agreement*") setting forth the relative priorities of TMF, the Obligated Group Bond Trustee and LCS with respect to the collateral securing the obligations of the Obligated Group with respect to the 2013 Bonds and the TMF

26

Loan.  Pursuant to the Intercreditor Agreement, except with respect to liens on the Waco Property and certain real undeveloped property located in Abilene (the "***Abilene Property***" and together with the Waco Property, the "***Undeveloped Properties***"), the liens and rights of the Obligated Group Bond Trustee under the bond documents are superior to the liens and rights of TMF and LCS.  Pursuant to the Intercreditor Agreement, the liens and rights of the Obligated Group Bond Trustee under its deeds of trust with respect to the Undeveloped Properties are subordinate to those of TMF and LCS.  Moreover, LCS's rights in the Abilene Property are subordinate to TMF's lien in such property.

The monthly debt service payment under the Non-Exchanged Bonds and the 2013 Bonds is approximately $443,667.  The monthly debt service under the TMF Loan is approximately $47,000.

The Debtors and their Estates believe they may have claims against various parties arising out of or related to the 2013 Restructuring.  The Debtors expressly reserve and transfer such claims to the Liquidating Trust.

### 2.    Plains/Garrison Prepetition Capital Structure.

On December 1, 2011, Plains entered into the Plains Loan Agreement pursuant to which it borrowed $9,000,000 from Prosperity.  The Plains Loan matures on October 1, 2016 and, as of May 2014, the loan balance was approximately $8,234,000.  The Plains Loan is evidenced by an A note, accruing interest at 3.50%, a B note, accruing interest at 3.50% and a C note, accruing interest at 4.25%.  The monthly debt service payment under the Plains Loan is approximately $57,392.

### 3.    Tyler/Meadow Lake Prepetition Capital Structure.

a.    **Tyler Bonds**.

The construction of Meadow Lake was initially financed with proceeds of $8,545,000 Series 2009A Term Retirement Facility Revenue Bonds and an additional $27,555,000 Series 2009A Term Retirement Facility Revenue Bonds (collectively, the "***Series 2009A Bonds***") and $7,850,000 Series 2009B Term Retirement Facility Revenue Bonds (the "***Series 2009B Bonds***" and together with the Series 2009A Bonds, the "***Series 2009 Bonds***"), issued pursuant to that certain Indenture of Trust, dated as of November 1, 2009 (the "***Original Tyler Bond Indenture***") between HFDC and UMB Bank, N.A., as successor trustee (the "***Tyler Bond Trustee***").  HFDC loaned the proceeds of the Series 2009 Bonds to Tyler pursuant to that certain Loan Agreement, dated as of November 1, 2009 (the "***Original Tyler Loan Agreement***"), between HFDC and Tyler and provided for the repayment of such loans by Tyler pursuant to certain notes issued by Tyler as required by the Original Tyler Loan Agreement (the "***Series 2009 Notes***").  The Series 2009A Bonds accrue interest at 7.75% and mature on either November 15, 2029 or November 15, 2044.  The Series 2009B Bonds accrue interest at 6.375% and mature on November 15, 2019.

The second phase of Meadow Lake's construction was financed with the proceeds of $3,895,000 Series 2011A Retirement Facility Revenue Bonds (the "***Series 2011A Bonds***")

and $1,500,000 Series 2011B Retirement Facility Revenue Bonds (the "*Series 2011B Bonds*" and together with the Series 2011A Bonds, the "*Series 2011 Bonds*"), issued pursuant to that certain Supplemental Bond Indenture No. 1, dated as of February 1, 2011, between the HFDC and the Tyler Bond Trustee (the "*Supplemental Bond Indenture No. 1*," and collectively with the Original Tyler Bond Indenture, the "*Tyler Bond Indenture*").  The Series 2011 Bonds and the Series 2009 Bonds are collectively referred to herein as the "*Tyler Bonds*."  HFDC loaned the proceeds of the Series 2011 Bonds to Tyler pursuant to Amendment No. 1 to the Original Tyler Loan Agreement, dated as of February 1, 2011 ("*Amendment No. 1*," and collectively with the Original Tyler Loan Agreement, the "*Tyler Loan Agreement*"), between HFDC and Tyler and provided for the repayment of such loans by Tyler pursuant to the Series 2011 Note (the "*Series 2011 Note*" and together with the Series 2009 Notes, the "*Tyler Notes*"), issued by Tyler as required by Amendment No. 1.  The Series 2011A Bonds accrue interest at 8.50% and the Series 2011B Bonds accrue interest at 7.25%.  Each of the Series 2011 Bonds mature on November 15, 2044.  On November 15, 2019, the interest rate on any outstanding Series 2011B Bonds will increase to 10.0% per annum.

To secure the payment of the Tyler Bonds and the Tyler Notes, Tyler and the Tyler Bond Trustee entered into that certain Master Trust Indenture, Deed of Trust and Security Agreement, dated as of November 1, 2009 (the "*Original Tyler Master Indenture*"), as supplemented by Supplemental Indenture Number 1, dated as of November 11, 2009 ("*Supplemental Indenture No. 1*"), Supplemental Indenture Number 2, dated as of February 1, 2011 ( "*Supplemental Indenture No. 2*"), and Supplemental Indenture Number 3, dated as of May 1, 2012 ("*Supplemental Indenture No. 3*" and collectively with the Original Tyler Master Indenture, Supplemental Indenture No. 1 and Supplemental Indenture No. 2, the "*Tyler Master Indenture*").

The proceeds of the Series 2011 Bonds were intended to: (i) pay a portion of the costs of completing the acquisition, construction, furnishing and equipping of Meadow Lake; (ii) fund an increase in the debt service reserve fund securing the Tyler Bonds; (iii) fund interest on the Series 2011 Bonds for approximately three months; and (iv) pay the costs of issuance of the Series 2011 Bonds.

As of May 2014, the outstanding balance owed in respect of the Tyler Bonds was approximately $43,050,000 and the monthly debt service payment was approximately $290,000.  Tyler has not made any payments to the Tyler Bond Trustee since May 2013, other than in connection with the forbearance agreements described below.

b.      **Forbearance**.

A number of events of default under the Tyler Bonds and the Tyler Master Indenture have occurred and are continuing, including: (i) Tyler has not remitted any of the required interest payments since May 1, 2012; (ii) Tyler did not begin replenishment payments to a certain debt service reserve fund as required under the Tyler Bond documents; (iii) Tyler has not deposited its gross revenues in a certain revenue fund since July 1, 2012; (iv) Tyler failed to maintain cumulative cash from operations at amounts set forth in the loan documents; and (v) Tyler failed to maintain an occupancy covenant (collectively, the "*Tyler Events of Default*").

28

As a result of the Tyler Events of Default, Tyler and certain holders of the Tyler Bonds engaged in negotiations regarding the terms of a permanent restructuring. In the course of these negotiations, on November 15, 2013, Tyler and the beneficial owners of at least 66-2/3% in aggregate principal amount of the Tyler Bonds entered into a Forbearance Agreement (the "*Tyler Forbearance Agreement*"), pursuant to which the bondholders agreed to, among other things, forbear from exercising any remedies available with respect to the payment defaults until March 31, 2014. In connection therewith, Tyler deposited $150,000 with the Tyler Bond Trustee to be used for fees and expenses related to the Tyler Forbearance Agreement. On March 31, 2014, the Tyler Bond Trustee agreed to forbear from initiating any formal legal action to accelerate the Tyler Bonds or to foreclose upon the underlying collateral until April 15, 2014.

On April 15, 2014, the Tyler Bond Trustee and Tyler entered into a separate Forbearance Agreement (the "*2014 Forbearance Agreement*"), pursuant to which the Tyler Bond Trustee agreed to, among other things, forbear on exercising any rights or remedies against Tyler available to the Tyler Bond Trustee under the Tyler Loan Agreement, the Tyler Master Indenture or any other document governing the Tyler Bonds until the earlier of (i) July 14, 2014 or (ii) the occurrence of any Forbearance Termination Event (as defined therein). The Tyler Bond Trustee may, in its sole discretion, extend the forbearance period for an additional ninety (90) days beyond July 14, 2014, to the extent that the Tyler Bond Trustee is satisfied with the progress made towards implementing a restructuring or sale transaction and in the absence of contrary direction from the holders of the Tyler Bonds.

c.    **Operating Support Agreement**.

In connection with the issuance of the Series 2009 Bonds, Tyler entered into an Operating Support Agreement with SDI, dated as of November 1, 2009 (the "*Operating Support Agreement*"), pursuant to which, among other things, SDI (i) agreed to deposit all of its net cash flow from the VLB contracts into an operating support fund, and (ii) granted to Tyler a continuing security interest in and to all right, title and interest of SDI in its right to receive payments of money under the VLB contracts. Based on historical operations and future projections there is no Net Cash Flow (as defined in the Operating Support Agreement) distributable to Tyler.

4.    **Caprock/Mesa Springs Prepetition Capital Structure.**

On April 10, 2008, Caprock acquired the assets of Mesa Springs. In consideration for the assets of Mesa Springs, Caprock paid the seller $5,600,000. On that same date, Caprock issued $3,275,000 Series 2008A Variable Rate Demand Retirement Facility Bonds and $4,620,000 Series 2008B Variable Rate Demand Retirement Facility Revenue Bonds (collectively, the "*Caprock Bonds*"). The proceeds of the Caprock Bonds were used to finance the acquisition, remodeling and equipping of Mesa Springs. The bonds were also used to fund additional startup costs and miscellaneous capital expenditures for Mesa Springs. As part of the asset purchase agreement, Caprock agreed to pay the seller, for a period of seven years after the closing, a deferred purchase price payment of (a) 50% of the proceeds of any initial sale or transaction where a deposit is generated or received involving certain gifted homes and (b) 50% of the increase in the amount of the refundable portion of any new deposits collected over the

amount of the refundable portion of the previous deposit in any sale or other transaction where a deposit is generated or received involving remaining non-gifted homes.

Caprock eventually defaulted under the credit and reimbursement agreement governing the Caprock Bonds. As discussed above, on May 20, 2013, Caprock entered into the Caprock Loan Agreement. In connection therewith, the Caprock Bonds were redeemed. The Caprock Loan consists of an A Note and a B Note, both of which accrue interest at LIBOR + 250 and matured on April 10, 2014. As of May 2014, the outstanding balance of the Caprock Loan was approximately $6,967,444 and the monthly debt service payment was approximately $56,200.

### 5. CSL/Canyons Prepetition Capital Structure.

Development of the Canyons began on December 31, 2010, and was financed through (i) the Canyons HUD Loan, (ii) a grant of $7,899,892 (the "**TDHCA Grant**") awarded by the Texas Department of Housing and Community Affairs ("**TDHCA**"); and (iii) a grant of $272,500 from the City of Amarillo, Texas (the "**Amarillo Grant**"). Canyons was completed and placed into service in 2011.

Pursuant to a certain Security Agreement (Equipment, Inventory, and Accounts), dated as of October 28, 2010, by and between CSL and Prudential (the "**Canyons Security Agreement**"), obligations arising under the Canyons HUD Loan are secured by the goods, inventory, equipment, accounts, general intangibles and fixtures arising from the property upon which Canyons is located.

No amounts are currently due under the TDHCA Grant or the Amarillo Grant. The TDHCA Grant may only be called in the event that CSL fails to comply with certain requirements for use of the grant, including, but not limited to, maintaining a minimum percentage of units as "low income units." As of May 2014, the outstanding balance of the Canyons HUD Loan was approximately $3,574,502 and the monthly debt service payment was approximately $26,896.

### 6. OMH/Desert Haven Prepetition Capital Structure.

On October 9, 1996, OMH received a capital advance note from HUD in the aggregate amount of $1,957,700 (the "**Desert Haven HUD Note**"). The Desert Haven HUD Note bears no interest and payment is not required as long as the housing remains available for low-income persons. The note will be forgiven at its maturity date of September 1, 2037 if Desert Haven remains available for occupancy by eligible families until that date. Otherwise, the entire amount, plus interest at 7% since October 9, 1996, will be declared due and payable to HUD. Pursuant to a certain Deed of Trust, dated as of October 9, 1996, by and between OMH, as successor grantor, and Jack T. Stark, as trustee, the Desert Haven HUD Note is secured by all property owned by OMH and all rents, profits and income attributed to its operations.

G.      **Events Leading to the Chapter 11 Cases.**

Senior living facilities have recently experienced substantial declines in occupancy as a result of market changes.  Prospective residents are faced with (i) difficulty selling their homes due to uncertainty in value and (ii) significant declines in their equity portfolio value.  This has made it difficult, if not impossible, for seniors to move into or remain in senior housing facilities due to, among other things, the upfront payment of EDs.  These market conditions have contributed to decreased revenue and lower than anticipated occupancy rates at certain of the Debtors' Facilities.

To address these issues, the Debtors sought to implement a number of restructuring initiatives over the last year, including making appropriate adjustments in staffing and increasing negotiations with creditors.  Additionally, the Debtors retained DLA Piper LLP (US) to provide legal advice in connection with a potential restructuring and Alvarez & Marsal Healthcare Industry Group, LLC to provide a Chief Restructuring Officer and other financial advisory services.

As discussed above, the relationship between the System and LCS became strained during the course of LCS's management and the LCS Management Agreements were terminated on April 8, 2014.  Additionally, around that time, the CCEO was terminated by the System.  The Debtors hired Susan Whittle as interim chief executive officer who remains employed by the System.  Mrs. Whittle, an attorney, has over twenty-five (25) years of experience in the health care industry and has previously held senior positions with other companies providing skilled nursing and long term health care services.

III.    **EVENTS OCCURRING DURING DEBTORS' CHAPTER 11 CASES**

A.      **Bankruptcy Filings and First Day Orders.**

The Debtors commenced their Chapter 11 Cases on the Petition Date by filing voluntary petitions under chapter 11 of the Bankruptcy Code.  The Debtors are considered debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  With the exception of CSL, the Debtors remain in possession of their Assets and continue to operate their businesses without interruption.

On June 12, 2014, the Bankruptcy Court held an initial hearing to consider certain "first day" matters and entered orders that, among other things:

1.      Permitted the joint administration of the Debtors' Chapter 11 Cases [Docket No. 54];

2.      Permitted the Debtors to make certain payroll payments to employees and continue certain employee benefit plans and other practices [Docket No. 55];

3.      Approved the Debtors' continued use of their existing cash management system, bank accounts and business forms [Docket No. 57];

31

4.      Authorized the Debtors' use of prepetition secured lenders' cash collateral on an interim basis [Docket Nos. 58,60, 62-65];

5.      Prohibited utility providers from altering, refusing or discontinuing services to the Debtors on account of prepetition invoices [Docket No. 59];

6.      Authorized the Debtors' maintenance of existing insurance policies and obligations thereunder [Docket No. 61]; and

7.      Extended the Debtors' time to file their Schedules and statements of financial affairs ("*SOFAs*") through July 8, 2014 [Docket No. 66].

### B.      Escrow of EDs.

On June 12, 2014, the Bankruptcy Court entered an order [Docket No. 56] (the "***ED Escrow Order***") authorizing the (i) deposit of all EDs received by the Debtors after the Petition Date into a newly established escrow account (the "***Escrow Account***"); and (ii) return of EDs in the Escrow Account to the respective residents who had made such payments to the extent (a) a resident is entitled to such a refund under his or her Residency Agreement; or (b) their respective Facility closes.  Pursuant to the ED Escrow Order, upon the earlier of (i) a disposition of all or substantially all of the Assets of the relevant Debtor (through a sale, transfer or otherwise); or (ii) consummation of a plan of reorganization, the escrowed EDs shall be disbursed pursuant to further order of the Bankruptcy Court.  Subject to the rights of the residents to the return on their EDs, the funds held in the Escrow Account constitute cash collateral in which the Debtors' Secured Lenders have an interest as reflected in the relevant cash collateral and debtor-in-possession financing orders.  The Escrow Account is at Happy State Bank located in Amarillo, Texas.  As of the date hereof, there is approximately $2,538,937 in EDs currently in the Escrow Account.

### C.      Schedules and Statements.

On July 8, 2014, the Debtors each filed its Schedules and SOFAs.  On July 18, 2014, OMH, Permian, Tyler and SDI filed amended SOFAs.

### D.      Retention and Employment of Ordinary Course Professionals.

On July 15, 2014, the Bankruptcy Court entered an order authorizing the Debtors' retention of certain professionals to represent the Debtors in matters arising in the ordinary course of their businesses, including, but not limited to, CliftonLarsonAllen LLP as the Debtors' auditor and Carls McDonald & Dalrymple, LLP as the Debtors' regulatory and business counsel. [Docket No. 196].

### E.      Retention and Employment of Bankruptcy Professionals.

During the Chapter 11 Cases, the Bankruptcy Court also approved the Debtors' retention and employment of the following Professionals to assist in the administration of the Debtors' Chapter 11 Cases: (i) DLA Piper LLP (US), as bankruptcy counsel to the Debtors; (ii) Alvarez & Marsal Healthcare Industry Group, LLC, to provide a Chief Restructuring Officer

and certain additional personnel for the Debtors; (iii) RBC, as investment banker to the Debtors; and (iv) GCG, Inc., as notice, claims and solicitation agent to the Debtors. [Docket Nos. 323, 338, 343 and 347].

F.      **Cash Collateral.**

In the ordinary course of their businesses, the Debtors require cash on hand and cash flow from their operations to fund their working capital, liquidity needs and other routine payables. In addition, the Debtors require cash on hand to fund their Chapter 11 Cases and to successfully reorganize. Accordingly, during the course of these Chapter 11 Cases, the Debtors sought and obtained approval from the Bankruptcy Court, on a final basis, to use "cash collateral" (as such term is defined in Bankruptcy Code section 363(a), "***Cash Collateral***"). [Docket Nos. 217, 261, 276, 284 and 339]. Without the use of Cash Collateral, the Debtors would be unable to continue operating their respective Facilities, thereby jeopardizing the health and well-being of their residents and stifling their ability to maximize the value of their Estates.

G.      **DIP Financing.**

During the Chapter 11 Cases, the Obligated Group, Caprock, Tyler and SDI negotiated and obtained debtor in possession financing in the aggregate principal amount of up to $10,650,000.

1.      **Obligated Group.**

On July 28, 2014, the Bankruptcy Court entered an order [Docket No. 276] (the "***Obligated Group DIP Financing Order***"), on a final basis, authorizing the Obligated Group to obtain post-petition financing in the form of a loan made available to the Obligated Group in the principal aggregate amount of up to $3,800,000 from the Obligated Group Bond Trustee on the terms and conditions of the Debtor in Possession Credit and Security Agreement attached to the Obligated Group DIP Financing Order.

2.      **SDI/VLB Homes.**

On August 12, 2014, the Bankruptcy Court entered an order [Docket No. 327] (the "***SDI DIP Financing Order***"), on a final basis, authorizing SDI to obtain post-petition financing in the form of a revolving loan made available to SDI in the principal aggregate amount of up to $1,500,000 from CVF Beadsea LLC or its designee on the terms and conditions of the Senior Secured Super-Priority Debtor-in-Possession Loan Agreement referenced in the SDI DIP Financing Order.

3.      **Caprock/Mesa Springs.**

On August 19, 2014, the Bankruptcy Court entered an order [Docket No. 344] (the "***Caprock DIP Financing Order***"), on a final basis, authorizing Caprock to obtain post-petition financing in the form of a loan made available to Caprock in the principal aggregate amount of up to $2,350,000 from Santander in accordance with the Senior Secured Super-

Priority Debtor-in-Possession Loan Agreement substantially on the terms set forth on the term sheet attached to the Caprock DIP Financing Order.

### 4. Tyler/Meadow Lake.

On August 26, 2014, the Bankruptcy Court entered an order [Docket No. 374] (the "*Tyler DIP Financing Order*"), on a final basis, authorizing Tyler to obtain post-petition financing in the form of a private placement note purchase transaction in an aggregate amount up to $3,000,000 from Invesco High Yield Municipal Fund or its designee, as note purchaser on the terms and conditions of the $3,000,000 Senior Secured Super-Priority Debtor-in-Possession Note Purchase and Security Agreement attached to the Tyler DIP Financing Order.

### H. Appointment of Creditors' Committee.

On June 19, 2014, an Official Committee of Unsecured Creditors (the "*Creditors' Committee*") was appointed by the United States Trustee. As of July 15, 2014, the current members of the Creditors' Committee are: (i) Jennifer J. Young; (ii) Critical Health Connection, Inc.; (iii) Select Medical Inc.; (iv) Joel K. Nail; and (v) McKesson Medical Surgical Inc. [Docket No. 198]. The Creditors' Committee retained Greenberg Traurig LLP as its counsel and Grant Thornton LLP as its financial advisor. [Docket Nos. 324-25].

### I. Appointment of Patient Care Ombudsman.

On July 15, 2014, the Bankruptcy Court entered an order [Docket No. 203] (the "*Ombudsman Order*") granting the United States Trustee's motion for appointment of a patient care ombudsman ("*PCO*"), pursuant to section 333 of the Bankruptcy Code, for the protection of residents who receive care within the skilled nursing and/or memory care units at the Facilities. In connection with the Ombudsman Order, Dr. Thomas Mackey, a registered nurse and nurse practitioner with thirty-eight (38) years of clinical and administrative experience, was appointed as the PCO charged with evaluating and reporting to the Bankruptcy Court on patient care, safety and quality at the VLB Homes and Meadow Lake. In addition, Susan N. Goodman, a registered nurse and an attorney with work experience in clinical and operational health care and health care regulatory compliance law, was appointed as the PCO charged with evaluating and reporting to the Bankruptcy Court on patient care, safety and quality at Craig, Garrison, Mesa Springs, Wesley Court and Parks. Since their appointment, the PCOs have submitted several reports to the Bankruptcy Court regarding each of their assigned Facilities based upon their onsite inspections and interviews of residents and staff. The PCOs have identified certain areas of improvement at the Facilities and the Debtors have promptly made changes at the various Facilities based upon the recommendations of the PCOs.

### J. Prudential Stay Relief.

On July 18, 2014, Prudential sought relief from the automatic stay to allow Prudential to foreclose upon the property owned by CSL that it asserted constituted its collateral (the "*CSL Collateral*"). Subject only to a statutory tax lien to secure the payment of property taxes, Prudential has a first and prior perfected security interest in the CSL Collateral.

The Debtors believe there is no equity in the CSL Collateral and that the CSL Collateral is not necessary for an effective reorganization.  Therefore, on August 29, 2014, and in accordance with a negotiated agreement among the Debtors, the Creditors' Committee and Prudential, the Bankruptcy Court granted Prudential relief from the automatic stay [Docket No. 384] (the "*Stay Relief Order*") to take any and all action necessary to protect its secured interest in the CSL Collateral.  Prudential indicated that it intended to seek appointment of a receiver for CSL who will oversee the continued operations of Canyons as a retirement community.  The Debtors agreed not to contest the appointment of a receiver for Canyons.

On September 24, 2014, the 298th Judicial District Court of Dallas County, Texas entered an order appointing David Wallace, General Counsel of Trigild Texas, Inc., as receiver over Canyons (the "*Receiver*"), effective as of September 25, 2014.  Pursuant to the Stay Relief Order, as a result of the appointment of the Receiver, SMRS, SMSH, SDI, Panhandle and CSL were relieved of all responsibility for the management and operation of Canyons and deemed no longer be in control of Canyons.

On October 24, 2014, Prudential filed a notice with the Bankruptcy Court indicating that it had assigned the CSL Loan, along with the CSL Collateral related thereto, to HUD [Docket No. 531].  Accordingly, Prudential is no longer the holder of the note related to the CSL Loan nor does it have a claim against Canyons arising out of the CSL Loan.

As a result of the Stay Relief Order, CSL is no longer in possession of any unencumbered Assets, other than Cash, that can be liquidated for the benefit of its Creditors.  Consequently, CSL will seek to dismiss its Chapter 11 Case as soon as practicable following payment of various Professionals' fees and expenses incurred in connection with CSL's Chapter 11 Case.

**K.**     **Interim Compensation and Expense Reimbursement.**

On September 24, 2014, the Bankruptcy Court entered an order approving certain interim compensation and expense reimbursement procedures for Professionals [Docket No. 474] (the "*Interim Compensation Order*").  In accordance with the Interim Compensation Order, Professionals that comply with the procedures set forth therein can request payment of eighty percent (80%) of their fees and one hundred percent (100%) of their expenses on a monthly basis.  The fees and expenses paid pursuant to the Interim Compensation Order are not deemed allowed or disallowed for purposes of sections 330 and 331 of the Bankruptcy Code, and Professionals are required to seek approval and allowance of such fees and expenses by filing and serving applications in accordance with the Bankruptcy Code and Bankruptcy Rules.

**L.**     **Approval of Exclusivity and Expense Reimbursement Provisions of BRS Letter of Intent.**

In connection with a transaction proposed by Buckner Retirement Services, Inc. (together with its affiliates and subsidiaries, "*BRS*"*)*, the Bankruptcy Court entered an order on September 30, 2014 approving the exclusivity and expense reimbursement provisions contained in a non-binding letter of intent from BRS proposing a potential affiliation and restructuring transaction with certain of the Debtors to be effectuated under a chapter 11 plan of

35

reorganization [Docket No. 495]. The BRS transaction contemplated a restructuring of substantially all of the Debtors' secured debt and the continuation of the System as a going concern. Therefore, the Debtors believed it was in the best interest of the Estates to expend time and resources on the BRS transaction. On September 30, 2014, however, BRS exercised its right to withdraw its LOI and elected not to pursue any transactions with the Debtors. In accordance with the LOI, the Debtors were not required to make any payments to BRS as a result of its withdrawal.

M.      **Exclusivity Extension.**

On October 7, 2014, the Bankruptcy Court entered an order [Docket No. 505] (the "***Extension Order***") granting the Debtors' request, pursuant to section 1121(d) of the Bankruptcy Code, to extend the Debtors' exclusive period to file a plan of reorganization and solicit acceptances thereof to December 7, 2014 and February 5, 2015, respectively. The Plan Debtors have filed the Plan within the exclusive time period to propose a plan of reorganization.

N.      **Assumption and Assignment of TTU Lease.**

On November 25, 2014, Plains filed a motion [Docket No. 587] seeking authority to assume and assign the unexpired TTU Lease and ancillary agreements to the Plains Successful Bidder in accordance with the terms of the Plains APA (described in detail below).

O.      **Non-Plan Debtors.**

CSL, OMH and Brazos do not join in the submission of this Disclosure Statement or the Plan. As previously described, the Chapter 11 Case of CSL will be dismissed as there will be no unencumbered Assets remaining in the CSL Estate, after payment of Professionals' fees and expenses, as a result of the Stay Relief Order. The Receiver has assumed the management and operations of CSL. Similarly, Brazos has no Assets in its Estate that can be liquidated for the benefit of its Creditors, and will therefore will be dissolved outside the Plan. Finally, OMH is considering all available alternatives for the transition of its operations to a qualified operator. Upon such a transition, OMH will seek to dismiss its Chapter 11 Case outside the Plan.

IV.      **THE CHAPTER 11 PLAN**

A.      **Treatment of Claims and Interests Under the Plan.**

**THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT 1.**

The Claims against the Plan Debtors are divided into Classes according to their seniority and other criteria. The Classes of Claims in the Plan Debtors and the funds and other property to be distributed under the Plan are described more fully below.

**THE PLAN DEBTORS BELIEVE THAT THE PLAN AFFORDS CREDITORS THE POTENTIAL FOR THE GREATEST REALIZATION OF THE**

VALUE OF THE PLAN DEBTORS' ASSETS. ADDITIONALLY, THE PLAN DEBTORS BELIEVE THAT THE PLAN AVOIDS SIGNIFICANT HARDSHIP TO RESIDENTS THAT WOULD OTHERWISE OCCUR AS A RESULT OF A LIQUIDATION.

### 1. Administrative and Priority Claims.

#### a. Administrative Expense Claims.

Except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to different treatment with the Plan Debtors or Liquidating Trustee, each Holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to the unpaid amount of such Allowed Administrative Expense Claim on the later of the Effective Date and the date on which such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable; *provided, however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Plan Debtors, as Debtors in Possession, or liabilities arising under obligations incurred by the Plan Debtors, as Debtors in Possession, prior to the Effective Date, shall be paid by the Plan Debtors, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions, including but not limited to the budgets related to the DIP Loan Agreements. In addition, Allowed Administrative Expense Claims of the United States Trustee for statutory fees under 28 U.S.C. § 1930 shall be paid on the Effective Date and thereafter, as such fees may thereafter accrue and be due and payable, by the Liquidating Trustee in accordance with the applicable schedule for payment of such fees. All statutory fees under 28 U.S.C. § 1930 with respect to the period prior to the Effective Date shall be paid by the Plan Debtors as and when such fees become due and payable.

### 1. Administrative Expense Claims Bar Date.

To be eligible to receive distributions under the Plan on account of an Administrative Expense Claim that is not otherwise Allowed by the Plan, a request for payment of an Administrative Expense Claim must have been or be filed with the Bankruptcy Court on or before the Administrative Expense Claims Bar Date. Any Administrative Expense Claim that is not asserted in accordance with section 2.1 of the Plan shall be deemed disallowed under the Plan and shall be forever barred against the Plan Debtors, the Plan Debtors' Estates, the Liquidating Trust, or any of their Assets or property, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.

2.      **Allocation of Allowed Administrative Expense Claims.**

Allowed Administrative Expense Claims incurred solely in connection with a particular Plan Debtor shall be paid from that Plan Debtor's Estate.  Administrative Expense Claims incurred on behalf of all of the Plan Debtors shall be paid by each of the Plan Debtors in accordance with the following allocation formula (the "***Shared Services Allocation***"):6

| Debtor | Allocation Percentages for Allowed Administrative Claims Incurred On Behalf of All Debtors |
|---|---|
| Panhandle | 17.3% |
| Permian | 9.4% |
| SMC | 9.4% |
| Caprock | 8.7% |
| Tyler | 9.8% |
| SDI | 34.0% |
| Plains | 10.2% |
| CSL | 0.9% |
| OMH | 0.3% |
| **Total** | **100%** |

b.      **Compensation and Reimbursement Claims.**

All Professionals seeking payment of Compensation and Reimbursement Claims shall (i) file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred in the Plan Debtors' Chapter 11 Cases by the date that is thirty (30) days after the Effective Date and (ii) be paid (a) the full unpaid amounts as is Allowed by the Bankruptcy Court within five (5) Business Days after the date that such Claim is Allowed by Order of the Bankruptcy Court, or (b) upon such other terms as may be mutually agreed upon between the Holder of such an Allowed Compensation and Reimbursement Claim and the Plan Debtor or Liquidating Trustee.  Any Compensation and Reimbursement Claim that is not asserted in accordance with Section 2.2 of the Plan shall be deemed disallowed under the Plan and shall be forever barred against the Plan Debtors, the Plan Debtors' Estates, the Liquidating Trust, or any of their Assets or property, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.

---

6 The Shared Services Allocation has generally been calculated based upon each Debtor's respective revenue share in the System.

Compensation and Reimbursement Claims incurred by a party solely in connection with a particular Plan Debtor shall be paid from that Plan Debtor's Estate. Compensation and Reimbursement Claims incurred on behalf of all of the Plan Debtors shall be paid by each of the Plan Debtors in accordance with the following allocation formula (the "*Professional Fee Allocation*"):

| Debtor | Allocation Percentages for Allowed Compensation and Reimbursement Claims Incurred On Behalf of All Debtors |
|---|---|
| Panhandle | 28.3% |
| Permian | 4.0% |
| SMC | 22.7% |
| Caprock | 15% |
| Tyler | 15% |
| SDI | 4% |
| Plains | 10% |
| CSL | 0.8% |
| OMH | 0.2% |
| **Total** | **100%** |

c.     **Priority Tax Claims.**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a different treatment of such Claim, each Holder of an Allowed Priority Tax Claim, if any such Claim exists, shall receive, Cash in an amount equal to the unpaid portion of such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the date that is ninety (90) calendar days after the Effective Date.

d.     **DIP Claims.**

On the Effective Date, the Plan Debtors shall pay Cash to each Holder of an Allowed DIP Claim in an amount equal to such Allowed DIP Claim in full and complete satisfaction of such Claim and all obligations and commitments thereunder shall be terminated. Upon payment or satisfaction in full of all obligations under the DIP Loan Agreements, any and all liens and security interests securing obligations thereunder shall be deemed terminated and shall be of no further force and effect.

2.     **Classification of Claims and Interests.**

a.     **Classified Claims Against and Interests in the Plan Debtors.**

Except as set forth herein, all Claims against and Interests in a particular Plan Debtor are placed in a particular Class for that Plan Debtor. The Plan Debtors have not classified Administrative Expense Claims, Compensation and Reimbursement Claims, Priority Tax Claims or DIP Claims.

The following tables classify Claims against and Interests in each of the Plan Debtors for all purposes, including voting, confirmation and Distribution pursuant hereto and

pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. Each Class set forth below is treated hereunder as a distinct Class for voting and Distribution purposes.

Subject to all other applicable provisions of the Plan (including its Distribution provisions), classified Claims shall receive the treatment described in Section 4 of the Plan. The Plan will not provide any Distributions on account of a Claim to the extent that such Claim has been disallowed, released, withdrawn, waived, or otherwise satisfied or paid as of the Effective Date, including, without limitation, payments by third parties.

b.    **SMRS.**

The following table designates the Classes of Claims against and Interests in SMRS and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interest | Status | Entitled to Vote | Estimated Recovery |
|-------|---------------------|--------|------------------|--------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Obligated Group Bond Claims | Impaired | Yes | 33-39%[7] |
| 4 | Other Secured Claims | Impaired | Yes | TBD |
| 5 | Deficiency Claims | Impaired | Yes | TBD |
| 6 | General Unsecured Claims | Impaired | Yes | TBD |

---

[7] Although Holders of Obligated Group Bond Claims may assert their Claims against more than one Estate, each such Claim is subject to the single satisfaction rule. As described in more detail herein, the estimated recovery for Holders of the Obligated Group Bond Claims is calculated based upon the (a) Obligated Group Purchase Price of $42,500,000 offered by the Obligated Group Stalking Horse, which remains subject to higher or better offers that may be submitted by other interested parties; (b) certain indemnification obligations of the Obligated Group Sellers described in Section IV(B) herein; and (c) certain assumptions regarding ordinary costs and taxes associated with the closing on the Obligated Group Sale. In the event the Obligated Group Sellers accept an offer that is higher or better than the Obligated Group Stalking Horse's offer, the estimated recovery for the Holders of the Obligated Group Bond Claims may increase.

c. **Panhandle.**

The following table designates the Classes of Claims against and Interests in Panhandle, a direct subsidiary of SMRS, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interest | Status | Entitled to Vote | Estimated Recovery |
|-------|---------------------|--------|------------------|--------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Obligated Group Bond Claims | Impaired | Yes | 33-39% |
| 4 | Entrance Deposit Refund Claims | Unimpaired | No (deemed to accept) | -- |
| 5 | Deficiency Claims | Impaired | Yes | TBD |
| 6 | General Unsecured Claims | Impaired | Yes | TBD |
| 7 | Interests in Panhandle | Impaired | No (deemed to reject) | 0% |

d. **Permian.**

The following table designates the Classes of Claims against and Interests in Permian, a direct subsidiary of SMRS, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interest | Status | Entitled to Vote | Estimated Recovery |
|-------|---------------------|--------|------------------|--------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Obligated Group Bond Claims | Impaired | Yes | 33-39% |
| 4 | Entrance Deposit Refund Claims | Unimpaired | No (deemed to accept) | -- |
| 5 | Deficiency Claims | Impaired | Yes | TBD |
| 6 | General Unsecured Claims | Impaired | Yes | TBD |
| 7 | Interests in Permian | Impaired | No (deemed to reject) | 0% |

41

e. **SMC.**

The following table designates the Classes of Claims against and Interests in SMC, a direct subsidiary of SMRS, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interest | Status | Entitled to Vote | Estimated Recovery |
|-------|---------------------|--------|------------------|--------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Obligated Group Bond Claims | Impaired | Yes | 33-39% |
| 4 | Entrance Deposit Refund Claims | Unimpaired | No (deemed to accept) | -- |
| 5 | Deficiency Claims | Impaired | Yes | TBD |
| 6 | General Unsecured Claims | Impaired | Yes | TBD |
| 7 | Interests in SMC | Impaired | No (deemed to reject) | 0% |

f. **SMF.**

The following table designates the Classes of Claims against and Interests in SMF, a direct subsidiary of SMRS, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interest | Status | Entitled to Vote | Estimated Recovery |
|-------|---------------------|--------|------------------|--------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Obligated Group Bond Claims | Impaired | Yes | 33-39% |
| 4 | Deficiency Claims | Impaired | Yes | TBD |
| 5 | General Unsecured Claims | Impaired | Yes | TBD |
| 6 | Interests in SMF | Impaired | No (deemed to reject) | 0% |

42

g.     **Tyler.**

The following table designates the Classes of Claims against and Interests in Tyler, a direct subsidiary of SMRS, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interest | Status | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Tyler Bond Claims | Impaired | Yes | 36-42%[8] |
| 4 | Other Secured Claims | Unimpaired | No (deemed to accept) | -- |
| 5 | Entrance Deposit Refund Claims | Unimpaired | No (deemed to accept) | -- |
| 6 | Deficiency Claims | Impaired | Yes | TBD |
| 7 | General Unsecured Claims | Impaired | Yes | TBD |
| 8 | Interests in Tyler | Impaired | No (deemed to reject) | 0% |

---

[8] As described in more detail herein, the estimated recovery for Holders of the Tyler Bond Claims is calculated based upon the (a) Tyler Purchase Price of $20,000,000 offered by the Tyler Stalking Horse, which remains subject to higher or better offers that may be submitted by other interested parties; (b) certain indemnification obligations of Tyler described in Section IV(B) herein; and (c) certain assumptions regarding ordinary costs and taxes associated with the closing on the Tyler Sale. In the event Tyler accepts an offer that is higher or better than the Tyler Stalking Horse's offer, the estimated recovery for Holders of the Tyler Bond Claims may increase.
.

h.    **Caprock.**

The following table designates the Classes of Claims against and Interests in Caprock, a direct subsidiary of SMRS, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interest | Status | Entitled to Vote | Estimated Recovery |
|-------|--------------------|--------|------------------|--------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Caprock Secured Loan Claim | Impaired | Yes | 57-64%[9] |
| 4 | Entrance Deposit Refund Claims | Unimpaired | No (deemed to accept) | -- |
| 5 | Deficiency Claims | Impaired | Yes | TBD |
| 6 | General Unsecured Claims | Impaired | Yes | TBD |
| 7 | Interests in Caprock | Impaired | No (deemed to reject) | 0% |

i.    **Plains.**

The following table designates the Classes of Claims against and Interests in Plains, a direct subsidiary of SMRS, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interest | Status | Entitled to Vote | Estimated Recovery |
|-------|--------------------|--------|------------------|--------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Plains Secured Loan Claim | Impaired | Yes | 58-65% |
| 4 | Deficiency Claims | Impaired | Yes | TBD |
| 5 | General Unsecured Claims | Impaired | Yes | TBD |
| 6 | Interests in Plains | Impaired | No (deemed to reject) | 0% |

---

[9] As described in more detail herein, the estimated recovery for the Holder of the Caprock Secured Loan Claim is calculated based upon the (a) Caprock Purchase Price of $6,600,000 offered by the Caprock Stalking Horse, which remains subject to higher or better offers that may be submitted by other interested parties; (b) certain indemnification obligations of Caprock described in Section IV(B) herein; and (c) certain assumptions regarding ordinary costs and taxes associated with the closing on the Caprock Sale. In the event Caprock accepts an offer that is higher or better than the Caprock Stalking Horse's offer, the estimated recovery for the Holder of the Caprock Secured Loan Claim may increase.

44

j.     **SDI.**

The following table designates the Classes of Claims against and Interests in SDI, a direct subsidiary of SMRS, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interest | Status | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Other Secured Claims | Unimpaired | No (deemed to accept) | -- |
| 4 | General Unsecured Claims | Impaired | Yes | TBD |
| 5 | Interests in SDI | Impaired | No (deemed to reject) | 0% |

**3.     Treatment of Claims and Interests.**

a.     **SMRS.**

i)     **Other Priority Claims (Class 1).**  This Class consists of all Allowed Other Priority Claims against SMRS that are specified as having priority in Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date.  Except to the extent that a Holder of an Allowed Other Priority Claim against SMRS's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date the Other Priority Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between SMRS or the Liquidating Trustee and the Holder of the Allowed Other Priority Claim.

ii)     **Secured Tax Claims (Class 2).**  This Class consists of all Allowed Secured Tax Claims against SMRS that, absent the secured status of such Claim, would be entitled to priority in right of payment under Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date.  Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Secured Tax Claim, Cash in an amount equal to such Allowed Secured Tax Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date the Secured Tax Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between SMRS or the Liquidating Trustee and the Holder of the Secured Tax Claim.  SMRS and the Liquidating Trustee specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

iii)     **Obligated Group Bond Claims (Class 3).**  This Class consists of all Claims of the Holders of the Obligated Group Bonds against SMRS, which Claims shall be deemed Allowed pursuant to the Plan in the aggregate amount of $95,858,814, which amount includes (i) unpaid principal and (ii) accrued but unpaid interest as of the Petition Date.

45

Upon the terms and subject to the conditions set forth in the Plan, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of each Allowed Obligated Group Bond Claim, each Holder of an outstanding Obligated Group Bond will receive, on the Effective Date or as soon as practicable thereafter, its Pro Rata Share of the Net Sale Proceeds of the Obligated Group Sale and the Obligated Group Encumbered Excluded Assets.

iv) **Other Secured Claims (Class 4)**. This Class consists of the Other Secured Claims against SMRS, if any such Claims exist as of the Effective Date. Upon the terms and subject to the conditions set forth in the Plan, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of the Other Secured Claims, the Holders of Other Secured Claims will receive, on the Effective Date or as soon as practicable thereafter, the Net Sale Proceeds of the Collateral that secures their Claims.

v) **Deficiency Claims (Class 5)**. This Class consists of all Deficiency Claims against SMRS. Except to the extent that a Holder of an Allowed Deficiency Claim agrees to a different treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of each Deficiency Claim, each Holder of an Allowed Deficiency Claim will receive its Pro Rata share of the Liquidating Trust Distributable Cash attributable to SMRS's Estate as soon as practicable as determined by the Liquidating Trustee. SMRS and the Liquidating Trustee reserve their rights, however, to dispute the validity of any Deficiency Claim, whether or not objected to prior to the Effective Date.

vi) **General Unsecured Claims (Class 6)**. This Class consists of all General Unsecured Claims against SMRS. Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a different treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim will receive its Pro Rata share of the Liquidating Trust Distributable Cash attributable to SMRS's Estate as soon as practicable as determined by the Liquidating Trustee. SMRS and the Liquidating Trustee reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

b. **Panhandle.**

i) **Other Priority Claims (Class 1)**. This Class consists of all Allowed Other Priority Claims against Panhandle that are specified as having priority in Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date. Except to the extent that a Holder of an Allowed Other Priority Claim against Panhandle's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date the Other Priority Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between Panhandle or the Liquidating Trustee and the Holder of the Allowed Other Priority Claim.

ii) **Secured Tax Claims (Class 2)**. This Class consists of all Allowed Secured Tax Claims against Panhandle that, absent the secured status of such Claim,

would be entitled to priority in right of payment under Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date. Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Secured Tax Claim, Cash in an amount equal to such Allowed Secured Tax Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date the Secured Tax Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between Panhandle or the Liquidating Trustee and the Holder of the Secured Tax Claim. Panhandle and the Liquidating Trustee specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

iii) **Obligated Group Bond Claims (Class 3)**. This Class consists of all Claims of the Holders of the Obligated Group Bonds against Panhandle, which Claims shall be deemed Allowed pursuant to the Plan in the aggregate amount of $95,858,814, which amount includes (i) unpaid principal and (ii) accrued but unpaid interest as of the Petition Date. Upon the terms and subject to the conditions set forth in the Plan, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of each Allowed Obligated Group Bond Claim, each Holder of an outstanding Obligated Group Bond will receive, on the Effective Date or as soon as practicable thereafter, its Pro Rata Share of the Net Sale Proceeds of the Obligated Group Sale and the Obligated Group Encumbered Excluded Assets.

iv) **Entrance Deposit Refund Claims (Class 4)**. This Class consists of all Entrance Deposit Refund Claims against Panhandle. The Residency Agreements of Holders of Allowed Entrance Deposit Refund Claims, and all obligations thereunder, will be assumed and assigned by Panhandle to the Obligated Group Successful Bidder pursuant to section 365 of the Bankruptcy Code and such Holders will have the same rights under their respective Residency Agreements as they had before the Petition Date.

v) **Deficiency Claims (Class 5)**. This Class consists of all Deficiency Claims against Panhandle. Except to the extent that a Holder of an Allowed Deficiency Claim agrees to a different treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of each Deficiency Claim, each Holder of an Allowed Deficiency Claim will receive its Pro Rata share of the Liquidating Trust Distributable Cash attributable to Panhandle's Estate as soon as practicable as determined by the Liquidating Trustee. Panhandle and the Liquidating Trustee reserve their rights, however, to dispute the validity of any Deficiency Claim, whether or not objected to prior to the Effective Date.

vi) **General Unsecured Claims (Class 6)**. This Class consists of all General Unsecured Claims against Panhandle. Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a different treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim will receive its Pro Rata share of the Liquidating Trust Distributable Cash attributable to Panhandle's Estate as soon as practicable as determined by the Liquidating Trustee. Panhandle and the Liquidating Trustee reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

vii) **Interests in Panhandle (Class 7)**. This Class consists of SMRS's ownership interests in Panhandle, which will be cancelled as of the Effective Date. SMRS shall not be entitled to a Distribution on account of its Interests in Panhandle.

c. **Permian.**

i) **Other Priority Claims (Class 1)**. This Class consists of all Allowed Other Priority Claims against Permian that are specified as having priority in Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date. Except to the extent that a Holder of an Allowed Other Priority Claim against Permian's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date the Other Priority Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between Permian or the Liquidating Trustee and the Holder of the Allowed Other Priority Claim.

ii) **Secured Tax Claims (Class 2)**. This Class consists of all Allowed Secured Tax Claims against Permian that, absent the secured status of such Claim, would be entitled to priority in right of payment under Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date. Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Secured Tax Claim, Cash in an amount equal to such Allowed Secured Tax Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date the Secured Tax Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between Permian or the Liquidating Trustee and the Holder of the Secured Tax Claim. Permian and the Liquidating Trustee specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

iii) **Obligated Group Bond Claims (Class 3)**. This Class consists of all Claims of the Holders of the Obligated Group Bonds against Permian, which Claims shall be deemed Allowed pursuant to the Plan in the aggregate amount of $95,858,814, which amount includes (i) unpaid principal and (ii) accrued but unpaid interest as of the Petition Date. Upon the terms and subject to the conditions set forth in the Plan, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of each Allowed Obligated Group Bond Claim, each Holder of an outstanding Obligated Group Bond will receive, on the Effective Date or as soon as practicable thereafter, its Pro Rata Share of the Net Sale Proceeds of the Obligated Group Sale and the Obligated Group Encumbered Excluded Assets.

iv) **Entrance Deposit Refund Claims (Class 4)**. This Class consists of all Entrance Deposit Refund Claims against Permian. The Residency Agreements of Holders of Allowed Entrance Deposit Refund Claims, and all obligations thereunder, will be assumed and assigned by Permian to the Obligated Group Successful Bidder under section 365 of the Bankruptcy Code and such Holders will have the same rights under their respective Residency Agreements as they had before the Petition Date.

48

v) **Deficiency Claims (Class 5)**. This Class consists of all Deficiency Claims against Permian. Except to the extent that a Holder of an Allowed Deficiency Claim agrees to a different treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of each Deficiency Claim, each Holder of an Allowed Deficiency Claim will receive its Pro Rata share of Liquidating Trust Distributable Cash attributable to Permian's Estate as soon as practicable as determined by the Liquidating Trustee. Permian and the Liquidating Trustee reserve their rights, however, to dispute the validity of any Deficiency Claim, whether or not objected to prior to the Effective Date.

vi) **General Unsecured Claims (Class 6)**. This Class consists of all General Unsecured Claims against Permian. Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a different treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim will receive its Pro Rata share of Liquidating Trust Distributable Cash attributable to Permian's Estate as soon as practicable as determined by the Liquidating Trustee. Permian and the Liquidating Trustee reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

vii) **Interests in Permian (Class 7)**. This Class consists of SMRS's ownership interests in Permian, which will be cancelled as of the Effective Date. SMRS shall not be entitled to a Distribution on account of its Interests in Permian.

d. **SMC.**

i) **Other Priority Claims (Class 1)**. This Class consists of all Allowed Other Priority Claims against SMC that are specified as having priority in Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date. Except to the extent that a Holder of an Allowed Other Priority Claim against SMC's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date the Other Priority Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between SMC or the Liquidating Trustee and the Holder of the Allowed Other Priority Claim.

ii) **Secured Tax Claims (Class 2)**. This Class consists of all Allowed Secured Tax Claims against SMC that, absent the secured status of such Claim, would be entitled to priority in right of payment under Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date. Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Secured Tax Claim, Cash in an amount equal to such Allowed Secured Tax Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date the Secured Tax Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between SMC or the Liquidating Trustee and the Holder of the Secured Tax Claim. SMC and the Liquidating Trustee specifically reserve the right to challenge the validity, nature,

49

and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

iii)     **Obligated Group Bond Claims (Class 3)**.   This Class consists of all Claims of the Holders of the Obligated Group Bonds against SMC, which Claims shall be deemed Allowed pursuant to the Plan in the aggregate amount of $95,858,814, which amount includes (i) unpaid principal and (ii) accrued but unpaid interest as of the Petition Date. Upon the terms and subject to the conditions set forth in the Plan, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of each Allowed Obligated Group Bond Claim, each Holder of an outstanding Obligated Group Bond will receive, on the Effective Date or as soon as practicable thereafter, its Pro Rata Share of the Net Sale Proceeds of the Obligated Group Sale and the Obligated Group Encumbered Excluded Assets.

iv)     **Entrance Deposit Refund Claims (Class 4)**.   This Class consists of all Entrance Deposit Refund Claims against SMC.   The Residency Agreements of Holders of Allowed Entrance Deposit Refund Claims, and all obligations thereunder, will assumed and assigned by SMC to the Obligated Group Successful Bidder under section 365 of the Bankruptcy Code and such Holders will have the same rights under their respective Residency Agreements as they had before the Petition Date.

v)     **Deficiency Claims (Class 5)**.   This Class consists of all Deficiency Claims against SMC.   Except to the extent that a Holder of an Allowed Deficiency Claim agrees to a different treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of each Deficiency Claim, each Holder of an Allowed Deficiency Claim will receive its Pro Rata share of Liquidating Trust Distributable Cash attributable to SMC's Estate as soon as practicable as determined by the Liquidating Trustee.   SMC and the Liquidating Trustee reserve their rights, however, to dispute the validity of any Deficiency Claim, whether or not objected to prior to the Effective Date.

vi)     **General Unsecured Claims (Class 6)**.   This Class consists of all General Unsecured Claims against SMC.   Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a different treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim will receive its Pro Rata share of Liquidating Trust Distributable Cash attributable to SMC's Estate as soon as practicable as determined by the Liquidating Trustee.   SMC and the Liquidating Trustee reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

vii)     **Interests in SMC (Class 7)**.   This Class consists of SMRS's ownership interests in SMC, which will be cancelled as of the Effective Date.   SMRS shall not be entitled to a Distribution on account of its Interests in SMC.

e.     **SMF.**

i)     **Other Priority Claims (Class 1)**.   This Class consists of all Allowed Other Priority Claims against SMF that are specified as having priority in

Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date. Except to the extent that a Holder of an Allowed Other Priority Claim against SMF's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date the Other Priority Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between SMF or the Liquidating Trustee and the Holder of the Allowed Other Priority Claim.

ii) **Secured Tax Claims (Class 2)**. This Class consists of all Allowed Secured Tax Claims against SMF that, absent the secured status of such Claim, would be entitled to priority in right of payment under Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date. Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Secured Tax Claim, Cash in an amount equal to such Allowed Secured Tax Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date the Secured Tax Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between SMF or the Liquidating Trustee and the Holder of the Secured Tax Claim. SMF and the Liquidating Trustee specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

iii) **Obligated Group Bond Claims (Class 3)**. This Class consists of all Claims of the Holders of the Obligated Group Bonds against SMF, which Claims shall be deemed Allowed pursuant to the Plan in the aggregate amount of $95,858,814, which amount includes (i) unpaid principal and (ii) accrued but unpaid interest as of the Petition Date. Upon the terms and subject to the conditions set forth in the Plan, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of each Allowed Obligated Group Bond Claim, each Holder of an outstanding Obligated Group Bond will receive, on the Effective Date or as soon as practicable thereafter, its Pro Rata Share of the Net Sale Proceeds of the Obligated Group Sale and the Obligated Group Encumbered Excluded Assets.

iv) **Deficiency Claims (Class 4)**. This Class consists of all Deficiency Claims against SMF. Except to the extent that a Holder of an Allowed Deficiency Claim agrees to a different treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of each Deficiency Claim, each Holder of an Allowed Deficiency Claim will receive its Pro Rata share of the Liquidating Trust Distributable Cash attributable to SMF's Estate as soon as practicable as determined by the Liquidating Trustee. SMF and the Liquidating Trustee reserve their rights, however, to dispute the validity of any Deficiency Claim, whether or not objected to prior to the Effective Date.

v) **General Unsecured Claims (Class 5)**. This Class consists of all General Unsecured Claims against SMF. Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim will receive its Pro Rata share of the Liquidating Trust Distributable Cash attributable to SMF's Estate as soon as practicable as determined by the Liquidating

Trustee. SMF and the Liquidating Trustee reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

      vi)    **Interests in SMF (Class 6)**. This Class consists of SMRS's ownership interests in SMF, which will be cancelled as of the Effective Date. SMRS shall not be entitled to a Distribution on accounts its Interests in SMF.

      f.    **Tyler.**

      i)    **Other Priority Claims (Class 1)**. This Class consists of all Allowed Other Priority Claims against Tyler that are specified as having priority in Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date. Except to the extent that a Holder of an Allowed Other Priority Claim against Tyler's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Tyler and the Holder of the Allowed Other Priority Claim.

      ii)    **Secured Tax Claims (Class 2)**. This Class consists of all Allowed Secured Tax Claims against Tyler that, absent the secured status of such Claim, would be entitled to priority in right of payment under Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date. Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Secured Tax Claim, Cash in an amount equal to such Allowed Secured Tax Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date the Secured Tax Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between Tyler or the Liquidating Trustee and the Holder of the Secured Tax Claim. Tyler and the Liquidating Trustee specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

      iii)    **Tyler Bond Claims (Class 3)**. This Class consists of all Claims of the Holders of the Tyler Bonds against Tyler, which Claims shall be deemed Allowed pursuant to the Plan in the aggregate amount of $43,050,000. Upon the terms and subject to the conditions set forth in the Plan, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of each Allowed Tyler Bond Claim, each Holder of an outstanding Tyler Bond Claim will receive, on the Effective Date or as soon as practicable thereafter, its Pro Rata Share of the Net Sale Proceeds of the Tyler Sale and the Tyler Encumbered Excluded Assets.

      iv)    **Other Secured Claims (Class 4)**. This Class consists of all Other Secured Claims against Tyler related to certain vehicles that will be sold to the Tyler Successful Bidder. The agreements related to such Other Secured Claims will be assumed and assigned by Tyler to the Tyler Successful Bidder under section 365 of the Bankruptcy Code and such Holders will have the same rights under such agreements as they had before the Petition Date.

v) **Entrance Deposit Refund Claims (Class 5)**. This Class consists of all Entrance Deposit Refund Claims against Tyler. The Residency Agreements of Holders of Allowed Entrance Deposit Refund Claims, and all obligations thereunder, will assumed and assigned by Tyler to the Tyler Successful Bidder under section 365 of the Bankruptcy Code and such Holders will have the same rights under their respective Residency Agreements as they had before the Petition Date.

vi) **Deficiency Claims (Class 6)**. This Class consists of all Deficiency Claims against Tyler. Except to the extent that a Holder of an Allowed Deficiency Claim agrees to a different treatment of such Claim, in full and final satisfaction and discharge of and in exchange for each Deficiency Claim, each Holder of an Allowed Deficiency Claim will receive its Pro Rata share of Liquidating Trust Distributable Cash attributable to Tyler's Estate as soon as practicable as determined by the Liquidating Trustee. Tyler and the Liquidating Trustee reserve their rights, however, to dispute the validity of any Deficiency Claim, whether or not objected to prior to the Effective Date.

vii) **General Unsecured Claims (Class 7)**. This Class consists of all General Unsecured Claims against Tyler. Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a different treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim will receive its Pro Rata share of Liquidating Trust Distributable Cash attributable to Tyler's Estate as soon as practicable as determined by the Liquidating Trustee. Tyler and the Liquidating Trustee reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

viii) **Interests in Tyler (Class 8)**. This Class consists of SMRS's ownership interests in Tyler, which will be cancelled as of the Effective Date. SMRS shall not be entitled to a Distribution on account of its Interests in Tyler.

g. **Caprock**.

i) **Other Priority Claims (Class 1)**. This Class consists of all Allowed Other Priority Claims against Caprock that are specified as having priority in Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date. Except to the extent that a Holder of an Allowed Other Priority Claim against Caprock's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Caprock and the Holder of the Allowed Other Priority Claim.

ii) **Secured Tax Claims (Class 2)**. This Class consists of all Allowed Secured Tax Claims against Caprock that, absent the secured status of such Claim, would be entitled to priority in right of payment under Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date. On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, in full and

final satisfaction, settlement, release, and discharge of each such Allowed Secured Tax Claim, Cash in an amount equal to such Allowed Secured Tax Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date the Secured Tax Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between Caprock or the Liquidating Trustee and the Holder of the Secured Tax Claim. Caprock and the Liquidating Trustee specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

                iii)    **Caprock Secured Loan Claim (Class 3)**. This Class consists of the Claim of the Caprock Secured Lender related to the Caprock Loan Agreement, which Claim shall be deemed Allowed pursuant to the Plan in the amount of $6,922,982.01. Upon the terms and subject to the conditions set forth in the Plan, on the Effective Date or as soon as practicable thereafter, in full and final satisfaction, settlement, release, and discharge of the Caprock Secured Loan Claim, the Caprock Secured Lender shall receive the Net Sale Proceeds of the Caprock Sale and the Caprock Encumbered Excluded Assets.

                iv)    **Entrance Deposit Refund Claims (Class 4)**. This Class consists of all Entrance Deposit Refund Claims against Caprock. The Residency Agreements of Holders of Allowed Entrance Deposit Refund Claims, and all obligations thereunder, will assumed and assigned by Caprock to the Caprock Successful Bidder under section 365 of the Bankruptcy Code and such Holders will have the same rights under their respective Residency Agreements as they had before the Petition Date.

                v)    **Deficiency Claims (Class 5)**. This Class consists of all Deficiency Claims against Caprock. Except to the extent that a Holder of an Allowed Deficiency Claim agrees to a different treatment of such Claim, in full and final satisfaction and discharge of and in exchange for each Deficiency Claim, each Holder of an Allowed Deficiency Claim will receive its Pro Rata share of Liquidating Trust Distributable Cash attributable to Caprock's Estate as soon as practicable as determined by the Liquidating Trustee. Caprock and the Liquidating Trustee reserve their rights, however, to dispute the validity of any Deficiency Claim, whether or not objected to prior to the Effective Date.

                vi)    **General Unsecured Claims (Class 6)**. This Class consists of all General Unsecured Claims against Caprock. Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a different treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim will receive its Pro Rata share of Liquidating Trust Distributable Cash attributable to Caprock's Estate as soon as practicable as determined by the Liquidating Trustee. Caprock and the Liquidating Trustee reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

                vii)    **Interests in Caprock (Class 7)**. This Class consists of SMRS's ownership interests in Caprock, which will be cancelled as of the Effective Date. SMRS shall not be entitled to a Distribution on account of its Interests in Caprock.

h. **Plains.**

i) **Other Priority Claims (Class 1)**. This Class consists of all Allowed Other Priority Claims against Plains that are specified as having priority in Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date. Except to the extent that a Holder of an Allowed Other Priority Claim against Plains's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Plains and the Holder of the Allowed Other Priority Claim.

ii) **Secured Tax Claims (Class 2)**. This Class consists of all Allowed Secured Tax Claims against Plains that, absent the secured status of such Claim, would be entitled to priority in right of payment under Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date. Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Secured Tax Claim, Cash in an amount equal to such Allowed Secured Tax Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date the Secured Tax Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between Plains or the Liquidating Trustee and the Holder of the Secured Tax Claim. Plains and the Liquidating Trustee specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

iii) **Plains Secured Loan Claim (Class 3)**. This Class consists of the Claim of the Plains Secured Lender related to the Plains Loan Agreement, which Claim shall be deemed Allowed pursuant to the Plan in the amount of $8,234,000. Upon the terms and subject to the conditions set forth in the Plan, on the Effective Date or as soon as practicable thereafter, in full and final satisfaction, settlement, release, and discharge of the Plains Secured Loan Claim, the Plains Secured Lender shall receive the Net Sale Proceeds of the Plains Sale and the Plains Encumbered Excluded Assets.

iv) **Deficiency Claims (Class 4)**. This Class consists of all Deficiency Claims against Plains. Except to the extent that a Holder of an Allowed Deficiency Claim agrees to a different treatment of such Claim, in full and final satisfaction and discharge of and in exchange for each Deficiency Claim, each Holder of an Allowed Deficiency Claim will receive its Pro Rata share of Liquidating Trust Distributable Cash attributable to Plains's Estate as soon as practicable as determined by the Liquidating Trustee. Plains and the Liquidating Trustee reserve their rights, however, to dispute the validity of any Deficiency Claim, whether or not objected to prior to the Effective Date.

v) **General Unsecured Claims (Class 5)**. This Class consists of all General Unsecured Claims against Plains. Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a different treatment of such Claim, in full and final satisfaction and discharge of and in exchange for each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim will receive its Pro Rata share of Liquidating Trust

55

Distributable Cash attributable to Plains's Estate as soon as practicable as determined by the Liquidating Trustee.  Plains and the Liquidating Trustee reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

vi)    **Interests in Plains  (Class 6)**.  This Class consists of SMRS's ownership interests in Plains, which will be cancelled as of the Effective Date.  SMRS shall not be entitled to a Distribution on account of its Interests in Plains.

i.    **SDI.**

i)    **Other Priority Claims (Class 1)**.  This Class consists of all Allowed Other Priority Claims against SDI that are specified as having priority in Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date.  Except to the extent that a Holder of an Allowed Other Priority Claim against SDI's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between SDI and the Holder of the Allowed Other Priority Claim.

ii)    **Secured Tax Claims (Class 2)**.  This Class consists of all Allowed Secured Tax Claims against SDI that, absent the secured status of such Claim, would be entitled to priority in right of payment under Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date.  Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Secured Tax Claim, Cash in an amount equal to such Allowed Secured Tax Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date the Secured Tax Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between SDI or the Liquidating Trustee and the Holder of the Secured Tax Claim. SDI and the Liquidating Trustee specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

iii)    **Other Secured Claims (Class 3)**.  This Class consists of all Other Secured Claims against SDI related to certain vehicles that will be sold to the new operator of the VLB Homes.  The agreements related to such Other Secured Claims will be assumed and assigned by SDI to the new operator  under section 365 of the Bankruptcy Code and such Holders will have the same rights under such agreements as they had before the Petition Date.

iv)    **General Unsecured Claims (Class 4)**.  This Class consists of all General Unsecured Claims against SDI.  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a different treatment of such Claim, in full and final satisfaction and discharge of and in exchange for each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim will receive its Pro Rata share of Liquidating Trust Distributable Cash attributable to SDI's Estate as soon as practicable as determined by the

Liquidating Trustee. SDI and the Liquidating Trustee reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

v)      **Interests in SDI (Class 5)**. This Class consists of SMRS's ownership interests in SDI, which will be cancelled as of the Effective Date. SMRS shall not be entitled to a Distribution on account of its Interests in SDI.

## B.     Means for Implementation of the Plan

### 1.     Obligated Group Sale.

#### a.     Selection of Stalking Horse.

On November 24, 2014, SMC, Permian and Panhandle (collectively, the "***Obligated Group Sellers***") filed a motion [Docket No. 583] (the "***Obligated Group Sale Motion***") seeking an order authorizing and approving of, among other things, (i) the sale (the "***Obligated Group Sale***") of substantially all of the Obligated Group Sellers' Assets and related business operations (collectively, the "***Obligated Group Assets***") free and clear of all liens, claims, interests and encumbrances to Yellow Rose Health Holdings LLC, a Nevada limited liability company (the "***Obligated Group Stalking Horse***"), pursuant to that certain Asset Purchase and Sale Agreement with the Obligated Group Stalking Horse (the "***Obligated Group APA***"), (ii) certain bid procedures to be employed in connection with the Obligated Group Sale, and (iii) certain bid protections offered to the Obligated Group Stalking Horse, including the payment of a break-up fee in the amount of One Million Two Hundred Thousand Dollars ($1,200,000) and an expense reimbursement in an amount up to One Hundred Thousand Dollars ($100,000) to be paid in accordance with the terms and conditions set forth in the Obligated Group APA. Pursuant to the Obligated Group APA, the Obligated Group Sellers have agreed to sell the Obligated Group Assets for Forty Two Million Five Hundred Thousand Dollars ($42,500,000) (the "***Obligated Group Purchase Price***") and to assume and assign certain Executory Contracts and Unexpired Leases to the Obligated Group Stalking Horse, subject to higher or otherwise better offers and the Obligated Group Bond Trustee's right to credit bid under section 363(k) of the Bankruptcy Code.

#### b.     Purchased Assets.

As more fully described in section 1.1 of the Obligated Group APA, the Obligated Group Assets include, but are not limited to, the following:

1.      certain real property located in Abilene, Odessa and Amarillo, Texas, together with all buildings, structures, fixtures and other improvements located in, on, at, under, above or attached to such land;

2.      all inventory used or held for use at Parks, Wesley Court and Craig;

3.      all furniture, fixtures, equipment, tools, machinery, vehicles and all other tangible personal property owned by the Obligated Group Sellers and used in connection with Parks, Wesley Court and Craig;

4.      to the extent assignable or transferable, all personal property leases with respect to ownership of Parks, Wesley Court and Craig; and

5.      to the extent assignable or transferable, all general intangibles related to the ownership, possession, lease or use of the Obligated Group Assets, including without limitation, lien waivers, surety agreements, bonds, warranties, guaranties, utility use agreements, covenants, commitments, permits, certificates, regulatory approvals, entitlements, service marks, trademarks and trade names owned or employed by the Obligated Group Sellers in conjunction with the ownership of their Facilities.

c.      **Excluded Assets**.

The Obligated Group Assets exclude certain assets (the "***Obligated Group Excluded Assets***"), including, but not limited to, the following assets of the Obligated Group Sellers:

1.      cash, cash equivalents and short-term investments, including all pre-paid deposits held by any party;

2.      all entrance fees received and held in escrow pursuant to the *Final Order (I) Authorizing the Obligated Group Debtors to (A) Use Cash Collateral and (B) Incur Postpetition Secured Indebtedness; (II) Granting Liens and Providing Super-Priority Administrative Expense Status; (III) Granting Adequate Protection to Wells Fargo Bank, National Association, as Trustee; and (IV) Modifying the Automatic Stay* [Docket No. 23], entered by the Bankruptcy Court on July 28, 2014;

3.      all accounts receivable and proceeds therefrom for services provided prior to a date certain;

4.      assets owned and provided by vendors of services or goods to Parks, Wesley Court and Craig;

5.      organizational record books and minute books;

6.      all bank accounts; and

7.      certain rights, claims and choses in action, and any payments, awards or other proceeds resulting therefrom.

The aforementioned Obligated Group Excluded Assets, with the exception of items 4, 5 and 7, are subject to the security interest of the Obligated Group Bond Trustee and will be distributed to the Holders of the Obligated Group Bond Claims.  Such encumbered Excluded Assets shall be referred to herein as the "***Obligated Group Encumbered Excluded Assets***."  The

58

remaining Obligated Group Excluded Assets, to the extent they are owned by the Obligated Group Sellers, will be transferred to the Liquidating Trust.

d. **Assumed Liabilities.**

As part of the consideration for the Obligated Group Sale, pursuant to the Obligated Group APA, the Obligated Group Stalking Horse has agreed to assume the following liabilities of the Obligated Group Sellers:

1. all amounts payable pursuant to section 365 of the Bankruptcy Code for all of the Obligated Group Sellers' Executory Contracts and Unexpired Leases to be assumed and assigned to the Obligated Group Stalking Horse pursuant to the Obligated Group APA;

2. certain employee obligations; and

3. all obligations, including, without limitation, all refund obligations, under the Residency Agreements related to Parks, Wesley Court and Craig.

e. **Indemnification Trust Fund**.

Subject to the occurrence of the closing on the Obligated Group APA, the Obligated Group Sellers have agreed to escrow a portion of the Obligated Group Purchase Price in an amount equal to Seven Hundred and Fifty Thousand Dollars ($750,000) to fund certain indemnification obligations of the Obligated Group Sellers for a period of one (1) year following the closing on the Obligated Group APA.

f. **Auction.**

In order to ensure that the Obligated Group Sellers are maximizing the return on the Obligated Group Assets, they have sought, in the Obligated Group Sale Motion, authority to conduct an auction of the Obligated Group Assets on or around January 21, 2015, to the extent other parties have expressed an interest in purchasing all or a portion of the Obligated Group Assets and have otherwise qualified to participate in the auction in accordance with the bid procedures outlined in the Obligated Group Sale Motion. The party offering the highest or otherwise best offer at that auction will be deemed the "***Obligated Group Successful Bidder***." The Obligated Group Sellers will thereafter seek Bankruptcy Court approval of the Obligated Group Sale to the Obligated Group Successful Bidder.

**2.** **Tyler Sale.**

a. **Selection of Stalking Horse.**

On November 24, 2014, Tyler filed a motion [Docket No. 584] (the "***Tyler Sale Motion***") seeking an order authorizing and approving of, among other things, (i) the sale (the "***Tyler Sale***") of substantially all of Tyler's Assets and related business operations (the "***Tyler Assets***") free and clear of all liens, claims, interests and encumbrances to ER Propco CO, LLC, a Delaware limited liability company (the "***Tyler Stalking Horse***"), pursuant to that certain Asset

EAST\86228047.5

Purchase and Sale Agreement with the Tyler Stalking Horse (the "**_Tyler APA_**"), (ii) certain bid procedures to be employed in connection with the Tyler Sale, and (iii) certain bid protections offered to the Tyler Stalking Horse, including the payment of a break-up fee in the amount of Six Hundred Thousand Dollars ($600,000) and an expense reimbursement in an amount of Fifty Thousand Dollars ($50,000) to be paid in accordance with the terms and conditions set forth in the Tyler APA. Pursuant to the Tyler APA, Tyler has agreed to sell the Tyler Assets for Twenty Million Dollars ($20,000,000) (the "**_Tyler Purchase Price_**") and to assume and assign certain Executory Contracts and Unexpired Leases to the Tyler Stalking Horse, subject to higher or otherwise better offers and the Tyler Bond Trustee's right to credit bid under section 363(k) of the Bankruptcy Code.

  b.    **Purchased Assets.**

        As more fully described in section 1.1 of the Tyler APA, the Tyler Assets include, but are not limited to, the following:

        1.    certain real property located in Tyler, Texas, together with all buildings, structures, fixtures and other improvements located in, on, at, under, above or attached to such land;

        2.    all inventory used or held for use at Meadow Lake;

        3.    all furniture, fixtures, equipment, tools, machinery, vehicles and all other tangible personal property owned by Tyler and used in connection with Meadow Lake;

        4.    to the extent assignable or transferable, all personal property leases with respect to ownership of Meadow Lake; and

        5.    to the extent assignable or transferable, all general intangibles related to the ownership, possession, lease or use of the Tyler Assets, including without limitation, lien waivers, surety agreements, bonds, warranties, guaranties, utility use agreements, covenants, commitments, permits, certificates, regulatory approvals, entitlements, service marks, trademarks and trade names owned or employed by Tyler in conjunction with the ownership of Meadow Lake.

  c.    **Excluded Assets.**

        The Tyler Assets exclude certain assets (the "**_Tyler Excluded Assets_**"), including, but not limited to, the following Assets of Tyler:

        1.    cash, cash equivalents and short-term investments;

        2.    all entrance fees received and held in escrow pursuant to the _Stipulated Final Order: (1) Authorizing Sears Tyler Methodist Retirement Corporation to Use Cash Collateral; and (2) Granting Adequate Protection to the Trustee_ [Docket No. 261], entered by the Bankruptcy Court on July 23, 2014, _the Final Order Authorizing Sears Tyler Methodist Retirement Corporation to Obtain Post petition Financing on a Senior Secured SuperPriority Basis Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364_ [Docket No. 374], entered by the

Bankruptcy Court on August 26, 2014 and the *Order Authorizing Debtors To Escrow Certain Entrance Deposits and Refund Certain Entrance Deposits* [Docket No. 56], entered by the Bankruptcy Court on June 12, 2014;

        3.      all accounts receivable and proceeds therefrom for services provided prior to a date certain;

        4.      assets owned and provided by vendors of services or goods to Meadow Lake;

        5.      organizational record books and minute books;

        6.      all bank accounts; and

        7.      certain rights, claims and choses in action, and any payments, awards or other proceeds resulting therefrom.

The aforementioned Tyler Excluded Assets, with the exception of items 4, 5 and 7, are subject to the security interest of the Tyler Bond Trustee and will be distributed to the Holders of the Tyler Bond Claims. Such encumbered Excluded Assets shall be referred to herein as the "***Tyler Encumbered Excluded Assets***." The remaining Tyler Excluded Assets, to the extent they are owned by Tyler, will be transferred to the Liquidating Trust.

        d.      **Assumed Liabilities.**

As part of the consideration for the Tyler Sale, pursuant to the Tyler APA, the Tyler Stalking Horse has agreed to assume the following liabilities of Tyler:

        1.      all amounts payable pursuant to section 365 of the Bankruptcy Code for all of Tyler's Executory Contracts and Unexpired Leases to be assumed and assigned to the Tyler Stalking Horse pursuant to the Tyler APA;

        2.      certain employee obligations; and

        3.      all obligations under the Residency Agreements related to Meadow Lake, except those obligations related to the entrance fees escrowed pursuant to the Order Authorizing Debtors To Escrow Certain Entrance Deposits and Refund Certain Entrance Deposits [Docket No. 56].

        e.      **Indemnification Trust Fund.**

Subject to the occurrence of the closing on the Tyler APA, Tyler has agreed to escrow a portion of the Tyler Purchase Price in an amount equal to Four Hundred Thousand Dollars ($400,000) to fund certain indemnification obligations of Tyler for a period of one (1) year following the closing on the Tyler APA.

f.      **Auction.**

In order to ensure that Tyler is maximizing the return on the Tyler Assets, it has sought, in the Tyler Sale Motion, authority to conduct an auction of the Tyler Assets on or around January 21, 2015, to the extent other parties have expressed an interest in purchasing the Tyler Assets and have otherwise qualified to participate in the auction in accordance with the bid procedures outlined in the Tyler Sale Motion.  The party offering the highest or otherwise best offer at that auction will be deemed the "***Tyler Successful Bidder***."  Tyler will thereafter seek Bankruptcy Court approval of the Tyler Sale to the Tyler Successful Bidder.

**3.      Caprock Sale.**

a.      **Selection of Stalking Horse.**

On October 28, 2014, Caprock filed a motion [Docket No. 533] (the "***Caprock Sale Motion***") seeking an order authorizing and approving of, among other things, (i) the sale (the "***Caprock Sale***") of substantially all of Caprock's Assets and related business operations (collectively, the "***Caprock Assets***") free and clear of all liens, claims, interests and encumbrances to Rio Mesa Health Holdings LLC, a Nevada limited liability company (the "***Caprock Stalking Horse***"), pursuant to that certain Asset Purchase and Sale Agreement with the Caprock Stalking Horse (the "***Caprock APA***"), (ii) certain bid procedures to be employed in connection with the Caprock Sale, and (iii) certain bid protections offered to the Caprock Stalking Horse, including the payment of a break-up fee in the amount of One Hundred Ninety Thousand Dollars ($190,000) and an expense reimbursement in an amount up to Twenty Five Thousand Dollars ($25,000), subject to the terms and conditions of the Caprock APA.  Pursuant to the Caprock APA, Caprock has agreed to sell the Caprock Assets for Six Million Six Hundred Thousand Dollars ($6,600,000) (the "***Caprock Purchase Price***") and to assume and assign certain Executory Contracts and Unexpired Leases to the Caprock Stalking Horse, subject to higher or otherwise better offers and Caprock Secured Lender's right to credit bid under section 363(k) of the Bankruptcy Code.

b.      **Purchased Assets.**

As more fully described in section 1.1 of the Caprock APA, the Caprock Assets include, but are not limited to, the following assets of Caprock:

1.      certain real property located in Abilene, Texas, together with all buildings, structures, fixtures and other improvements located in, on, at, under, above or attached to such land;

2.      all inventory used or held for use at Mesa Springs;

3.      all furniture, fixtures, equipment, tools, machinery, vehicles and all other tangible personal property owned by Caprock and used in connection with Mesa Springs;

4.      to the extent assignable or transferable, all personal property leases with respect to ownership of Mesa Springs; and

62

5.      to the extent assignable or transferable, all general intangibles related to the ownership, possession, lease or use of the Caprock Assets, including without limitation, lien waivers, surety agreements, bonds, warranties, guaranties, utility use agreements, covenants, commitments, permits, certificates, regulatory approvals, entitlements, service marks, trademarks and trade names owned or employed by Caprock in conjunction with the ownership of Mesa Springs.

c.      **Excluded Assets.**

The Caprock Assets exclude certain assets (the "***Caprock Excluded Assets***"), including, but not limited to, the following Assets of Caprock:

1.      cash, cash equivalents and short-term investments;

2.      all accounts receivable and proceeds therefrom for services provided prior to a date certain;

3.      assets owned and provided by vendors of services or goods to Mesa Springs;

4.      organizational record books and minute books;

5.      all bank accounts; and

6.      certain rights, claims and choses in action, and any payments, awards or other proceeds resulting therefrom.

The aforementioned Caprock Excluded Assets, with the exception of items 3, 4 and 6, are subject to the security interest of the Caprock Secured Lender and will be distributed to the Holder of the Caprock Secured Loan Claim.  Such encumbered Excluded Assets shall be referred to herein as the "***Caprock Encumbered Excluded Assets***."  The remaining Caprock Excluded Assets, to the extent they are owned by Caprock, will be transferred to the Liquidating Trust.

d.      **Assumed Liabilities.**

As part of the consideration for the Caprock Sale, the Caprock Stalking Horse has agreed to assume the following liabilities of Caprock:

1.      all amounts payable pursuant to section 365 of the Bankruptcy Code for all of Caprock's Executory Contracts and Unexpired Leases to be assumed and assigned to the Caprock Stalking Horse pursuant to the Caprock APA;

2.      certain employee obligations; and

3.      all obligations under the Residency Agreements related to Mesa Springs.

EAST\86228047.5

e.      **Indemnification Trust Fund.**

Subject to the occurrence of the closing on the Caprock APA, Caprock has agreed to escrow a portion of the Caprock Purchase Price in an amount equal to Two Hundred and Fifty Thousand Dollars ($250,000) to fund certain indemnification obligations of Caprock for a period of one (1) year following the closing on the Caprock APA.

f.      **Auction.**

In order to ensure that Caprock is maximizing the return on the Caprock Assets, it has sought, in the Caprock Sale Motion, authority to conduct an auction of the Caprock Assets on or around December 17, 2014, to the extent other parties have expressed an interest in purchasing the Caprock Assets and have otherwise qualified to participate in the auction in accordance with the bid procedures outlined in the Caprock Sale Motion.  The party offering the highest or otherwise best offer at that auction will be deemed the "***Caprock Successful Bidder***." Caprock will thereafter seek Bankruptcy Court approval of the Caprock Sale to the Caprock Successful Bidder.

4.      **Plains Sale.**

a.      **Selection of Stalking Horse.**

On September 18, 2014, Plains filed a motion [Docket No. 448] (the "***Plains Sale Motion***") seeking an order authorizing and approving of, among other things, (i) the sale (the "***Plains Sale***") of substantially all of Plains' Assets and related business operations (collectively, the "***Plains Assets***") free and clear of all liens, claims, interests and encumbrances to Knight Health Holdings LLC, a Nevada limited liability company (the "***Plains Stalking Horse***"), pursuant to that that certain Asset Purchase and Sale Agreement with the Plains Stalking Horse (the "***Plains APA***"), (ii) certain bid procedures to be employed in connection with the Plains Sale, and (iii) certain bid protections offered to the Plains Stalking Horse, including the payment of a break-up fee in the amount of One Hundred Eighty Thousand Dollars ($180,000) and an expense reimbursement in an amount up to Twenty Five Thousand Dollars ($25,000), subject to the terms and conditions set forth in the Plains APA.  Pursuant to the Plains APA, Plains has agreed to sell the Plains Assets for Six Million Two Hundred and Forty Thousand Dollars ($6,240,000) (the "***Plains Purchase Price***") and to assume and assign certain Executory Contracts and Unexpired Leases to the Plains Stalking Horse, subject to higher or otherwise better offers and the Plains Secured Lender's right to credit bid under section 363(k) of the Bankruptcy Code.

b.      **Purchased Assets.**

As more fully described in section 1.1 of the Plains APA, the Plains Assets include, but are not limited to, the following Assets of Plains:

1.      that certain Lease Agreement by and between Texas Tech University and Plains as lessee, dated August 1, 1999 as amended;

      2.      all inventory used or held for use at Garrison;

      3.      all furniture, fixtures, equipment, tools, machinery, vehicles and all other tangible personal property owned by Plains and used in connection with Garrison;

      4.      to the extent assignable or transferable, all personal property leases with respect to ownership of Garrison; and

      5.      to the extent assignable or transferable, all general intangibles related to the ownership, possession, lease or use of the Plains Assets, including without limitation, lien waivers, surety agreements, bonds, warranties, guaranties, utility use agreements, covenants, commitments, permits, certificates, regulatory approvals, entitlements, service marks, trademarks and trade names owned or employed by Plains in conjunction with the ownership of Garrison.

      c.      **Excluded Assets.**

The Plains Assets exclude certain Assets (the "***Plains Excluded Assets***"), including, but not limited to, the following Assets of Plains:

      1.      cash, cash equivalents and short-term investments;

      2.      assets owned and provided by vendors of services or goods to the Plains Facility;

      3.      organizational record books and minute books;

      4.      all bank accounts; and

      5.      certain rights, claims and choses in action, and any payments, awards or other proceeds resulting therefrom.

The aforementioned Plains Excluded Assets, with the exception of items 2, 3 and 5, are subject to the security interest of the Plains Secured Lender and will be distributed to the Holder of the Plains Secured Loan Claim. Such encumbered Excluded Assets shall be referred to herein as the "***Plains Encumbered Excluded Assets***." The remaining Plains Excluded Assets, to the extent they are owned by Plains, will be transferred to the Liquidating Trust.

      d.      **Assumed Liabilities.**

As part of the consideration for the Plains Sale, the Plains Stalking Horse has agreed to assume all amounts payable pursuant to section 365 of the Bankruptcy Code for all of Plains's Executory Contracts and Unexpired Leases to be assumed and assigned to the Plains Stalking Horse pursuant to the Plains APA.

e.      **Indemnification Trust Fund.**

Subject to the occurrence of the closing on the Plains APA, Plains has agreed to escrow a portion of the Plains Purchase Price in an amount equal to Two Hundred and Fifty Thousand Dollars ($250,000) to fund certain indemnification obligations of Plains for a period of one (1) year following the closing on the Plains APA.

f.      **Bankruptcy Court Approval of Plains Sale.**

After receiving no other qualified bids for the Plains Assets, Plains sought and obtained Bankruptcy Court approval to sell the Plains Assets to the Plains Stalking Horse in accordance with the Plains APA [Docket No. 559].

5.      **Sale of SMF Real Property.**

Pursuant to a motion under section 363 of the Bankruptcy Code, SMF will sell and assign its interests in real property located at W Highway 84 at Twin Rivers Blvd., Waco, McLennan County, TX (the "*SMF Sale*").   The motion will outline a competitive bidding process under which parties interested in acquiring these interests can submit bids and participate in a Bankruptcy Court administered auction, with the prevailing bidder acquiring title to the real property.   The proceeds of the SMF Sale will be distributed to Holders of Claims who have a security interest in such real property.

6.      **Transition of Management and Operations Agreements for VLB Homes.**

SDI intends to terminate the Management and Operations Agreements with the VLB in connection with the VLB Homes and transition the management and operations of the VLB Homes to a third party operator.   All remaining Assets of SDI will be liquidated for the benefit of Holders of Claims against SDI's Estate.

7.      **Sources of Consideration.**

All Cash consideration necessary to make payments or distributions pursuant to the Plan shall be obtained from (i) Cash on hand; (ii) the Net Sale Proceeds of the Sales; (iii) the Excluded Assets; (iv) the Causes of Action; and (v) all other unencumbered Assets of the Plan Debtors not otherwise sold pursuant to the Sales.

8. **Liquidating Trust**

a. **Establishment of Liquidating Trust.**

On the Effective Date, the Liquidating Trustee shall sign the Liquidating Trust Agreement and, in his capacity as Liquidating Trustee, accept all Liquidating Trust Assets on behalf of the Beneficiaries thereof, and be authorized to obtain, seek the turnover, liquidate, and collect all of the Liquidating Trust Assets not in his possession. The Liquidating Trust will then be deemed created and effective without any further action by the Bankruptcy Court or any Person as of the Effective Date. The Liquidating Trust shall be established for the purposes of (i) liquidating any non-cash Liquidating Trust Assets; (ii) prosecuting and resolving the Causes of Action; (iii) maximizing recovery of the Liquidating Trust Assets for the benefit of the Beneficiaries; and (iv) distributing the proceeds of the Liquidating Trust Assets to the Beneficiaries in accordance with the Plan and the Liquidating Trust Agreement, with no objective to continue or engage in the conduct of a trade or business, except only in the event and to the extent necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.

b. **Appointment of the Liquidating Trustee.**

The Liquidating Trustee shall be appointed pursuant to the Confirmation Order and subject to removal only by the Bankruptcy Court upon application or motion by a Beneficiary of the Liquidating Trust, after notice and a hearing, and for cause shown, including (i) the willful and continued refusal by the Liquidating Trustee to perform his duties under the Plan and the Liquidating Trust Agreement, and (ii) gross negligence, gross misconduct, fraud, embezzlement or theft. The Liquidating Trustee will be chosen by the Plan Debtors, after consultation with the Beneficiaries. During the term of the Liquidating Trust, the Liquidating Trustee shall be entitled to compensation payable from the Liquidating Trust Assets as set forth in the Liquidating Trust Agreement.

c. **Beneficiaries of Liquidating Trust.**

The Holders of Allowed Deficiency Claims and General Unsecured Claims against the Plan Debtors that are entitled to Distributions shall be the beneficiaries of the Liquidating Trust. Such Beneficiaries shall be bound by the Liquidating Trust Agreement. To the extent Liquidating Trust Assets are attributable exclusively to one Estate, the proceeds of those assets will be shared Pro Rata among the Beneficiaries of that Estate. In the event there are Liquidating Trust Assets allocated to more than one Estate, the proceeds of such assets shall be shared Pro Rata among the Beneficiaries associated with those Estates. The interests of the Beneficiaries in the Liquidating Trust shall be uncertificated and nontransferable except upon death of the interest holder or by operation of law.

d. **Vesting and Transfer of Liquidating Trust Assets to the Liquidating Trust.**

Pursuant to Bankruptcy Code section 1141(b), the Liquidating Trust Assets shall vest in the Liquidating Trust free and clear of all Liens, Claims and Interests, except as otherwise specifically provided in the Plan or in the Confirmation Order; *provided, however*, that the

Liquidating Trustee may abandon or otherwise not accept any non-Cash Liquidating Trust Assets that the Liquidating Trustee believes, in good faith, have no value to the Liquidating Trust. Any non-cash Liquidating Trust Assets that the Liquidating Trustee so abandons or otherwise does not accept shall not be property of the Liquidating Trust. The Liquidating Trust Assets primarily consist of claims against third parties. These claims include, but are not limited to, claims against former directors and officers (for which the Debtors have a $5.0 million dollar insurance policy), claims against parties involved in the 2013 Restructuring, claims against LCS and claims against entities with whom the Debtors formerly did business, including vendors. These claims will be preserved and transferred to the Liquidating Trust.

### e. Limited Substantive Consolidation.

The formation and implementation of the Liquidating Trust is not, and shall not be deemed, to constitute or cause in effect a substantive consolidation of the Plan Debtors. The Liquidating Trustee shall maintain separate accounts for each of the Plan Debtors, and shall not commingle Liquidating Trust Assets of the various Plan Debtors. All Liquidating Trust Assets and the proceeds therefrom will be allocated to the Estates pursuant to the Shared Services Allocation.

### f. Retention of Professionals.

The Liquidating Trustee shall have the right to retain the services of attorneys, accountants, and other professionals (collectively, the "*Liquidating Trust Professionals*") that are necessary to assist the Liquidating Trustee in the performance of his duties pursuant to the Plan, the Liquidating Trust Agreement and the Confirmation Order. The reasonable fees and expenses of such professionals shall be paid by the Liquidating Trustee from the Liquidating Trust Assets upon submission of monthly statements ("*Liquidating Trust Monthly Fee Statements*") for services rendered and cost incurred to the Liquidating Trustee for review and approval. The Liquidating Trustee will have thirty (30) days from receipt of each Liquidating Trust Monthly Fee Statement to object to the Liquidating Trust Monthly Fee Statement. In the event that any objection is received by the relevant Liquidating Trust Professional that cannot be promptly resolved by the Liquidating Trust Professional and the Liquidating Trustee, the dispute will be submitted by the Liquidating Trustee to the Bankruptcy Court for adjudication. The Bankruptcy Court will retain jurisdiction to adjudicate objections to Liquidating Trust Monthly Fee Statements. In the event that no objection is raised to a Liquidating Trust Monthly Fee Statement within the thirty (30) day period, the requested amount in the Liquidating Trust Monthly Fee Statement will be promptly paid by the Liquidating Trustee, subject to any requirements under the Plan.

### g. Liquidating Trust Expenses.

Subject to the provisions of the Liquidating Trust Agreement, all costs, expenses and obligations incurred by the Liquidating Trustee in administering the Plan, the Liquidating Trust, or in any manner connected, incidental or related thereto, in effecting distributions from, as applicable, the Liquidating Trust shall be a charge against the Liquidating Trust Assets remaining from time to time in the hands of the Liquidating Trustee. Such expenses shall be paid in accordance with the Liquidating Trust Agreement.

h.    **Certain Powers and Duties of the Liquidating Trust and Liquidating Trustee.**

1.    **General Powers of the Liquidating Trustee.**

The Liquidating Trustee shall be the exclusive trustee of the Liquidating Trust and the Liquidating Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3). The powers, rights, and responsibilities of the Liquidating Trustee shall be specified in the Liquidating Trust Agreement and shall include the authority and responsibility to:  (a) receive, manage, invest, supervise, and protect the Liquidating Trust Assets; (b) pay taxes or other obligations incurred by the Liquidating Trust; (c) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals and consultants to advise and assist in the administration, prosecution and distribution of Liquidating Trust Assets; (d) calculate and implement Distributions of Liquidating Trust Assets; (e) investigate, prosecute, compromise, and settle, in accordance with the specific terms of the Liquidating Trust Agreement, Causes of Action vested in the Liquidating Trust; (f) resolve issues involving Claims and Interests in accordance with the Plan; (g) undertake all administrative functions of the Plan Debtors' Chapter 11 Cases, including the payment of fees payable to the United States Trustee and the ultimate closing of the Plan Debtors' Chapter 11 Cases.  The Liquidating Trust is the successor to the Plan Debtors and their Estates.

2.    **Books and Records.**

On the Effective Date, the Liquidating Trust shall:  (a) take possession of all books, records, and files of the Plan Debtors and their respective Estates; and (b) provide for the retention and storage of such books, records, and files until such time as the Liquidating Trust determines, in accordance with the Liquidating Trust Agreement, that retention of same is no longer necessary or required.

3.    **Investments of Cash.**

The Liquidating Trust may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by Bankruptcy Code section 345 or in other prudent investments, *provided, however*, that such investments are permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

4.    **Claims Process.**

The Liquidating Trust shall have the right to object to Claims in connection with post-Effective Date Claims allowance process.

5.    **Reporting.**

In no event later than thirty (30) Business Days after the end of the first full month following the Effective Date and on a quarterly basis thereafter until all Cash in the Liquidating Trust has been released or paid out in accordance with the Plan, the Liquidating

EAST\86228047.5

Trustee shall file with the Bankruptcy Court a report setting forth the amounts, recipients and dates of all Distributions made by the Liquidating Trustee under the Plan through each applicable reporting period.

### 6.       Tax Reporting.

The Liquidating Trustee shall file tax returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with the Plan. The Liquidating Trust also shall annually (for tax years in which Distributions from the Liquidating Trust are made) send to each Beneficiary a separate statement setting forth the Beneficiary's share of items of income, gain, loss, deduction or credit and all such holders shall report such items on their federal income tax returns; *provided, however*, that no such statement need be sent to any Class that is not expected to receive any Distribution from the Liquidating Trust.  The Liquidating Trust's taxable income, gain, loss, deduction or credit will be allocated to the Liquidating Trust's beneficiaries in accordance with their relative beneficial interests in the Liquidating Trust.

As soon as possible after the Effective Date, the Liquidating Trust shall make a good faith valuation of assets of the Liquidating Trust, and such valuation shall be used consistently by all parties for all federal income tax purposes.  The Liquidating Trust also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidating Trust that are required by any Governmental Unit for taxing purposes.  The Liquidating Trust may request an expedited determination of taxes of the Plan Debtors or of the Liquidating Trust under Bankruptcy Code section 505(b) for all tax returns filed for, or on behalf of, the Plan Debtors and the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

The Liquidating Trust shall be responsible for filing all federal, state, and local tax returns for the Plan Debtors and the Liquidating Trust.  The Liquidating Trust shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions made by the Liquidating Trust shall be subject to any such withholding and reporting requirements.

### 7.       Payment of Taxes.

The Liquidating Trust shall be responsible for payments of all Allowed tax obligations of the Plan Debtors, and any taxes imposed on the Liquidating Trust or the Liquidating Trust Assets.

### i.       Preservation of Right to Conduct Investigations.

The preservation for the Liquidating Trust of any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 is necessary and relevant to the liquidation and administration of the Liquidating Trust Assets.  Accordingly, any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 held by the Plan Debtors prior to the Effective Date shall vest with the Liquidating Trust and shall continue until dissolution of the Liquidating Trust.

j.    **Prosecution and Resolution of Causes of Action.**

1.    **The Liquidating Trust's Exclusive Authority to Pursue, Settle, or Abandon Causes of Action.**

From and after the Effective Date, prosecution and settlement of all Causes of Action, including Avoidance Actions, transferred to the Liquidating Trust shall be the sole responsibility of the Liquidating Trust pursuant to the Plan and the Confirmation Order.  From and after the Effective Date, the Liquidating Trust shall have exclusive rights, powers, and interests of the Plan Debtors' Estates to pursue, settle or abandon such Causes of Action as the sole representative of the Plan Debtors' Estates pursuant to Bankruptcy Code section 1123(b)(3). Proceeds recovered from all Causes of Action will be deposited into the Liquidating Trust and will be distributed by the Liquidating Trustee to the Beneficiaries in accordance with the provisions of the Plan and Liquidating Trust Agreement.  All Causes of Action, including Avoidance Actions, that are not expressly released or waived under the Plan are reserved and preserved and vest in the Liquidating Trust in accordance with the Plan.  No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Plan Debtors or Liquidating Trustee will not pursue any and all available Causes of Action against such Person.  The Liquidating Trustee expressly reserves all Causes of Action, except for any Causes of Action against any Person that are expressly released or waived under the Plan, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of confirmation or consummation of the Plan.  For the avoidance of doubt, no claims or Causes of Action against the Released Parties shall be transferred to the Liquidating Trust, the Liquidating Trustee shall not have standing to pursue such claims or Causes of Action, and all such claims and Causes of Action shall be waived, released and discharged pursuant to the Plan.

2.    **Settlement of Causes of Action.**

Settlement by the Liquidating Trust of any Cause of Action transferred to the Liquidating Trust shall require:  (i) approval only of the Liquidating Trustee if the amount claimed by the Liquidating Trust against a defendant is less than one million dollars ($1,000,000); and (ii) approval of the Liquidating Trustee and the Bankruptcy Court, upon notice and a hearing, if the amount claimed by the Liquidating Trust against a defendant is unliquidated or equals to or exceeds one million dollars ($1,000,000).

k.    **Federal Income Tax Treatment of the Liquidating Trust for the Liquidating Trust Assets.**

For federal income tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury regulations and that such trust be owned by its beneficiaries.  Accordingly, for federal income tax purposes, it is intended that the Beneficiaries be treated as if they had received a distribution from the Plan Debtors' Estates of an undivided interest in each of the Liquidating Trust Assets (to the extent of the value of their respective share in the applicable assets) and then contributed such interests to

71

the Liquidating Trust, and the Liquidating Trust's Beneficiaries will be treated as the grantors and owners thereof.

### l.    **Limitation of Liability.**

No recourse will ever be had, directly or indirectly, against the Liquidating Trustee, its members, officers, directors, employees, professionals, representatives, agents, successors or assigns, by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge or note, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Liquidating Trust under the Plan or by reason of the creation of any indebtedness by the Liquidating Trust or the Liquidating Trustee under the Plan. All such liabilities under the Plan will be enforceable only against, and will be satisfied only out of, the assets of the Liquidating Trust. The Liquidating Trust and the Liquidating Trustee and their respective officers, directors, employees, professionals, representatives, agents, successors or assigns will not be liable for any act they may do, or omit to do hereunder in good faith and in the exercise of their sound judgment; *provided, however*, that this Section will not apply to any gross negligence or willful misconduct by the Liquidating Trust and the Liquidating Trustee or their respective officers, directors, employees, professionals, representatives, agents, successors or assigns.

### m.    **Term of Liquidating Trust.**

The Liquidating Trustee shall be discharged and the Liquidating Trust shall be terminated, at such time as (i) all Disputed Claims have been resolved, (ii) all of the Liquidating Trust Assets have been liquidated, (iii) all duties and obligations of the Liquidating Trustee under the Liquidating Trust Agreement have been fulfilled, (iv) all Distributions required to be made by the Liquidating Trust under the Plan and the Liquidating Trust Agreement have been made, and (v) the Plan Debtors' Chapter 11 Cases have been closed; *provided, however*, that in no event shall the Liquidating Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or the end of any extension period approved by the Bankruptcy Court), determines that a fixed period extension not to exceed one (1) year is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

### n.    **Conflicts Between the Liquidating Trust Agreement and the Plan.**

In the event of any inconsistencies or conflict between the Liquidating Trust Agreement and the Plan, the terms and provisions of the Plan shall control.

### o.    **Excess Funds.**

In the event there is Liquidating Trust Distributable Cash remaining after all Distributions required to be made by the Liquidating Trust under the Plan and the Liquidating Trust Agreement have been, such Cash will be turned over to the Attorney General for the State of Texas in accordance with Texas law.

72

### C. Acceptance or Rejection of the Plan.

#### 1. Holders of Claims and Interests Entitled to Vote.

Pursuant to section 1126 of the Bankruptcy Code, each Impaired Class of Claims or Interests that will receive a Distribution pursuant to the Plan may vote separately to accept or reject the Plan. Each Holder of an Allowed Claim in such an Impaired Class shall receive a ballot and may cast a vote to accept or reject the Plan. The following Classes of each of the Plan Debtors are Impaired and entitled to vote:

| Plan Debtor | Impaired Classes Entitled to Vote |
|---|---|
| SMRS | 3, 4, 5 and 6 |
| Panhandle | 3, 5 and 6 |
| Permian | 3, 5 and 6 |
| SMC | 3, 5 and 6 |
| SMF | 3, 4 and 5 |
| Tyler | 3, 6 and 7 |
| Caprock | 3, 5 and 6 |
| Plains | 3, 4 and 5 |
| SDI | 4 |

#### 2. Classes Deemed to Reject.

The following Classes of each of the Plan Debtors are Impaired, are not entitled to a Distribution and are deemed to reject the Plan:

| Plan Debtor | Impaired Classes Deemed to Reject Plan |
|---|---|
| SMRS | None |
| Panhandle | 7 |
| Permian | 7 |
| SMC | 7 |
| SMF | 6 |
| Tyler | 8 |
| Caprock | 7 |
| Plains | 6 |
| SDI | 5 |

73

3.      **Classes Deemed to Accept.**

The following Classes of the Plan Debtors are Unimpaired, not entitled to vote to accept or reject the Plan and are deemed to accept the Plan:

| Plan Debtor | Unimpaired Classes Deemed to Accept Plan |
|---|---|
| SMRS | 1 and 2 |
| Panhandle | 1, 2 and 4 |
| Permian | 1, 2 and 4 |
| SMC | 1, 2 and 4 |
| SMF | 1 and 2 |
| Tyler | 1, 2, 4 and 5 |
| Caprock | 1, 2 and 4 |
| Plains | 1 and 2 |
| SDI | 1, 2 and 3 |

4.      **Acceptance by a Class.**

A Class of Claims entitled to vote to accept or reject the Plan accepts the Plan if the Holders of Claims in such voting Class that hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Claims that complete and return Ballots in such Class vote to accept the Plan. A Class of Interests is deemed to accept the Plan if the Plan has been accepted by Holders of at least 2/3 of the amount of the Allowed Interests held by Holders of such Interests who vote in such Class.

5.      **Cramdown Under Section 1129(b) of the Bankruptcy Code.**

If all applicable requirements for confirmation of the Plan are met as set forth in section 1129(a) of the Bankruptcy Code except subsection (8) thereof, the Plan Debtors may request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code on the bases that the Plan is fair and equitable and does not discriminate unfairly with respect to each Class of Claims or Interests that is Impaired under, and has not accepted or is deemed to reject, the Plan.

D.      **Distributions**

1.      **Distribution Record Date.**

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Plan Debtor or their agents shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Interests. The Plan Debtors or the Liquidating Trustee shall have no obligation to recognize any ownership transfer of the Claims or Interests occurring after the Distribution Record Date. The Plan Debtors, the Liquidating Trustee, or any party responsible for making Distributions shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

### 2.      Date of Distributions.

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, on the next Distribution Date or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Plan Debtors shall receive the full amount of the Distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein.  Distributions made after the Effective Date to holders of Allowed Claims shall be deemed to have been made on the Effective Date and, except as otherwise provided in the Plan, no interest shall accrue or be payable with respect to such Claims or any Distribution related thereto.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the Plan.  Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends or accruals on the Distributions provided for herein, regardless of whether such Distributions are delivered on or at any time after the Effective Date.

### 3.      Disbursing Agent.

Except as otherwise provided in the Plan, all Distributions under the Plan shall be made by the Plan Debtors or Liquidating Trustee as Disbursing Agent or such other Person designated by the Plan Debtors or Liquidating Trustee as a Disbursing Agent on the Effective Date.

### 4.      Rights and Powers of Disbursing Agent.

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan; (b) make all Distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

### 5.      Delivery of Distributions in General.

Except as otherwise provided in the Plan, Distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Disbursing Agent.  Distributions to Holders of Allowed Claims will be made at the address of each such Holder as set forth in the Plan Debtors' books and records, except that, in the case of Holders of Obligated Group Bond Claims and Tyler Bond Claims, the Obligated Group Bond Trustee and Tyler Bond Trustee shall be deemed to be the Holder of the Obligated Group Bond Claims and Tyler Bond Claims, respectively, for purposes of Distributions to be made hereunder, and all Distributions on account of such Claims shall be made to or at the direction of the Obligated Group Bond Trustee and Tyler Bond Trustee.  As soon as practicable, the Obligated Group Bond

Trustee and Tyler Bond Trustee shall arrange to deliver such distributions to or on behalf of the Holders of Allowed Obligated Group Bond Claims and Tyler Bond Claims, respectively. None of the Plan Debtors or the Liquidating Trustee shall incur any liability whatsoever on account of any Distributions under the Plan except for gross negligence, willful misconduct or fraud.

6.     **Payments and Distributions on Disputed Claims.**

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date. Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Plan Debtors or the Liquidating Trustee, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial Distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

7.     **Manner of Payment.**

Any Distributions to be made by or on behalf of the Plan Debtors or the Liquidating Trustee, as applicable, pursuant to the Plan shall be made by checks drawn on accounts maintained by the Plan Debtors or the Liquidating Trustee, respectively, or by wire transfer if circumstances justify, at the option of the Plan Debtors or the Liquidating Trustee, as applicable.

8.     **Undeliverable Distributions and Unclaimed Property.**

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such Distribution shall be made as soon as practicable after such Distribution has become deliverable; *provided, however*, that such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the applicable Distribution Date. After such date, all "unclaimed property" or interests in property shall revert to the Liquidating Trust (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any Holder to such property shall be discharged and forever barred.

9.     **Withholding and Reporting Requirements.**

In connection with the Plan and all instruments issued in connection therewith, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Distributions under the Plan shall be subject to any such withholding or reporting requirements.

10. **Surrender Instruments.**

Pursuant to Bankruptcy Code section 1143, as a condition precedent to receiving any Distribution under the Plan, each holder of a certificated instrument or note must surrender such instrument or note held by it to the Disbursing Agent or its designee. Any holder of such instrument or note that fails to (i) surrender the instrument or note or (ii) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Disbursing Agent and furnish a bond in form, substance, and amount reasonably satisfactory to the Disbursing Agent before the fifth anniversary of the Confirmation Date shall be deemed to have forfeited all rights and claims and may not participate any Distribution hereunder. Any Distribution so forfeited shall become property of the Liquidating Trust.

11. **Setoffs.**

The Plan Debtors and the Liquidating Trustee may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which a Distribution shall be made), any claims of any nature whatsoever that the Plan Debtors and the Liquidating Trustee may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Plan Debtors and the Liquidating Trustee of any such claim the Plan Debtors and the Liquidating Trustee may have against the Holder of such Claim.

12. **Insurance Claims.**

No Distributions under the Plan shall be made on account of Allowed Claims until the Holder of such Allowed Claim has exhausted all remedies with respect to the Plan Debtors' Insurance Policies. To the extent that one or more of the Plan Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

13. **Applicability of Insurance Policies.**

Except as otherwise provided in the Plan, Distributions to Holders of Allowed Claims shall be made in accordance with the provisions of any applicable Insurance Policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Plan Debtors, Liquidating Trustee or any Person may hold against any other Person, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

14. **No Postpetition Interest.**

Unless otherwise specifically provided for herein or in the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any

Claims or Interests, and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on such Claim.

### 15. Distributions Free and Clear.

Except as may be otherwise provided herein, all Distributions under the Plan shall be free and clear of any Liens, Claims, encumbrances, and other interests.

### 16. Fractional Dollars; De Minimis Distributions.

Notwithstanding any other provision of the Plan, Cash payments of fractions of dollars shall not be made. Whenever any Distribution to a Holder of a Claim would otherwise call for Distribution of Cash in a fractional dollar amount, the actual Distribution of such Cash shall be rounded to the nearest whole dollar (up or down), with half dollars (or less) being rounded down. Neither the Plan Debtors nor the Liquidating Trustee shall be required to make any Cash payment of less than fifty dollars ($50.00) with respect to any Claim or Interest unless a request therefor is made in writing to the Plan Debtors or the Liquidating Trustee, as applicable; *provided, however*, that neither the Plan Debtor nor the Liquidating Trustee shall have any obligation to make any Distribution, whether final or not, unless and until the total amount of such Distribution to a specific Holder of an Allowed Claim or Interest is equal to or greater than ten dollars ($10.00).

### 17. Allocation of Distributions between Principal and Unpaid Interest.

To the extent that any Allowed Claim entitled to a Distribution under the Plan includes both principal and accrued but unpaid interest, such Distribution shall be allocated to the principal amount (as determined for federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

### 18. Single Satisfaction of Claims.

Holders of Allowed Claims may assert such Claims against each Plan Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Plan Debtor based upon the full Allowed amount of the Claim. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of Allowed Claims exceed 100% of the underlying Allowed Claim.

### E. Procedures for Disputed Claims

### 1. Allowance of Claims and Interests.

Except as expressly provided herein, or in any order entered in the Plan Debtors' Chapter 11 Cases prior to the Effective Date, including the Confirmation Order, no Claim or Interest shall be deemed Allowed unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code or Allowed by the Bankruptcy Court by entry of a Final Order allowing such Claim or Interest. Prior to and following the Effective Date, the Liquidating

Trust shall be vested with any and all rights and defenses the Plan Debtors had with respect to any Claim or Interest immediately prior to the Effective Date.

### 2. Objections to Claims.

The Plan Debtors (before the Effective Date) or the Liquidating Trustee (on or after the Effective Date), as applicable, shall have the exclusive authority to file, settle, compromise, withdraw or litigate to judgment any objections to Claims as permitted under the Plan. Any objections to claims shall be filed and served on or before the later of (i) one hundred eighty (180) days after the Effective Date or (ii) such date as may be fixed by the Bankruptcy Court. From and after the Effective Date, the Liquidating Trustee may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. The Plan Debtors and the Liquidating Trustee reserve all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

### 3. Estimation of Claims.

The Plan Debtors (before the Effective Date) or the Liquidating Trustee (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Contingent Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to such objection. In the event that the Bankruptcy Court estimates any Contingent Claim or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Plan Debtors or the Liquidating Trustee may pursue supplementary proceedings to object to the allowance of such Claim; *provided, however*, the Liquidating Trustee may elect not to pursue such supplementary proceedings, instead electing to treat such maximum amount as the Allowed amount of such Claim.

### 4. No Distribution Pending Allowance.

Notwithstanding any other provision of the Plan, if any portion of a Claim is Disputed, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 5. Distributions after Allowance.

At such time as a Contingent Claim or a Disputed Claim becomes an Allowed Claim, a Distribution shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Contingent Claim or Disputed Claim becomes a Final Order. To the extent that all or a portion of a Contingent Claim or a Disputed Claim is disallowed, the

Holder of such Claim shall not receive any Distribution on account of the portion of such Claim that is disallowed.

### 6.      Preservations of Rights to Settle Claims.

In accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Trustee shall have the discretion to retain and enforce, sue on, settle, or compromise all claims, rights, causes of action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Plan Debtors or their Estates may hold against any person or entity without the approval of the Bankruptcy Court, subject to the terms of the Plan, the Confirmation Order, the Liquidating Trust Agreement, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith.  The Liquidating Trustee may pursue such retained claims, rights, or causes of action, suits, or proceedings, as appropriate, in accordance with the best interests of the Liquidating Trust and its Beneficiaries.

### 7.      Disallowed Claims.

All Claims held by persons or entities against whom or which the Plan Debtors or Liquidating Trustee has commenced a proceeding asserting a cause of action under sections 542, 543, 544, 545, 547, 548, 549, and/or 550 of the Bankruptcy Code shall be deemed Disallowed Claims pursuant to section 502(d) of the Bankruptcy Code and Holders of such Claims shall not be entitled to vote to accept or reject the Plan.  Disallowed Claims pursuant to this Section shall continue to be Disallowed Claims for all purposes until the avoidance action against such party has been settled or resolved by Final Order and any sums due to the Plan Debtors or Liquidating Trustee from such party have been paid.

### F.      Executory Contracts and Unexpired Leases

### 1.      Assumption and Rejection of Executory Contracts and Unexpired Leases.

Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, including, but not limited to, the Obligated Group APA, Tyler APA, Caprock APA and Plains APA and any other asset purchase agreement entered into by Plan Debtors in connection with the Sales, each of the Executory Contracts and Unexpired Leases of the Plan Debtors shall be deemed rejected as of the Effective Date, unless such Executory Contract or Unexpired Lease:  (1) was assumed or rejected previously by the applicable Plan Debtor; (2) expired or terminated pursuant to its own terms before the Effective Date; (3) is the subject of a motion to assume or reject filed on or before the Effective Date; or (4) is identified as an Executory Contract or Unexpired Lease to be assumed in connection with the Sales.

### 2.      Inclusiveness.

Unless otherwise specified, each Executory Contract and Unexpired Lease assumed or rejected by the Plan Debtor shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement,

instrument or other document that in any manner affects such Executory Contract or Unexpired Lease.

### 3.     Rejection Claims.

Except as otherwise provided in orders entered by the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court and served on counsel to the Plan Debtors or the Liquidating Trustee  on or before the date that is thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; provided, that any such Claims arising from the rejection of an Unexpired Lease shall be subject to the cap on rejection damages imposed by Bankruptcy Code section 502(b)(6). Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the Plan Debtors or the Liquidating Trustee, the Plan Debtors' Estates or their property without the need for any objection by the Plan Debtors or the Liquidating Trustee or further notice to, or action, order or approval of the Bankruptcy Court.   All Allowed Claims arising from the rejection of the Plan Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims against the applicable Plan Debtor and shall be treated in accordance with the Plan.

### 4.     Cure of Defaults.

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed under the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by Cure.  If there is a dispute regarding (i) the nature or amount of any Cure, (ii) the ability of the Successful Bidders to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (iii) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption.

### 5.     Full Release and Satisfaction.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

### 6.     Reservation of Rights.

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Plan Debtors or the Liquidating Trustee that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Plan Debtors or the Liquidating Trustee have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Plan Debtors or the

Liquidating Trustee, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### G.    Conditions Precedent to Confirmation and the Effective Date

#### 1.    Conditions Precedent to Confirmation.

Confirmation of the Plan shall not occur, and the Confirmation Order shall not be entered, until each of the following conditions precedent have been satisfied or waived pursuant to the provisions of the Plan:

a.   The Bankruptcy Court shall have entered an order, which shall not be subject to any stay or subject to an unresolved request for revocation under section 1144 of the Bankruptcy Code, in form and substance acceptable to the Plan Debtors, approving the Disclosure Statement with respect to the Plan and the solicitation of votes thereon as being in compliance with section 1125 of the Bankruptcy Code and applicable non-bankruptcy law.

b.   The proposed Confirmation Order shall be in form and substance satisfactory in all respects to the Plan Debtor and the Liquidating Trustee; and

c.   The Plan and the Plan Supplement, including any schedules, documents, supplements and exhibits thereto shall be, in form and substance, acceptable the Plan Debtors.

#### 2.    Conditions Precedent to the Effective Date.

The Effective Date shall not occur until each of the following conditions precedent have been satisfied or waived pursuant to the provisions of the Plan:

a.   The Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to the Plan Debtors, and such Confirmation Order shall not be subject to any stay or an unresolved request for revocation under section 1144 of the Bankruptcy Code;

b.   The Bankruptcy Court shall have entered one or more orders, in form and substance acceptable to the Plan Debtors, (i) authorizing the Sales to the Successful Bidders pursuant to section 363 of the Bankruptcy Code and (ii) authorizing the assumption and rejection of Executory Contracts and Unexpired Leases by the Plan Debtors as contemplated by the asset purchase agreements governing the Sales;

c.   The Plan Debtors shall have closed on the Sales; and

d.   All actions, documents, certificates, and agreements necessary to implement the Plan, including, without limitation, the Liquidating Trust Agreement, shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

3.      **Waiver of Conditions.**

The conditions to confirmation and consummation of the Plan set forth herein may be waived at any time by the Plan Debtors without notice to any other parties in interest or the Bankruptcy Court and without a hearing; *provided, however*, that the Plan Debtors may not waive entry of the Order approving the Disclosure Statement and the Confirmation Order.

4.      **Effect of Failure of Conditions.**

If the consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any claims by or Claims against the Plan Debtors; (2) prejudice in any manner the rights of the Plan Debtors, any Holders of Claims or any other Person; or (3) constitute an admission, acknowledgment, offer or undertaking by the Plan Debtors, any Holders or any other Person in any respect.

H.      **Effect of Confirmation**

1.      **Immediate Binding Effect.**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of the Plan and the Liquidating Trust Agreement shall be immediately effective and enforceable and deemed binding upon the Plan Debtors, the Liquidating Trustee, the Liquating Trust and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Persons that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each Person acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Plan Debtors.

2.      **Compromise and Settlement of Claims, Interests and Controversies.**

Pursuant to sections 363 and 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any Distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Plan Debtors, their Estates and Holders of Claims and Interests and is fair, equitable and reasonable.

3.      **Discharge of Claims and Termination of Interests.**

Except as otherwise provided herein or in the Confirmation Order, the rights afforded herein and the payments and Distributions to be made hereunder shall discharge all

existing debts and Claims, and terminate all Interests in the Plan Debtors of any kind, nature, or description whatsoever against or in the Plan Debtors or any of their Assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code. Except as provided herein, on the Effective Date, all existing Claims against the Plan Debtors and Interests in the Plan Debtors shall be deemed to be discharged and terminated, and all Holders of Claims and Interests shall be precluded and enjoined from asserting against the Plan Debtors or the Liquidating Trust or any of their Assets or properties, any other or further Claim or Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such Holder has filed a Proof of Claim or proof of interest. Notwithstanding any provision herein, any valid setoff or recoupment rights held against any of the Plan Debtors shall not be affected by the Plan and shall be expressly preserved in the Confirmation Order.

4.      **Releases by the Plan Debtors.**

Pursuant to section 1123(b) of the Bankruptcy Code and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious liquidation of the Plan Debtors and the consummation of the transactions contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Plan Debtors and their Estates from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Plan Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Plan Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Plan Debtors, the Plan Debtors' Chapter 11 Cases, the Sales or the transactions or events giving rise to any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Plan Debtor and any Released Party, the restructuring of Claims and Interests before or during the Plan Debtors' Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, any Plan Supplement or related agreements, instruments or other documents (collectively, the "***Plan Debtor Released Claims***"), other than Plan Debtor Released Claims against a Released Party arising out of the gross negligence, willful misconduct, intentional fraud, or criminal liability of any such person or entity.

5.      **Releases by Holders of Claims.**

**ON THE EFFECTIVE DATE, EXCEPT AS OTHERWISE PROVIDED HEREIN AND EXCEPT FOR THE RIGHT TO ENFORCE THE PLAN, ALL PERSONS WHO HAVE (I) VOTED TO ACCEPT THE PLAN OR WHO ARE PRESUMED OR DEEMED TO HAVE VOTED TO ACCEPT THE PLAN UNDER SECTION 1126(f) OF THE BANKRUPTCY CODE, (II) ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN AND WHO VOTE TO REJECT THE PLAN OR ABSTAIN FROM VOTING, AND (III) DO NOT MARK THEIR BALLOTS AS OPTING OUT OF THE RELEASES GRANTED UNDER THIS SECTION, SHALL, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BE DEEMED TO FOREVER**

84

**RELEASE, WAIVE AND DISCHARGE THE RELEASED PARTIES AND EACH OF THEIR RESPECTIVE CONSTITUENTS, PRINCIPALS, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, REPRESENTATIVES, ATTORNEYS, PROFESSIONALS, ADVISORS, AFFILIATES, FUNDS, SUCCESSORS, PREDECESSORS, AND ASSIGNS, OF AND FROM ALL LIENS, CLAIMS, CAUSES OF ACTION, LIABILITIES, ENCUMBRANCES, SECURITY INTERESTS, INTERESTS OR CHARGES OF ANY NATURE OR DESCRIPTION WHATSOEVER RELATING TO THE PLAN DEBTORS, THE CHAPTER 11 CASES OR AFFECTING PROPERTY OF THE ESTATES, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, SCHEDULED OR UNSCHEDULED, CONTINGENT OR NOT CONTINGENT, UNLIQUIDATED OR FIXED, ADMITTED OR DISPUTED, MATURED OR UNMATURED, SENIOR OR SUBORDINATED, WHETHER ASSERTABLE DIRECTLY OR DERIVATIVELY BY, THROUGH, OR RELATED TO THE PLAN DEBTORS, AGAINST SUCCESSORS OR ASSIGNS OF THE PLAN DEBTORS AND THE INDIVIDUALS AND ENTITIES LISTED ABOVE WHETHER AT LAW, IN EQUITY OR OTHERWISE, BASED UPON ANY CONDITION, EVENT, ACT, OMISSION OCCURRENCE, TRANSACTION OR OTHER ACTIVITY, INACTIVITY, INSTRUMENT OR OTHER AGREEMENT OF ANY KIND OR NATURE OCCURRING, ARISING OR EXISTING PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO OR ARISING OUT OF, IN WHOLE OR IN PART, THE PLAN DEBTORS, THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE NEGOTIATION AND CONSUMMATION OF THE SALES, THE CONSUMMATION OF THE PLAN OR THE ADMINISTRATION OF THE PLAN, INCLUDING WITHOUT LIMITATION, THE NEGOTIATION AND SOLICITATION OF THE PLAN, ALL REGARDLESS OF WHETHER (A) A PROOF OF CLAIM OR EQUITY INTEREST HAS BEEN FILED OR IS DEEMED TO HAVE BEEN FILED, (B) SUCH CLAIM OR EQUITY INTEREST IS ALLOWED OR (C) THE HOLDER OF SUCH CLAIM OR EQUITY INTEREST HAS VOTED TO ACCEPT OR REJECT THE PLAN, EXCEPT FOR WILLFUL MISCONDUCT OR GROSS NEGLIGENCE. FOR THE AVOIDANCE OF DOUBT, NOTHING CONTAINED HEREIN SHALL IMPACT THE RIGHT OF ANY HOLDER OF AN ALLOWED CLAIM TO RECEIVE A DISTRIBUTION ON ACCOUNT OF ITS ALLOWED CLAIM IN ACCORDANCE WITH SECTION 4 HEREOF.**

   6.  **Exculpation.**

   None of the Released Parties, nor any of their respective members, officers, directors, employees, advisors, professionals, attorneys or agents or any of their successors and assigns, shall have or incur any liability to any Holder of a Claim or Interest, or other party in interest, or any of their respective members, officers, directors, employees, advisors, professionals, attorneys or agents or any of their successors and assigns, for any act or omission in connection with, related to, or arising out of, in whole or in part, the Plan Debtors' Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan, including without limitation, the negotiation and solicitation of the Plan and the negotiation and consummation of the Sales, except for their willful misconduct or gross negligence as determined by a Final Order of a court of competent jurisdiction, and, in all

respects, the Released Parties, and each of their respective members, officers, directors, employees, advisors, professionals, attorneys or agents, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

      **7.**      **Injunction.**

      **FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST OR INTEREST IN THE PLAN DEBTORS ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.**

      **FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN THE PLAN, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN.**

      **EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED, DISCHARGED, OR ARE SUBJECT TO EXCULPATION, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (B) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (C) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH PERSONS OR THE PROPERTY OR ESTATES OF SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (D) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THE PLAN.**

      **THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND**

**AFTER THE PETITION DATE, AGAINST THE PLAN DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE PLAN DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED (EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN).**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE PLAN DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL INTERESTS SHALL BE CANCELLED, AND THE PLAN DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.**

**ALL PERSONS SHALL BE PRECLUDED FROM ASSERTING AGAINST THE PLAN DEBTORS, THE PLAN DEBTORS' ESTATES, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.**

### 8. Term of Injunctions or Stays.

Unless otherwise provided in the Plan or Confirmation Order, all injunctions or stays provided for under the Plan and ordered in the Confirmation Order or pursuant to sections 105 or 362 of the Bankruptcy Code arising under or entered during the Chapter 11 Cases, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay and to the extent consistent with the terms and provisions of the Plan or the Confirmation Order, as applicable.

### 9. Injunction Against Interference with Plan.

Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Interests, the Plan Debtors, and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the Plan Debtors', the Liquidating Trust's, the Liquidating Trustee's, and their respective affiliates', employees', advisors', officers' and directors', and agents' implementation or consummation of the Plan.

### 10. Release of Liens.

Except as otherwise provided in the Plan, or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the

Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged.  For the avoidance of doubt, except as otherwise provided in the Plan, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Plan Debtors' Estates shall be fully released and discharged on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

### 11.    Effectuating Documents and Further Transactions.

Upon entry of the Confirmation Order, the appropriate officers of the Plan Debtors and the Liquidating Trustee shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, consents, certificates, resolutions, programs, and other agreements and/or documents, and take such acts and actions as may be reasonably necessary or appropriate to effectuate, implement, consummate, and/or further evidence the terms and conditions of the Plan and any transactions described in or contemplated by the Plan.  The Plan Debtors or Liquidating Trustee, as applicable, may, and all Holders of Allowed Claims or Interests receiving Distributions pursuant to the Plan, at the request or direction of the Plan Debtors or Liquidating Trustee, as applicable, shall, from time to time, prepare, execute, and deliver any agreements or documents, and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 12.    Corporate Action.

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including all actions contemplated by the Plan (whether to occur before, on or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Plan Debtors, and any corporate action required by the Plan Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors or officers of the Plan Debtors.

### 13.    Cancellation of Documents.

On the Effective Date, except to the extent otherwise provided in the Plan, any and all notes, instruments, debentures, certificates and other documents evidencing Claims and Interests in the Plan Debtors Debtor including, without limitation, the Obligated Group Loan Documents, Tyler Loan Documents, the Caprock Loan Documents, the Plains Loan Documents, the Obligated Group DIP Loan Documents, the Tyler DIP Loan Documents, the Caprock DIP Loan Documents and the SDI DIP Loan Documents shall be deemed automatically extinguished, canceled, and of no further effect with the Plan Debtors having no continuing obligations thereunder, and shall be deemed rejected and terminated.

### 14.    Dissolution of the Plan Debtors.

On the Effective Date and upon the Plan Debtors causing the Liquidating Trust Assets to be transferred to the Liquidating Trust in accordance with section 6.3 of the Plan, the Plan Debtors shall have no further duties or responsibilities in connection with implementation

EAST\86228047.5

congress

of the Plan. Upon entry of a final decree closing the Plan Debtors' Chapter 11 Cases, the Plan Debtors shall be deemed dissolved for all purposes in accordance with applicable state law without the need to take any further action or file any plan of dissolution, notice, or application with the Secretary of State of the State of Texas.

### 15. Preservation of Causes of Action of the Plan Debtors.

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the releases by the Plan Debtors and exculpation provisions provided in the Plan), the Plan Debtors and Liquidating Trustee shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, including, but not limited to any claims against former officers and directors, advisors or third parties involved in the 2013 Restructuring and the use of Garrison Restricted Cash, claims against LCS, and any claims against parties with whom the Debtors formerly did business, including vendors, whether arising before or after the Petition Date, and the Liquidating Trustee's rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Plan Debtors and Liquidating Trustee may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Creditors and Beneficiaries. No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Plan Debtors or Liquidating Trustee, as applicable, will not pursue any and all available Causes of Action against them. Except with respect to Causes of Action as to which the Plan Debtors and Liquidating Trustee have released any Person or Person on or before the Effective Date, the Plan Debtors and Liquidating Trustee, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan.

### I. Modification, Revocation or Withdrawal of the Plan

### 1. Modification and Amendments.

The Plan or any Exhibits thereto may be amended, modified, or supplemented by the Plan Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code. In addition, after the Confirmation Date, the Plan Debtors or Liquidating Trustee may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

### 2. Effect of Confirmation on Modifications.

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re solicitation under Bankruptcy Rule 3019.

3.       **Revocation or Withdrawal of the Plan.**

The Plan Debtors reserve the right to, consistent with their fiduciary duties, revoke or withdraw the Plan before the Effective Date. If the Plan Debtors revoke or withdraw the Plan, or if Confirmation does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Plan Debtors or any other Person; or (iii) constitute an admission, acknowledgement, offer or undertaking of any sort by the Plan Debtors or any other Person.

**J.      Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or related to, the Plan Debtors' Chapter 11 Cases and the Plan, including, but not limited to, jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount or allowance of Claims;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to: (i) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Plan Debtor is party or with respect to which a Plan Debtor may be liable in any manner and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including rejection Claims and cure Claims, pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease in connection with the Sales; and (iv) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving a Plan Debtor that may be pending on the Effective Date;

6. adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, including, but not limited to the Causes of Action, involving the Liquidating Trustee or the Liquidating Trust;

7. adjudicate, decide or resolve any and all matters related to any Cause of Action;

8. adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

9. enter and enforce any order for the sale of property pursuant to sections 363, 1123 or 1146(a) of the Bankruptcy Code;

10. issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation or enforcement of the Plan;

11. resolve any cases, controversies, suits, disputes or Causes of Action with respect to the discharge, releases, injunctions, exculpations, indemnifications and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

12. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

13. resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, the Liquidating Trust, the Liquidating Trust Agreement, any transactions or payments contemplated thereby, or any contract, instrument, release, indenture or other agreement or document relating to any of the foregoing;

14. adjudicate any and all disputes arising from or relating to Distributions under the Plan;

15. consider any modifications of the Plan, cure any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

16. determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

17. hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

18. hear and determine all disputes involving the existence, nature or scope of the Plan Debtors' discharge;

19. enforce all orders previously entered by the Bankruptcy Court;

91

20.     hear any other matter not inconsistent with the Bankruptcy Code; and

21.     enter final decrees closing the Plan Debtors' Chapter 11 Cases.

### K.     Miscellaneous Provisions

#### 1.     Payment of Statutory Fees.

All fees payable pursuant to 28 U.S.C. § 1930 shall be paid on the earlier of when due or the Effective Date by the Plan Debtors.   From and after the Effective Date, the Liquidating Trustee shall be liable for payment of any such fees until entry of final decrees closing the Plan Debtors' Chapter 11 Cases.

#### 2.     Dissolution of Creditors' Committee.

On the Effective Date, the Creditors' Committee shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Plan Debtors' Chapter 11 Cases.

#### 3.     Section 1125(e) Good Faith Compliance.

As of and subject to the occurrence of the Confirmation Date, the Plan Debtors and their Related Persons shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation.

#### 4.     Substantial Consummation.

On the Effective Date, the Plan shall be deemed to be substantially consummated within the meaning set forth in section 1101 and pursuant to section 1127(b) of the Bankruptcy Code.

#### 5.     Section 1146 Exemption.

To the fullest extent permitted under section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of any security under or pursuant to the Plan, and the execution, delivery, or recording of any instrument of transfer under or pursuant to the Plan, and the revesting, transfer, or sale of any property of or to the Liquidating Trust or the Successful Bidders at the Sales, shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee.   Consistent with the foregoing, each recorder of deeds or similar official for any county, city or other Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, mortgage recording tax, intangible tax, or similar tax.

6. **Closing of the Chapter 11 Cases.**

When all Liquidating Trust Assets have been liquidated and converted into Cash and such Cash has been distributed in accordance with the Liquidating Trust Agreement and the Confirmation Order, the Liquidating Trustee shall seek authority from the Bankruptcy Court to close the Plan Debtors' Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

7. **Plan Supplement.**

Any exhibits or schedules not filed with the Plan may be contained in the Plan Supplement, if any, and the Plan Debtors hereby reserve the right to file such exhibits or schedules as a Plan Supplement.

8. **Further Assurances.**

The Plan Debtors or the Liquidating Trustee may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Plan Debtors, the Liquidating Trustee, and all Holders of Claims receiving Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

9. **Exhibits Incorporated.**

All exhibits to the Plan, including the Plan Supplement, are incorporated into and are part of the Plan as if fully set forth herein.

10. **Inconsistency.**

In the event of any inconsistency among the Plan, the Disclosure Statement and any exhibit to the Disclosure Statement, the provisions of the Plan shall govern.

11. **No Admissions.**

If the Effective Date does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan shall (a) constitute a waiver or release of any Claims by or against, or any Interests in, the Plan Debtors, (b) prejudice in any manner the rights of the Plan Debtors or any other party in interest, or (c) constitute an admission of any sort by the Plan Debtors or other party in interest.

12. **Reservation of Rights.**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order and the Effective Date has occurred. None of the Plan, any statement or provision contained in the Plan or any action taken or not taken by any Plan Debtor with respect to the Plan, the Disclosure Statement or the Plan

93

Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Plan Debtor with respect to the Holders of Claims or Interests before the Effective Date.

### 13. Successors and Assigns.

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries or guardian, if any, of each Person.

### 14. Entire Agreement.

On the Effective Date, the Plan, supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 15. Notices.

All notices, requests, and demands to or upon the Plan Debtors in the Chapter 11 Cases shall be in writing and, unless otherwise provided herein, shall be deemed to have been duly given or made when actually delivered or, if by facsimile transmission, when received and telephonically confirmed to the below recipients:

SEARS METHODIST RETIREMENT
SYSTEM, INC.
Attention: Paul Rundell
2100 Ross Avenue, 21st Floor
Dallas, Texas 75201
Attention: Paul Rundell
2100 Ross Avenue, 21st Floor
Dallas, Texas 75201

with copies to:

DLA PIPER LLP US
Attention: Thomas R. Califano
1251 Avenue of the Americas, 27th Floor
New York, New York 10020
Telephone: (212) 335-4500
Facsimile: (212) 335-4501
E-mail: Thomas.califano@dlapiper.com

-and-

DLA PIPER LLP US
Attention:  Vincent P. Slusher
1717 Main Street, Suite 4600
Dallas, Texas 75201
Telephone:  (214) 743-4500
Facsimile:  (214) 743-4545
E-mail: vince.slusher@dlapiper.com

All notices and requests to Persons holding any Claim in any Class shall be sent to them at their last known address or to the last known address of their attorney of record in the Plan Debtors' Chapter 11 Cases.  Any such Holder of a Claim may designate in writing any other address for purposes of this Section, which designation will be effective upon receipt by the Plan Debtors.

### 16.     Severability.

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 17.     Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Texas, without giving effect to the principles of conflicts of laws, shall govern the rights, obligations, construction, and implementation of the Plan and the transactions consummated or to be consummated in connection therewith.

## V.     RISK FACTORS IN CONNECTION WITH THE PLAN

The Holders of Claims against the Plan Debtors should read and carefully consider the following risk factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith), before deciding whether to vote to accept or reject the Plan.  These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

## A.     Bankruptcy Considerations.

Although the Plan Debtors believe the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm the Plan as proposed.  Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

In addition, the occurrence of the Effective Date is conditioned on the satisfaction (or waiver) of the conditions precedent set forth in Section 10.2 of the Plan, and there can be no assurance that such conditions will be satisfied or waived.  In the event the conditions precedent described in Section 10 of the Plan have not been satisfied, or waived (to the extent possible) by the Plan Debtors or applicable parties (as provided for in the Plan) as of the Effective Date, then the Confirmation Order will be vacated, no Distributions will be made pursuant to the Plan, and the Plan Debtors and all Holders of Claims and Interests will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Plan Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because each Class of Claims and Interests encompass Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Plan provides that certain Classes are to receive a Pro Rata share of Liquidating Trust Distributable Cash, which will be generated, in part, by the liquidation of certain Assets and the prosecution of certain Causes of Action.  The potential recoveries from such actions, however, are unknown.  In addition, there can be no assurance that the Liquidating Trust Assets will be sufficient to pay the fees and expenses of the Liquidating Trustee and/or the Liquidating Trust Professionals or make any Distributions to the Beneficiaries.

The Plan provides for no Distribution to certain Classes as specified in Sections 3 and 4 of the Plan.  The Bankruptcy Code conclusively deems these Classes to have rejected the Plan.  Pursuant to section 1129(a)(10) of the Bankruptcy Code, notwithstanding the fact that these Classes are deemed to have rejected the Plan, the Bankruptcy Court may confirm the Plan if at least one Impaired Class votes to accept the Plan (with such acceptance being determined without including the vote of any "insider" in such class).  As to each Impaired Class that has not accepted the Plan, the Plan may be confirmed if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to these Classes.  The Plan Debtors believe that the Plan satisfies these requirements.

EAST\86228047.5

### B.    Risks Related to Sales.

The Plan contemplates that the Sales will be consummated with the Successful Bidders and that the Net Sale Proceeds from the Sales will distributed to certain Holders of Claims in accordance with the Plan. Although the Plan Debtors have executed APAs with the Obligated Group Stalking Horse, the Tyler Stalking Horse, the Caprock Stalking Horse and the Plains Stalking Horse, there is no guarantee that these parties, or any other Successful Bidder, will close on the transactions. Moreover, there is no guarantee that the Successful Bidders will obtain the requisite approval from state and federal regulatory authorities in connection with the Sales. In the event the Plan Debtors are unable to close on the Sales, they may request that the Confirmation Order be vacated.

### C.    No Duty to Update Disclosures.

The Plan Debtors have no duty to update the information contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, or unless the Plan Debtors are required to do so pursuant to an order of the Bankruptcy Court. Delivery of the Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

### D.    Representations Outside this Disclosure Statement.

This Disclosure Statement contains representations concerning or related to the Plan Debtors and the Plan that are authorized by the Bankruptcy Code and the Bankruptcy Court. Please be advised that any representations or inducements outside this Disclosure Statement and any related documents which are intended to secure your acceptance or rejection of the Plan should not be relied upon by Holders of Claims or Interests that are entitled to vote to accept or reject the Plan.

### E.    No Admission.

The information and representations contained herein shall not be construed to constitute an admission of, or be deemed evidence of, any legal effect of the Plan on the Plan Debtors or Holders of Claims and Interests.

### F.    Tax and Other Related Considerations.

A discussion of potential tax consequences of the Plan is provided in Section VIII hereof; however, the content of this Disclosure Statement is not intended and should not be construed as tax, legal, business or other professional advice. Holders of Claims and/or Interests should seek advice from their own independent tax, legal or other professional advisors based on their own individual circumstances.

## VI.    PLAN CONFIRMATION AND CONSUMMATION

### A.    The Confirmation Hearing.

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan (the "***Confirmation Hearing***").  On, or as promptly as practicable after the filing of the Plan and this Disclosure Statement, the Plan Debtors will request, pursuant to the requirements of the Bankruptcy Code and the Bankruptcy Rules, that the Bankruptcy Court schedule the Confirmation Hearing.  Notice of the Confirmation Hearing (the "***Confirmation Hearing Notice***") will be provided to all known Creditors or their representatives.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Pursuant to Bankruptcy Code section 1128(b), any party in interest may object to confirmation of a plan of reorganization.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the particular Plan Debtor(s), the basis for the objection and the specific grounds of the objection, and must be filed with the Bankruptcy Court, with a copy to Chambers, together with proof of service thereof, and served upon: (i) DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020, Attn: Thomas R. Califano, and 1717 Main Street, Suite 4600, Dallas, TX 75201, Attn: Vincent P. Slusher, counsel to the Debtors; (ii) Greenberg Traurig, LLP, 2200 Ross Avenue, Suite 5200, Dallas, TX 75201, Attn: Clifton R. Jessup, Jr., and 77 West Wacker Drive, Suite 3100, Chicago, IL 60601, Attn: Nancy A. Peterman, counsel to the Creditors' Committee; (iii) the United States Trustee, 1100 Commerce Street, Room 976, Dallas, TX 75242, Attn: Nancy S. Resnick; and (iv) such other parties as the Bankruptcy Court may order, so as to be actually received no later than the date and time designated in the Confirmation Hearing Notice.

Bankruptcy Rule 9014 governs objections to confirmation of the Plan.  **UNLESS AN OBJECTION TO CONFIRMATION OF THE PLAN IS TIMELY SERVED UPON THE PARTIES LISTED ABOVE AND FILED WITH THE BANKRUPTCY COURT, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT IN DETERMINING CONFIRMATION OF THE PLAN.**

### B.    Plan Confirmation Requirements Under the Bankruptcy Code.

In order for the Plan to be confirmed, the Bankruptcy Code requires that the Bankruptcy Court determine that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures concerning the Plan have been adequate and have included information concerning all payments made or promised in connection with the Plan and these Chapter 11 Cases.  The Bankruptcy Code also requires that: (1) the Plan be accepted by the requisite votes of Creditors except to the extent that confirmation despite dissent is available under Bankruptcy Code section 1129(b); (2) the Plan is feasible (that is, there is a reasonable probability that the Plan Debtors will be able to perform their obligations under the Plan without needing further financial reorganization not contemplated by the Plan); and (3) the

98

Plan is in the "best interests" of all Creditors (that is, Creditors will receive at least as much under the Plan as they would receive in a hypothetical liquidation case under chapter 7 of the Bankruptcy Code). To confirm the Plan, the Bankruptcy Court must find that all of the above conditions are met, unless the applicable provisions of Bankruptcy Code section 1129(b) are employed to confirm the Plan, subject to satisfying certain conditions, over the dissent or deemed rejections of Classes of Claims.

### 1.    Best Interests of Creditors.

The Bankruptcy Code requires that, with respect to an impaired class of claims or interests, each holder of an impaired claim or interest in such class either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount (value) such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The Plan Debtors, with the assistance of their professionals, have prepared the Liquidation Analyses attached hereto as **Exhibit 3**. The Liquidation Analyses are based upon a hypothetical liquidation in a chapter 7 case. The Plan Debtors have taken into account the nature, status and underlying value of their Assets, the ultimate realizable value of their Assets, and the extent to which such Assets are subject to the liens and security interests. Based upon the Liquidation Analyses, the Plan Debtors believe that liquidation under chapter 7 would result in smaller distributions, if any, being made to Creditors than those provided for in the Plan because of (a) the likelihood that other Assets of the Plan Debtors would have to be sold or otherwise disposed of in a less orderly fashion; (b) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals, and (c) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Plan Debtors' operations. In the opinion of the Plan Debtors, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford the Holders of Claims as great a realization potential as afforded to them under the Plan.

Accordingly, the Plan Debtors believe that in a chapter 7 liquidation, Holders of Claims would receive less than such Holders would receive under the Plan. There can be no assurance, however, as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Plan Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

### 2.    Feasibility of the Plan.

Pursuant to section 1129(a)(11) of the Bankruptcy Code, a debtor must demonstrate that a bankruptcy court's confirmation of a plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor or its successor under the plan, unless such liquidation or reorganization is proposed under the plan. Pursuant to the Plan, the Plan Debtors intend to sell all or substantially all of their Assets to third parties and transfer the Excluded Assets (to the extent they are unencumbered), the Causes of Action and all

remaining unencumbered Assets to the Liquidating Trust to be liquidated and distributed to Beneficiaries in accordance with the Plan and Liquidating Trust Agreement. Therefore, the Bankruptcy Court's confirmation of the Plan is not likely to be followed by liquidation or the need for any further reorganization.

### 3. Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, that, except as described below, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. As a general matter under the Bankruptcy Code, a class is "impaired," unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such claim or equity interest; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their ballots in favor of acceptance. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. If no votes to accept or reject the Plan are received with respect to a Class whose votes have been solicited under the Plan (other than a Class that is deemed eliminated under the Plan), such Class shall be deemed to have voted to accept the Plan.

### 4. Section 1129(b).

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as (a) the plan otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted it without taking into consideration the votes of any insiders in such class, and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan. These so called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

100

a. **No Unfair Discrimination.**

The "no unfair discrimination" test requires that the plan not provide for unfair treatment with respect to classes of claims or interests that are of equal priority, but are receiving different treatment under the plan.

b. **Fair and Equitable.**

The fair and equitable requirement applies to classes of claims of different priority and status, such as secured versus unsecured. The plan satisfies the fair and equitable requirement if no class of claims receives more than 100% of the allowed amount of the claims in such class. Further, if a class of claims is considered a dissenting class ("***Dissenting Class***"), *i.e.*, a Class of Claims that is deemed to reject the Plan because the required majorities in amount and number of votes is not received from the Class, the following requirements apply:

1. **Class of Secured Claims.**

Each holder of an impaired secured claim either (i) retains its liens on the subject property, to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the plan of at least the allowed amount of such claim, (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof), or (iii) receives the "indubitable equivalent" of its allowed secured claim.

2. **Class of Unsecured Creditors.**

Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the Dissenting Class will not receive any property under the plan.

3. **Class of Interests.**

Either (i) each interest holder will receive or retain under the plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the interests of the Dissenting Class will not receive any property under the plan.

The Plan Debtors believe the Plan does not "discriminate unfairly" and will satisfy the "fair and equitable" requirement notwithstanding that certain Classes of Interests are deemed to reject the Plan because no Class that is junior to such Class will receive or retain any property on account of the Claims and Interests in such Class and the Plan does not provide for unfair treatment with respect to Classes of Claims or Interests that are of equal priority.

EAST\86228047.5

## VII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Plan Debtors believe the Plan is in the best interests of their Creditors and should accordingly be accepted and confirmed. If the Plan as proposed, however, is not confirmed, the following three alternatives may be available to the Plan Debtors: (i) a liquidation of the Plan Debtors' Assets pursuant to chapter 7 of the Bankruptcy Code; (ii) an alternative plan of reorganization or liquidation may be proposed and confirmed; or (iii) the Plan Debtors' Chapter 11 Cases may be dismissed.

### A. Chapter 7 Liquidation.

If a plan pursuant to chapter 11 of the Bankruptcy Code is not confirmed by the Bankruptcy Court, the Plan Debtors' Chapter 11 Cases may be converted to liquidation cases under chapter 7 of the Bankruptcy Code, in which a trustee would be elected or appointed, pursuant to applicable provisions of chapter 7 of the Bankruptcy Code, to liquidate the Assets of the Plan Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. The Plan Debtors believe that such a liquidation would result in smaller distributions being made to the Plan Debtors' creditors than those provided for in the Plan because (a) the likelihood that other Assets of the Plan Debtors would have to be sold or otherwise disposed of in a less orderly fashion, (b) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals, (c) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Plan Debtors' operations. The Plan Debtors have found that confirmation of the Plan will provide each Holder of an Allowed Claim with a recovery that is not less than such Holder would receive pursuant to liquidation of the Plan Debtors under chapter 7 of the Bankruptcy Code.

### B. Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code.

If the Plan is not confirmed, the Plan Debtors may propose a different plan, which might involve an alternative means for the reorganization or liquidation of the Plan Debtors' Assets. However, the Plan Debtors believe that the terms of the Plan provide for an orderly and efficient liquidation of the Plan Debtors' Assets and will result in the realization of the most value for Holders of Claims against the Plan Debtors' Estates.

### C. Dismissal of the Plan Debtors' Chapter 11 Cases.

Dismissal of the Plan Debtors' Chapter 11 Cases would have the effect of restoring (or attempting to restore) all parties to the *status quo ante*. Upon dismissal of the Plan Debtors' Chapter 11 Cases, the Plan Debtors would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiation with the various creditors of the Plan Debtors, and possibly resulting in costly and protracted litigation in various jurisdictions. Most significantly, dismissal of the Plan Debtors' Chapter 11 Cases would permit secured creditors to foreclose upon any Assets that are subject to their Liens. Dismissal will also permit unpaid unsecured creditors to obtain and enforce judgments against

the Plan Debtors. The Plan Debtors believe that these actions could lead ultimately to the liquidation of the Plan Debtors' Assets under chapter 7 of the Bankruptcy Code. Therefore, the Plan Debtors believe that dismissal of the Plan Debtors' Chapter 11 Cases is not a preferable alternative to the Plan.

## VIII. CERTAIN FEDERAL TAX CONSEQUENCES

**THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

### A. General.

The following discussion summarizes certain material U.S. federal income tax consequences to the Plan Debtors, the Liquidating Trust and Holders entitled to vote on the Plan. This discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "*IRC*"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service (the "*Service*"). There can be no assurance that the Service will not take a contrary view, no ruling from the Service has been or will be sought nor will any counsel provide a legal opinion as to any of the expected tax consequences set forth below.

Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to Holders of Claims, the Liquidating Trust or the Plan Debtor. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences described herein.

The following summary is for general information only. The tax treatment of a Holder may vary depending upon such Holder's particular situation. This summary does not address all of the tax consequences that may be relevant to a Holder, including any alternative minimum tax consequences and does not address the tax consequences to a Holder that has made an agreement to resolve its claim in a manner not explicitly provided for in the Plan. This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on the Plan or Holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, partnerships and other pass-through entities, Holders that have a "functional currency" other than the United States dollar and Holders that have acquired Claims in connection with the performance of services. The following summary assumes that the Claims are held by Holders as "capital assets" within the meaning of Section 1221 of the IRC and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

The tax treatment of Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Holder in exchange for the Claim and whether the Holder receives Distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the Holder. Therefore, each Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

### B.     U.S. Federal Income Tax Consequences to the Plan Debtors.

The Plan Debtors are not-for-profit corporations that are exempt from federal income taxation under 501(c)(3) of the IRC. It is intended that nothing in the Plan shall adversely affect the tax-exempt status of the Plan Debtors. Accordingly, the Plan Debtors do not expect the implementation of the Plan to have any adverse federal income tax consequences on the Plan Debtors before or after the Effective Date. If the tax-exempt status of the Plan Debtors would terminate, the Plan Debtors may be subject to tax on its income, which would reduce the amount of distributions payable to the Holders of Claims.

### C.     U.S. Federal Income Tax Treatment With Respect to the Liquidating Trust.

It is intended that the Liquidating Trust will be treated as a "grantor trust" for U.S. federal income tax purposes. In general, a grantor trust is not a separate taxable entity. The

Service, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an advanced ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Plan Debtors are not requesting a private letter ruling regarding the status of the Liquidating Trust as a grantor trust. Consistent with the requirements of Revenue Procedure 94-45, however, the Liquidating Trust Agreement requires all relevant parties to treat, for federal income tax purposes, the transfer of the Plan Debtors' Assets to the Liquidating Trust as (i) a transfer of such assets to the beneficiaries of the Liquidating Trust (to the extent of the value of their respective interests in the applicable Liquidating Trust Assets) followed by (ii) a transfer of such assets by such beneficiaries to the Liquidating Trust (to the extent of the value of their respective interests in the applicable Liquidating Trust Assets), with the beneficiaries of the Liquidating Trust being treated as the grantors and owners of the Liquidating Trust. Each beneficiary of the Liquidating Trust will generally recognize gain (or loss) in its taxable year that includes the Effective Date in an amount equal to the difference between the amount realized in respect of its Claim and its adjusted tax basis in such Claim. The amount realized for this purpose should generally equal the amount of cash and the fair market value of any other assets received or deemed received for U.S. federal income tax purposes under the Plan in respect of such Holder's Claim. A Holder that is deemed to receive for U.S. federal income tax purposes a non-cash asset under the Plan in respect of its Claim should generally have a tax basis in such asset in an amount equal to the fair market value of such asset on the date of its deemed receipt.

The Plan and the Liquidating Trust Agreement generally provide that the beneficiaries of the Liquidating Trust must value the assets of the Liquidating Trust consistently with the values determined by the Liquidating Trustee for all U.S. federal, state, and local income tax purposes. As soon as possible after the Effective Date, the Liquidating Trustee shall make a good faith valuation of the assets transferred to the Liquidating Trust.

Consistent with the treatment of the Liquidating Trust as a grantor trust, the Liquidating Trust Agreement and the Plan will require each Holder to report on its U.S. federal income tax return its allocable share of the Liquidating Trust's income. Therefore, a Holder may incur a U.S. federal income tax liability with respect to its allocable share of the income of the Liquidating Trust whether or not the Liquidating Trust has made any distributions to such Holder. The character of items of income, gain, deduction, and credit to any Holder and the ability of such Holder to benefit from any deduction or losses will depend on the particular situation of such Holder.

In general, a distribution of underlying assets from the Liquidating Trust to a Beneficiary thereof may not be taxable to such Holder because such Holders are already regarded for U.S. federal income tax purposes as owning such assets. Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of distributions from the Liquidating Trust.

The Liquidating Trustee will file with the Service tax returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and will also send to each Holder a separate statement setting forth such Holder's share of items of Liquidating Trust income, gain, loss, deduction, or credit. Each such Holder will be required to report such items on its U.S. federal income tax return.

The discussion above assumes that the Liquidating Trust will be respected as a grantor trust for U.S. federal income tax purposes. If the Service were to successfully challenge such classification, the U.S. federal income tax consequences to the Liquidating Trust and the beneficiaries of the Liquidating Trust could differ materially from those discussed herein (including the potential for an entity level tax to be imposed on all income of the Liquidating Trust).

### D.     U.S. Federal Income Tax Treatment With Respect to Holders of Allowed Claims that are Beneficiaries of the Liquidating Trust.

Holders of Allowed Claims as of the Effective Date that are Beneficiaries of the Liquidating Trust should be treated as receiving from the Plan Debtors their respective shares of the applicable assets of the Liquidating Trust in satisfaction of their Allowed Claims, and simultaneously transferring such assets to the Liquidating Trust. Accordingly, a Holder of such Claim should generally recognize gain or loss in an amount equal to the amount deemed realized on the Effective Date (as described above) less its adjusted tax basis of its Claim. Additionally, such Holders should generally recognize their allocable share of income, gain, loss and deductions recognized by the Liquidating Trust on an annual basis.

Because a Holder's ultimate share of the assets of the Liquidating Trust based on its Allowed Claim will not be determinable on the Effective Date due to, among other things, the existence of Disputed Claims and the value of the assets at the time of actual receipt not being ascertainable on the Effective Date, such Holder should recognize additional or offsetting gain or loss if, and to the extent that, the aggregate amount of cash and fair market value of the assets of the Liquidating Trust ultimately received by such Holder is greater than or less than the amount used in initially determining gain or loss in accordance with the procedures described in the preceding paragraph. It is unclear when a Holder of an Allowed Claim that is a beneficiary of the Liquidating Trust should recognize, as an additional amount received for purposes of computing gain or loss, an amount attributable to the disallowance of a Disputed Claim.

The character of any gain or loss as capital gain or loss or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of the Claim; (ii) the tax status of the Holder of the Claim; (iii) whether the Claim has been held for more than one year; (iv) the extent to which the Holder previously claimed a loss or bad debt deduction with respect to the Claim; and (v) whether the Claim was acquired at a market discount. A Holder that purchased its Claim from a prior Holder at a market discount may be subject to the market discount rules of the IRC. Under those rules (subject to a *de minimis* exception), assuming that such Holder has made no election to accrue the market discount and include it in income on a current basis, any gain recognized on the exchange of such Claim generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

It is possible that the Service may assert that any loss should not be recognizable until the Liquidating Trustee makes its final distribution of the assets of the Liquidating Trust. Holders should consult their tax advisors regarding the possibility that the recognition of gain or loss may be deferred until the final distribution of the assets of the Liquidating Trust.

106

Although not free from doubt, Holders of Disputed Claims should not recognize any gain or loss on the date that the assets of the Plan Debtors are transferred to the Liquidating Trust, but should recognize gain or loss in an amount equal to: (i) the amount of cash and the fair market value of any other property actually distributed to such Holder less (ii) the adjusted tax basis of its Claim. It is possible, however, that such Holders may be required to recognize the fair market value of such Holder's allocable share of the Liquidating Trust's assets, as an amount received for purposes of computing gain or loss, either on the Effective Date or the date such Holder's Claim becomes an Allowed Claim.

Holders of Allowed Claims will be treated as receiving a payment of interest (includible in income in accordance with the Holder's method of accounting for tax purposes) to the extent that any cash or other property received (or deemed received) pursuant to the Plan is attributable to accrued but unpaid interest, if any, on such Allowed Claims. The extent to which the receipt of cash or other property should be attributable to accrued but unpaid interest is unclear. The Plan Debtors and the Liquidating Trust intend to take the position, and the Plan provides, that such cash or property distributed pursuant to the Plan will first be allocable to the principal amount of an Allowed Claim and then, to the extent necessary, to any accrued but unpaid interest thereon. Each Holder should consult its tax advisor regarding the determination of the amount of consideration received under the Plan that is attributable to interest (if any). A Holder generally will be entitled to recognize a loss to the extent any accrued interest was previously included in its gross income and is not paid in full.

## IX. RECOMMENDATION AND CONCLUSION

The Plan Debtors believe the Plan is in the best interests of their Estates, Creditors and other interested parties and urge the Holders of Impaired Claims entitled to vote to accept the Plan and to evidence such acceptance by properly voting and timely returning their ballots.

Dated: December 6, 2014     Respectfully submitted,

         Sears Methodist Retirement System, Inc.
         Sears Caprock Retirement Corporation
         Sears Methodist Centers, Inc.
         Sears Methodist Foundation
         Sears Panhandle Retirement Corporation
         Sears Permian Retirement Corporation
         Sears Plains Retirement Corporation
         Sears Tyler Methodist Retirement Corporation
         Senior Dimensions, Inc.

       By: /s/ Paul Rundell
         Name: Paul Rundell
         Title: Chief Restructuring Officer

## **Exhibit 1**

Plan Debtors' Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code,
dated December 6, 2014

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | CASE NO. 14-32821-11 |
| | § | |
| SEARS METHODIST RETIREMENT | § | CHAPTER 11 |
| SYSTEM, INC., *et al.*[1] | § | |
| | § | Jointly Administered |
| Debtors. | § | |

PLAN DEBTORS' JOINT PLAN OF REORGANIZATION
PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Vincent P. Slusher, State Bar No. 00785480
vincent.slusher@dlapiper.com
Andrew Zollinger, State Bar No. 24063944
andrew.zollinger@dlapiper.com
DLA Piper LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201-4629
Telephone: (214) 743-4500
Facsimile: (214) 743-4545

Thomas R. Califano (admitted *pro hac vice*)
thomas.califano@dlapiper.com
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Tel: (212) 335-4500
Fax: (212) 335-4501

*Attorneys for the Debtors and*
*Debtors in Possession*

Dated: December 6, 2014

---

[1] The debtors in these chapter 11 cases, along with the last four (4) digits of their taxpayer identification numbers, are: Sears Methodist Retirement System, Inc. (6330), Canyons Senior Living, L.P. (8545), Odessa Methodist Housing, Inc. (9569), Sears Brazos Retirement Corporation (8053), Sears Caprock Retirement Corporation (9581), Sears Methodist Centers, Inc. (4917), Sears Methodist Foundation (2545), Sears Panhandle Retirement Corporation (3233), Sears Permian Retirement Corporation (7608), Sears Plains Retirement Corporation (8233), Sears Tyler Methodist Retirement Corporation (0571) and Senior Dimensions, Inc. (4016). The mailing address of each of the debtors, solely for purposes of notices and communications, is 2100 Ross Avenue, 21st Floor, c/o Paul Rundell, Dallas, Texas 75201.

# TABLE OF CONTENTS

**Page**

SECTION 1.     DEFINITIONS AND INTERPRETATION ................................................... 1
1.1     Definitions.............................................................................. 1
1.2     Interpretation, Application of Definitions and Rules of Construction................ 17
1.3     Computation of Time ........................................................................ 17
SECTION 2.     ADMINISTRATIVE AND PRIORITY CLAIMS ....................................... 17
2.1     Administrative Expense Claims............................................................ 17
2.2     Compensation and Reimbursement Claims ........................................... 19
2.3     Priority Tax Claims............................................................................ 19
2.4     DIP Claims ....................................................................................... 20
SECTION 3.     CLASSIFICATION OF CLAIMS AND INTERESTS ............................... 20
3.1     Classified Claims Against and Interests in the Plan Debtors............................ 20
3.2     SMRS ............................................................................................... 21
3.3     Panhandle ........................................................................................ 21
3.4     Permian ........................................................................................... 22
3.5     SMC ................................................................................................ 22
3.6     SMF................................................................................................. 23
3.7     Tyler ............................................................................................... 23
3.8     Caprock ........................................................................................... 24
3.9     Plains .............................................................................................. 24
3.10    SDI .................................................................................................. 25
SECTION 4.     TREATMENT OF CLAIMS AND INTERESTS ....................................... 25
4.1     SMRS ............................................................................................... 25
4.2     Panhandle ........................................................................................ 26
4.3     Permian ........................................................................................... 28
4.4     SMC. ............................................................................................... 29
4.5     SMF................................................................................................. 31
4.6     Tyler ............................................................................................... 32
4.7     Caprock ........................................................................................... 33
4.8     Plains.............................................................................................. 35
4.9     SDI .................................................................................................. 36

EAST\86867991.7

# TABLE OF CONTENTS
(continued)

**Page**

SECTION 5.  ACCEPTANCE OR REJECTION OF THE PLAN ...................................... 37

5.1  Holders of Claims and Interests Entitled to Vote ................................. 37

5.2  Classes Deemed to Reject ................................................................. 37

5.3  Classes Deemed to Accept ................................................................ 38

5.4  Acceptance by a Class ...................................................................... 38

5.5  Cramdown Under Section 1129(b) of the Bankruptcy Code .............................. 38

5.6  Ballot Instructions ........................................................................... 38

SECTION 6.  MEANS FOR IMPLEMENTATION ................................................. 38

6.1  Obligated Group Sale ........................................................................ 38

6.2  Tyler Sale ...................................................................................... 41

6.3  Caprock Sale .................................................................................. 43

6.4  Plains Sale ..................................................................................... 45

6.5  Sale of SMF Real Property .................................................................. 47

6.6  Transition of Management and Operations Agreements for VLB Homes .......... 47

6.7  Sources of Consideration ................................................................... 47

6.8  Liquidating Trust ............................................................................. 47

SECTION 7.  DISTRIBUTIONS ................................................................. 53

7.1  Distribution Record Date .................................................................... 53

7.2  Date of Distributions ......................................................................... 53

7.3  Disbursing Agent ............................................................................. 53

7.4  Rights and Powers of Disbursing Agent .................................................. 53

7.5  Delivery of Distributions in General ....................................................... 54

7.6  Payments and Distributions on Disputed Claims ......................................... 54

7.7  Manner of Payment ........................................................................... 54

7.8  Undeliverable Distributions and Unclaimed Property .................................... 54

7.9  Withholding and Reporting Requirements ................................................. 54

7.10  Surrender Instruments ....................................................................... 55

7.11  Setoffs ......................................................................................... 55

7.12  Insurance Claims ............................................................................. 55

7.13  Applicability of Insurance Policies ........................................................ 55

EAST\86867991.7

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 7.14 | No Postpetition Interest | 55 |
| 7.15 | Distributions Free and Clear | 55 |
| 7.16 | Fractional Dollars; De Minimis Distributions | 55 |
| 7.17 | Allocation of Distributions between Principal and Unpaid Interest | 56 |
| 7.18 | Single Satisfaction of Claims | 56 |
| SECTION 8. | PROCEDURES FOR DISPUTED CLAIMS | 56 |
| 8.1 | Allowance of Claims and Interests | 56 |
| 8.2 | Objections to Claims | 56 |
| 8.3 | Estimation of Claims | 56 |
| 8.4 | No Distribution Pending Allowance | 57 |
| 8.5 | Distributions after Allowance | 57 |
| 8.6 | Preservations of Rights to Settle Claims | 57 |
| 8.7 | Disallowed Claims | 57 |
| SECTION 9. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 58 |
| 9.1 | Assumption and Rejection of Executory Contracts and Unexpired Leases | 58 |
| 9.2 | Inclusiveness | 58 |
| 9.3 | Rejection Claims | 58 |
| 9.4 | Cure of Defaults | 58 |
| 9.5 | Full Release and Satisfaction | 59 |
| 9.6 | Reservation of Rights | 59 |
| SECTION 10. | CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE | 59 |
| 10.1 | Conditions Precedent to Confirmation | 59 |
| 10.2 | Conditions Precedent to the Effective Date | 59 |
| 10.3 | Waiver of Conditions | 60 |
| 10.4 | Effect of Failure of Conditions | 60 |
| SECTION 11. | EFFECT OF CONFIRMATION | 60 |
| 11.1 | Immediate Binding Effect | 60 |
| 11.2 | Compromise and Settlement of Claims, Interests and Controversies | 60 |
| 11.3 | Discharge of Claims and Termination of Interests | 61 |

EAST\86867991.7

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 11.4 | Releases by the Plan Debtors | 61 |
| 11.5 | Releases by Holders of Claims | 61 |
| 11.6 | Exculpation | 62 |
| 11.7 | Injunction | 63 |
| 11.8 | Term of Injunctions or Stays | 64 |
| 11.9 | Injunction Against Interference with Plan | 64 |
| 11.10 | Release of Liens | 64 |
| 11.11 | Effectuating Documents and Further Transactions | 64 |
| 11.12 | Corporate Action | 65 |
| 11.13 | Cancellation of Documents | 65 |
| 11.14 | Dissolution of the Plan Debtors | 65 |
| 11.15 | Preservation of Causes of Action of the Plan Debtors | 65 |
| SECTION 12. | MODIFICATION, REVOCATION OR WITHDRAWAL OF THIS PLAN | 66 |
| 12.1 | Modification and Amendments | 66 |
| 12.2 | Effect of Confirmation on Modifications | 66 |
| 12.3 | Revocation or Withdrawal of this Plan | 66 |
| SECTION 13. | RETENTION OF JURISDICTION | 66 |
| SECTION 14. | MISCELLANEOUS PROVISIONS | 68 |
| 14.1 | Payment of Statutory Fees | 68 |
| 14.2 | Dissolution of Creditors' Committee | 68 |
| 14.3 | Section 1125(e) Good Faith Compliance | 68 |
| 14.4 | Substantial Consummation | 69 |
| 14.5 | Section 1146 Exemption | 69 |
| 14.6 | Closing of the Chapter 11 Cases | 69 |
| 14.7 | Plan Supplement | 69 |
| 14.8 | Further Assurances | 69 |
| 14.9 | Exhibits Incorporated | 69 |
| 14.10 | Inconsistency | 69 |
| 14.11 | No Admissions | 69 |

EAST\86867991.7

**TABLE OF CONTENTS**
(continued)

**Page**

14.12   Reservation of Rights...................................................................................... 70

14.13   Successors and Assigns................................................................................... 70

14.14   Entire Agreement ............................................................................................ 70

14.15   Notices ............................................................................................................ 70

14.16   Severability ..................................................................................................... 71

14.17   Governing Law ............................................................................................... 71

14.18   Request for Confirmation Pursuant to Bankruptcy Code Sections 1129(a)
        and 1129(b) ..................................................................................................... 71

EAST\86867991.7

## INTRODUCTION

On the Petition Date, Sears Methodist Retirement System, Inc. ("***SMRS***"), Sears Brazos Retirement Corporation ("***Brazos***") Canyons Senior Living, L.P. ("***CSL")***, Odessa Methodist Housing, Inc. ("***OMH***"), Sears Caprock Retirement Corporation ("***Caprock***"), Sears Methodist Centers, Inc. ("***SMC***"), Sears Methodist Foundation ("***SMF***"), Sears Panhandle Retirement Corporation ("***Panhandle***"), Sears Permian Retirement Corporation ("***Permian***"), Sears Plains Retirement Corporation ("***Plains***"), Sears Tyler Methodist Retirement Corporation ("***Tyler***") and Senior Dimensions, Inc. ("***SDI***," and collectively with SMRS, Brazos, CSL, OMH, Caprock, SMC, SMF, Panhandle, Permian, Plains and Tyler, the "***Debtors***") each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

SMRS, Caprock, SMC, SMF, Panhandle, Permian, Plains, Tyler and SDI (collectively, the "***Plan Debtors***") propose this *Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (as it may be amended, modified, or supplemented from time to time, together with any and all exhibits and schedules attached hereto or referenced herein, this "***Plan***") for the resolution and satisfaction of all Claims against and Interests in the Plan Debtors. The remaining Debtors, namely Brazos, Canyons and OMH, do not join in this Plan as their Chapter 11 Cases will be dismissed outside of this Plan for reasons set forth in the Disclosure Statement.

Subject to certain restrictions and requirements set forth in Bankruptcy Code section 1127 and Bankruptcy Rule 3019, the Plan Debtors reserve the right to alter, amend, modify, revoke, or withdraw this Plan prior to its substantial consummation. Reference is made to the Disclosure Statement for a discussion of the Debtors' history and assets, a summary and analysis of this Plan, and certain related matters, including the distributions to be made under this Plan and the risk factors relating to consummation of this Plan. Capitalized terms used but not defined herein have the meanings ascribed to them in Section 1 of this Plan.

## SECTION 1. DEFINITIONS AND INTERPRETATION

    1.1    ***Definitions***.

The following terms used herein shall have the respective meanings below:

***1998 Bond Indenture*** means that certain Indenture of Trust, dated as of August 1, 1998, between Abilene Health and Chase Bank of Texas, N.A., as predecessor to the Obligated Group Bond Trustee.

***2013 Bond Indenture*** means that certain Indenture of Trust, dated as of May 1, 2013, between Red River and the Obligated Group Bond Trustee.

***Abilene Health*** means Abilene Health Facilities Development Corporation, a nonstock nonprofit health facilities development corporation duly organized and existing under the laws of the State of Texas.

***Accrued Professional Compensation*** means, at any given time, all accrued, contingent and/or unpaid fees (including success fees) for legal, financial advisory, investment banking, accounting and other services and obligations for reimbursement of expenses rendered

or incurred before the Effective Date under sections 328, 330(a), 331 or 363 of the Bankruptcy Code by any retained Professional in the Chapter 11 Cases, or under section 503 of the Bankruptcy Code, that the Bankruptcy Court has not denied by a Final Order, all to the extent that any such fees and expenses have not been previously paid.

*Administrative Expense Claim* means any Claim for payment of costs and expenses of administration pursuant to sections 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Plan Debtors' Estates and operating the businesses of the Plan Debtors; (b) compensation for Accrued Professional Compensation; (c) all fees and charges assessed against the Estates pursuant to 28 U.S.C. § 1930; and (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code.

*Administrative Expense Claims Bar Date* means the first Business Day that is at least thirty (30) days after the Effective Date or such other date ordered by the Bankruptcy Court.

*Alfredo Gonzalez* means the Alfredo Gonzalez Texas State Veterans Home, located in McAllen, Texas and managed and operated by SDI.

*Allowed* means, with reference to any Claim against the Plan Debtors, a Claim (i) as to which no objection or request for estimation has been filed on or before any deadline therefor set by the Bankruptcy Court or the expiration of such other applicable period fixed by the Bankruptcy Court or this Plan; (ii) as to which any objection has been settled, waived, withdrawn or denied by a Final Order or in accordance with this Plan; or (iii) that is allowed (a) by a Final Order, (b) by an agreement between the Holder of such Claim and the Plan Debtor or Liquidating Trustee or (c) pursuant to the terms of this Plan; *provided, however*, that, notwithstanding anything herein to the contrary, by treating a Claim as "Allowed" under clause (i) above (the expiration of the applicable deadline), neither the Plan Debtors nor the Liquidating Trustee waives their rights to contest the amount and validity of any disputed, contingent and/or unliquidated Claim in the time, manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced. An Allowed Claim shall be net of any valid setoff exercised with respect to such Claim pursuant to the provisions of the Bankruptcy Code and applicable law. Moreover, any portion of a Claim that is satisfied, released, or waived during the Chapter 11 Cases is not an Allowed Claim. Unless otherwise specified in this Plan, in section 506(b) of the Bankruptcy Code or by Final Order of the Bankruptcy Court, "Allowed" Claims shall not, for purposes of Distributions under this Plan, include interest on such Claim accruing from and after the Petition Date.

*Ambrosio Guillen* means the Ambrosio Guillen Texas State Veterans Home, located in El Paso, Texas and managed and operated by SDI.

*Assets* means all assets of the Plan Debtors of any nature whatsoever, including, without limitation, all property of the Plan Debtors' Estates pursuant to Bankruptcy Code section 541, Cash, Avoidance Actions, Causes of Action, equipment, inventory, tax refunds, claims of right, interests and property, real and personal, tangible and intangible, and proceeds of any of the foregoing.

*Avoidance Actions* means causes of action arising under Bankruptcy Code sections 502, 510, 541, 544, 545, 547 548, 549, 550, 551 or 553, or under related state or federal statutes and common law, including, without limitation, fraudulent transfer laws, whether or not litigation is commenced to prosecute such causes of action.

*Ballot* means the ballots upon which Holders of Impaired Claims or Interests entitled to vote on this Plan have indicated their acceptance or rejection of this Plan in accordance with the instructions regarding voting.

*Bankruptcy Code* means title 11 of the United States Code, as now in effect or hereafter applicable to these Chapter 11 Cases.

*Bankruptcy Court* means the United States Bankruptcy Court for the Northern District of Texas having jurisdiction over the Chapter 11 Cases.

*Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure, as amended, and the local rules of the Bankruptcy Court, as applicable to these Chapter 11 Cases.

*Beneficiaries* means Holders of Allowed General Unsecured Claims and Deficiency Claims against the Plan Debtors' Estates as beneficiaries of the Liquidating Trust, as defined in the Liquidating Trust Agreement.

*Business Day* means any day of the calendar week, except Saturday, Sunday, a "legal holiday," as defined in Bankruptcy Rule 9006(a), or any day on which commercial banks are authorized or required by law to close in Dallas, Texas.

*Caprock* shall have the meaning set forth in the Introduction.

*Caprock APA* shall have the meaning set forth in section 6.3(a).

*Caprock DIP Facility* means the debtor in possession financing facility established pursuant to the Caprock DIP Loan Agreement.

*Caprock DIP Lender* means the lender (or lenders) party to the Caprock DIP Loan Agreement from time to time, each in its (or their) capacity as such.

*Caprock DIP Loan Agreement* means the credit agreement and related security agreements, mortgages and similar documents governing the Caprock DIP Facility by and between Caprock and the Caprock DIP Lender.

*Caprock Encumbered Excluded Assets* shall have the meaning set forth in section 6.3(c).

*Caprock Excluded Assets* shall have the meaning set forth in section 6.3(c).

*Caprock Loan Agreement* means that certain Amended and Restated Reimbursement and Credit Agreement, dated as of May 20, 2013, between Caprock and the Caprock Secured Lender.

***Caprock Purchase Price*** shall have the meaning set forth in section 6.3(a).

***Caprock Sale*** shall have the meaning set forth in section 6.3(a).

***Caprock Sale Motion*** shall have the meaning set forth in section 6.3(a).

***Caprock Secured Loan Claim*** means the Claim of the Caprock Secured Lender arising under or related to the Caprock Loan Agreement.

***Caprock Secured Lender*** means Santander Bank, N.A., in its capacity as successor administrative agent and lender to Sovereign Bank, N.A., under the Caprock Loan Agreement.

***Caprock Stalking Horse*** shall have the meaning set forth in section 6.3(a).

***Caprock Successful Bidder*** shall have the meaning set forth in section 6.3(f).

***Cash*** means cash and cash equivalents including, without limitation, checks and wire transfers; *provided, that* other than as set forth in the 2014 Obligated Group Bond Documents or the 2014 Tyler Bond Documents, as applicable, no Distributions to be made in Cash under this Plan shall be comprised of any funds held by the Obligated Group Bond Trustee pursuant to the Obligated Group Bond Documents or the Tyler Bond Trustee pursuant to the Tyler Bond Documents.

***Cash Collateral Order*** means any order, whether interim or final, allowing the use by the Plan Debtors during the Chapter 11 Cases of the cash collateral of the Secured Lenders, as applicable.

***Causes of Action*** means any claim, cause of action, controversy, demand, agreement, right (including to legal or equitable remedies), action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. Cause of Action also includes: (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

***Chapter 11 Case*** means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code; and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court under case number 14-3282-11.

***Claim*** has the meaning set forth in section 101(5) of the Bankruptcy Code.

*Class* means a class or category of Claims as classified and described in Section 3 of this Plan pursuant to Bankruptcy Code section 1122.

*Collateral* means any property or interest in property of the Estates subject to a Lien, charge or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or other applicable law.

*Compensation and Reimbursement Claim* means a Claim for compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date pursuant to Bankruptcy Code sections 330, 331, 363, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5).

*Confirmation Date* means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the Bankruptcy Court's docket in each Chapter 11 Case.

*Confirmation Hearing* means the hearing on confirmation of this Plan, and approval of the Disclosure Statement related thereto, pursuant to Bankruptcy Code section 1129.

*Confirmation Order* means the order entered by the Bankruptcy Court confirming this Plan in accordance with chapter 11 of the Bankruptcy Code.

*Contingent Claim* means any contingent or unliquidated Claim asserted or which may be asserted against any of the Plan Debtors.

*Craig* means the Craig Methodist Retirement Community, a senior living facility located in Amarillo, Texas and owned by Panhandle.

*Creditor* means a Holder of a Claim.

*Creditors' Committee* means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases by the United States Trustee for the Northern District of Texas on June 19, 2014 pursuant to section 1102 of the Bankruptcy Code.

*Cure* means the payment of Cash by the Plan Debtors, the Successful Bidders, or the Liquidating Trustee, as applicable, as necessary to (i) cure a monetary default by a Plan Debtor in accordance with the terms of an executory contract or unexpired lease of a Plan Debtor, and (ii) permit that Plan Debtor to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

*CSL* shall have the meaning set forth in the Introduction.

*Debtors* means SMRS, Panhandle, Permian, SMC, SMF, Brazos, Tyler, Caprock, Plains, SDI, OMH and CSL, as debtors and debtors in possession, and includes the Estates.

*Debtors in Possession* means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to Bankruptcy Code sections 1101, 1107(a) and 1108.

*Deficiency Claim* means, to the extent the value of any property securing a Claim is less than the amount of such Claim, the difference between such value and such Claim.

*DIP Claim* means any Claim derived from or based upon, as applicable, the Obligated Group DIP Loan Agreement, the SDI DIP Loan Agreement, the Tyler DIP Loan Agreement and the Caprock DIP Loan Agreement.

*DIP Lenders* means, collectively, the Obligated Group DIP Lender, the SDI DIP Lender, the Tyler DIP Lender and the Caprock DIP Lender.

*DIP Loan Agreements* means, collectively, the Obligated Group DIP Loan Agreement, the SDI DIP Loan Agreement, the Tyler DIP Loan Agreement and the Caprock DIP Loan Agreement.

*Disallowed Claim* means any Claim or portion thereof which has been disallowed by a Final Order and includes any Claim which is not an Allowed Claim for any other reason.

*Disclosure Statement* means the Disclosure Statement for the Plan Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code, dated December 6, 2014, as the same may be altered, modified, or amended.

*Disputed Claim* means a Claim that has neither been Allowed nor disallowed pursuant to a Final Order of the Bankruptcy Court, and (a) if no Proof of Claim has been filed by the applicable deadline:  (i) a Claim that has been or hereafter is listed on the Schedules as disputed, contingent, or unliquidated; or (ii) a Claim that has been or hereafter is listed on the Schedules as other than disputed, contingent, or unliquidated, but as to which a Plan Debtor, the Liquidating Trustee, or any other party in interest has interposed an objection or request for estimation which has not been withdrawn or determined by a Final Order; or (b) if a Proof of Claim or other request for payment has been filed by the applicable deadline:  (i) a Claim for which no corresponding Claim has been or hereafter is listed on the Schedules or Allowed in this Plan; (ii) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as other than disputed, contingent, or unliquidated, but the nature or amount of the Claim or as asserted in the Proof of Claim varies from the nature and amount of such Claim as listed on the Schedules to the extent of such positive variance; (iii) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as disputed, contingent, or unliquidated; or (iv) a Claim for which a timely objection or request for estimation is interposed by the Plan Debtor, the Liquidating Trustee, or any other party in interest which has not been withdrawn or determined by a Final Order.

*Distribution* means Cash, property, interests in property or other value distributed to Holders of Allowed Claims, or their designated agents, under this Plan.

*Distribution Record Date* means five (5) Business Days prior to the Confirmation Date.

*Effective Date* means the first Business Day after the Confirmation Date on which the conditions precedent specified in Section 10 of this Plan have been either satisfied or waived.

**Entrance Deposit Refund Claim** means a contingent claim of a resident of one of the Facilities for a refund of an entrance fee deposit paid by the resident pursuant to a Residency Agreement.

**Estates** means the estate created in each Debtor's Chapter 11 Case containing all property and other interests of the Debtor pursuant to Bankruptcy Code section 541.

**Excluded Assets** means, collectively, the Obligated Group Excluded Assets, the Tyler Excluded Assets, the Caprock Excluded Assets and the Plains Excluded Assets.

**Exculpated Claim** means any claim related to any act or omission in connection with, relating to or arising out of the Plan Debtors' in or out of court restructuring efforts, the Chapter 11 Cases, negotiation and closing on the Sales, formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement or this Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or this Plan, the filing of the Chapter 11 Cases, the pursuit of confirmation of this Plan, the administration and implementation of this Plan, or Distribution of property under this Plan or any other related agreement; *provided*, *however*, that Exculpated Claims shall not include any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct or fraud to the extent imposed by applicable non-bankruptcy law. For the avoidance of doubt, no Cause of Action, obligation or liability expressly set forth in or preserved by the Plan or the Plan Supplement constitutes an Exculpated Claim.

**Exculpated Party** means each of: (i) the Plan Debtors and their members or partners, as applicable, (ii) the Obligated Group Bond Trustee, (iii) the Tyler Bond Trustee, (iv) the DIP Lenders, (v) the Secured Lenders, (vi) the Liquidating Trustee, (vii) the Liquidating Trust, and (viii) the current and former officers, directors, members, managers, employees, attorneys and advisors, each in their respective capacities as such, of each of the foregoing.

**Executory Contract** means a contract to which one or more of the Plan Debtors is a party that is capable of assumption or rejection under section 365 of the Bankruptcy Code.

**Exchanged Bonds** means the Series 2013A Bonds and $3,725,000 in principal amount of Series 2013D Bonds issued by Red River Issuer pursuant to the 2013 Bond Indenture.

**Facilities** means, collectively, Wesley Court, Craig, Parks, Mesa Springs, Meadow Lake, Garrison, Desert Haven Retirement Community, Canyons Retirement Community, and the VLB Homes.

**Final Order** means an order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to

take any further appeal, petition for *certiorari* or move for a new trial, reargument, or rehearing shall have expired; *provided*, *however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or Bankruptcy Rule 9024, may be filed relating to such order shall not cause such order to not be a Final Order.

*Garrison* means The Mildred and Shirley L. Garrison Geriatric Education and Care Center, a geriatric learning center and nursing facility located in Lubbock, Texas on the campus of Texas Tech University and owned by Plains.

*General Unsecured Claim* means any Claim asserted against any Plan Debtor which is not included within the other specifically defined Classes hereunder or which is otherwise determined by the Bankruptcy Court to be a General Unsecured Claim.

*Governmental Unit* has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

*HFDC* means HFDC of Central Texas, Inc., a nonstock nonprofit health facilities development corporation duly organized and existing under the laws of the State of Texas.

*Holder* means the legal or beneficial holder of a Claim or Interest.

*Impaired* means, with respect to a Claim or Interest, that such Class of Claims or Interests is impaired within the meaning of Bankruptcy Code section 1124.

*Insurance Policies* means, collectively, all of the Plan Debtors' insurance policies.

*Interest* means the interest of any Holder in an equity security of any Plan Debtor, within the meaning of Bankruptcy Code section 101(16) represented by any issued and outstanding shares of common or preferred stock or other instrument evidencing a present ownership or membership interest in any of the Plan Debtors, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest, including a partnership, limited liability company or similar interest in a Plan Debtor.

*Lamun Lusk Sanchez* means Lamun Lusk Sanchez Texas State Veterans Home, located in Big Spring, Texas and managed and operated by SDI.

*LCS* means Life Care Services LLC.

*Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

*Liquidating Trust* means the grantor trust to be created upon the Effective Date for the benefit of the Beneficiaries.

*Liquidating Trust Agreement* means the agreement, substantially in the form included in the Plan Supplement, governing the operations of the Liquidating Trust, as it may be subsequently modified from time to time.

*Liquidating Trust Assets* means the assets held in the Liquidating Trust comprised of (i) the Excluded Assets from the Sales, to the extent such assets are not encumbered by a Lien; (ii) all Causes of Action, and (iii) all other unencumbered assets of the Plan Debtors' Estates remaining after all required payments have been made pursuant to the Plan, Confirmation Order and Liquidating Trust Agreement, as applicable, on the Effective Date.

*Liquidating Trust Distributable Cash* means the Liquidating Trust Cash and any other assets of the Liquidating Trust reduced to Cash net of all expenses and costs of operating or effectuating the duties of the Liquidating Trust and establishing any reserves as the Liquidating Trustee may determine is necessary in its sole discretion pursuant to the terms of this Plan and the Liquidating Trust Agreement.

*Liquidating Trust Monthly Fee Statements* shall have the meaning set forth in Section 6.7(f).

*Liquidating Trust Professionals* shall have the meaning set forth in Section 6.7(f).

*Liquidating Trustee* means the individual or entity designated and retained as the trustee to the Liquidating Trust, as of the Effective Date or as soon as reasonably practicable thereafter, as the fiduciary responsible for administering the Liquidating Trust.

*Meadow Lake* means Meadow Lake Retirement Community, a senior living facility located in Tyler, Texas and owned by Tyler.

*Mesa Springs* means Mesa Springs Retirement Village, a senior living facility located in Abilene, Texas and owned by Caprock.

*Net Sale Proceeds* means, the proceeds, net of taxes and customary costs, of each of the Obligated Group Sale, the Tyler Sale, the Caprock Sale, the Plains Sale and the SMF Sale.

*Non-Exchanged Bonds* means the approximately $3,965,000 in aggregate outstanding principal amount of the Series 1998A Bonds, Series 1999 Bonds and Series 2003A Bonds.

*Obligated Group* means SMRS, Permian, SMC, Panhandle, SMF and Brazos.

*Obligated Group APA* shall have the meaning set forth in section 6.1(a).

*Obligated Group Assets* shall have the meaning set forth in section 6.1(a).

*Obligated Group Bond Claims* means any and all Claims in respect of the Obligated Group Bonds.

*Obligated Group Bonds* means, collectively, the Non-Exchanged Bonds, the Series 2013A Bonds, the Series 2013B Bonds, the Series 2013C Bonds and the Series 2013D Bonds.

***Obligated Group Bond Documents*** means, collectively, the Obligated Group Master Trust Indenture, the 1998 Bond Indenture, the related supplemental bond indentures, the 2013 Bond Indenture, and the promissory notes, loan agreements, mortgages and other documents related to the Obligated Group Bonds.

***Obligated Group Bond Trustee*** means Wells Fargo Bank, N.A., in its capacity as trustee under the Obligated Group Master Trust Indenture, and any successor trustee in such capacity.

***Obligated Group DIP Facility*** means any debtor in possession financing facility or facilities established pursuant to the Obligated Group DIP Loan Agreement.

***Obligated Group DIP Lender*** means the lender (or lenders) party to the Obligated Group DIP Loan Agreement from time to time, each in its (or their) capacity as such.

***Obligated Group DIP Loan Agreement*** means the credit agreement and related security agreements, mortgages and similar documents governing the Obligated Group DIP Facility by and between the Debtors and the Obligated Group DIP Lender.

***Obligated Group Encumbered Excluded Assets*** shall have the meaning set forth in section 6.1(c).

***Obligated Group Excluded Assets*** shall have the meaning set forth in section 6.1(c).

***Obligated Group Facilities*** means, collectively, Parks, Wesley Court and Craig.

***Obligated Group Loan Agreement*** means that certain Loan Agreement, dated as of May 1, 2013, between Red River and SMRS.

***Obligated Group Master Indenture*** means that certain Amended and Restated Master Trust Indenture, dated August 1, 1998 and effective as of May 1, 2013, between the Debtors and the Obligated Group Bond Trustee.

***Obligated Group Purchase Price*** shall have the meaning set forth in section 6.1(a).

***Obligated Group Sale*** shall have the meaning set forth in section 6.1(a).

***Obligated Group Sale Motion*** shall have the meaning set forth in section 6.1(a).

***Obligated Group Sellers*** shall have the meaning set forth in section 6.1(a).

***Obligated Group Stalking Horse*** shall have the meaning set forth in section 6.1(a).

***Obligated Group Successful Bidder*** shall have the meaning set forth in section 6.1(f).

**OMH** shall have the meaning set forth in the Introduction.

**Other Priority Claim** means any Claim entitled to priority under Bankruptcy Code sections 507(a)(4) and 507(a)(5).

**Other Secured Claim** means a Secured Claim other than the DIP Claims, Secured Tax Claims, Obligated Group Bond Claims, Tyler Bond Claims, Caprock Secured Loan Claim and Plains Secured Loan Claim.

**Panhandle** shall have the meaning set forth in the Introduction.

**Parks** means Parks Methodist Retirement Village, a senior living facility located in Odessa, Texas and owned by Permian.

**Permian** shall have the meaning set forth in the Introduction.

**Person** means an individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust, estate, unincorporated organization, governmental unit, government (or agency or political subdivision thereof), or other entity, including, without limitation, the Debtors.

**Petition Date** means June 10, 2014.

**Plains** shall have the meaning set forth in the Introduction.

**Plains APA** shall have the meaning set forth in section 6.4(a).

**Plains Assets** shall have the meaning set forth in section 6.4(a).

**Plains Encumbered Excluded Assets** shall have the meaning set forth in section 6.4(c).

**Plains Excluded Assets** shall have the meaning set forth in section 6.4(c).

**Plains Loan Agreement** means that certain Loan Agreement, dated as of December 1, 2011, among Plains, Plains Secured Lender and Red River.

**Plains Purchase Price** shall have the meaning set forth in section 6.4(a).

**Plains Sale** shall have the meaning set forth in section 6.4(a).

**Plains Sale Motion** shall have the meaning set forth in section 6.4(a).

**Plains Secured Loan Claim** means all Claims arising under or related to the Plains Loan Agreement.

**Plains Secured Lender** means Prosperity Bank, N.A., in its capacity as successor lender to American State Bank, under the Plains Loan Agreement.

*Plains Stalking Horse* shall have the meaning set forth in section 6.4(a).

*Plan* means the Plan Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated December 6, 2014, either in its present form or as it may be altered, amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, or the terms hereof, as the case may be, together with any and all exhibits and schedules hereto.

*Plan Debtor Released Claims* shall have the meaning set forth in section 11.4.

*Plan Debtors* shall have the meaning set forth in the Introduction.

*Plan Supplement* means the compilation of documents and forms of documents, schedules, and exhibits to this Plan, to be filed prior to the Confirmation Hearing, as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code and the Bankruptcy Rules.

*Priority Claim* means any Claim entitled to priority pursuant to Bankruptcy Code section 507(a) other than an Administrative Expense Claim, Compensation and Reimbursement Claim, Priority Tax Claims or DIP Claim.

*Priority Tax Claim* means any Claim of a governmental unit of a kind entitled to priority under Bankruptcy Code section 507(a)(8), if Allowed.

*Pro Rata* shall mean the proportion that the amount of a Claim in a particular Class or Classes bears to the aggregate amount of all Claims in such Class or Classes, unless the Plan otherwise provides.

*Professional Fee Allocation* shall gave the meaning set forth in section 2.2(b).

*Professionals* means all professionals employed in these Chapter 11 Cases pursuant to Bankruptcy Code sections 327, 363 and 1103.

*Proof of Claim* means a proof of Claim filed against any of the Plan Debtors in the Chapter 11 Cases.

*Red River* means Red River Health Facilities Development Corporation, a nonstock health facilities development corporation duly organized and existing under the laws of the State of Texas.

*Related Persons* means, with respect to any Person, such Person's predecessors, successors, assigns and present and former affiliates (whether by operation of law or otherwise) and each of their respective members, partners, equity holders, certificate holders, officers, directors, employees, representatives, advisors, attorneys, auditors, agents, and professionals, in each case acting in such capacity on or any time prior to or after the Petition Date, and any Person claiming by or through any of them.

***Released Parties*** means (i) the Plan Debtors and their member or partners, as applicable, (ii) the Obligated Group Bond Trustee, (iii) the Tyler Bond Trustee; (iv) the Secured Lenders, (v) the DIP Lenders, and (vi) the Liquidating Trustee, (vii) the Liquidating Trust, and (viii) the current and former officers, directors, members, managers, employees, attorneys and advisors, each in their respective capacities as such, of each of the foregoing.

***Releasing Parties*** means all Persons who have held, hold or may hold Claims or Interests that have been released, discharged or are subject to exculpation pursuant to this Plan.

***Residency Agreement*** means those certain residence and care agreements entered into by and between the residents of the Facilities and the Facilities and any additional documents related thereto.

***Sales*** means, collectively, the Obligated Group Sale, the Tyler Sale, the Caprock Sale, the Plains Sale and the SMF Sale.

***Schedules*** means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs, if any, filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

***SDI*** shall have the meaning set forth in the Introduction.

***SDI DIP Facility*** means any debtor in possession financing facility or facilities established pursuant to the SDI DIP Loan Agreement.

***SDI DIP Lender*** means the lender (or lenders) party to the SDI DIP Loan Agreement from time to time, each in its (or their) capacity as such.

***SDI DIP Loan Agreement*** means the credit agreement and related security agreements, mortgages and similar documents governing the SDI DIP Facility by and between SDI and the SDI DIP Lender.

***Secured Claim*** means any Claim of a Creditor that is secured by property of the Estates, to the extent of the value of the Creditor's interest in the Estate's interest in such property, as provided in Bankruptcy Code section 506(a). Secured Claim also means a Claim of a Creditor that is subject to setoff under Bankruptcy Code section 553, to the extent of the amount subject to setoff, as provided in Bankruptcy Code section 506(a). To the extent the value of any property securing such Claim is less than the amount of such Claim, the difference between such value and such Claim is a ***"Deficiency Claim"*** unless the holder of such Claim validly elects under Section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent allowed.

***Secured Lenders*** means, collectively, the Obligated Group Bond Trustee, the Tyler Bond Trustee, the Caprock Secured Lender, the Plains Secured Lender and the SDI Secured Lender.

***Secured Tax Claim*** means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under Bankruptcy Code section 507(a)(8) (determined irrespective of any time limitations therein), and including any related Secured Claim for penalties.

***Series 1998A Bonds*** means those certain Series 1998A Abilene Health Facilities Development Corporation Bonds, issued by Abilene Health pursuant to the 1998 Bond Indenture.

***Series 1999 Bonds*** means those certain Series 1999 Abilene Health Facilities Development Corporation Bonds, issued by Abilene Health pursuant to the 1998 Bond Indenture.

***Series 2003A Bonds*** means those certain Series 2003A Abilene Health Facilities Development Corporation Bonds, issued by Abilene Health pursuant to the 1998 Bond Indenture.

***Series 2009 Notes*** means those certain notes issued by Tyler as required by the Original Tyler Loan Agreement.

***Series 2009A Bonds*** means those certain Series 2009A Term Retirement Facility Revenue Bonds, issued by HFDC pursuant to the Original Tyler Bond Indenture.

***Series 2009B Bonds*** means those certain Series 2009B Term Retirement Facility Revenue Bonds, issued by HFDC pursuant to the Original Tyler Bond Indenture.

***Series 2011 Note*** means that certain note providing for the repayment of the proceeds of the Series 2011 Bonds loaned to Tyler under the Tyler Loan Agreement.

***Series 2011A Bonds*** means those certain Series 2011A Retirement Facility Revenue Bonds, issued by HFDC pursuant to the Supplemental Tyler Bond Indenture No.1.

***Series 2011B Bonds*** means those certain Series 2011B Retirement Facility Revenue Bonds, issued by HFDC pursuant to the Supplemental Tyler Bond Indenture No.1.

***Series 2013A Bonds*** means those certain Series 2013A Retirement Facility Revenue Bonds, issued by Red River pursuant to the Obligated Group Bond Indenture.

***Series 2013B Bonds*** means those certain Series 2013B Retirement Facility Revenue Bonds, issued by Red River pursuant to the Obligated Group Bond Indenture.

***Series 2013C Bonds*** means those certain Series 2013C Retirement Facility Revenue Bonds, issued by Red River pursuant to the Obligated Group Bond Indenture.

***Series 2013D Bonds*** means those certain Series 2013D Retirement Facility Revenue Bonds, issued by Red River pursuant to the Obligated Group Bond Indenture.

***Shared Services Allocation*** shall have the meaning set forth in section 2.1(c).

*SMC* shall have the meaning set forth in the Introduction.

*SMF* shall have the meaning set forth in the Introduction.

*SMF Sale* shall have the meaning set forth in section 6.5.

*SMRS* shall have the meaning set forth in the Introduction.

*Successful Bidders* means, collectively, the Obligated Group Successful Bidder, the Tyler Successful Bidder, the Caprock Successful Bidder and the Plains Successful Bidder.

*Supplemental Tyler Bond Indenture No.1* means that certain Supplemental Bond Indenture No. 1, dated as of February 1, 2011, between the HFDC and the Tyler Trustee.

*System* means the Sears Methodist Retirement System, which includes the Debtors, Sears Methodist Senior Housing, LLC, Texas Senior Management, Inc., Senior Living Assurance, Inc. and Southwest Assurance Company, Ltd.

*TMF Claim* means the Secured Claim of the Texas Methodist Foundation.

*Tyler* shall have the meaning set forth in the Introduction.

*Tyler APA* shall have the meaning set forth in section 6.2(a).

*Tyler Assets* shall have the meaning set forth in section 6.2(a).

*Tyler Bonds* means, collectively, the Series 2009A Bonds, the Series 2009B Bonds, the Series 2011A Bonds and the Series 2011B Bonds.

*Tyler Bond Claims* means any and all Claims in respect of the Tyler Bonds.

*Tyler Bond Documents* means, collectively, the Tyler Master Trust Indenture, the Tyler Bond Indenture, and the promissory notes, loan agreements, mortgages and other documents related to the Tyler Bonds.

*Tyler Bond Indenture* means, collectively, the Original Tyler Bond Indenture and the Supplement Tyler Bond Indenture No. 1.

*Tyler Bond Trustee* means UMB Bank, N.A., in its capacity as successor trustee under the Tyler Bond Indenture and master trustee under the Tyler Master Indenture, and any successor trustee in either capacity.

*Tyler DIP Facility* means any debtor in possession financing facility or facilities established pursuant to the Tyler DIP Loan Agreement.

*Tyler DIP Lender* means the lender (or lenders) party to the Tyler DIP Loan Agreement from time to time, each in its (or their) capacity as such.

***Tyler DIP Loan Agreement*** means the note purchase agreement and related security agreements, mortgages and similar documents governing the Tyler DIP Facility by and between Tyler and the Tyler DIP Lender.

***Tyler Encumbered Excluded Assets*** shall have the meaning set forth in section 6.2(c).

***Tyler Excluded Assets*** shall have the meaning set forth in section 6.2(c).

***Tyler Loan Agreement*** means, collectively, the Tyler Original Loan Agreement and Amendment No. 1 to the Tyler Original Loan Agreement, dated as of February 1, 2011, between HFDC and Tyler.

***Tyler Purchase Price*** shall have the meaning set forth in section 6.2(a).

***Tyler Original Bond Indenture*** means that certain Indenture of Trust, dated as of November 1, 2009, between HFDC and the Tyler Bond Trustee.

***Tyler Original Loan Agreement*** means that certain Loan Agreement, dated as of November 1, 2009, between HFDC and Tyler.

***Tyler Original Master Indenture*** means that that certain Master Trust Indenture, Deed of Trust and Security Agreement, dated as of November 1, 2009, between Tyler and the Tyler Bond Trustee.

***Tyler Master Indenture*** means the Tyler Original Master Indenture, as supplemented by Supplemental Indenture Number 1, dated as of November 11, 2009, Supplemental Indenture Number 2, dated as of February 1, 2011, and Supplemental Indenture Number 3, dated as of May 1, 2012.

***Tyler Notes*** means, collectively, the Series 2009 Notes and the Series 2011 Note.

***Tyler Sale*** shall have the meaning set forth in section 6.2(a).

***Tyler Sale Motion*** shall have the meaning set forth in section 6.2(a).

***Tyler Stalking Horse*** shall have the meaning set forth in section 6.2(a).

***Tyler Successful Bidder*** shall have the meaning set forth in section 6.2(f).

***Unexpired Lease*** means a lease to which one or more of the Plan Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

***Unimpaired*** means, with respect to a Claim or Interest, a Class of Claims or Interests that is not Impaired within the meaning of Bankruptcy Code section 1124.

***United States Trustee*** means the Office of the United States Trustee for the Northern District of Texas.

*VLB* means the Veterans Land Board of Texas.

*VLB Homes* means, collectively, Alfredo Gonzalez, Ambrosio Guillen and Lamun Lusk Sanchez.

*Voting Agent* means GCG, Inc.

*Voting Record Date* shall have the meaning ascribed to such term in the Disclosure Statement.

*Wesley Court* means Wesley Court Methodist Retirement Community, a senior living facility located in Abilene, Texas and owned by SMC.

1.2 *Interpretation, Application of Definitions and Rules of Construction*. Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan, as the same may be amended, supplemented, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein. A term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to this Plan. The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. Unless otherwise provided, any reference in this Plan to an existing document, exhibit or schedule means such document, exhibit or schedule as it may have been amended, restated, revised, supplemented or otherwise modified. If a time or date is specified for any payments or other Distribution under this Plan, it shall mean on or as soon as reasonably practicable thereafter. Further, where appropriate from a contextual reading of a term, each term includes the singular and plural form of the term regardless of how the term is stated and each stated pronoun is gender neutral. In the event of any ambiguity or conflict between this Plan and the Disclosure Statement, the provisions of this Plan shall govern. Any reference to the "Liquidating Trustee" shall be deemed to include a reference to the "Liquidating Trust" and any reference to the "Liquidating Trust" shall be deemed to include a reference to the "Liquidating Trustee" unless the context otherwise required.

1.3 *Computation of Time*. Bankruptcy Rule 9006 shall apply to all computations of time periods prescribed or allowed by this Plan unless otherwise set forth herein or provided by the Bankruptcy Court.

## SECTION 2. ADMINISTRATIVE AND PRIORITY CLAIMS

2.1 *Administrative Expense Claims*.

(a) *Treatment*. Except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to different treatment with the Plan Debtors or Liquidating Trustee, each Holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to the unpaid amount of such Allowed Administrative Expense Claim on the later of the Effective Date and the date on which such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable;

*provided, however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Plan Debtors, as Debtors in Possession, or liabilities arising under obligations incurred by the Plan Debtors, as Debtors in Possession, prior to the Effective Date, shall be paid by the Plan Debtors, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions, including but not limited to the budgets related to the DIP Loan Agreements.  In addition, Allowed Administrative Expense Claims of the United States Trustee for statutory fees under 28 U.S.C. § 1930 shall be paid on the Effective Date and thereafter, as such fees may thereafter accrue and be due and payable, by the Liquidating Trustee in accordance with the applicable schedule for payment of such fees.  All statutory fees under 28 U.S.C. § 1930 with respect to the period prior to the Effective Date shall be paid by the Plan Debtors as and when such fees become due and payable.

(b) **_Administrative Expense Claims Bar Date_**.  To be eligible to receive distributions under this Plan on account of an Administrative Expense Claim that is not otherwise Allowed by this Plan, a request for payment of an Administrative Expense Claim must have been or be filed with the Bankruptcy Court on or before the Administrative Expense Claims Bar Date.  Any Administrative Expense Claim that is not asserted in accordance with this Section 2.1 shall be deemed disallowed under this Plan and shall be forever barred against the Plan Debtors, the Plan Debtors' Estates, the Liquidating Trust, or any of their Assets or property, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.

(c) **_Allocation of Allowed Administrative Expense Claims_**.  Allowed Administrative Expense Claims incurred solely in connection with a particular Plan Debtor shall be paid from that Plan Debtor's Estate.  Administrative Expense Claims incurred on behalf of all of the Plan Debtors shall be paid by each of the Plan Debtors in accordance with the following allocation formula (the "**_Shared Services Allocation_**"):[2]

| Debtor | Allocation Percentages for Allowed Administrative Claims Incurred On Behalf of All Debtors |
|---|---|
| Panhandle | 17.3% |
| Permian | 9.4% |
| SMC | 9.4% |
| Caprock | 8.7% |
| Tyler | 9.8% |
| SDI | 34.0% |
| Plains | 10.2% |
| CSL | 0.9% |
| OMH | 0.3% |
| **Total** | **100%** |

---

[2] The Shared Services Allocation has generally been calculated based upon each Debtor's respective revenue share in the System.

2.2     *Compensation and Reimbursement Claims*.

(a)     **Treatment.**  All Professionals seeking payment of Compensation and Reimbursement Claims shall (i) file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred in the Plan Debtors' Chapter 11 Cases by the date that is thirty (30) days after the Effective Date and (ii) be paid (a) the full unpaid amounts as is Allowed by the Bankruptcy Court within five (5) Business Days after the date that such Claim is Allowed by Order of the Bankruptcy Court, or (b) upon such other terms as may be mutually agreed upon between the Holder of such an Allowed Compensation and Reimbursement Claim and the Plan Debtor or Liquidating Trustee.  Any Compensation and Reimbursement Claim that is not asserted in accordance with this Section 2.2 shall be deemed disallowed under this Plan and shall be forever barred against the Plan Debtors, the Plan Debtors' Estates, the Liquidating Trust, or any of their Assets or property, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Claim.

(b)     *Allocation of Allowed Compensation and Reimbursement Claims*.  Compensation and Reimbursement Claims incurred by a party solely in connection with a particular Plan Debtor shall be paid from that Plan Debtor's Estate.  Compensation and Reimbursement Claims incurred on behalf of all of the Plan Debtors shall be paid by each of the Plan Debtors in accordance with the following allocation formula (the "*Professional Fee Allocation*"):[3]

| Debtor | Allocation Percentages for Allowed Compensation and Reimbursement Claims Incurred On Behalf of All Debtors |
|---|---|
| Panhandle | 28.3% |
| Permian | 4.0% |
| SMC | 22.7% |
| Caprock | 15% |
| Tyler | 15% |
| SDI | 4% |
| Plains | 10% |
| CSL | 0.8% |
| OMH | 0.2% |
| **Total** | **100%** |

2.3     *Priority Tax Claims*.  Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a different treatment of such Claim, each Holder of an Allowed Priority Tax Claim, if any such Claim exists, shall receive, Cash in an amount equal to the unpaid portion of such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the date that is ninety (90) calendar days after the Effective Date.

---

[3] Like the Shared Services Allocation, the Professional Fee Allocation is based on a particular Debtor's respective revenue share in the System.  However, certain adjustments have made to the Professional Fee Allocation to reflect the anticipated fees and costs to be incurred by Professionals in connection with each Debtor's Chapter 11 Case.

2.4     ***DIP Claims***.  On the Effective Date, the Plan Debtors shall pay Cash to each Holder of an Allowed DIP Claim in an amount equal to such Allowed DIP Claim in full and complete satisfaction of such Claim and all obligations and commitments thereunder shall be terminated.  Upon payment or satisfaction in full of all obligations under the DIP Loan Agreements, any and all liens and security interests securing obligations thereunder shall be deemed terminated and shall be of no further force and effect.

## SECTION 3.    CLASSIFICATION OF CLAIMS AND INTERESTS

3.1     ***Classified Claims Against and Interests in the Plan Debtors***.  Except as set forth herein, all Claims against and Interests in a particular Plan Debtor are placed in a particular Class for that Plan Debtor.  The Plan Debtors have not classified Administrative Expense Claims, Compensation and Reimbursement Claims, Priority Tax Claims or DIP Claims.

The following tables classify Claims against and Interests in each of the Plan Debtors for all purposes, including voting, confirmation and Distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  This Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.  Each Class set forth below is treated hereunder as a distinct Class for voting and Distribution purposes.

Subject to all other applicable provisions of this Plan (including its Distribution provisions), classified Claims shall receive the treatment described in Section 4 herein.  This Plan will not provide any Distributions on account of a Claim to the extent that such Claim has been disallowed, released, withdrawn, waived, or otherwise satisfied or paid as of the Effective Date, including, without limitation, payments by third parties.

3.2 *SMRS*.

The following table designates the Classes of Claims against and Interests in **SMRS** and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interest | Status | Entitled to Vote | Estimated Recovery |
|:---:|:---:|:---:|:---:|:---:|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Obligated Group Bond Claims | Impaired | Yes | 33-39%[4] |
| 4 | Other Secured Claims | Impaired | Yes | TBD |
| 5 | Deficiency Claims | Impaired | Yes | TBD |
| 6 | General Unsecured Claims | Impaired | Yes | TBD |

3.3 *Panhandle*.

The following table designates the Classes of Claims against and Interests in **Panhandle**, a direct subsidiary of SMRS, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interest | Status | Entitled to Vote | Estimated Recovery |
|:---:|:---:|:---:|:---:|:---:|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Obligated Group Bond Claims | Impaired | Yes | 33-39% |
| 4 | Entrance Deposit Refund Claims | Unimpaired | No (deemed to accept) | -- |
| 5 | Deficiency Claims | Impaired | Yes | TBD |
| 6 | General Unsecured Claims | Impaired | Yes | TBD |
| 7 | Interests in Panhandle | Impaired | No (deemed to reject) | 0% |

---

[4] Although Holders of Obligated Group Bond Claims may assert their Claims against more than one Estate, each such Claim is subject to the single satisfaction rule. As described in more detail herein, the estimated recovery for Holders of the Obligated Group Bond Claims is calculated based upon the (a) Obligated Group Purchase Price of $42,500,000 offered by the Obligated Group Stalking Horse, which remains subject to higher or better offers that may be submitted by other interested parties; (b) certain indemnification obligations of the Obligated Group Sellers described herein; and (c) certain assumptions regarding ordinary costs and taxes associated with the closing on the Obligated Group Sale. In the event the Obligated Group Sellers accept an offer that is higher or better than the Obligated Group Stalking Horse's offer, the estimated recovery for the Holders of the Obligated Group Bond Claims may increase.

3.4 *Permian*.

The following table designates the Classes of Claims against and Interests in **Permian**, a direct subsidiary of SMRS, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interest | Status | Entitled to Vote | Estimated Recovery |
|-------|---------------------|--------|------------------|--------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Obligated Group Bond Claims | Impaired | Yes | 33-39% |
| 4 | Entrance Deposit Refund Claims | Unimpaired | No (deemed to accept) | -- |
| 5 | Deficiency Claims | Impaired | Yes | TBD |
| 6 | General Unsecured Claims | Impaired | Yes | TBD |
| 7 | Interests in Permian | Impaired | No (deemed to reject) | 0% |

3.5 *SMC*.

The following table designates the Classes of Claims against and Interests in **SMC**, a direct subsidiary of SMRS, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interest | Status | Entitled to Vote | Estimated Recovery |
|-------|---------------------|--------|------------------|--------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Obligated Group Bond Claims | Impaired | Yes | 33-39% |
| 4 | Entrance Deposit Refund Claims | Unimpaired | No (deemed to accept) | -- |
| 5 | Deficiency Claims | Impaired | Yes | TBD |
| 6 | General Unsecured Claims | Impaired | Yes | TBD |
| 7 | Interests in SMC | Impaired | No (deemed to reject) | 0% |

### 3.6 *SMF*.

The following table designates the Classes of Claims against and Interests in **SMF**, a direct subsidiary of SMRS, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interest | Status | Entitled to Vote | Estimated Recovery |
|-------|---------------------|--------|------------------|--------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Obligated Group Bond Claims | Impaired | Yes | 33-39% |
| 4 | Deficiency Claims | Impaired | Yes | TBD |
| 5 | General Unsecured Claims | Impaired | Yes | TBD |
| 6 | Interests in SMF | Impaired | No (deemed to reject) | 0% |

### 3.7 *Tyler*.

The following table designates the Classes of Claims against and Interests in **Tyler**, a direct subsidiary of SMRS, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interest | Status | Entitled to Vote | Estimated Recovery |
|-------|---------------------|--------|------------------|--------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Tyler Bond Claims | Impaired | Yes | 36-42%[5] |
| 4 | Other Secured Claims | Unimpaired | No (deemed to accept) | -- |
| 5 | Entrance Deposit Refund Claims | Unimpaired | No (deemed to accept) | -- |
| 6 | Deficiency Claims | Impaired | Yes | TBD |
| 7 | General Unsecured Claims | Impaired | Yes | TBD |
| 8 | Interests in Tyler | Impaired | No (deemed to reject) | 0% |

---

[5] As described in more detail herein, the estimated recovery for Holders of the Tyler Bond Claims is calculated based upon the (a) Tyler Purchase Price of $20,000,000 offered by the Tyler Stalking Horse, which remains subject to higher or better offers that may be submitted by other interested parties; (b) certain indemnification obligations of Tyler described herein; and (c) certain assumptions regarding ordinary costs and taxes associated with the closing on the Tyler Sale. In the event Tyler accepts an offer that is higher or better than the Tyler Stalking Horse's offer, the estimated recovery for Holders of the Tyler Bond Claims may increase.
.

3.8    *Caprock*.

The following table designates the Classes of Claims against and Interests in **Caprock**, a direct subsidiary of SMRS, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interest | Status | Entitled to Vote | Estimated Recovery |
|:---:|:---:|:---:|:---:|:---:|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Caprock Secured Loan Claim | Impaired | Yes | 57-64%[6] |
| 4 | Entrance Deposit Refund Claims | Unimpaired | No (deemed to accept) | -- |
| 5 | Deficiency Claims | Impaired | Yes | TBD |
| 6 | General Unsecured Claims | Impaired | Yes | TBD |
| 7 | Interests in Caprock | Impaired | No (deemed to reject) | 0% |

3.9    *Plains*.

The following table designates the Classes of Claims against and Interests in **Plains**, a direct subsidiary of SMRS, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Claims and Interest | Status | Entitled to Vote | Estimated Recovery |
|:---:|:---:|:---:|:---:|:---:|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Plains Secured Loan Claim | Impaired | Yes | 58-65% |
| 4 | Deficiency Claims | Impaired | Yes | TBD |
| 5 | General Unsecured Claims | Impaired | Yes | TBD |
| 6 | Interests in Plains | Impaired | No (deemed to reject) | 0% |

---

[6] As described in more detail herein, the estimated recovery for the Holder of the Caprock Secured Loan Claim is calculated based upon the (a) Caprock Purchase Price of $6,600,000 offered by the Caprock Stalking Horse, which remains subject to higher or better offers that may be submitted by other interested parties; (b) certain indemnification obligations of Caprock described herein; and (c) certain assumptions regarding ordinary costs and taxes associated with the closing on the Caprock Sale.  In the event Caprock accepts an offer that is higher or better than the Caprock Stalking Horse's offer, the estimated recovery for the Holder of the Caprock Secured Loan Claim may increase.

3.10 **SDI**

| Class | Claims and Interest | Status | Entitled to Vote | Estimated Recovery |
|-------|---------------------|--------|------------------|--------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) | 100% |
| 3 | Other Secured Claims | Unimpaired | No (deemed to accept) | -- |
| 4 | General Unsecured Claims | Impaired | Yes | TBD |
| 5 | Interests in SDI | Impaired | No (deemed to reject) | 0% |

# SECTION 4.    TREATMENT OF CLAIMS AND INTERESTS[7]

4.1 *SMRS*.

(a) ***Other Priority Claims (Class 1)***.  This Class consists of all Allowed Other Priority Claims against SMRS that are specified as having priority in Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date.  Except to the extent that a Holder of an Allowed Other Priority Claim against SMRS's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date the Other Priority Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between SMRS or the Liquidating Trustee and the Holder of the Allowed Other Priority Claim.

(b) ***Secured Tax Claims (Class 2)***.  This Class consists of all Allowed Secured Tax Claims against SMRS that, absent the secured status of such Claim, would be entitled to priority in right of payment under Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date.  Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Secured Tax Claim, Cash in an amount equal to such Allowed Secured Tax Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date the Secured Tax Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between SMRS or the Liquidating Trustee and the Holder of the Secured Tax Claim.  SMRS and the Liquidating Trustee specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

(c) ***Obligated Group Bond Claims (Class 3)***.  This Class consists of all Claims of the Holders of the Obligated Group Bonds against SMRS, which Claims shall be deemed Allowed pursuant to this Plan in the aggregate amount of $95,858,814, which amount includes (i) unpaid principal and (ii) accrued but unpaid interest as of the Petition Date.  Upon the terms and subject to the conditions set forth in this Plan, on the Effective Date, in full and

---

[7] This Plan has provided for a separate classification of Claims against and Interests in each of the Plan Debtors.  For purposes of Section 4 of the Plan, the discussion regarding the treatment of Claims and Interests shall be in reference to the particular Plan Debtor identified in the sub-headings.

final satisfaction, settlement, release, and discharge of each Allowed Obligated Group Bond Claim, each Holder of an outstanding Obligated Group Bond will receive, on the Effective Date or as soon as practicable thereafter, its Pro Rata Share of the Net Sale Proceeds of the Obligated Group Sale and the Obligated Group Encumbered Excluded Assets.

(d)    *Other Secured Claims (Class 4)*.  This Class consists of the Other Secured Claims against SMRS, if any such Claims exist as of the Effective Date.  Upon the terms and subject to the conditions set forth in this Plan, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of the Other Secured Claims, the Holders of Other Secured Claims will receive, on the Effective Date or as soon as practicable thereafter, the Net Sale Proceeds of the Collateral that secures their Claims.

(e)    *Deficiency Claims (Class 5)*.  This Class consists of all Deficiency Claims against SMRS.  Except to the extent that a Holder of an Allowed Deficiency Claim agrees to a different treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of each Deficiency Claim, each Holder of an Allowed Deficiency Claim will receive its Pro Rata share of the Liquidating Trust Distributable Cash attributable to SMRS's Estate as soon as practicable as determined by the Liquidating Trustee.  SMRS and the Liquidating Trustee reserve their rights, however, to dispute the validity of any Deficiency Claim, whether or not objected to prior to the Effective Date.

(f)    *General Unsecured Claims (Class 6)*.  This Class consists of all General Unsecured Claims against SMRS.  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a different treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim will receive its Pro Rata share of the Liquidating Trust Distributable Cash attributable to SMRS's Estate as soon as practicable as determined by the Liquidating Trustee.  SMRS and the Liquidating Trustee reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

4.2    *Panhandle.*

(a)    *Other Priority Claims (Class 1)*.  This Class consists of all Allowed Other Priority Claims against Panhandle that are specified as having priority in Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date.  Except to the extent that a Holder of an Allowed Other Priority Claim against Panhandle's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date the Other Priority Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between Panhandle or the Liquidating Trustee and the Holder of the Allowed Other Priority Claim.

(b)    *Secured Tax Claims (Class 2)*.  This Class consists of all Allowed Secured Tax Claims against Panhandle that, absent the secured status of such Claim, would be entitled to priority in right of payment under Bankruptcy Code section 507(a), if any such Claims

exist as of the Effective Date. Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Secured Tax Claim, Cash in an amount equal to such Allowed Secured Tax Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date the Secured Tax Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between Panhandle or the Liquidating Trustee and the Holder of the Secured Tax Claim. Panhandle and the Liquidating Trustee specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

(c)  ***Obligated Group Bond Claims (Class 3)***.  This Class consists of all Claims of the Holders of the Obligated Group Bonds against Panhandle, which Claims shall be deemed Allowed pursuant to this Plan in the aggregate amount of $95,858,814, which amount includes (i) unpaid principal and (ii) accrued but unpaid interest as of the Petition Date.  Upon the terms and subject to the conditions set forth in this Plan, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of each Allowed Obligated Group Bond Claim, each Holder of an outstanding Obligated Group Bond will receive, on the Effective Date or as soon as practicable thereafter, its Pro Rata Share of the Net Sale Proceeds of the Obligated Group Sale and the Obligated Group Encumbered Excluded Assets.

(d)  ***Entrance Deposit Refund Claims (Class 4)***.  This Class consists of all Entrance Deposit Refund Claims against Panhandle.  The Residency Agreements of Holders of Allowed Entrance Deposit Refund Claims, and all obligations thereunder, will be assumed and assigned by Panhandle to the Obligated Group Successful Bidder pursuant to section 365 of the Bankruptcy Code and such Holders will have the same rights under their respective Residency Agreements as they had before the Petition Date.

(e)  ***Deficiency Claims (Class 5)***.  This Class consists of all Deficiency Claims against Panhandle.  Except to the extent that a Holder of an Allowed Deficiency Claim agrees to a different treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of each Deficiency Claim, each Holder of an Allowed Deficiency Claim will receive its Pro Rata share of the Liquidating Trust Distributable Cash attributable to Panhandle's Estate as soon as practicable as determined by the Liquidating Trustee.  Panhandle and the Liquidating Trustee reserve their rights, however, to dispute the validity of any Deficiency Claim, whether or not objected to prior to the Effective Date.

(f)  ***General Unsecured Claims (Class 6)***.  This Class consists of all General Unsecured Claims against Panhandle.  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a different treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim will receive its Pro Rata share of the Liquidating Trust Distributable Cash attributable to Panhandle's Estate as soon as practicable as determined by the Liquidating Trustee.  Panhandle and the Liquidating Trustee reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

(g) ***Interests in Panhandle (Class 7)***. This Class consists of SMRS's ownership interests in Panhandle, which will be cancelled as of the Effective Date. SMRS shall not be entitled to a Distribution on account of its Interests in Panhandle.

4.3 ***Permian.***

(a) ***Other Priority Claims (Class 1)***. This Class consists of all Allowed Other Priority Claims against Permian that are specified as having priority in Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date. Except to the extent that a Holder of an Allowed Other Priority Claim against Permian's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date the Other Priority Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between Permian or the Liquidating Trustee and the Holder of the Allowed Other Priority Claim.

(b) ***Secured Tax Claims (Class 2)***. This Class consists of all Allowed Secured Tax Claims against Permian that, absent the secured status of such Claim, would be entitled to priority in right of payment under Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date. Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Secured Tax Claim, Cash in an amount equal to such Allowed Secured Tax Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date the Secured Tax Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between Permian or the Liquidating Trustee and the Holder of the Secured Tax Claim. Permian and the Liquidating Trustee specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

(c) ***Obligated Group Bond Claims (Class 3)***. This Class consists of all Claims of the Holders of the Obligated Group Bonds against Permian, which Claims shall be deemed Allowed pursuant to this Plan in the aggregate amount of $95,858,814, which amount includes (i) unpaid principal and (ii) accrued but unpaid interest as of the Petition Date. Upon the terms and subject to the conditions set forth in this Plan, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of each Allowed Obligated Group Bond Claim, each Holder of an outstanding Obligated Group Bond will receive, on the Effective Date or as soon as practicable thereafter, its Pro Rata Share of the Net Sale Proceeds of the Obligated Group Sale and the Obligated Group Encumbered Excluded Assets.

(d) ***Entrance Deposit Refund Claims (Class 4)***. This Class consists of all Entrance Deposit Refund Claims against Permian. The Residency Agreements of Holders of Allowed Entrance Deposit Refund Claims, and all obligations thereunder, will be assumed and assigned by Permian to the Obligated Group Successful Bidder under section 365 of the Bankruptcy Code and such Holders will have the same rights under their respective Residency Agreements as they had before the Petition Date.

(e)　　*Deficiency Claims (Class 5)*.  This Class consists of all Deficiency Claims against Permian.  Except to the extent that a Holder of an Allowed Deficiency Claim agrees to a different treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of each Deficiency Claim, each Holder of an Allowed Deficiency Claim will receive its Pro Rata share of Liquidating Trust Distributable Cash attributable to Permian's Estate as soon as practicable as determined by the Liquidating Trustee.  Permian and the Liquidating Trustee reserve their rights, however, to dispute the validity of any Deficiency Claim, whether or not objected to prior to the Effective Date.

(f)　　*General Unsecured Claims (Class 6)*.  This Class consists of all General Unsecured Claims against Permian.  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a different treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim will receive its Pro Rata share of Liquidating Trust Distributable Cash attributable to Permian's Estate as soon as practicable as determined by the Liquidating Trustee.  Permian and the Liquidating Trustee reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

(g)　　*Interests in Permian (Class 7)*.  This Class consists of SMRS's ownership interests in Permian, which will be cancelled as of the Effective Date.  SMRS shall not be entitled to a Distribution on account of its Interests in Permian.

4.4　　*SMC.*

(a)　　*Other Priority Claims (Class 1)*.  This Class consists of all Allowed Other Priority Claims against SMC that are specified as having priority in Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date.  Except to the extent that a Holder of an Allowed Other Priority Claim against SMC's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date the Other Priority Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between SMC or the Liquidating Trustee and the Holder of the Allowed Other Priority Claim.

(b)　　*Secured Tax Claims (Class 2)*.  This Class consists of all Allowed Secured Tax Claims against SMC that, absent the secured status of such Claim, would be entitled to priority in right of payment under Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date.  Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Secured Tax Claim, Cash in an amount equal to such Allowed Secured Tax Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date the Secured Tax Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between SMC or the Liquidating Trustee and the Holder of the Secured Tax Claim.  SMC and the Liquidating Trustee specifically reserve the right to challenge the validity, nature, and

perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

(c) **Obligated Group Bond Claims (Class 3)**. This Class consists of all Claims of the Holders of the Obligated Group Bonds against SMC, which Claims shall be deemed Allowed pursuant to this Plan in the aggregate amount of $95,858,814, which amount includes (i) unpaid principal and (ii) accrued but unpaid interest as of the Petition Date. Upon the terms and subject to the conditions set forth in this Plan, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of each Allowed Obligated Group Bond Claim, each Holder of an outstanding Obligated Group Bond will receive, on the Effective Date or as soon as practicable thereafter, its Pro Rata Share of the Net Sale Proceeds of the Obligated Group Sale and the Obligated Group Encumbered Excluded Assets.

(d) **Entrance Deposit Refund Claims (Class 4)**. This Class consists of all Entrance Deposit Refund Claims against SMC. The Residency Agreements of Holders of Allowed Entrance Deposit Refund Claims, and all obligations thereunder, will assumed and assigned by SMC to the Obligated Group Successful Bidder under section 365 of the Bankruptcy Code and such Holders will have the same rights under their respective Residency Agreements as they had before the Petition Date.

(e) **Deficiency Claims (Class 5)**. This Class consists of all Deficiency Claims against SMC. Except to the extent that a Holder of an Allowed Deficiency Claim agrees to a different treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of each Deficiency Claim, each Holder of an Allowed Deficiency Claim will receive its Pro Rata share of Liquidating Trust Distributable Cash attributable to SMC's Estate as soon as practicable as determined by the Liquidating Trustee. SMC and the Liquidating Trustee reserve their rights, however, to dispute the validity of any Deficiency Claim, whether or not objected to prior to the Effective Date.

(f) **General Unsecured Claims (Class 6)**. This Class consists of all General Unsecured Claims against SMC. Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a different treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim will receive its Pro Rata share of Liquidating Trust Distributable Cash attributable to SMC's Estate as soon as practicable as determined by the Liquidating Trustee. SMC and the Liquidating Trustee reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

(g) **Interests in SMC (Class 7)**. This Class consists of SMRS's ownership interests in SMC, which will be cancelled as of the Effective Date. SMRS shall not be entitled to a Distribution on account of its Interests in SMC.

4.5 **SMF**.

(a) ***Other Priority Claims (Class 1)***. This Class consists of all Allowed Other Priority Claims against SMF that are specified as having priority in Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date. Except to the extent that a Holder of an Allowed Other Priority Claim against SMF's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date the Other Priority Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between SMF or the Liquidating Trustee and the Holder of the Allowed Other Priority Claim.

(b) ***Secured Tax Claims (Class 2)***. This Class consists of all Allowed Secured Tax Claims against SMF that, absent the secured status of such Claim, would be entitled to priority in right of payment under Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date. Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Secured Tax Claim, Cash in an amount equal to such Allowed Secured Tax Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date the Secured Tax Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between SMF or the Liquidating Trustee and the Holder of the Secured Tax Claim. SMF and the Liquidating Trustee specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

(c) ***Obligated Group Bond Claims (Class 3)***. This Class consists of all Claims of the Holders of the Obligated Group Bonds against SMF, which Claims shall be deemed Allowed pursuant to this Plan in the aggregate amount of $95,858,814, which amount includes (i) unpaid principal and (ii) accrued but unpaid interest as of the Petition Date. Upon the terms and subject to the conditions set forth in this Plan, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of each Allowed Obligated Group Bond Claim, each Holder of an outstanding Obligated Group Bond will receive, on the Effective Date or as soon as practicable thereafter, its Pro Rata Share of the Net Sale Proceeds of the Obligated Group Sale and the Obligated Group Encumbered Excluded Assets.

(d) ***Deficiency Claims (Class 4)***. This Class consists of all Deficiency Claims against SMF. Except to the extent that a Holder of an Allowed Deficiency Claim agrees to a different treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of each Deficiency Claim, each Holder of an Allowed Deficiency Claim will receive its Pro Rata share of the Liquidating Trust Distributable Cash attributable to SMF's Estate as soon as practicable as determined by the Liquidating Trustee. SMF and the Liquidating Trustee reserve their rights, however, to dispute the validity of any Deficiency Claim, whether or not objected to prior to the Effective Date.

(e) ***General Unsecured Claims (Class 5)***. This Class consists of all General Unsecured Claims against SMF. Except to the extent that a Holder of an Allowed

General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim will receive its Pro Rata share of the Liquidating Trust Distributable Cash attributable to SMF's Estate as soon as practicable as determined by the Liquidating Trustee. SMF and the Liquidating Trustee reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

(f) *Interests in SMF (Class 6)*. This Class consists of SMRS's ownership interests in SMF, which will be cancelled as of the Effective Date. SMRS shall not be entitled to a Distribution on accounts its Interests in SMF.

4.6 *Tyler.*

(a) *Other Priority Claims (Class 1)*. This Class consists of all Allowed Other Priority Claims against Tyler that are specified as having priority in Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date. Except to the extent that a Holder of an Allowed Other Priority Claim against Tyler's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Tyler and the Holder of the Allowed Other Priority Claim.

(b) *Secured Tax Claims (Class 2)*. This Class consists of all Allowed Secured Tax Claims against Tyler that, absent the secured status of such Claim, would be entitled to priority in right of payment under Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date. Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Secured Tax Claim, Cash in an amount equal to such Allowed Secured Tax Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date the Secured Tax Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between Tyler or the Liquidating Trustee and the Holder of the Secured Tax Claim. Tyler and the Liquidating Trustee specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

(c) *Tyler Bond Claims (Class 3)*. This Class consists of all Claims of the Holders of the Tyler Bonds against Tyler, which Claims shall be deemed Allowed pursuant to this Plan in the aggregate amount of $43,050,000. Upon the terms and subject to the conditions set forth in this Plan, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of each Allowed Tyler Bond Claim, each Holder of an outstanding Tyler Bond Claim will receive, on the Effective Date or as soon as practicable thereafter, its Pro Rata Share of the Net Sale Proceeds of the Tyler Sale and the Tyler Encumbered Excluded Assets.

(d) *Other Secured Claims (Class 4)*. This Class consists of all Other Secured Claims against Tyler related to certain vehicles that will be sold to the Tyler Successful Bidder. The agreements related to such Other Secured Claims will be assumed and assigned by

Tyler to the Tyler Successful Bidder under section 365 of the Bankruptcy Code and such Holders will have the same rights under such agreements as they had before the Petition Date.

(e)     *Entrance Deposit Refund Claims (Class 5)*.  This Class consists of all Entrance Deposit Refund Claims against Tyler.  The Residency Agreements of Holders of Allowed Entrance Deposit Refund Claims, and all obligations thereunder, will assumed and assigned by Tyler to the Tyler Successful Bidder under section 365 of the Bankruptcy Code and such Holders will have the same rights under their respective Residency Agreements as they had before the Petition Date.

(f)     *Deficiency Claims (Class 6)*.  This Class consists of all Deficiency Claims against Tyler.  Except to the extent that a Holder of an Allowed Deficiency Claim agrees to a different treatment of such Claim, in full and final satisfaction and discharge of and in exchange for each Deficiency Claim, each Holder of an Allowed Deficiency Claim will receive its Pro Rata share of Liquidating Trust Distributable Cash attributable to Tyler's Estate as soon as practicable as determined by the Liquidating Trustee.  Tyler and the Liquidating Trustee reserve their rights, however, to dispute the validity of any Deficiency Claim, whether or not objected to prior to the Effective Date.

(g)     *General Unsecured Claims (Class 7)*.  This Class consists of all General Unsecured Claims against Tyler.  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a different treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim will receive its Pro Rata share of Liquidating Trust Distributable Cash attributable to Tyler's Estate as soon as practicable as determined by the Liquidating Trustee.  Tyler and the Liquidating Trustee reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

(h)     *Interests in Tyler (Class 8)*.  This Class consists of SMRS's ownership interests in Tyler, which will be cancelled as of the Effective Date.  SMRS shall not be entitled to a Distribution on account of its Interests in Tyler.

4.7     *Caprock.*

(a)     *Other Priority Claims (Class 1)*.  This Class consists of all Allowed Other Priority Claims against Caprock that are specified as having priority in Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date.  Except to the extent that a Holder of an Allowed Other Priority Claim against Caprock's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Caprock and the Holder of the Allowed Other Priority Claim.

(b)     *Secured Tax Claims (Class 2)*.  This Class consists of all Allowed Secured Tax Claims against Caprock that, absent the secured status of such Claim, would be

entitled to priority in right of payment under Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date. On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Secured Tax Claim, Cash in an amount equal to such Allowed Secured Tax Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date the Secured Tax Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between Caprock or the Liquidating Trustee and the Holder of the Secured Tax Claim. Caprock and the Liquidating Trustee specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

(c)     ***Caprock Secured Loan Claim (Class 3)***. This Class consists of the Claim of the Caprock Secured Lender related to the Caprock Loan Agreement, which Claim shall be deemed Allowed pursuant to the Plan in the amount of $6,922,982.01. Upon the terms and subject to the conditions set forth in this Plan, on the Effective Date or as soon as practicable thereafter, in full and final satisfaction, settlement, release, and discharge of the Caprock Secured Loan Claim, the Caprock Secured Lender shall receive the Net Sale Proceeds of the Caprock Sale and the Caprock Encumbered Excluded Assets.

(d)     ***Entrance Deposit Refund Claims (Class 4)***. This Class consists of all Entrance Deposit Refund Claims against Caprock. The Residency Agreements of Holders of Allowed Entrance Deposit Refund Claims, and all obligations thereunder, will assumed and assigned by Caprock to the Caprock Successful Bidder under section 365 of the Bankruptcy Code and such Holders will have the same rights under their respective Residency Agreements as they had before the Petition Date.

(e)     ***Deficiency Claims (Class 5)***. This Class consists of all Deficiency Claims against Caprock. Except to the extent that a Holder of an Allowed Deficiency Claim agrees to a different treatment of such Claim, in full and final satisfaction and discharge of and in exchange for each Deficiency Claim, each Holder of an Allowed Deficiency Claim will receive its Pro Rata share of Liquidating Trust Distributable Cash attributable to Caprock's Estate as soon as practicable as determined by the Liquidating Trustee. Caprock and the Liquidating Trustee reserve their rights, however, to dispute the validity of any Deficiency Claim, whether or not objected to prior to the Effective Date.

(f)     ***General Unsecured Claims (Class 6).*** This Class consists of all General Unsecured Claims against Caprock. Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a different treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim will receive its Pro Rata share of Liquidating Trust Distributable Cash attributable to Caprock's Estate as soon as practicable as determined by the Liquidating Trustee. Caprock and the Liquidating Trustee reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

(g) *Interests in Caprock (Class 7)*. This Class consists of SMRS's ownership interests in Caprock, which will be cancelled as of the Effective Date. SMRS shall not be entitled to a Distribution on account of its Interests in Caprock.

4.8 *Plains.*

(a) *Other Priority Claims (Class 1)*. This Class consists of all Allowed Other Priority Claims against Plains that are specified as having priority in Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date. Except to the extent that a Holder of an Allowed Other Priority Claim against Plains's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Plains and the Holder of the Allowed Other Priority Claim.

(b) *Secured Tax Claims (Class 2)*. This Class consists of all Allowed Secured Tax Claims against Plains that, absent the secured status of such Claim, would be entitled to priority in right of payment under Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date. Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Secured Tax Claim, Cash in an amount equal to such Allowed Secured Tax Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date the Secured Tax Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between Plains or the Liquidating Trustee and the Holder of the Secured Tax Claim. Plains and the Liquidating Trustee specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

(c) *Plains Secured Loan Claim (Class 3)*. This Class consists of the Claim of the Plains Secured Lender related to the Plains Loan Agreement, which Claim shall be deemed Allowed pursuant to the Plan in the amount of $8,234,000. Upon the terms and subject to the conditions set forth in this Plan, on the Effective Date or as soon as practicable thereafter, in full and final satisfaction, settlement, release, and discharge of the Plains Secured Loan Claim, the Plains Secured Lender shall receive the Net Sale Proceeds of the Plains Sale and the Plains Encumbered Excluded Assets.

(d) *Deficiency Claims (Class 4)*. This Class consists of all Deficiency Claims against Plains. Except to the extent that a Holder of an Allowed Deficiency Claim agrees to a different treatment of such Claim, in full and final satisfaction and discharge of and in exchange for each Deficiency Claim, each Holder of an Allowed Deficiency Claim will receive its Pro Rata share of Liquidating Trust Distributable Cash attributable to Plains's Estate as soon as practicable as determined by the Liquidating Trustee. Plains and the Liquidating Trustee reserve their rights, however, to dispute the validity of any Deficiency Claim, whether or not objected to prior to the Effective Date.

(e)    **_General Unsecured Claims (Class 5)_.** This Class consists of all General Unsecured Claims against Plains. Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a different treatment of such Claim, in full and final satisfaction and discharge of and in exchange for each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim will receive its Pro Rata share of Liquidating Trust Distributable Cash attributable to Plains's Estate as soon as practicable as determined by the Liquidating Trustee. Plains and the Liquidating Trustee reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

(f)    **_Interests in Plains (Class 6)_.** This Class consists of SMRS's ownership interests in Plains, which will be cancelled as of the Effective Date. SMRS shall not be entitled to a Distribution on account of its Interests in Plains.

4.9    **_SDI_**

(a)    **_Other Priority Claims (Class 1)_.** This Class consists of all Allowed Other Priority Claims against SDI that are specified as having priority in Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date. Except to the extent that a Holder of an Allowed Other Priority Claim against SDI's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between SDI and the Holder of the Allowed Other Priority Claim.

(b)    **_Secured Tax Claims (Class 2)_.** This Class consists of all Allowed Secured Tax Claims against SDI that, absent the secured status of such Claim, would be entitled to priority in right of payment under Bankruptcy Code section 507(a), if any such Claims exist as of the Effective Date. Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of each such Allowed Secured Tax Claim, Cash in an amount equal to such Allowed Secured Tax Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date the Secured Tax Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between SDI or the Liquidating Trustee and the Holder of the Secured Tax Claim. SDI and the Liquidating Trustee specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

(c)    **_Other Secured Claims (Class 3)_.** This Class consists of all Other Secured Claims against SDI related to certain vehicles that will be sold to the new operator of the VLB Homes. The agreements related to such Other Secured Claims will be assumed and assigned by SDI to the new operator under section 365 of the Bankruptcy Code and such Holders will have the same rights under such agreements as they had before the Petition Date.

(d)    **_General Unsecured Claims (Class 4)_.** This Class consists of all General Unsecured Claims against SDI. Except to the extent that a Holder of an Allowed

General Unsecured Claim agrees to a different treatment of such Claim, in full and final satisfaction and discharge of and in exchange for each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim will receive its Pro Rata share of Liquidating Trust Distributable Cash attributable to SDI's Estate as soon as practicable as determined by the Liquidating Trustee. SDI and the Liquidating Trustee reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

(e) *Interests in SDI (Class 5)*. This Class consists of SMRS's ownership interests in SDI, which will be cancelled as of the Effective Date. SMRS shall not be entitled to a Distribution on account of its Interests in SDI.

**SECTION 5.    ACCEPTANCE OR REJECTION OF THE PLAN.**

5.1 *Holders of Claims and Interests Entitled to Vote*. Pursuant to section 1126 of the Bankruptcy Code, each Impaired Class of Claims or Interests that will receive a Distribution pursuant to this Plan may vote separately to accept or reject this Plan. Each Holder of an Allowed Claim in such an Impaired Class shall receive a ballot and may cast a vote to accept or reject this Plan. The following Classes of each of the Plan Debtors are Impaired and entitled to vote:

| Plan Debtor | Impaired Classes Entitled to Vote |
|:---:|:---:|
| SMRS | 3, 4, 5 and 6 |
| Panhandle | 3, 5 and 6 |
| Permian | 3, 5 and 6 |
| SMC | 3, 5 and 6 |
| SMF | 3, 4 and 5 |
| Tyler | 3, 6 and 7 |
| Caprock | 3, 5 and 6 |
| Plains | 3, 4 and 5 |
| SDI | 4 |

5.2 *Classes Deemed to Reject*. The following Classes of each of the Plan Debtors are Impaired, are not entitled to a Distribution and are deemed to reject the Plan:

| Plan Debtor | Impaired Classes Deemed to Reject Plan |
|:---:|:---:|
| SMRS | None |
| Panhandle | 7 |
| Permian | 7 |
| SMC | 7 |
| SMF | 6 |
| Tyler | 8 |
| Caprock | 7 |
| Plains | 6 |
| SDI | 5 |

5.3 ***Classes Deemed to Accept***. The following Classes of the Plan Debtors are Unimpaired, not entitled to vote to accept or reject the Plan and are deemed to accept the Plan:

| Plan Debtor | Unimpaired Classes Deemed to Accept Plan |
|---|---|
| SMRS | 1 and 2 |
| Panhandle | 1, 2 and 4 |
| Permian | 1, 2 and 4 |
| SMC | 1, 2 and 4 |
| SMF | 1 and 2 |
| Tyler | 1, 2, 4 and 5 |
| Caprock | 1, 2 and 4 |
| Plains | 1 and 2 |
| SDI | 1, 2 and 3 |

5.4 ***Acceptance by a Class.*** A Class of Claims entitled to vote to accept or reject this Plan accepts this Plan if the Holders of Claims in such voting Class that hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Claims that complete and return Ballots in such Class vote to accept this Plan. A Class of Interests is deemed to accept this Plan if this Plan has been accepted by Holders of at least 2/3 of the amount of the Allowed Interests held by Holders of such Interests who vote in such Class.

5.5 ***Cramdown Under Section 1129(b) of the Bankruptcy Code***. If all applicable requirements for confirmation of this Plan are met as set forth in section 1129(a) of the Bankruptcy Code except subsection (8) thereof, the Plan Debtors may request that the Bankruptcy Court confirm this Plan in accordance with section 1129(b) of the Bankruptcy Code on the bases that this Plan is fair and equitable and does not discriminate unfairly with respect to each Class of Claims or Interests that is Impaired under, and has not accepted or is deemed to reject, this Plan.

5.6 ***Ballot Instructions***. Each Holder of a Claim or Interest entitled to vote on this Plan will be asked to complete and return a Ballot to the Voting Agent, which will compile the votes so received.

## SECTION 6.    MEANS FOR IMPLEMENTATION

6.1 ***Obligated Group Sale.***

(a) ***Selection of Stalking Horse.*** On November 24, 2014, SMC, Permian and Panhandle (collectively, the "***Obligated Group Sellers***") filed a motion [Docket No. 583] (the "***Obligated Group Sale Motion***") seeking an order authorizing and approving of, among other things, (i) the sale (the "***Obligated Group Sale***") of substantially all of the Obligated Group Sellers' Assets and related business operations (collectively, the "***Obligated Group Assets***") free and clear of all liens, claims, interests and encumbrances to Yellow Rose Health Holdings LLC, a Nevada limited liability company (the "***Obligated Group Stalking Horse***"), pursuant to that certain Asset Purchase and Sale Agreement with the Obligated Group

Stalking Horse (the "**_Obligated Group APA_**"), (ii) certain bid procedures to be employed in connection with the Obligated Group Sale, and (iii) certain bid protections offered to the Obligated Group Stalking Horse, including the payment of a break-up fee in the amount of One Million Two Hundred Thousand Dollars ($1,200,000) and an expense reimbursement in an amount up to One Hundred Thousand Dollars ($100,000) to be paid in accordance with the terms and conditions set forth in the Obligated Group APA. Pursuant to the Obligated Group APA, the Obligated Group Sellers have agreed to sell the Obligated Group Assets for Forty Two Million Five Hundred Thousand Dollars ($42,500,000) (the "**_Obligated Group Purchase Price_**") and to assume and assign certain Executory Contracts and Unexpired Leases to the Obligated Group Stalking Horse, subject to higher or otherwise better offers and the Obligated Group Bond Trustee's right to credit bid under section 363(k) of the Bankruptcy Code.

(b) **_Purchased Assets_**. As more fully described in section 1.1 of the Obligated Group APA, the Obligated Group Assets include, but are not limited to, the following:

(i) certain real property located in Abilene, Odessa and Amarillo, Texas, together with all buildings, structures, fixtures and other improvements located in, on, at, under, above or attached to such land;

(ii) all inventory used or held for use at Parks, Wesley Court and Craig;

(iii) all furniture, fixtures, equipment, tools, machinery, vehicles and all other tangible personal property owned by the Obligated Group Sellers and used in connection with Parks, Wesley Court and Craig;

(iv) to the extent assignable or transferable, all personal property leases with respect to ownership of Parks, Wesley Court and Craig; and

(v) to the extent assignable or transferable, all general intangibles related to the ownership, possession, lease or use of the Obligated Group Assets, including without limitation, lien waivers, surety agreements, bonds, warranties, guaranties, utility use agreements, covenants, commitments, permits, certificates, regulatory approvals, entitlements, service marks, trademarks and trade names owned or employed by the Obligated Group Sellers in conjunction with the ownership of their Facilities.

(c) **_Excluded Assets_**. The Obligated Group Assets exclude certain assets (the "**_Obligated Group Excluded Assets_**"), including, but not limited to, the following assets of the Obligated Group Sellers:

(i) cash, cash equivalents and short-term investments, including all pre-paid deposits held by any party;

(ii)    all entrance fees received and held in escrow pursuant to the *Final Order (I) Authorizing the Obligated Group Debtors to (A) Use Cash Collateral and (B) Incur Postpetition Secured Indebtedness; (II) Granting Liens and Providing Super-Priority Administrative Expense Status; (III) Granting Adequate Protection to Wells Fargo Bank, National Association, as Trustee; and (IV) Modifying the Automatic Stay* [Docket No. 23], entered by the Bankruptcy Court on July 28, 2014;

(iii)    all accounts receivable and proceeds therefrom for services provided prior to a date certain;

(iv)    assets owned and provided by vendors of services or goods to Parks, Wesley Court and Craig;

(v)    organizational record books and minute books;

(vi)    all bank accounts; and

(vii)    certain rights, claims and choses in action, and any payments, awards or other proceeds resulting therefrom.

The aforementioned Obligated Group Excluded Assets, with the exception of items iv, v and vii, are subject to the security interest of the Obligated Group Bond Trustee and will be distributed to the Holders of the Obligated Group Bond Claims. Such encumbered Excluded Assets shall be referred to herein as the "**Obligated Group Encumbered Excluded Assets**." The remaining Obligated Group Excluded Assets, to the extent they are owned by the Obligated Group Sellers, will be transferred to the Liquidating Trust.

(d)    *Assumed Liabilities*. As part of the consideration for the Obligated Group Sale, pursuant to the Obligated Group APA, the Obligated Group Stalking Horse has agreed to assume the following liabilities of the Obligated Group Sellers:

(i)    all amounts payable pursuant to section 365 of the Bankruptcy Code for all of the Obligated Group Sellers' Executory Contracts and Unexpired Leases to be assumed and assigned to the Obligated Group Stalking Horse pursuant to the Obligated Group APA;

(ii)    certain employee obligations; and

(iii)    all obligations, including, without limitation, all refund obligations, under the Residency Agreements related to Parks, Wesley Court and Craig.

(e)    *Indemnification Trust Fund*. Subject to the occurrence of the closing on the Obligated Group APA, the Obligated Group Sellers have agreed to escrow a

portion of the Obligated Group Purchase Price in an amount equal to Seven Hundred and Fifty Thousand Dollars ($750,000) to fund certain indemnification obligations of the Obligated Group Sellers for a period of one (1) year following the closing on the Obligated Group APA.

(f)     *Auction*.   In order to ensure that the Obligated Group Sellers are maximizing the return on the Obligated Group Assets, they have sought, in the Obligated Group Sale Motion, authority to conduct an auction of the Obligated Group Assets on or around January 21, 2015, to the extent other parties have expressed an interest in purchasing all or a portion of the Obligated Group Assets and have otherwise qualified to participate in the auction in accordance with the bid procedures outlined in the Obligated Group Sale Motion. The party offering the highest or otherwise best offer at that auction will be deemed the "***Obligated Group Successful Bidder***." The Obligated Group Sellers will thereafter seek Bankruptcy Court approval of the Obligated Group Sale to the Obligated Group Successful Bidder.

6.2     *Tyler Sale*.

(a)     *Selection of Stalking Horse*.  On November 24, 2014, Tyler filed a motion [Docket No. 584] (the "***Tyler Sale Motion***") seeking an order authorizing and approving of, among other things, (i) the sale (the "***Tyler Sale***") of substantially all of Tyler's Assets and related business operations (the "***Tyler Assets***") free and clear of all liens, claims, interests and encumbrances to ER Propco CO, LLC, a Delaware limited liability company (the "***Tyler Stalking Horse***"), pursuant to that certain Asset Purchase and Sale Agreement with the Tyler Stalking Horse (the "***Tyler APA***"), (ii) certain bid procedures to be employed in connection with the Tyler Sale, and (iii) certain bid protections offered to the Tyler Stalking Horse, including the payment of a break-up fee in the amount of Six Hundred Thousand Dollars ($600,000) and an expense reimbursement in an amount of Fifty Thousand Dollars ($50,000) to be paid in accordance with the terms and conditions set forth in the Tyler APA.  Pursuant to the Tyler APA, Tyler has agreed to sell the Tyler Assets for Twenty Million Dollars ($20,000,000) (the "***Tyler Purchase Price***") and to assume and assign certain Executory Contracts and Unexpired Leases to the Tyler Stalking Horse, subject to higher or otherwise better offers and the Tyler Bond Trustee's right to credit bid under section 363(k) of the Bankruptcy Code.

(b)     *Purchased Assets*.  As more fully described in section 1.1 of the Tyler APA, the Tyler Assets include, but are not limited to, the following:

(i)     certain real property located in Tyler, Texas, together with all buildings, structures, fixtures and other improvements located in, on, at, under, above or attached to such land;

(ii)     all inventory used or held for use at Meadow Lake;

(iii)    all furniture, fixtures, equipment, tools, machinery, vehicles and all other tangible personal property owned by Tyler and used in connection with Meadow Lake;

(iv)    to the extent assignable or transferable, all personal property leases with respect to ownership of Meadow Lake; and

(v)    to the extent assignable or transferable, all general intangibles related to the ownership, possession, lease or use of the Tyler Assets, including without limitation, lien waivers, surety agreements, bonds, warranties, guaranties, utility use agreements, covenants, commitments, permits, certificates, regulatory approvals, entitlements, service marks, trademarks and trade names owned or employed by Tyler in conjunction with the ownership of Meadow Lake.

(c)    ***Excluded Assets***.  The Tyler Assets exclude certain assets (the "***Tyler Excluded Assets***"), including, but not limited to, the following Assets of Tyler:

(i)    cash, cash equivalents and short-term investments;

(ii)    all entrance fees received and held in escrow pursuant to the *Stipulated Final Order: (1) Authorizing Sears Tyler Methodist Retirement Corporation to Use Cash Collateral; and (2) Granting Adequate Protection to the Trustee* [Docket No. 261], entered by the Bankruptcy Court on July 23, 2014, the *Final Order Authorizing Sears Tyler Methodist Retirement Corporation to Obtain Postpetition Financing on a Senior Secured SuperPriority Basis Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364* [Docket No. 374], entered by the Bankruptcy Court on August 26, 2014 and the *Order Authorizing Debtors To Escrow Certain Entrance Deposits and Refund Certain Entrance Deposits* [Docket No. 56], entered by the Bankruptcy Court on June 12, 2014;

(iii)    all accounts receivable and proceeds therefrom for services provided prior to a date certain;

(iv)    assets owned and provided by vendors of services or goods to Meadow Lake;

(v)    organizational record books and minute books;

(vi)    all bank accounts; and

(vii)    certain rights, claims and choses in action, and any payments, awards or other proceeds resulting therefrom.

The aforementioned Tyler Excluded Assets, with the exception of items iv, v and vii, are subject to the security interest of the Tyler Bond Trustee and will be distributed to the Holders of the Tyler Bond Claims.  Such encumbered Excluded Assets shall be referred to herein as the "***Tyler Encumbered Excluded Assets***."  The remaining Tyler Excluded Assets, to the extent they are owned by Tyler, will be transferred to the Liquidating Trust.

(d) ***Assumed Liabilities***. As part of the consideration for the Tyler Sale, pursuant to the Tyler APA, the Tyler Stalking Horse has agreed to assume the following liabilities of Tyler:

> (i) all amounts payable pursuant to section 365 of the Bankruptcy Code for all of Tyler's Executory Contracts and Unexpired Leases to be assumed and assigned to the Tyler Stalking Horse pursuant to the Tyler APA;
>
> (ii) certain employee obligations; and
>
> (iii) all obligations under the Residency Agreements related to Meadow Lake, except those obligations related to the entrance fees escrowed pursuant to the *Order Authorizing Debtors To Escrow Certain Entrance Deposits and Refund Certain Entrance Deposits* [Docket No. 56].

(e) ***Indemnification Trust Fund***. Subject to the occurrence of the closing on the Tyler APA, Tyler has agreed to escrow a portion of the Tyler Purchase Price in an amount equal to Four Hundred Thousand Dollars ($400,000) to fund certain indemnification obligations of Tyler for a period of one (1) year following the closing on the Tyler APA.

(f) ***Auction***. In order to ensure that Tyler is maximizing the return on the Tyler Assets, it has sought, in the Tyler Sale Motion, authority to conduct an auction of the Tyler Assets on or around January 21, 2015, to the extent other parties have expressed an interest in purchasing the Tyler Assets and have otherwise qualified to participate in the auction in accordance with the bid procedures outlined in the Tyler Sale Motion. The party offering the highest or otherwise best offer at that auction will be deemed the "***Tyler Successful Bidder.***" Tyler will thereafter seek Bankruptcy Court approval of the Tyler Sale to the Tyler Successful Bidder.

6.3 ***Caprock Sale.***

(a) ***Selection of Stalking Horse***. On October 28, 2014, Caprock filed a motion [Docket No. 533] (the "***Caprock Sale Motion***") seeking an order authorizing and approving of, among other things, (i) the sale (the "***Caprock Sale***") of substantially all of Caprock's Assets and related business operations (collectively, the "***Caprock Assets***") free and clear of all liens, claims, interests and encumbrances to Rio Mesa Health Holdings LLC, a Nevada limited liability company (the "***Caprock Stalking Horse***"), pursuant to that certain Asset Purchase and Sale Agreement with the Caprock Stalking Horse (the **"*Caprock APA*"**), (ii) certain bid procedures to be employed in connection with the Caprock Sale, and (iii) certain bid protections offered to the Caprock Stalking Horse, including the payment of a break-up fee in the amount of One Hundred Ninety Thousand Dollars ($190,000) and an expense reimbursement in an amount up to Twenty Five Thousand Dollars ($25,000), subject to the terms and conditions of the Caprock Sale. Pursuant to the Caprock APA, Caprock has agreed to sell the Caprock Assets for Six Million Six Hundred Thousand Dollars ($6,600,000) (the "***Caprock Purchase Price***") and to assume and assign certain Executory Contracts and Unexpired Leases to the Caprock

Stalking Horse, subject to higher or otherwise better offers and Caprock Secured Lender's right to credit bid under section 363(k) of the Bankruptcy Code.

(b) **_Purchased Assets_**. As more fully described in section 1.1 of the Caprock APA, the Caprock Assets include, but are not limited to, the following Assets of Caprock:

(i) certain real property located in Abilene, Texas, together with all buildings, structures, fixtures and other improvements located in, on, at, under, above or attached to such land;

(ii) all inventory used or held for use at Mesa Springs;

(iii) all furniture, fixtures, equipment, tools, machinery, vehicles and all other tangible personal property owned by Caprock and used in connection with Mesa Springs;

(iv) to the extent assignable or transferable, all personal property leases with respect to ownership of Mesa Springs; and

(v) to the extent assignable or transferable, all general intangibles related to the ownership, possession, lease or use of the Caprock Assets, including without limitation, lien waivers, surety agreements, bonds, warranties, guaranties, utility use agreements, covenants, commitments, permits, certificates, regulatory approvals, entitlements, service marks, trademarks and trade names owned or employed by Caprock in conjunction with the ownership of Mesa Springs.

(c) **_Excluded Assets_**. The Caprock Assets exclude certain assets (the "**_Caprock Excluded Assets_**"), including, but not limited to, the following assets of Caprock:

(i) cash, cash equivalents and short-term investments;

(ii) all accounts receivable and proceeds therefrom for services provided prior to a date certain;

(iii) assets owned and provided by vendors of services or goods to Mesa Springs;

(iv) organizational record books and minute books;

(v) all bank accounts; and

(vi)    certain rights, claims and choses in action, and any payments, awards or other proceeds resulting therefrom.

The aforementioned Caprock Excluded Assets, with the exception of items iii, iv and vi, are subject to the security interest of the Caprock Secured Lender and will be distributed to the Holder of the Caprock Secured Loan Claim. Such encumbered Excluded Assets shall be referred to herein as the "*Caprock Encumbered Excluded Assets*." The remaining Caprock Excluded Assets, to the extent they are owned by Caprock, will be transferred to the Liquidating Trust.

(d)    *Assumed Liabilities*. As part of the consideration for the Caprock Sale, the Caprock Stalking Horse has agreed to assume the following liabilities of Caprock:

(i)    all amounts payable pursuant to section 365 of the Bankruptcy Code for all of Caprock's Executory Contracts and Unexpired Leases to be assumed and assigned to the Caprock Stalking Horse pursuant to the Caprock APA;

(ii)    certain employee obligations; and

(iii)    all obligations under the Residency Agreements related to Mesa Springs.

(e)    *Indemnification Trust Fund*. Subject to the occurrence of the closing on the Caprock APA, Caprock has agreed to escrow a portion of the Caprock Purchase Price in an amount equal to Two Hundred and Fifty Thousand Dollars ($250,000) to fund certain indemnification obligations of Caprock for a period of one (1) year following the closing on the Caprock APA.

(f)    *Auction*. In order to ensure that Caprock is maximizing the return on the Caprock Assets, it has sought, in the Caprock Sale Motion, authority to conduct an auction of the Caprock Assets on or around December 17, 2014, to the extent other parties have expressed an interest in purchasing the Caprock Assets and have otherwise qualified to participate in the auction in accordance with the bid procedures outlined in the Caprock Sale Motion. The party offering the highest or otherwise best offer at that auction will be deemed the "*Caprock Successful Bidder.*" Caprock will thereafter seek Bankruptcy Court approval of the Caprock Sale to the Caprock Successful Bidder.

6.4    *Plains Sale*.

(a)    *Selection of Stalking Horse*. On September 18, 2014, Plains filed a motion [Docket No. 448] (the "*Plains Sale Motion*") seeking an order authorizing and approving of, among other things, (i) the sale (the "*Plains Sale*") of substantially all of Plains' Assets and related business operations (collectively, the "*Plains Assets*") free and clear of all liens, claims, interests and encumbrances to Knight Health Holdings LLC, a Nevada limited liability company (the "*Plains Stalking Horse*"), pursuant to that that certain Asset Purchase and Sale Agreement with the Plains Stalking Horse (the "*Plains APA*"), (ii) certain bid procedures to be employed in connection with the Plains Sale, and (iii) certain bid protections offered to the Plains Stalking Horse, including the payment of a break-up fee in the amount of One Hundred

Eighty Thousand Dollars ($180,000) and an expense reimbursement in an amount up to Twenty Five Thousand Dollars ($25,000), subject to the terms and conditions set forth in the Plains APA. Pursuant to the Plains APA, Plains has agreed to sell the Plains Assets for Six Million Two Hundred and Forty Thousand Dollars ($6,240,000) (the "*Plains Purchase Price*") and to assume and assign certain Executory Contracts and Unexpired Leases to the Plains Stalking Horse, subject to higher or otherwise better offers and the Plains Secured Lender's right to credit bid under section 363(k) of the Bankruptcy Code.

        (b)    *Purchased Assets*.  As more fully described in section 1.1 of the Plains APA, the Plains Assets include, but are not limited to, the following Assets of Plains:

      (i)    that certain Lease Agreement by and between Texas Tech University and Plains as lessee, dated August 1, 1999 as amended;

      (ii)    all inventory used or held for use at Garrison;

      (iii)    all furniture, fixtures, equipment, tools, machinery, vehicles and all other tangible personal property owned by Plains and used in connection with Garrison;

      (iv)    to the extent assignable or transferable, all personal property leases with respect to ownership of Garrison; and

      (v)    to the extent assignable or transferable, all general intangibles related to the ownership, possession, lease or use of the Plains Assets, including without limitation, lien waivers, surety agreements, bonds, warranties, guaranties, utility use agreements, covenants, commitments, permits, certificates, regulatory approvals, entitlements, service marks, trademarks and trade names owned or employed by Plains in conjunction with the ownership of Garrison.

        (c)    *Excluded Assets*.  The Plains Assets exclude certain assets (the "*Plains Excluded Assets*"), including, but not limited to, the following assets of Plains:

      (i)    cash, cash equivalents and short-term investments;

      (ii)    assets owned and provided by vendors of services or goods to the Plains Facility;

      (iii)    organizational record books and minute books;

      (iv)    all bank accounts; and

      (v)    certain rights, claims and choses in action, and any payments, awards or other proceeds resulting therefrom.

The aforementioned Plains Excluded Assets, with the exception of items ii, iii and v, are subject to the security interest of the Plains Secured Lender and will be distributed to the Holder of the Plains Secured Loan Claim. Such encumbered Excluded Assets shall be referred to herein as the "*Plains Encumbered Excluded Assets*." The remaining Plains Excluded Assets, to the extent they are owned by Plains, will be transferred to the Liquidating Trust.

(d) *Assumed Liabilities*. As part of the consideration for the Plains Sale, the Plains Stalking Horse has agreed to assume all amounts payable pursuant to section 365 of the Bankruptcy Code for all of Plains's Executory Contracts and Unexpired Leases to be assumed and assigned to the Plains Stalking Horse pursuant to the Plains APA.

(e) *Indemnification Trust Fund*. Subject to the occurrence of the closing on the Plains APA, Plains has agreed to escrow a portion of the Plains Purchase Price in an amount equal to Two Hundred and Fifty Thousand Dollars ($250,000) to fund certain indemnification obligations of Plains for a period of one (1) year following the closing on the Plains APA.

(f) *Bankruptcy Court Approval of Plains Sale.* After receiving no other qualified bids for the Plains Assets, Plains sought and obtained Bankruptcy Court approval to sell the Plains Assets to the Plains Stalking Horse in accordance with the Plains APA [Docket No. 559].

6.5 *Sale of SMF Real Property*. Pursuant to a motion under section 363 of the Bankruptcy Code, SMF will sell and assign its interests in real property located at W Highway 84 at Twin Rivers Blvd., Waco, McLennan County, TX (the "*SMF Sale*"). The motion will outline a competitive bidding process under which parties interested in acquiring these interests can submit bids and participate in a Bankruptcy Court administered auction, with the prevailing bidder acquiring title to the real property.

6.6 *Transition of Management and Operations Agreements for VLB Homes*. SDI intends to terminate the Management and Operations Agreements with the VLB in connection with the VLB Homes and transition the management and operations of the VLB Homes to a third party operator. All remaining Assets of SDI will be liquidated for the benefit of Holders of Claims against SDI's Estate.

6.7 *Sources of Consideration.* All Cash consideration necessary to make payments or distributions pursuant to this Plan shall be obtained from (i) Cash on hand; (ii) the Net Sale Proceeds of the Sales; (iii) the Excluded Assets; (iv) the Causes of Action; and (v) all other unencumbered Assets of the Plan Debtors not otherwise sold pursuant to the Sales.

6.8 *Liquidating Trust*

(a) *Establishment of Liquidating Trust*. On the Effective Date, the Liquidating Trustee shall sign the Liquidating Trust Agreement and, in his capacity as Liquidating Trustee, accept all Liquidating Trust Assets on behalf of the Beneficiaries thereof, and be authorized to obtain, seek the turnover, liquidate, and collect all of the Liquidating Trust Assets not in his possession. The Liquidating Trust will then be deemed created and effective without any further action by the Bankruptcy Court or any Person as of the Effective Date. The

Liquidating Trust shall be established for the purposes of (i) liquidating any non-cash Liquidating Trust Assets; (ii) prosecuting and resolving the Causes of Action; (iii) maximizing recovery of the Liquidating Trust Assets for the benefit of the Beneficiaries; and (iv) distributing the proceeds of the Liquidating Trust Assets to the Beneficiaries in accordance with this Plan and the Liquidating Trust Agreement, with no objective to continue or engage in the conduct of a trade or business, except only in the event and to the extent necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.

(b)     ***Appointment of the Liquidating Trustee***.  The Liquidating Trustee shall be appointed pursuant to the Confirmation Order and subject to removal only by the Bankruptcy Court upon application or motion by a Beneficiary of the Liquidating Trust, after notice and a hearing, and for cause shown, including (i) the willful and continued refusal by the Liquidating Trustee to perform his duties under this Plan and the Liquidating Trust Agreement, and (ii) gross negligence, gross misconduct, fraud, embezzlement or theft.  The Liquidating Trustee will be chosen by the Plan Debtors, after consultation with the Beneficiaries.  During the term of the Liquidating Trust, the Liquidating Trustee shall be entitled to compensation payable from the Liquidating Trust Assets as set forth in the Liquidating Trust Agreement.

(c)     ***Beneficiaries of Liquidating Trust***.  The Holders of Allowed Deficiency Claims and General Unsecured Claims against the Plan Debtors, entitled to Distributions shall be the beneficiaries of the Liquidating Trust.  Such Beneficiaries shall be bound by the Liquidating Trust Agreement.  To the extent Liquidating Trust Assets are attributable exclusively to one Estate, the proceeds of those assets will be shared Pro Rata among the Beneficiaries of that Estate.  In the event there are Liquidating Trust Assets allocated to more than one Estate, the proceeds of such assets shall be shared Pro Rata among the Beneficiaries associated with those Estates.  The interests of the Beneficiaries in the Liquidating Trust shall be uncertificated and nontransferable except upon death of the interest holder or by operation of law.

(d)     ***Vesting and Transfer of Liquidating Trust Assets to the Liquidating Trust***.  Pursuant to Bankruptcy Code section 1141(b), the Liquidating Trust Assets shall vest in the Liquidating Trust free and clear of all Liens, Claims and Interests, except as otherwise specifically provided in this Plan or in the Confirmation Order; *provided, however*, that the Liquidating Trustee may abandon or otherwise not accept any non-Cash Liquidating Trust Assets that the Liquidating Trustee believes, in good faith, have no value to the Liquidating Trust.  Any non-cash Liquidating Trust Assets that the Liquidating Trustee so abandons or otherwise does not accept shall not be property of the Liquidating Trust.   The Liquidating Trust Assets primarily consist of claims against third parties.  These claims include, but are not limited to, claims against former directors and officers (for which the Debtors have a $5.0 million dollar insurance policy), claims against parties involved in the 2013 Restructuring (as defined in the Disclosure Statement), claims against LCS and claims against entities with whom the Debtors formerly did business, including vendors.  These claims will be preserved and transferred to the Liquidating Trust.

(e)     ***Limited Substantive Consolidation.***     The formation and implementation of the Liquidating Trust is not, and shall not be deemed, to constitute or cause in effect a substantive consolidation of the Plan Debtors.  The Liquidating Trustee shall maintain

separate accounts for each of the Plan Debtors, and shall not commingle Liquidating Trust Assets of the various Plan Debtors. All Liquidating Trust Assets and the proceeds therefrom will be allocated to the Estates pursuant to the Shared Services Allocation.

(f) **_Retention of Professionals_**. The Liquidating Trustee shall have the right to retain the services of attorneys, accountants, and other professionals (collectively, the "**_Liquidating Trust Professionals_**") that are necessary to assist the Liquidating Trustee in the performance of his duties pursuant to this Plan, the Liquidating Trust Agreement and the Confirmation Order. The reasonable fees and expenses of such professionals shall be paid by the Liquidating Trustee from the Liquidating Trust Assets upon submission of monthly statements ("**_Liquidating Trust Monthly Fee Statements_**") for services rendered and cost incurred to the Liquidating Trustee for review and approval. The Liquidating Trustee will have thirty (30) days from receipt of each Liquidating Trust Monthly Fee Statement to object to the Liquidating Trust Monthly Fee Statement. In the event that any objection is received by the relevant Liquidating Trust Professional that cannot be promptly resolved by the Liquidating Trust Professional and the Liquidating Trustee, the dispute will be submitted by the Liquidating Trustee to the Bankruptcy Court for adjudication. The Bankruptcy Court will retain jurisdiction to adjudicate objections to Liquidating Trust Monthly Fee Statements. In the event that no objection is raised to a Liquidating Trust Monthly Fee Statement within the thirty (30) day period, the requested amount in the Liquidating Trust Monthly Fee Statement will be promptly paid by the Liquidating Trustee, subject to any requirements under the Plan.

(g) **_Liquidating Trust Expenses_**. Subject to the provisions of the Liquidating Trust Agreement, all costs, expenses and obligations incurred by the Liquidating Trustee in administering this Plan, the Liquidating Trust, or in any manner connected, incidental or related thereto, in effecting distributions from, as applicable, the Liquidating Trust shall be a charge against the Liquidating Trust Assets remaining from time to time in the hands of the Liquidating Trustee. Such expenses shall be paid in accordance with the Liquidating Trust Agreement.

(h) **_Certain Powers and Duties of the Liquidating Trust and Liquidating Trustee._**

(i) **_General Powers of the Liquidating Trustee._** The Liquidating Trustee shall be the exclusive trustee of the Liquidating Trust and the Liquidating Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3). The powers, rights, and responsibilities of the Liquidating Trustee shall be specified in the Liquidating Trust Agreement and shall include the authority and responsibility to: (a) receive, manage, invest, supervise, and protect the Liquidating Trust Assets; (b) pay taxes or other obligations incurred by the Liquidating Trust; (c) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals and consultants to advise and assist in the administration, prosecution and distribution of Liquidating Trust Assets; (d) calculate and implement Distributions of Liquidating Trust Assets; (e) investigate, prosecute, compromise, and settle, in accordance with the specific terms of the Liquidating Trust Agreement, Causes of Action vested in the Liquidating Trust; (f) resolve issues involving Claims and Interests in accordance with this Plan; (g) undertake all administrative functions of the Plan Debtors' Chapter 11 Cases, including the payment of fees payable to the United States Trustee and the

ultimate closing of the Plan Debtors' Chapter 11 Cases. The Liquidating Trust is the successor to the Plan Debtors and their Estates.

(ii) ***Books and Records***. On the Effective Date, the Liquidating Trust shall: (a) take possession of all books, records, and files of the Plan Debtors and their respective Estates; and (b) provide for the retention and storage of such books, records, and files until such time as the Liquidating Trust determines, in accordance with the Liquidating Trust Agreement, that retention of same is no longer necessary or required.

(iii) ***Investments of Cash***. The Liquidating Trust may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by Bankruptcy Code section 345 or in other prudent investments, *provided, however*, that such investments are permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

(iv) ***Claims Process***. The Liquidating Trust shall have the right to object to Claims in connection with post-Effective Date Claims allowance process.

(v) ***Reporting***. In no event later than thirty (30) Business Days after the end of the first full month following the Effective Date and on a quarterly basis thereafter until all Cash in the Liquidating Trust has been released or paid out in accordance with this Plan, the Liquidating Trustee shall file with the Bankruptcy Court a report setting forth the amounts, recipients and dates of all Distributions made by the Liquidating Trustee under this Plan through each applicable reporting period.

(vi) ***Tax Reporting***. The Liquidating Trustee shall file tax returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Plan. The Liquidating Trust also shall annually (for tax years in which Distributions from the Liquidating Trust are made) send to each Beneficiary a separate statement setting forth the Beneficiary's share of items of income, gain, loss, deduction or credit and all such holders shall report such items on their federal income tax returns; *provided, however,* that no such statement need be sent to any Class that is not expected to receive any Distribution from the Liquidating Trust. The Liquidating Trust's taxable income, gain, loss, deduction or credit will be allocated to the Liquidating Trust's beneficiaries in accordance with their relative beneficial interests in the Liquidating Trust.

As soon as possible after the Effective Date, the Liquidating Trust shall make a good faith valuation of assets of the Liquidating Trust, and such valuation shall be used consistently by all parties for all federal income tax purposes. The Liquidating Trust also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidating Trust that are required by any Governmental Unit for taxing purposes. The Liquidating Trust may request an expedited determination of taxes of the Plan Debtors or of the Liquidating Trust under Bankruptcy Code section 505(b) for all tax returns filed for, or on behalf of, the Plan Debtors and the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

The Liquidating Trust shall be responsible for filing all federal, state, and local tax returns for the Plan Debtors and the Liquidating Trust. The Liquidating Trust shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions made by the Liquidating Trust shall be subject to any such withholding and reporting requirements.

(vii)    ***Payment of Taxes***.    The Liquidating Trust shall be responsible for payments of all Allowed tax obligations of the Plan Debtors, and any taxes imposed on the Liquidating Trust or the Liquidating Trust Assets.

(i)    ***Preservation of Right to Conduct Investigations***.    The preservation for the Liquidating Trust of any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 is necessary and relevant to the liquidation and administration of the Liquidating Trust Assets.    Accordingly, any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 held by the Plan Debtors prior to the Effective Date shall vest with the Liquidating Trust and shall continue until dissolution of the Liquidating Trust.

(j)    ***Prosecution and Resolution of Causes of Action***.

(i)    ***The Liquidating Trust's Exclusive Authority to Pursue, Settle, or Abandon Causes of Action***.    From and after the Effective Date, prosecution and settlement of all Causes of Action, including Avoidance Actions, transferred to the Liquidating Trust shall be the sole responsibility of the Liquidating Trust pursuant to this Plan and the Confirmation Order.    From and after the Effective Date, the Liquidating Trust shall have exclusive rights, powers, and interests of the Plan Debtors' Estates to pursue, settle or abandon such Causes of Action as the sole representative of the Plan Debtors' Estates pursuant to Bankruptcy Code section 1123(b)(3).    Proceeds recovered from all Causes of Action will be deposited into the Liquidating Trust and will be distributed by the Liquidating Trustee to the Beneficiaries in accordance with the provisions of the Plan and Liquidating Trust Agreement. All Causes of Action, including Avoidance Actions, that are not expressly released or waived under this Plan are reserved and preserved and vest in the Liquidating Trust in accordance with this Plan.    No Person may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Plan Debtors or Liquidating Trustee will not pursue any and all available Causes of Action against such Person. The Liquidating Trustee expressly reserves all Causes of Action, except for any Causes of Action against any Person that are expressly released or waived under this Plan, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of confirmation or consummation of this Plan.    For the avoidance of doubt, no claims or Causes of Action against the Released Parties shall be transferred to the Liquidating Trust, the Liquidating Trustee shall not have standing to pursue such claims or Causes of Action, and all such claims and Causes of Action shall be waived, released and discharged pursuant to the Plan.

(ii)    ***Settlement of Causes of Action***.    Settlement by the Liquidating Trust of any Cause of Action transferred to the Liquidating Trust shall require: (i) approval only of the Liquidating Trustee if the amount claimed by the Liquidating Trust

against a defendant is less than one million dollars ($1,000,000); and (ii) approval of the Liquidating Trustee and the Bankruptcy Court, upon notice and a hearing, if the amount claimed by the Liquidating Trust against a defendant is unliquidated or equals to or exceeds one million dollars ($1,000,000).

(k)     *Federal Income Tax Treatment of the Liquidating Trust for the Liquidating Trust Assets*.  For federal income tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury regulations and that such trust be owned by its beneficiaries.  Accordingly, for federal income tax purposes, it is intended that the Beneficiaries be treated as if they had received a distribution from the Plan Debtors' Estates of an undivided interest in each of the Liquidating Trust Assets (to the extent of the value of their respective share in the applicable assets) and then contributed such interests to the Liquidating Trust, and the Liquidating Trust's Beneficiaries will be treated as the grantors and owners thereof.

(l)     *Limitation of Liability.*  No recourse will ever be had, directly or indirectly, against the Liquidating Trustee, its members, officers, directors, employees, professionals, representatives, agents, successors or assigns, by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge or note, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Liquidating Trust under this Plan or by reason of the creation of any indebtedness by the Liquidating Trust or the Liquidating Trustee under this Plan.  All such liabilities under this Plan will be enforceable only against, and will be satisfied only out of, the assets of the Liquidating Trust.  The Liquidating Trust and the Liquidating Trustee and their respective officers, directors, employees, professionals, representatives, agents, successors or assigns will not be liable for any act they may do, or omit to do hereunder in good faith and in the exercise of their sound judgment; *provided, however*, that this Section will not apply to any gross negligence or willful misconduct by the Liquidating Trust and the Liquidating Trustee or their respective officers, directors, employees, professionals, representatives, agents, successors or assigns.

(m)     *Term of Liquidating Trust*.  The Liquidating Trustee shall be discharged and the Liquidating Trust shall be terminated, at such time as (i) all Disputed Claims have been resolved, (ii) all of the Liquidating Trust Assets have been liquidated, (iii) all duties and obligations of the Liquidating Trustee under the Liquidating Trust Agreement have been fulfilled, (iv) all Distributions required to be made by the Liquidating Trust under this Plan and the Liquidating Trust Agreement have been made, and (v) the Plan Debtors' Chapter 11 Cases have been closed; *provided, however*, that in no event shall the Liquidating Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or the end of any extension period approved by the Bankruptcy Court), determines that a fixed period extension not to exceed one (1) year is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

(n)     *Conflicts Between the Liquidating Trust Agreement and the Plan*.  In the event of any inconsistencies or conflict between the Liquidating Trust Agreement and this Plan, the terms and provisions of this Plan shall control.

(o) ***Excess Funds***.   In the event there is Liquidating Trust Distributable Cash remaining after all Distributions required to be made by the Liquidating Trust under the Plan and the Liquidating Trust Agreement have been, such Cash will be turned over to the Attorney General for the State of Texas in accordance with Texas law.

## SECTION 7.   DISTRIBUTIONS

7.1   ***Distribution Record Date***.  As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Plan Debtor or their agents shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Interests.  The Plan Debtors or the Liquidating Trustee shall have no obligation to recognize any ownership transfer of the Claims or Interests occurring after the Distribution Record Date.  The Plan Debtors, the Liquidating Trustee, or any party responsible for making Distributions shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

7.2   ***Date of Distributions.***  Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, on the next Distribution Date or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Plan Debtors shall receive the full amount of the Distributions that this Plan provides for Allowed Claims in the applicable Class and in the manner provided herein. Distributions made after the Effective Date to holders of Allowed Claims shall be deemed to have been made on the Effective Date and, except as otherwise provided in this Plan, no interest shall accrue or be payable with respect to such Claims or any Distribution related thereto.  In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in this Plan. Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends or accruals on the Distributions provided for herein, regardless of whether such Distributions are delivered on or at any time after the Effective Date.

7.3   ***Disbursing Agent.***   Except as otherwise provided in this Plan, all Distributions under this Plan shall be made by the Plan Debtors or Liquidating Trustee as Disbursing Agent or such other Person designated by the Plan Debtors or Liquidating Trustee as a Disbursing Agent on the Effective Date.

7.4   ***Rights and Powers of Disbursing Agent.***  The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under this Plan; (b) make all Distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of this Plan.

7.5 ***Delivery of Distributions in General.*** Except as otherwise provided in this Plan, Distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Disbursing Agent. Distributions to Holders of Allowed Claims will be made at the address of each such Holder as set forth in the Plan Debtors' books and records, except that, in the case of Holders of Obligated Group Bond Claims and Tyler Bond Claims, the Obligated Group Bond Trustee and Tyler Bond Trustee shall be deemed to be the Holder of the Obligated Group Bond Claims and Tyler Bond Claims, respectively, for purposes of Distributions to be made hereunder, and all Distributions on account of such Claims shall be made to or at the direction of the Obligated Group Bond Trustee and Tyler Bond Trustee. As soon as practicable, the Obligated Group Bond Trustee and Tyler Bond Trustee shall arrange to deliver such distributions to or on behalf of the Holders of Allowed Obligated Group Bond Claims and Tyler Bond Claims, respectively. None of the Plan Debtors or the Liquidating Trustee shall incur any liability whatsoever on account of any Distributions under this Plan except for gross negligence, willful misconduct or fraud.

7.6 ***Payments and Distributions on Disputed Claims.*** Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date. Notwithstanding any provision otherwise in this Plan and except as may be agreed to by the Plan Debtors or the Liquidating Trustee, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial Distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

7.7 ***Manner of Payment***. Any Distributions to be made by or on behalf of the Plan Debtors or the Liquidating Trustee, as applicable, pursuant to this Plan shall be made by checks drawn on accounts maintained by the Plan Debtors or the Liquidating Trustee, respectively, or by wire transfer if circumstances justify, at the option of the Plan Debtors or the Liquidating Trustee, as applicable.

7.8 ***Undeliverable Distributions and Unclaimed Property.*** In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such Distribution shall be made as soon as practicable after such Distribution has become deliverable; *provided, however*, that such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the applicable Distribution Date. After such date, all "unclaimed property" or interests in property shall revert to the Liquidating Trust (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any Holder to such property shall be discharged and forever barred.

7.9 ***Withholding and Reporting Requirements.*** In connection with this Plan and all instruments issued in connection therewith, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Distributions under this Plan shall be subject to any such withholding or reporting requirements.

54

7.10 ***Surrender Instruments***. Pursuant to Bankruptcy Code section 1143, as a condition precedent to receiving any Distribution under the Plan, each holder of a certificated instrument or note must surrender such instrument or note held by it to the Disbursing Agent or its designee. Any holder of such instrument or note that fails to (i) surrender the instrument or note or (ii) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Disbursing Agent and furnish a bond in form, substance, and amount reasonably satisfactory to the Disbursing Agent before the fifth anniversary of the Confirmation Date shall be deemed to have forfeited all rights and claims and may not participate any Distribution hereunder. Any Distribution so forfeited shall become property of the Liquidating Trust.

7.11 ***Setoffs.*** The Plan Debtors and the Liquidating Trustee may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which a Distribution shall be made), any claims of any nature whatsoever that the Plan Debtors and the Liquidating Trustee may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Plan Debtors and the Liquidating Trustee of any such claim the Plan Debtors and the Liquidating Trustee may have against the Holder of such Claim.

7.12 ***Insurance Claims.*** No Distributions under this Plan shall be made on account of Allowed Claims until the Holder of such Allowed Claim has exhausted all remedies with respect to the Plan Debtors' Insurance Policies. To the extent that one or more of the Plan Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

7.13 ***Applicability of Insurance Policies.*** Except as otherwise provided in this Plan, Distributions to Holders of Allowed Claims shall be made in accordance with the provisions of any applicable Insurance Policy. Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Plan Debtors, Liquidating Trustee or any Person may hold against any other Person, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

7.14 ***No Postpetition Interest***. Unless otherwise specifically provided for herein or in the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests, and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on such Claim.

7.15 ***Distributions Free and Clear***. Except as may be otherwise provided herein, all Distributions under this Plan shall be free and clear of any Liens, Claims, encumbrances, and other interests.

7.16 ***Fractional Dollars; De Minimis Distributions***. Notwithstanding any other provision of this Plan, Cash payments of fractions of dollars shall not be made. Whenever any Distribution to a Holder of a Claim would otherwise call for Distribution of Cash in a fractional dollar amount, the actual Distribution of such Cash shall be rounded to the nearest

whole dollar (up or down), with half dollars (or less) being rounded down. Neither the Plan Debtors nor the Liquidating Trustee shall be required to make any Cash payment of less than fifty dollars ($50.00) with respect to any Claim or Interest unless a request therefor is made in writing to the Plan Debtors or the Liquidating Trustee, as applicable; *provided, however*, that neither the Plan Debtor nor the Liquidating Trustee shall have any obligation to make any Distribution, whether final or not, unless and until the total amount of such Distribution to a specific Holder of an Allowed Claim or Interest is equal to or greater than ten dollars ($10.00).

7.17    ***Allocation of Distributions between Principal and Unpaid Interest***.    To the extent that any Allowed Claim entitled to a Distribution under this Plan includes both principal and accrued but unpaid interest, such Distribution shall be allocated to the principal amount (as determined for federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

7.18    ***Single Satisfaction of Claims.***    Holders of Allowed Claims may assert such Claims against each Plan Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Plan Debtor based upon the full Allowed amount of the Claim.    Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under this Plan on account of Allowed Claims exceed 100% of the underlying Allowed Claim.

## SECTION 8.    PROCEDURES FOR DISPUTED CLAIMS

8.1    ***Allowance of Claims and Interests***.    Except as expressly provided herein, or in any order entered in the Plan Debtors' Chapter 11 Cases prior to the Effective Date, including the Confirmation Order, no Claim or Interest shall be deemed Allowed unless and until such Claim or Interest is deemed Allowed under this Plan or the Bankruptcy Code or Allowed by the Bankruptcy Court by entry of a Final Order allowing such Claim or Interest.    Prior to and following the Effective Date, the Liquidating Trust shall be vested with any and all rights and defenses the Plan Debtors had with respect to any Claim or Interest immediately prior to the Effective Date.

8.2    ***Objections to Claims***.    The Plan Debtors (before the Effective Date) or the Liquidating Trustee (on or after the Effective Date), as applicable, shall have the exclusive authority to file, settle, compromise, withdraw or litigate to judgment any objections to Claims as permitted under this Plan.    Any objections to claims shall be filed and served on or before the later of (i) one hundred eighty (180) days after the Effective Date or (ii) such date as may be fixed by the Bankruptcy Court.    From and after the Effective Date, the Liquidating Trustee may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.    The Plan Debtors and the Liquidating Trustee reserve all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

8.3    ***Estimation of Claims.***    The Plan Debtors (before the Effective Date) or the Liquidating Trustee (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Contingent Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the

Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to such objection. In the event that the Bankruptcy Court estimates any Contingent Claim or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Plan Debtors or the Liquidating Trustee may pursue supplementary proceedings to object to the allowance of such Claim; *provided, however*, the Liquidating Trustee may elect not to pursue such supplementary proceedings, instead electing to treat such maximum amount as the Allowed amount of such Claim.

8.4 ***No Distribution Pending Allowance***. Notwithstanding any other provision of this Plan, if any portion of a Claim is Disputed, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

8.5 ***Distributions after Allowance.*** At such time as a Contingent Claim or a Disputed Claim becomes an Allowed Claim, a Distribution shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Contingent Claim or Disputed Claim becomes a Final Order. To the extent that all or a portion of a Contingent Claim or a Disputed Claim is disallowed, the Holder of such Claim shall not receive any Distribution on account of the portion of such Claim that is disallowed.

8.6 ***Preservations of Rights to Settle Claims***. In accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Trustee shall have the discretion to retain and enforce, sue on, settle, or compromise all claims, rights, causes of action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Plan Debtors or their Estates may hold against any person or entity without the approval of the Bankruptcy Court, subject to the terms of this Plan, the Confirmation Order, the Liquidating Trust Agreement, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith. The Liquidating Trustee may pursue such retained claims, rights, or causes of action, suits, or proceedings, as appropriate, in accordance with the best interests of the Liquidating Trust and its Beneficiaries.

8.7 ***Disallowed Claims***. All Claims held by persons or entities against whom or which the Plan Debtors or Liquidating Trustee has commenced a proceeding asserting a cause of action under sections 542, 543, 544, 545, 547, 548, 549, and/or 550 of the Bankruptcy Code shall be deemed Disallowed Claims pursuant to section 502(d) of the Bankruptcy Code and Holders of such Claims shall not be entitled to vote to accept or reject the Plan. Disallowed Claims pursuant to this Section shall continue to be Disallowed Claims for all purposes until the avoidance action against such party has been settled or resolved by Final Order and any sums due to the Plan Debtors or Liquidating Trustee from such party have been paid.

## SECTION 9.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

9.1    ***Assumption and Rejection of Executory Contracts and Unexpired Leases.***  Except as otherwise provided in this Plan, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with this Plan, including but not limited to the Obligated Group APA, Tyler APA, Caprock APA and Plains APA and any other asset purchase agreement entered into by Plan Debtors in connection with the Sales, each of the Executory Contracts and Unexpired Leases of the Plan Debtors shall be deemed rejected as of the Effective Date, unless such Executory Contract or Unexpired Lease:  (1) was assumed or rejected previously by the applicable Plan Debtor; (2) expired or terminated pursuant to its own terms before the Effective Date; (3) is the subject of a motion to assume or reject filed on or before the Effective Date; or (4) is identified as an Executory Contract or Unexpired Lease to be assumed in connection with the Sales.

9.2    ***Inclusiveness***.  Unless otherwise specified, each Executory Contract and Unexpired Lease assumed or rejected by the Plan Debtor shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract or Unexpired Lease.

9.3    ***Rejection Claims***.  Except as otherwise provided in orders entered by the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court and served on counsel to the Plan Debtors or the Liquidating Trustee  on or before the date that is thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; *provided, that* any such Claims arising from the rejection of an Unexpired Lease shall be subject to the cap on rejection damages imposed by Bankruptcy Code section 502(b)(6).  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the Plan Debtors or the Liquidating Trustee, the Plan Debtors' Estates or their property without the need for any objection by the Plan Debtors or the Liquidating Trustee or further notice to, or action, order or approval of the Bankruptcy Court.  All Allowed Claims arising from the rejection of the Plan Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims against the applicable Plan Debtor and shall be treated in accordance with this Plan.

9.4    ***Cure of Defaults.***  Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed under this Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by Cure.  If there is a dispute regarding (i) the nature or amount of any Cure, (ii) the ability of the Successful Bidders to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (iii) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption.

9.5 **_Full Release and Satisfaction_**. Assumption of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

9.6 **_Reservation of Rights._** Nothing contained in this Plan or the Plan Supplement shall constitute an admission by the Plan Debtors or the Liquidating Trustee that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Plan Debtors or the Liquidating Trustee have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Plan Debtors or the Liquidating Trustee, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## SECTION 10. CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE

10.1 **_Conditions Precedent to Confirmation._** Confirmation of this Plan shall not occur, and the Confirmation Order shall not be entered, until each of the following conditions precedent have been satisfied or waived pursuant to the provisions of this Plan:

(a) The Bankruptcy Court shall have entered an order, which shall not be subject to any stay or subject to an unresolved request for revocation under section 1144 of the Bankruptcy Code, in form and substance acceptable to the Plan Debtors, approving the Disclosure Statement with respect to this Plan and the solicitation of votes thereon as being in compliance with section 1125 of the Bankruptcy Code and applicable non-bankruptcy law.

(b) The proposed Confirmation Order shall be in form and substance satisfactory in all respects to the Plan Debtor and the Liquidating Trustee; and

(c) The Plan and the Plan Supplement, including any schedules, documents, supplements and exhibits thereto shall be, in form and substance, acceptable the Plan Debtors.

10.2 **_Conditions Precedent to the Effective Date._** The Effective Date shall not occur until each of the following conditions precedent have been satisfied or waived pursuant to the provisions of this Plan:

(a) The Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to the Plan Debtors, and such Confirmation Order shall not be subject to any stay or an unresolved request for revocation under section 1144 of the Bankruptcy Code;

(b) The Bankruptcy Court shall have entered one or more orders, in form and substance acceptable to the Plan Debtors, (i) authorizing the Sales to the Successful Bidders pursuant to section 363 of the Bankruptcy Code and (ii) authorizing the assumption and

rejection of Executory Contracts and Unexpired Leases by the Plan Debtors as contemplated by the asset purchase agreements governing the Sales;

(c)      The Plan Debtors shall have closed on the Sales; and

(d)      All actions, documents, certificates, and agreements necessary to implement this Plan, including, without limitation, the Liquidating Trust Agreement, shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

10.3    ***Waiver of Conditions.***  The conditions to confirmation and consummation of this Plan set forth herein may be waived at any time by the Plan Debtors without notice to any other parties in interest or the Bankruptcy Court and without a hearing; *provided, however*, that the Plan Debtors may not waive entry of the Order approving the Disclosure Statement and the Confirmation Order.

10.4    ***Effect of Failure of Conditions.***  If the consummation of this Plan does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any claims by or Claims against the Plan Debtors; (2) prejudice in any manner the rights of the Plan Debtors, any Holders of Claims or any other Person; or (3) constitute an admission, acknowledgment, offer or undertaking by the Plan Debtors, any Holders or any other Person in any respect.

## SECTION 11.  EFFECT OF CONFIRMATION

11.1    ***Immediate Binding Effect.***  Notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of this Plan and the Liquidating Trust Agreement shall be immediately effective and enforceable and deemed binding upon the Plan Debtors, the Liquidating Trustee, the Liquiating Trust and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted this Plan), all Persons that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in this Plan, each Person acquiring property under this Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Plan Debtors.

11.2    ***Compromise and Settlement of Claims, Interests and Controversies.*** Pursuant to sections 363 and 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided pursuant to this Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any Distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Plan Debtors, their Estates and Holders of Claims and Interests and is fair, equitable and reasonable.

11.3 ***Discharge of Claims and Termination of Interests.*** Except as otherwise provided herein or in the Confirmation Order, the rights afforded herein and the payments and Distributions to be made hereunder shall discharge all existing debts and Claims, and terminate all Interests in the Plan Debtors of any kind, nature, or description whatsoever against or in the Plan Debtors or any of their Assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code. Except as provided herein, on the Effective Date, all existing Claims against the Plan Debtors and Interests in the Plan Debtors shall be deemed to be discharged and terminated, and all Holders of Claims and Interests shall be precluded and enjoined from asserting against the Plan Debtors or the Liquidating Trust or any of their Assets or properties, any other or further Claim or Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such Holder has filed a Proof of Claim or proof of interest. Notwithstanding any provision herein, any valid setoff or recoupment rights held against any of the Plan Debtors shall not be affected by the Plan and shall be expressly preserved in the Confirmation Order.

11.4 ***Releases by the Plan Debtors.*** Pursuant to section 1123(b) of the Bankruptcy Code and except as otherwise specifically provided in this Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious liquidation of the Plan Debtors and the consummation of the transactions contemplated by this Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Plan Debtors and their Estates from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Plan Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Plan Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Plan Debtors, the Plan Debtors' Chapter 11 Cases, the Sales or the transactions or events giving rise to any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Plan Debtor and any Released Party, the restructuring of Claims and Interests before or during the Plan Debtors' Chapter 11 Cases, the negotiation, formulation or preparation of this Plan, the Disclosure Statement, any Plan Supplement or related agreements, instruments or other documents (collectively, the "***Plan Debtor Released Claims***"), other than Plan Debtor Released Claims against a Released Party arising out of the gross negligence, willful misconduct, intentional fraud, or criminal liability of any such person or entity.

11.5 ***Releases by Holders of Claims.*** **ON THE EFFECTIVE DATE, EXCEPT AS OTHERWISE PROVIDED HEREIN AND EXCEPT FOR THE RIGHT TO ENFORCE THIS PLAN, ALL PERSONS WHO HAVE (I) VOTED TO ACCEPT THIS PLAN OR WHO ARE PRESUMED OR DEEMED TO HAVE VOTED TO ACCEPT THIS PLAN UNDER SECTION 1126(f) OF THE BANKRUPTCY CODE, (II) ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THIS PLAN AND WHO VOTE TO REJECT THIS PLAN OR ABSTAIN FROM VOTING, AND (III) DO NOT MARK THEIR BALLOTS AS OPTING OUT OF THE RELEASES GRANTED UNDER THIS SECTION, SHALL, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BE DEEMED TO FOREVER RELEASE, WAIVE AND DISCHARGE THE RELEASED PARTIES AND EACH OF THEIR RESPECTIVE CONSTITUENTS,**

PRINCIPALS, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, REPRESENTATIVES, ATTORNEYS, PROFESSIONALS, ADVISORS, AFFILIATES, FUNDS, SUCCESSORS, PREDECESSORS, AND ASSIGNS, OF AND FROM ALL LIENS, CLAIMS, CAUSES OF ACTION, LIABILITIES, ENCUMBRANCES, SECURITY INTERESTS, INTERESTS OR CHARGES OF ANY NATURE OR DESCRIPTION WHATSOEVER RELATING TO THE PLAN DEBTORS, THE CHAPTER 11 CASES OR AFFECTING PROPERTY OF THE ESTATES, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, SCHEDULED OR UNSCHEDULED, CONTINGENT OR NOT CONTINGENT, UNLIQUIDATED OR FIXED, ADMITTED OR DISPUTED, MATURED OR UNMATURED, SENIOR OR SUBORDINATED, WHETHER ASSERTABLE DIRECTLY OR DERIVATIVELY BY, THROUGH, OR RELATED TO THE PLAN DEBTORS, AGAINST SUCCESSORS OR ASSIGNS OF THE PLAN DEBTORS AND THE INDIVIDUALS AND ENTITIES LISTED ABOVE WHETHER AT LAW, IN EQUITY OR OTHERWISE, BASED UPON ANY CONDITION, EVENT, ACT, OMISSION OCCURRENCE, TRANSACTION OR OTHER ACTIVITY, INACTIVITY, INSTRUMENT OR OTHER AGREEMENT OF ANY KIND OR NATURE OCCURRING, ARISING OR EXISTING PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO OR ARISING OUT OF, IN WHOLE OR IN PART, THE PLAN DEBTORS, THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION OF THIS PLAN, THE NEGOTIATION AND CONSUMMATION OF THE SALES, THE CONSUMMATION OF THIS PLAN OR THE ADMINISTRATION OF THIS PLAN, INCLUDING WITHOUT LIMITATION, THE NEGOTIATION AND SOLICITATION OF THIS PLAN, ALL REGARDLESS OF WHETHER (A) A PROOF OF CLAIM OR EQUITY INTEREST HAS BEEN FILED OR IS DEEMED TO HAVE BEEN FILED, (B) SUCH CLAIM OR EQUITY INTEREST IS ALLOWED OR (C) THE HOLDER OF SUCH CLAIM OR EQUITY INTEREST HAS VOTED TO ACCEPT OR REJECT THIS PLAN, EXCEPT FOR WILLFUL MISCONDUCT OR GROSS NEGLIGENCE. FOR THE AVOIDANCE OF DOUBT, NOTHING CONTAINED HEREIN SHALL IMPACT THE RIGHT OF ANY HOLDER OF AN ALLOWED CLAIM TO RECEIVE A DISTRIBUTION ON ACCOUNT OF ITS ALLOWED CLAIM IN ACCORDANCE WITH SECTION 4 HEREOF.

      11.6 *Exculpation.* None of the Released Parties, nor any of their respective members, officers, directors, employees, advisors, professionals, attorneys or agents or any of their successors and assigns, shall have or incur any liability to any Holder of a Claim or Interest, or other party in interest, or any of their respective members, officers, directors, employees, advisors, professionals, attorneys or agents or any of their successors and assigns, for any act or omission in connection with, related to, or arising out of, in whole or in part, the Plan Debtors' Chapter 11 Cases, the pursuit of confirmation of this Plan, the consummation of this Plan or the administration of this Plan, including without limitation, the negotiation and solicitation of this Plan and the negotiation and consummation of the Sales, except for their willful misconduct or gross negligence as determined by a Final Order of a court of competent jurisdiction, and, in all respects, the Released Parties, and each of their respective members, officers, directors, employees, advisors, professionals, attorneys or agents, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.

11.7 *Injunction.* FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST OR INTEREST IN THE PLAN DEBTORS ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN THIS PLAN, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THIS PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THIS PLAN, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED, DISCHARGED, OR ARE SUBJECT TO EXCULPATION, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (B) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (C) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH PERSONS OR THE PROPERTY OR ESTATES OF SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (D) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THIS PLAN.

THE RIGHTS AFFORDED IN THIS PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE PLAN DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE PLAN DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED (EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN).

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THIS PLAN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE PLAN DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL INTERESTS SHALL BE CANCELLED, AND THE PLAN DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.**

**ALL PERSONS SHALL BE PRECLUDED FROM ASSERTING AGAINST THE PLAN DEBTORS, THE PLAN DEBTORS' ESTATES, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.**

11.8  ***Term of Injunctions or Stays***.  Unless otherwise provided in this Plan or Confirmation Order, all injunctions or stays provided for under this Plan and ordered in the Confirmation Order or pursuant to sections 105 or 362 of the Bankruptcy Code arising under or entered during the Chapter 11 Cases, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay and to the extent consistent with the terms and provisions of this Plan or the Confirmation Order, as applicable.

11.9  ***Injunction Against Interference with Plan***.  Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Interests, the Plan Debtors, and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the Plan Debtors', the Liquidating Trust's, the Liquidating Trustee's, and their respective affiliates', employees', advisors', officers' and directors', and agents' implementation or consummation of this Plan.

11.10  ***Release of Liens.***  Except as otherwise provided in this Plan, or in any contract, instrument, release or other agreement or document created pursuant to this Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to this Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged.  For the avoidance of doubt, except as otherwise provided in this Plan, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Plan Debtors' Estates shall be fully released and discharged on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

11.11  ***Effectuating Documents and Further Transactions***.  Upon entry of the Confirmation Order, the appropriate officers of the Plan Debtors and the Liquidating Trustee shall be authorized to execute, deliver, file, or record such contracts, instruments, releases,

consents, certificates, resolutions, programs, and other agreements and/or documents, and take such acts and actions as may be reasonably necessary or appropriate to effectuate, implement, consummate, and/or further evidence the terms and conditions of this Plan and any transactions described in or contemplated by this Plan. The Plan Debtors or Liquidating Trustee, as applicable, may, and all Holders of Allowed Claims or Interests receiving Distributions pursuant to this Plan, at the request or direction of the Plan Debtors or Liquidating Trustee, as applicable, shall, from time to time, prepare, execute, and deliver any agreements or documents, and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

      11.12 ***Corporate Action.*** Upon the Effective Date, all actions contemplated by this Plan shall be deemed authorized and approved in all respects, including all actions contemplated by this Plan (whether to occur before, on or after the Effective Date). All matters provided for in this Plan involving the corporate structure of the Plan Debtors, and any corporate action required by the Plan Debtors in connection with this Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors or officers of the Plan Debtors.

      11.13 ***Cancellation of Documents***. On the Effective Date, except to the extent otherwise provided in this Plan, any and all notes, instruments, debentures, certificates and other documents evidencing Claims and Interests in the Plan Debtors Debtor including, without limitation, the Obligated Group Loan Documents, Tyler Loan Documents, the Caprock Loan Documents, the Plains Loan Documents, the Obligated Group DIP Loan Documents, the Tyler DIP Loan Documents, the Caprock DIP Loan Documents and the SDI DIP Loan Documents shall be deemed automatically extinguished, canceled, and of no further effect with the Plan Debtors having no continuing obligations thereunder, and shall be deemed rejected and terminated.

      11.14 ***Dissolution of the Plan Debtors***. On the Effective Date and upon the Plan Debtors causing the Liquidating Trust Assets to be transferred to the Liquidating Trust in accordance with section 6.3 of this Plan, the Plan Debtors shall have no further duties or responsibilities in connection with implementation of this Plan. Upon entry of a final decree closing the Plan Debtors' Chapter 11 Cases, the Plan Debtors shall be deemed dissolved for all purposes in accordance with applicable state law without the need to take any further action or file any plan of dissolution, notice, or application with the Secretary of State of the State of Texas.

      11.15 ***Preservation of Causes of Action of the Plan Debtors.*** In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the releases by the Plan Debtors and exculpation provisions provided in the Plan), the Plan Debtors and Liquidating Trustee shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, including, but not limited to any claims against former officers and directors, advisors or third parties involved in the 2013 Restructuring and the use of Garrison Restricted Cash, claims against LCS, and any claims against parties with whom the Debtors formerly did business, including vendors, whether arising before or after the Petition Date, and the Liquidating Trustee's rights to commence, prosecute or settle such Causes of Action shall be

preserved notwithstanding the occurrence of the Effective Date. The Plan Debtors and Liquidating Trustee may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Creditors and Beneficiaries. No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Plan Debtors or Liquidating Trustee, as applicable, will not pursue any and all available Causes of Action against them. Except with respect to Causes of Action as to which the Plan Debtors and Liquidating Trustee have released any Person or Person on or before the Effective Date, the Plan Debtors and Liquidating Trustee, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan.

## SECTION 12. MODIFICATION, REVOCATION OR WITHDRAWAL OF THIS PLAN

12.1 ***Modification and Amendments.*** This Plan or any Exhibits thereto may be amended, modified, or supplemented by the Plan Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code. In addition, after the Confirmation Date, the Plan Debtors or Liquidating Trustee may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of this Plan.

12.2 ***Effect of Confirmation on Modifications.*** Entry of a Confirmation Order shall mean that all modifications or amendments to this Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

12.3 ***Revocation or Withdrawal of this Plan.*** The Plan Debtors reserve the right to, consistent with their fiduciary duties, revoke or withdraw this Plan before the Effective Date. If the Plan Debtors revoke or withdraw this Plan, or if Confirmation does not occur, then: (a) this Plan shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (c) nothing contained in this Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Plan Debtors or any other Person; or (iii) constitute an admission, acknowledgement, offer or undertaking of any sort by the Plan Debtors or any other Person.

## SECTION 13. RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or related to, the Plan Debtors' Chapter 11 Cases and this Plan, including, but not limited to, jurisdiction to:

(a)     allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount or allowance of Claims;

(b)     decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or this Plan;

(c)     resolve any matters related to:  (i) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Plan Debtor is party or with respect to which a Plan Debtor may be liable in any manner and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including rejection Claims and cure Claims, pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease in connection with the Sales; and (iv) any dispute regarding whether a contract or lease is or was executory or expired;

(d)     ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

(e)     adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving a Plan Debtor that may be pending on the Effective Date;

(f)     adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, including, but not limited to the Causes of Action, involving the Liquidating Trustee or the Liquidating Trust;

(g)     adjudicate, decide or resolve any and all matters related to any Cause of Action;

(h)     adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(i)     enter and enforce any order for the sale of property pursuant to sections 363, 1123 or 1146(a) of the Bankruptcy Code;

(j)     issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation or enforcement of this Plan;

(k)     resolve any cases, controversies, suits, disputes or Causes of Action with respect to the discharge, releases, injunctions, exculpations, indemnifications and other provisions contained in this Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

(l)     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(m)     resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Liquidating Trust, the Liquidating Trust Agreement, any transactions or payments contemplated thereby, or any contract, instrument, release, indenture or other agreement or document relating to any of the foregoing;

(n)     adjudicate any and all disputes arising from or relating to Distributions under this Plan;

(o)     consider any modifications of this Plan, cure any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(p)     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

(q)     hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(r)     hear and determine all disputes involving the existence, nature or scope of the Plan Debtors' discharge;

(s)     enforce all orders previously entered by the Bankruptcy Court;

(t)     hear any other matter not inconsistent with the Bankruptcy Code; and

(u)     enter final decrees closing the Plan Debtors' Chapter 11 Cases.

## SECTION 14.  MISCELLANEOUS PROVISIONS

14.1    ***Payment of Statutory Fees***.  All fees payable pursuant to 28 U.S.C. § 1930 shall be paid on the earlier of when due or the Effective Date by the Plan Debtors.  From and after the Effective Date, the Liquidating Trustee shall be liable for payment of any such fees until entry of final decrees closing the Plan Debtors' Chapter 11 Cases.

14.2    ***Dissolution of Creditors' Committee.***  On the Effective Date, the Creditors' Committee shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Plan Debtors' Chapter 11 Cases.

14.3    ***Section 1125(e) Good Faith Compliance***.  As of and subject to the occurrence of the Confirmation Date, the Plan Debtors and their Related Persons shall be deemed to have solicited acceptances of this Plan in good faith and in compliance with the

applicable provisions of the Bankruptcy Code and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation.

14.4 **Substantial Consummation**. On the Effective Date, the Plan shall be deemed to be substantially consummated within the meaning set forth in section 1101 and pursuant to section 1127(b) of the Bankruptcy Code.

14.5 **Section 1146 Exemption**. To the fullest extent permitted under section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of any security under or pursuant to this Plan, and the execution, delivery, or recording of any instrument of transfer under or pursuant to this Plan, and the revesting, transfer, or sale of any property of or to the Liquidating Trust or the Successful Bidders at the Sales, shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or other Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, mortgage recording tax, intangible tax, or similar tax.

14.6 **Closing of the Chapter 11 Cases.** When all Liquidating Trust Assets have been liquidated and converted into Cash and such Cash has been distributed in accordance with the Liquidating Trust Agreement and the Confirmation Order, the Liquidating Trustee shall seek authority from the Bankruptcy Court to close the Plan Debtors' Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

14.7 **Plan Supplement**. Any exhibits or schedules not filed with this Plan may be contained in the Plan Supplement, if any, and the Plan Debtors hereby reserve the right to file such exhibits or schedules as a Plan Supplement.

14.8 **Further Assurances.** The Plan Debtors or the Liquidating Trustee may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan. The Plan Debtors, the Liquidating Trustee, and all Holders of Claims receiving Distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

14.9 **Exhibits Incorporated**. All exhibits to the Plan, including the Plan Supplement, are incorporated into and are part of this Plan as if fully set forth herein.

14.10 **Inconsistency**. In the event of any inconsistency among this Plan, the Disclosure Statement and any exhibit to the Disclosure Statement, the provisions of this Plan shall govern.

14.11 **No Admissions**. If the Effective Date does not occur, this Plan shall be null and void in all respects, and nothing contained in this Plan shall (a) constitute a waiver or release of any Claims by or against, or any Interests in, the Plan Debtors, (b) prejudice in any

manner the rights of the Plan Debtors or any other party in interest, or (c) constitute an admission of any sort by the Plan Debtors or other party in interest.

14.12 ***Reservation of Rights.*** Except as expressly set forth herein, this Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order and the Effective Date has occurred. None of this Plan, any statement or provision contained in this Plan or any action taken or not taken by any Plan Debtor with respect to this Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Plan Debtor with respect to the Holders of Claims or Interests before the Effective Date.

14.13 ***Successors and Assigns.*** The rights, benefits and obligations of any Person named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries or guardian, if any, of each Person.

14.14 ***Entire Agreement***. On the Effective Date, this Plan, supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

14.15 ***Notices***. All notices, requests, and demands to or upon the Plan Debtors in the Chapter 11 Cases shall be in writing and, unless otherwise provided herein, shall be deemed to have been duly given or made when actually delivered or, if by facsimile transmission, when received and telephonically confirmed to the below recipients:

SEARS METHODIST RETIREMENT SYSTEM, INC.
Attention: Paul Rundell
2100 Ross Avenue, 21st Floor
Dallas, Texas 75201

with copies to:

DLA PIPER LLP US
Attention: Thomas R. Califano
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 335-4500
Facsimile: (212) 335-4501
E-mail: Thomas.califano@dlapiper.com

-and-

DLA PIPER LLP US
Attention: Vincent P. Slusher
1717 Main Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 743-4500
Facsimile: (214) 743-4545
E-mail: vince.slusher@dlapiper.com

All notices and requests to Persons holding any Claim in any Class shall be sent to them at their last known address or to the last known address of their attorney of record in the Plan Debtors' Chapter 11 Cases. Any such Holder of a Claim may designate in writing any other address for purposes of this Section, which designation will be effective upon receipt by the Plan Debtors.

14.16 **Severability**. If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

14.17 **Governing Law**. Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Texas, without giving effect to the principles of conflicts of laws, shall govern the rights, obligations, construction, and implementation of the Plan and the transactions consummated or to be consummated in connection therewith.

14.18 **Request for Confirmation Pursuant to Bankruptcy Code Sections 1129(a) and 1129(b)**. The Plan Debtors request entry of the Confirmation Order under

Bankruptcy Code section 1129(a) and, to the extent necessary, Bankruptcy Code section 1129(b).

Dated: December 6, 2014                    Respectfully submitted,


                                           Sears Methodist Retirement System, Inc.
                                           Sears Caprock Retirement Corporation
                                           Sears Methodist Centers, Inc.
                                           Sears Methodist Foundation
                                           Sears Panhandle Retirement Corporation
                                           Sears Permian Retirement Corporation
                                           Sears Plains Retirement Corporation
                                           Sears Tyler Methodist Retirement Corporation
                                           Senior Dimensions, Inc.

                                           By: /s/ Paul Rundell
                                               Name: Paul Rundell
                                               Title: Chief Restructuring Officer

**Exhibit 2**

Organizational Chart of the System



SEARS METHODIST RETIREMENT SYSTEM, INC. ORGANIZATIONAL CHART

** Sears Permian is a limited partner in Prevarian Al Odessa, LP, which owns The Courtyards, an assisted living facility located on the campus of The Parks. The Courtyards is managed by Texas Senior Management, Inc.
++ Sears Methodist Senior Housing, LLC is the General Partner of, and owns .01% of the interests in, Canyons Senior Living, L.P. Senior Dimensions, Inc. is the Limited Partner of, and owns 99.99% percent of the interests in, Canyons Senior Living, L.P.
• Senior Dimensions, Inc., Sears Methodist Senior Housing, LLC, Texas Senior Management, Inc. and Senior Living Assurance, Inc. are for profit entities. All other entities are not for profit.
• Southwest Assurance Company Ltd. is an offshore captive domiciled in Grand Cayman.
• The three facilities below Senior Dimensions, Inc. are owned by the State of Texas. Senior Dimensions, Inc. operates those three facilities, as well as The Canyons Retirement Community.

**<u>Exhibit 3</u>**

Liquidation Analyses

(TO BE FILED AT A LATER DATE)